Lori Rifkin, Esq. [S.B. #244081]
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, CA 94608
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Email: lrifkin@hadsellstormer.com

Dan Stormer, Esq. [S.B. #101967]
Brian Olney, Esq. [S.B. #298089]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Ave.
Pasadena, CA 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        bolney@hadsellstormer.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| Nathaniel Smith,<br><br>             Plaintiff,<br><br>     v.<br><br>City of Stockton; Officer Patrick Mayer, Officer Robin Harrison, and Officer Michael Perez, in their individual capacities; and Chief of Police Eric Jones, in his official and individual capacities,<br><br>             Defendants. | Case No.: 2:15-cv-00363-KJM-AC<br><br>[Assigned to the Honorable Kimberly J. Mueller – Courtroom 3]<br><br>**PLAINTIFF'S RESPONSIVE SEPARATE STATEMENT IN OPPOSITION TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Date:        August 25, 2017<br>Time:       10:00 a.m.<br>Crtrm:       3<br><br>Complaint filed:          February 12, 2015<br>Discovery Cut-Off:    May 26, 2017<br>Motion Cut-Off:         July 14, 2017<br>Trial Date:                   None Set |

I. **PLAINTIFF'S RESPONSE TO DEFENDANTS' ALLEGEDLY UNDISPUTED FACTS**

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
| 1. | Plaintiff, Nathaniel Smith ("Smith"), is 47 years old and has been arrested for various serious offenses over many years, going back to at least his teens. Exhibit 1. | Undisputed as to age. Disputed as to the phrase "various serious offenses" <br><br>Nearly all of the charges against Mr. Smith have been for non-violent offenses and he has never been convicted of a violent crime. Defts' Ex. 1. |
| 2. | On April 3, 2010, Smith was driving under the influence and seriously injured two CHP officers sitting in a parked vehicle. Exhibit 2, 8:20 - 9: 1; 31: 19-22. | Undisputed that Mr. Smith was convicted of driving under the influence in an incident that involved his accidental collision with a CHP vehicle. Disputed to the extent that the evidence Defendants cite does not support the claimed fact that Mr. Smith "seriously injured two CHP officers." <br><br>The evidence Defendants cite does not identify the individual(s) injured, whether they were police officers, the number of individuals injured, whether the individuals were sitting inside a vehicle, or the nature or severity of any injuries. |
| 3. | On or about October 25, 2012, Smith was convicted for this offense and sentenced to 9 years in prison. Exhibit 1, p. 8. | Undisputed except as specified in Plaintiff's response to DSUF 2. <br><br>Mr. Smith's conviction was under California Penal Code § 23153(A): DUI Alcohol: Causing Bodily Injury. |
| 4. | After sentencing, Smith was given time to get his affairs in order before reporting to prison. However, he failed to turn himself in as required and, instead, went on the run. On January 4, 2013, a "no bail" felony warrant was issued for his arrest. Exhibit 3 | Undisputed. |
| 5. | The incidents giving rise to this lawsuit occurred while Smith was a wanted felon, on the run. Smith knew he had an outstanding felony warrant and he was evading law enforcement to avoid serving time. Exhibit 2, 31: 19 - 32:3. | Undisputed that there was an outstanding felony warrant for Mr. Smith at the time of the incident giving rise to this lawsuit. Disputed to the extent Defendants purport to describe Mr. Smith's actions, intentions, or state of mind. |
| 6. | During this time period, Smith stayed off and on with his pregnant girlfriend, Natasha Whitfield ("Whitfield"), at her home in Stockton, California. Exhibit 2, 27:13-24. | Disputed. <br><br>The evidence Defendants cite does not support this statement. |
| 7. | They had a tumultuous relationship. On February 6, 2013, Smith smashed all of the | Undisputed except to the extent Defendants purport to characterize the relationship of Mr. |

PLTF'S RESPONSIVE SEPARATE STATEMENT IN OPP TO DEFTS' MSJ        -1-

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
| | windows in Whitfield's car. This led to a neighbor, Somari Thunder ("Thunder"), calling the police to report Smith. Exhibit 4, p. 1; Exhibit 5, 26:13 - 27:5. | Smith and Ms. Whitfield. |
| 8. | On February 13, 2013, Smith was once more staying with Whitfield, and Thunder again called the SPD, around 10:26 a.m., to report Smith's actions and location. Exhibit 4, p. 1. | Disputed.

The record reflects that Mr. Thunder called the SPD on February 13, 2013, around 10:26 a.m. seeking a financial reward by reporting the location and providing a general description of a Black Male whose name he did not know. Defts' Ex. 4 at 1. |
| 9. | Officer Mayer, assigned to K-9 patrol, became aware of the "no bail" felony warrant for Smith's arrest from his failure to surrender, triggered by this call from Thunder to the SPD. Exhibit 6, 45:1-24. | Undisputed. |
| 10. | Officer Mayer was in uniform in his marked patrol car. He reviewed the warrant. Exhibit 6, 46:15-47:12, 50:11-25. | Undisputed. |
| 11. | It stated Smith was 6'3" tall and weighed 240 pounds, was wanted for a felony DUI with injury, had failed to appear for a prior court hearing, and was also wanted for questioning by a detective in Hayward. Exhibit 3; Exhibit 6, 45:1-24. | Undisputed. |
| 12. | Around noon, Officer Mayer asked Officer Harrison, who was in an unmarked police vehicle, to check Whitfield's home to see if Smith was present. Exhibit 7, 75:7-9; 78:1-7, 109:11 - 110:5. | Undisputed. |
| 13. | Officer Harrison went by Whitfield's home and saw her vehicle parked outside the residence, and reported this to Officer Mayer. Exhibit 7, 78:1-80:17. | Undisputed except to the extent that Defendants claim that Officer Harrison knew that the vehicle belonged to Ms. Whitfield. |
| 14. | Officer Mayer parked his car a few blocks away and waited for further information. Exhibit6, 47:10-48:17 | Undisputed. |
| 15. | Shortly thereafter, Officer Harrison observed Smith enter the rear of Whitfield's vehicle, along with a small child around 2 years of age. Exhibit 7, 78: 1 - 80: 17. | Undisputed except to the extent that Defendants claim that Officer Harrison knew that the man she observed enter the vehicle was Mr. Smith. The evidence reflects that Harrison saw a bald Back male whom she was not able to positively identify as Mr. Smith at that time. Defts' Ex. 7 at 83:1-2. |
| 16. | Whitfield took the driver's position and drove away from the residence with the child in a car seat in the back passenger seat, with Smith seated directly behind | Undisputed except to the extent that Defendants claim that Officer Harrison knew that the man she observed enter the vehicle was Mr. Smith. The evidence reflects that |

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
|  | Whitfield. Officer Harrison followed closely and was in communication with Officer Mayer. Exhibit 7, 82:1 - 83:8. | Harrison saw a bald Back male whom she was not able to positively identify as Mr. Smith at that time. Defts' Ex. 7 at 83:1-2. |
| 17. | When Whitfield's vehicle passed Officer Mayer's parked vehicle, Officer Mayer pulled behind Whitfield and conducted a traffic stop. Exhibit 6, 48:7 -49:8. | Undisputed. |
| 18. | The traffic stop was made just south of the Interstate 5 ("1-5") freeway onramp, along a curb and to the immediate east of an embankment leading up to 1-5. Exhibit 7, 84: 10-12; Exhibit 8; Exhibit 5, 34:23 - 36:5. | Undisputed. |
| 19. | Officer Harrison pulled behind Officer Mayer's vehicle shortly after Officer Mayer made the stop. Exhibit 7, 86: 1 - 87:3. | Undisputed. |
| 20. | The traffic stop Officer Mayer 20 conducted was a "felony car stop" due to the nature of the "no bail" felony arrest warrant out for Smith. Exhibit 6, 49:9-21. | Undisputed that the traffic stop was a "felony car stop" but disputed that this was due to the nature of the "no bail" felony arrest warrant and not SPD policy classifying all felony warrants as felony car stops regardless of the nature or type of the felony. *See* deposition of Patrick Mayer ("Mayer Dep.") at 21:11-17, 23:22-24; Deposition of Michael Perez ("Perez Dep.") at 21:8-15, 42:9-14; Deposition of Robin Harrison ("Harrison Dep.") at 77:15-17; Deposition of Michael Reynosa ("Reynosa Dep.") at 55:1-3. |
| 21. | Whitfield's car pulled over to the side of the road. Exhibit 6, 52:7-24. | Undisputed. |
| 22. | Officer Mayer exited his vehicle with his hand on his gun (still in its holster) due to the felony nature of the stop. Exhibit 6, 56:2-5. | Undisputed that Mayer exited his vehicle because the stop was a felony stop. Disputed that Mayer exited the car with "his hand on the gun (still in its holster)." <br><br>As Mayer exited his vehicle he immediately drew his gun and pointed it at Mr. Smith. Defts' Ex. 6 at 24-25; Mayer Dep. at 56:24-25, 59:20-60:2; Deposition of Nathaniel Smith ("N. Smith Dep.") at 34:2-4. |
| 23. | A number of alarming events then occurred in very quick succession. Upon exiting the vehicle, Officer Mayer noted furtive movements inside Whitfield's car as Smith, in the back seat, was moving inside the vehicle and leaning forward towards Whitfield. Exhibit 6, 54:4 - 55:12. | Disputed that "[a] number of alarming events then occurred in quick succession," that the movements inside Ms. Whitfield's car were "furtive," that Mr. Smith was leaning forward towards Ms. Whitfield, or that Mayer knew the identity of Mr. Smith. Further disputed that the evidence Defendants cite supports their alleged fact. |
| 24. | Smith also looked back at Officer Mayer. | Undisputed. |

PLTF'S RESPONSIVE SEPARATE STATEMENT IN OPP TO DEFTS' MSJ      -3-

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
|  | Exhibit 2, 29:17-21; Exhibit 6, 54:4 - 55:12. |  |
| 25. | Whitfield testified in her deposition that when the traffic stop was initiated, Smith leaned forward and kissed her, and, knowing he was about to go to prison, told her he loved her. Exhibit 5, 34:17-22, 39:17 - 40:12, 40:20-41:10. | Undisputed that Ms. Whitfield testified in her deposition that . Disputed to the extent Defendants purport to establish Mr. Smith's knowledge or state of mind. |
| 26. | Smith then leaned over and told Whitfield's son that he loved him too. Exhibit 5, 41:13-15, 113:10-15. | Undisputed. |
| 27. | Smith then took off his jacket in the backseat. Thus, it is undisputed that Smith was moving inside the vehicle after the stop. Exhibit 5, 41:13-15, 51:7-13, 113:10-15. | Disputed. *See* Smith Dep. at 30:9-13. |
| 28. | Then, as Officer Mayer was still exiting his vehicle, Whitfield's rear door opened and Smith unexpectedly exited Whitfield's car at the same time. Exhibit 6, 56: 18 - 57:3. | Disputed as to the characterization that Mr. Smith's exit was "unexpected." Officer Mayer did not give any directions to the passengers in the vehicle to stay in the car while initiating the stop. Harrison Dep. at 87:8-15; N. Smith Dep. at 14-17. |
| 29. | After seeing these things (in addition to the felony nature of the stop), Officer Mayer drew his gun. Exhibit 6, 56:24-25. | Disputed. The timing of Officer Mayer drawing his gun during the stop and the reason(s) for Mayer drawing his gun are disputed. *See* N. Smith Dep. at 34:2-4; Mayer Dep. at 56:24-25. |
| 30. | At the same time, Officer Mayer also reached back and rolled down the window of his vehicle with his other hand, in case he would need to deploy his K-9. Exhibit 6, 56:25 - 57:20. | Undisputed that Officer Mayer reached back and rolled down the window in preparation for deploying his K-9. |
| 31. | Smith exited the vehicle and squared his body towards Officer Mayer and challenged him by saying, "You'll have to come and get me." Exhibit 6, 59:6-14. | Disputed. Mr. Smith testified that he said nothing to Mayer and that when he got out of the car, Mayer was already pointing his gun at him. *See* N. Smith Dep. at 33:17-20, 34:2-4, 34:12-14. |
| 32. | Smith also defiantly said "fuck you" to Officer Mayer. Exhibit 5, 50:2-10. | Disputed. Mr. Smith testified that he said nothing to Mayer. *See* N. Smith Dep. at 33:17-20, 34:12-14. |
| 33. | It is undisputed that only after Smith unexpectedly exited the vehicle, Officer Mayer raised his gun and pointed it at Smith. Exhibit 2, 33:15 - 34:21; Exhibit 5, 61:14-21; Second Amended Complaint, ¶ 19. | Disputed. Mayer was already pointing his gun at Mr. Smith when Mr. Smith got out of his car. *See* N. Smith Dep. at 33:7-34:8. |
| 34. | Smith immediately took off running up the nearby embankment on the side of I-5. Exhibit 2, 32:15-21, 34:16 - 35:9; Exhibit 5, 63:18-25; Exhibit 6, 61:9- 24, 65:15-23; Second Amended Complaint, ¶ 20; Exhibit 9. | Disputed. After Mr. Smith saw Mayer pointing his gun at him, he ran in front of the police car and then jumped over a fence before running up an embankment and over the freeway. *See* N. Smith Dep. at 34:2-35:5. |

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
| 35. | Officer Mayer barely had time to yell "Stop!" before sending his K-9 after Smith. Exhibit 6, 61:9-24. | Disputed. Neither Harrison nor Mr. Smith recall Mayer giving any warning. *See* Harrison Dep. at 94:17-19; N. Smith Dep. at 35:13-18. |
| 36. | Smith admits Officer Mayer's K-9 was deployed only *after* Smith started running. Exhibit 2, 35:19 - 36:12; Second Amended Complaint, ¶ 21. | Undisputed. |
| 37. | Smith does not recall hearing any threats by Officer Mayer about the K-9. Exhibit 2, 35:13 - 36:25. | Undisputed. |
| 38. | Smith had made the decision to run as soon as Officer Mayer initiated the stop. Exhibit 2, 32:15-21. | Disputed. Mr. Smith did not begin running until after he saw Mayer pointing his gun at him. Mr. Smith had an existing fear of the police due to his prior DUI. N. Smith Dep. at 31:17-22, 34:2-21. |
| 39. | Smith based this decision on: (1) knowing the police were after him for a felony (and he was set to serve a significant prison sentence), and (2) an unsubstantiated fear of law enforcement wanting to hurt him since he had injured two CHP officers in his prior DUI incident. Exhibit 2, 31:11 - 32:18; 57:12-16; Second Amended Complaint, ¶ 20. | Disputed to the extent that it states that Mr. Smith based any decision on knowing that "he was set to serve a significant prison sentence" or that Mr. Smith's "fear of law enforcement wanting to hurt him" was unsubstantiated. Deposition of Ingrid Smith ("I. Smith Dep.") at 36:3-5. |
| 40. | It is undisputed that the K-9 did not make contact with Smith. Exhibit 2, 35:22 - 36:8. | Undisputed. |
| 41. | In fact, the dog fell and Smith developed a lead. Exhibit 6, 66: 15 - 67: 11. | Undisputed except to the extent that Mr. Smith developed a lead or that the dog was never close to him. |
| 42. | Smith continued to run west, in a straight line, completely across all lanes of I-5 during heavy noontime traffic, presenting a significant danger to the public of causing any number of vehicular accidents. Exhibit 2, 36:3 - 37:21; Exhibit 10. | Undisputed that Mr. Smith ran across the I-5 around noon. Disputed that Mr. Smith presented a significant danger to the public of causing any number of vehicular accidents. Mayer himself crossed I-5, with his dog. Mayer Dep. at 69:20-25. |
| 43. | Smith made it across I-5 and down the embankment on the opposing west side of the freeway, and headed toward the rear of a nearby AM-PM gas station located just west of I-5. Exhibit 2, 38:21-25; Exhibit 11. | Undisputed. |
| 44. | Officer Mayer and his K-9 pursued Smith across I-5, but were unable to catch him because Officer Mayer also fell. Exhibit 6, 77:13-17. | Undisputed. |
| 45. | Officer Harrison drove around the freeway to cut Smith off. Exhibit 7, 98:19 - 99:24. | Undisputed. |
| 46. | At the AM-PM, an SUV driver, Sergio | Undisputed as to Sergio Contreras and Jose |

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
|  | Contreras ("Contreras"), and his two male friends, Gabriel Sanchez ("Sanchez") and Jose Contreras ("Jose"), were putting air into their SUV's rear tire. Exhibit 12, 45:21-24, 89:11 - 92:25. | Hermosillo (erroneously referred to in Defendants' SUF as Jose Contreras). Sanchez was inside the vehicle, sitting in the front passenger seat. *See* N. Smith Dep. at 39:18-23, 41:14-21; Contreras Dep. at 90:6-7, 91:21-92:25. |
| 47. | None of them saw Smith approach, but Contreras and Jose noticed Smith standing by the chain-link fence beside them, breathing heavily. Exhibit 2, 39:13-14; Exhibit 12, 45:25 - 46:20, 89:22 - 90:7. | Undisputed. |
| 48. | Smith asked if he could get a ride from them, and claims he was told "yes" by one of them. Exhibit 2, 40:10-14. | Undisputed except to the extent Defendants suggest that Mr. Smith's testimony is uncorroborated or untrue. *See* N. Smith Dep. at 39:18-40:14, 42:4-6; Deposition of Sergio Contreras ("Contreras Dep.") at 89:22-90:7; Ex. 3 at 2; Ex. 4 at 14:2-5. |
| 49. | Smith then climbed the fence and entered the SUV's open rear passenger door. Exhibit 2, 40:16-24; Exhibit 12, 91:14-92:23. | Undisputed. |
| 50. | Contreras noticed Smith attempting to duck down and hide inside the SUV as police officers converged on the scene. Exhibit 2, 43:5-11, 44:2-14. | Undisputed. |
| 51. | At this point, the three men were in the SUV and they began to fight with Smith in an effort to remove him from the vehicle. Exhibit 2, 45:4 - 47:12; Exhibit 12, 94:2 - 101:20. | Undisputed that after Smith had gotten into the vehicle and the men noticed the police, the three men were in the SUV and began to try to physically remove Smith from the vehicle. Disputed to the extent it suggests that Smith was physically assaulting any of the three men. Harrison Dep. at 114:4-10. |
| 52. | In response, Smith dove forward between the front seats and grabbed the steering wheel with his left hand while lying on his stomach over the center console, and held on to avoid being pulled from the SUV. Exhibit 2, 44:2-21, 47:11 -48:1. | Undisputed except to the extent that it states that Mr. Smith "dove" or that he was using his left hand to grab the steering wheel. Defts' Ex. 2. at 44:2-21, 47:11-48:1. |
| 53. | Smith's right arm was down, near the front passenger seat area. Exhibit 2, 48:3-6. | Disputed. It is unclear what is meant by the description that Mr. Smith's right arm was "down." |
| 54. | As Smith was fleeing towards the AM-PM, Officer Perez was in his vehicle, nearby, transporting a female arrestee to jail. Exhibit 13, 60:6-61:4. | Undisputed except as to the characterization as "nearby." |
| 55. | Officer Perez heard radio traffic regarding the car stop and foot pursuit, and drove to the AM-PM hoping to set up a perimeter to block Smith's flight. Exhibit 13, 64:8-15, 66:9-11. | Undisputed. |
| 56. | As Officer Perez arrived, he saw Officer Harrison exiting her vehicle near the edge | Undisputed. |

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
|  | of the AM-PM parking lot, and saw the SUV referenced over the radio. Exhibit 13, 63:16 - 64:6, 66:17-23. |  |
| 57. | He heard an officer (Officer Mayer, coming down from the nearby hillside and witnessing the events) broadcast that a fleeing suspect (Smith) was trying to carjack a vehicle. Exhibit 6, 76:1-10, 77:4-8; Exhibit 13, 67:3 - 68:4. | Undisputed that Perez testified that he heard a radio broadcast but disputed that Perez was able to accurately discern what Mayer was saying over the noise created by the intoxicated female prisoner yelling in the back seat. Perez Dep. at 49:5-13, 50:24-51:3; 57:22-25. |
| 58. | Officer Perez saw what clearly appeared to be a physical fight among several occupants inside the SUV. Exhibit 13, 72:10-16. | Disputed. Mr. Contreras, Mr. Sanchez, and Mr. Hermosillo gained physical control of Mr. Smith by grabbing his legs and placing him in a headlock. N. Smith Dep. at 43:7-20, 44:22-25, 45:2-6. |
| 59. | Officer Perez parked his unit some distance from the SUV on the AM-PM's lawn, exited, and walked toward the SUV. Exhibit 13, 62:23 - 63:2. | Undisputed that Perez jumped the curb and parked his car on the AM-PM lawn "some distance" from the SUV and exited the vehicle. Disputed that Perez "walked" toward the SUV. Perez Dep. at 63:3-15, 64:22-25, 69:12-24. |
| 60. | He positioned himself outside the open driver's door of the SUV while Officer Harrison positioned herself to his left, near the front of the SUV, with her gun drawn. Exhibit 13, 70:3 - 71: 1; Exhibit 7, 107:15-25. | Disputed Perez was not paying attention to Harrison's location. Further disputed to the extent Defendants purport to imply that Perez and Harrison coordinated or communicated with each other in any manner during the incident. Further disputed that Harrison drew her gun at the same time that Perez drew his gun. Perez Dep. at 70:16-18. Harrison Dep. at 112:10-14. |
| 61. | Officer Perez drew his gun when he became aware Smith was attempting to carjack the SUV, knowing that carjackings are often completed while armed. Exhibit 13, 69:5-11. | Disputed as to the timing and reason for Perez drawing his gun. Further disputed that Smith was attempting to carjack the SUV. Further disputed as to the truth of the facts underlying any of Perez's beliefs stated in this compound representation. Perez Dep. at 49:5-13, 50:24-51:3; 57:22-25; N. Smith Dep. at 39:18-40:14, 42:4-6; Contreras Dep. at 89:22-90:7; Ex. 3 at 2; Ex. 4 at 14:2-5. |
| 62. | As Officers Harrison and Perez approached the SUV, they saw Smith lying across the center console. Exhibit 7, 114:15-115:8. | Undisputed that Smith was lying across the center console. Disputed as to what the Officers testified that they saw. See Perez depo 76:2-15. |
| 63. | Officer Perez could not see Smith's right hand because it was down near the passenger seat, concealed from his view. Exhibit 2, 48:3-6; Exhibit 13, 77:23 -78:18. | Undisputed that Perez testified that his view of Mr. Smith's right hand was obstructed. Disputed as to the truth of the underlying facts. See N. Smith Dep. at 53:19-54:12. |
| 64. | Smith admits the officers ordered him to put his hands up. Exhibit 2, 52:11 - 53:13. | Undisputed. |
| 65. | For purposes of this motion, it is undisputed Smith spontaneously stated "I don't have a gun" and then moved his | Undisputed that Mr. Smith stated "I don't have a gun" and put his hands up, which, given his body position, meant extending his |

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
| | hands towards the SUV's dash. Exhibit 2, 52:11 - 53:13. | arms out in front of him in a "Superman"-type pose. Disputed as to the characterization of these as "spontaneous." Mr. Smith was responding to the Officers' commands. *See* N. Smith Dep. at 52:20-53:13. |
| 66. | Smith was on his stomach and contends that moving his hands towards the dash was similar to taking a "Superman-esque" position. Exhibit 2, 53: 19 - 54: 12. | Undisputed. |
| 67. | It is undisputed that Smith was out-of-breath when he made this statement about a gun, following his flight from the officers and fight with the occupants of the SUV. Exhibit 2, 39:13-19; Exhibit 12, 106:9-15. | Disputed that Mr. Smith remained out-of-breath by the time that he stated that "I don't have a gun." Further disputed as to the characterization of a "fight with the occupants of the SUV." N. Smith Dep. at 43:7-20, 44:22-25, 45:2-6; Harrison Dep. at 114:4-10. |
| 68. | It is undisputed that Officer Perez and Contreras both heard Smith say the words "I" and "have a gun." Exhibit 12, 101:10-16, 109:10-15; Exhibit 13, 79:10-24. | Undisputed that each witness provided this testimony. Disputed as to the truth of the underlying facts. *See* N. Smith Dep. at 53:12-13. |
| 69. | The three occupants exited the SUV. Exhibit 12, 107: 15-20. | Undisputed that Mr. Contreras, Mr. Hermosillo, and Mr. Sanchez exited the SUV. Disputed to the extent Defendants suggest that they did simultaneously, in response to Mr. Smith's statement, and/or prior to Officer Perez firing into the SUV. |
| 70. | Officer Perez, fearing that Smith in fact had a gun and might shoot him, fired two rounds, striking Smith with both rounds. Exhibit 13, 81:6-23. | Undisputed that Officer Perez fired two rounds into the SUV. Disputed as to whether in fact Officer Perez feared that Smith had a gun and might shoot him and whether such fear was reasonable. Further disputed as to the assertion that it has been factually established which Officers' bullets struck Mr. Smith. *See* deposition of Bradley Swanson ("Swanson Dep.") at 65:9-25, 92:9-11, 93:10-19, 124:22-125:7, 126:16-21, 134:23-135:24, 141:24-144:15. |
| 71. | One round entered Smith's abdomen. The other round entered Smith's left elbow and then entered and exited his forearm. Exhibit 14; Second Amended Complaint, ¶ 43. | Undisputed except to the extent that it has been factually established that Mr. Smith's three bullet wounds were caused by only two bullets. *See* Ex. 5 at 1-2, 8-17. |
| 72. | Upon approaching the SUV, Officer Harrison had re-holstered her gun when she saw the struggle inside the SUV, thinking she might be able to apprehend Smith with a "hands on" approach. Exhibit 7, 112:10-21. | Undisputed that Harrison had re-holstered her gun and planned to use a "hands-on" approach to apprehend Smith. Disputed to the extent that it suggests that Harrison's plan to go "hands-on" was conditional or that Harrison did not believe the men had control of Smith." |
| 73. | As she approached, however, she thought she saw the barrel of a revolver beneath Smith and believed the first shot she heard | Undisputed that Harrison testified for the first time in her deposition three years after the incident that she saw what she believed to be |

| No. | Moving Party's Undisputed Facts And Supporting Evidence | Plaintiff's Response to Defendants' Undisputed Facts And Supporting Evidence ("PRUF") |
|---|---|---|
|  | was actually Smith firing at her and Officer Perez. Exhibit 7, 116:19 - 117:17. | a barrel of a gun. Disputed that Harrison actually thought she saw this and disputed that Harrison believed that the first shot she heard was actually Mr. Smith firing at her and/or Perez. Harrison Dep. at 117:18-20. |
| 74. | Once she heard the first gunshot, she ran for cover towards the front of the SUV, drew her gun again, and fired three rounds into the hood of the SUV. Exhibit 7, 117:21 - 118:14; Exhibit 15. | Undisputed. |
| 75. | There is no evidence that any of Officer Harrison's three bullets injured Smith. Exhibit 16, 53:21 - 54:21, 124:3-13; Declaration of Officer Perez, ¶¶ 3-5. | Disputed. There is no evidence factually establishing which Officers' bullets struck Ms. Smith. See Swanson Dep. at 65:9-25, 92:9-11, 93:10-19, 124:22-125:7, 126:16-21, 134:23-135:24, 141:24-144:15. |
| 76. | Smith was extracted and handcuffed. Exhibit 2, 55:7-10; Exhibit 7, 149:6-24; Second Amended Complaint, ¶ 40. | Undisputed. |
| 77. | Officers initiated first aid and summoned an ambulance. Exhibit 7, 121:9-14, 152:25-153:6. | Undisputed except to the extent it suggests that the officers provided first aid to Mr. Smith. See N. Smith Dep. at 55:14-16. |
| 78. | Neither of Smith's wounds were life-threatening. Exhibit 14. | Disputed. Mr. Smith suffered a lacerated liver and required emergency surgery to remove a bullet from his chest. See Pltf's Exs. 12, 13. |
| 79. | Both wounds were consistent with where Officer Perez fired at, confirming that only he wounded Smith. Declaration of Officer Perez, ¶¶ 4-5. | Disputed. There is no evidence factually establishing which Officers' bullets struck Ms. Smith. See Swanson Dep. at 65:9-25, 92:9-11, 93:10-19, 124:22-125:7, 126:16-21, 134:23-135:24, 141:24-144:15. |
| 80. | Once caught, Smith was found to be unarmed. Second Amended Complaint, ¶¶ 19, 42 | Undisputed. |
| 81. | Smith was convicted of carjacking. Exhibit 1, p. 11. | Disputed to the extent that it implies that a factfinder heard evidence and found Mr. Smith guilty of carjacking. Mr. Smith accepted a plea offer of 54 months. |

II.   PLAINTIFF'S STATEMENT OF DISPUTED FACTS AND SUPPORTIN EVIDENCE

| No. | Plaintiff's Additional Facts Material Facts ("PAF") | Plaintiff's Supporting Evidence |
|---|---|---|
| PAF 1. | The call to which Mayer responded on February 13, 2013, stated that Mr. Smith was wanted for a felony warrant, but did not specify the type of offense associated with the warrant and included no information indicating that Mr. Smith might be armed, violent, or likely to resist officers. | Mayer Dep. at 45:17-24, 46:8-14, 50:2-10; see also Harrison Dep. at 76:14-15, 77:9-14, 77:18-25, 82:9-14; Perez Dep. at 55:17-56:4, 57:4-11, 122:3-123:2; Ex. 1. |
| PAF 2. | Mayer activated his siren and car containing Mr. Smith immediately complied, quickly pulling to the curb. | Mayer Dep. at 52:15-24. |

| No. | Plaintiff's Additional Facts Material Facts ("PAF") | Plaintiff's Supporting Evidence |
|---|---|---|
| PAF 3. | Mayer exited his squad car without giving any command over the car's PA system, and with his gun pointed at Smith. | Harrison Dep. at 87:8-15; N. Smith Dep. at 30:14-17, 34:2-4; Mayer Dep. at 56:24-25, |
| PAF 4. | As Mayer exited his car, Mr. Smith also got out of the stopped car. | Mayer Dep. at 54:5-7. |
| PAF 5. | As Mr. Smith exited the car, Mayer and Harrison could both see that his hands were empty and that he was not holding any weapon. | Mayer Dep. at 59:20-24, 60:1-2; Harrison Dep. at 90:16-21, 163:2-4. |
| PAF 6. | According to Harrison, Mr. Smith exited the vehicle in a "nonchalant manner" such that she concluded that "it's just going to be an easy stop. No big deal." | Ex. 2 at 2; Harrison Dep. at 162:18-163:1. |
| PAF 7. | As a matter of policy, the SPD divides all traffic stops into two categories, "low risk" and purportedly "high risk" stops. | Mayer Dep. at 21:11-17. |
| PAF 8. | SPD policy deems *any* traffic stop involving a felony warrant "high risk" even though officers are well aware that these warrants can be issued for non-violent felonies that do not suggest a high risk of harm to officers during the stop. | Mayer Dep. at 23:22-24; Perez Dep. at 21:8-15, 42:9-14; Harrison Dep. at 77:15-17; Reynosa Dep. at 55:1-3. |
| PAF 9. | SPD trains its officers to get out of their cars, draw their guns, and point their weapons at the vehicle's occupants during "high risk" stops. | Mayer Dep. at 24:13-25:2; Reynosa Dep. at 51:8-52:4, 52:13-20, 53:15-22, 54:8-16. |
| PAF 10. | SPD applies a similarly indiscriminate policy to the use of police dogs in "high risk" stops even where the felony does not involve violence, and permits officers to deploy police dogs to bite suspects who refuse to exit their vehicle, or who flee on foot. | Mayer Dep. at 29:8-30:2, 64:7-65:6. |
| PAF 11. | Although Mr. Smith made no aggressive movement or statement and had nothing in his hands, Mayer immediately pointed his gun at Mr. Smith. | Mayer Dep. at 56:24-25, 59:20-60:2; N. Smith Dep. at 33:17-20, 34:2-4, 34:12-14. |
| PAF 12. | Mayer also began rolling down his car window with his other hand to deploy the police dog located in his backseat. | Mayer Dep. at 56:24-57:2. |
| PAF 13. | Because the DUI resulted in injury to a police officer, and a CHP Detective had left Mr. Smith's wife a voicemail threatening that Mr. Smith had better "turn himself in before someone gets hurt," Mr. Smith feared for his safety around police officers. | N. Smith Dep. at 30:9-31:22, 32:15-18; I. Smith Dep. at 36:3-5. |
| PAF 14. | Believing Mayer was going to shoot him, Mr. Smith turned and ran away from the cars and up an embankment next to the freeway on-ramp. | N. Smith Dep. at 34:21-35:9, 57:2-20, 58:3-8. |
| PAF 15. | Without any verbal warning, Mayer immediately deployed the dog and commanded it to bite Mr. Smith. | Mayer Dep. at 61:18-25; Harrison Dep. at 94:17-19; N. Smith Dep. at 35:13-18. |

PLTF'S RESPONSIVE SEPARATE STATEMENT IN OPP TO DEFTS' MSJ   -10-

| No. | Plaintiff's Additional Facts Material Facts ("PAF") | Plaintiff's Supporting Evidence |
|---|---|---|
| PAF 16. | Mr. Smith offered to pay Sergio Contreras and Jose Hermosillo for a ride, and they agreed. | N. Smith Dep. at 39:18-40:14, 42:4-6; Contreras Dep. at 89:22-90:7; Ex. 3 at 2; Ex. 4 at 14:2-5. |
| PAF 17. | As Harrison watched Mayer and his dog chase after Mr. Smith, she did not see any weapon on Smith. | Harrison Dep. at 97:22-24. |
| PAF 18. | Harrison thought Contreras and Hermosillo were simply giving Mr. Smith a ride and that the three men were preparing to leave because nothing unusual was happening. | Harrison Dep. at 163:23-164:9; Ex. 2 at 3. |
| PAF 19. | Harrison got out of her police cruiser and began walking over toward the SUV. | Harrison Dep. at 108:13-15. |
| PAF 20. | Meanwhile, a third SPD Officer, Perez, was transporting a highly intoxicated prisoner to jail who was in a "very excited state, yelling [and] screaming." | Perez Dep. at 49:5-13, 50:24-51:3. |
| PAF 21. | Even though standard SPD protocol when transporting a prisoner is to not respond to another call absent exigent circumstances, and the radio reports stated that two other officers were already responding, Perez decided on his own to respond. | Perez Dep. at 33:16-22, 59:12-23; Reynosa Dep. at 47:15-49:3. |
| PAF 22. | Perez did not inform SPD dispatch of his decision. | Perez Dep. at 61:2-5. |
| PAF 23. | Arriving at the gas station shortly after Harrison, Perez jumped the curb, parked in the grass, abandoned his still-screaming prisoner in the backseat, and sprinted toward the SUV with his gun drawn. | Perez Dep. at 63:3-15, 64:22-25, 69:12-24. |
| PAF 24. | Once Contreras and Hermosillo saw the officers, they began trying to get Mr. Smith out of the SUV. Contreras was afraid the police would find out he had been driving without a license. | Contreras Dep. at 110:25-111:10. |
| PAF 25. | Contreras and Hermosillo tried to pull Mr. Smith out of the SUV with the help of Contreras's friend Gabriel Sanchez, who was in the front passenger seat of the SUV. | Harrison Dep. at 164:9-25; Ex. 4 at 9:6-7, 9:14-15, 16:13-14. |
| PAF 26. | At that point, Mr. Smith was laying flat on his belly across the center console, with his legs in the back seat, and trying to grab onto the steering wheel his hands to prevent the men from dragging him outside. | N. Smith Dep. at 44:3-21, 45:15-16. |
| PAF 27. | Two of the men grabbed Mr. Smith by his legs, while a third put Mr. Smith in a headlock. | N. Smith Dep. at 43:7-20, 44:22-25, 45:2-6. |
| PAF 28. | Harrison, approaching the SUV, saw that the three men had gotten control of Mr. Smith. | Harrison Dep. at 167:10-171:1, 171:10-14. |
| PAF 29. | Harrison could see that Mr. Smith was lying over the center console and his feet were not in a position to reach the pedals. | Harrison Dep. at 114:24-115:8, 171:3-7. |

PLTF'S RESPONSIVE SEPARATE STATEMENT IN OPP TO DEFTS' MSJ      -11-

| No. | Plaintiff's Additional Facts Material Facts ("PAF") | Plaintiff's Supporting Evidence |
|---|---|---|
| PAF 30. | At no point did Mr. Smith reach for the car keys or attempt to start the SUV. | N. Smith Dep. at 50:24-51:5. |
| PAF 31. | Concluding that a weapon was unnecessary, Harrison holstered her gun and approached intending to apprehend Mr. Smith "hands on." | Harrison Dep. at 113:1-12, 114:1-3, 167:10-168:14. |
| PAF 32. | SPD officers are trained to go "hands on" instead of using a greater degree of force when a person is complying, acting in a non-aggressive manner like lying on their stomach with their hands out, and the officer can clearly see what is going on. | Reynosa Dep. at 133:15-19; Harrison Dep. at 39:3-40:2. |
| PAF 33. | Harrison ordered Mr. Smith to "put your hands up," at which point the men got off of Mr. Smith and began to move away. | Smtih Dep. at 52:7-24; Harrison Dep. at 110:23-111:11, 112:11-21. |
| PAF 34. | At the same time Harrison was giving orders to Mr. Smith, Perez had arrived and was yelling his own commands at Mr. Smith to put his hands up, even though SPD protocol permits only one officer to give commands in order to avoid generating confusion. | Perez Dep. at 32:11-21; 75:23-76:1; 79:11-12; Ex. 4 at 84:20-23; Mayer Dep. at 35:13-22; Harrison Dep. at 63:25-64:10, 174:3-21; Ex. 4 at 73:7-16; Reynosa Dep. at 71:3-10. |
| PAF 35. | Perez stood facing the driver-side door, with Harrison "a couple feet" to his left. | Perez Dep. at 70:22-71:1. |
| PAF 36. | In response to the officers' commands, Mr. Smith said "I don't have a gun" and complied with the order to put his hands up, raising his hands in front of him in a Superman-like pose due to the fact that he was still lying prone across the center console. | N. Smith Dep. at 53:3-54:12. |
| PAF 37. | Mr. Smith, who was unarmed, never told the officers or the men in the car that he had a gun, nor did he threaten to shoot any of them. | N. Smith Dep. at 49:5-7, 51:21-52:2. |
| PAF 38. | Yet, when Perez saw Mr. Smith move his hands in response to the officers' commands to put his hands up, Perez opened fire. | N. Smith Dep. at 54:13-55:3. |
| PAF 39. | Perez testified that he had a clear view of Mr. Smith, did not see Mr. Smith with a weapon, did not know where any of the bystanders were, and believed they might still be inside the SUV or standing next to the passenger doors when he shot into the vehicle. | Perez Dep. at 74:5-9, 82:15-21, 87:2-12, 129:13-16. |
| PAF 40. | In fact, Perez nearly shot Contreras as he was still scrambling to get out of the back seat. | Perez Dep. at 81:6-13, 82:15-83:1, 129:17-130:1; Ex. 4 at 85:20-26; Contreras Dep. at 75:21-76:21, 119:12-18. |
| PAF 41. | Contreras testified that "My butt was still in the car when they started shooting and when I picked up the truck there was two bullet holes in the seat I was in." | Contreras Dep. at 75:21-76:21. |
| PAF | Perez explained that even though he could | Perez Dep. at 94:20-95:21, 95:23-96:1, |

PLTF'S RESPONSIVE SEPARATE STATEMENT IN OPP TO DEFTS' MSJ    -12-

| No. | Plaintiff's Additional Facts Material Facts ("PAF") | Plaintiff's Supporting Evidence |
|---|---|---|
| 42. | "easily go to my belt to pull out a taser [or] pepper spray if I see his hands," he did not consider using such less-lethal measures because he suspected Mr. Smith was committing a carjacking and assumed that he must therefore be violent and was likely armed. | 110:24-111:1. |
| PAF 43. | Mr. Smith suffered two gunshot wounds to his left arm and was struck by another bullet in his chest, which lacerated his liver and required emergency surgery. | Ex. 5; Ex. 6. |
| PAF 44. | Significantly, at no time did Mr. Smith make any aggressive motions toward the officers or actively resist arrest, and by the time Perez opened fire Mr. Smith has been overcome by the men in the car and was not further attempting to flee. | N. Smith Dep. at 50:24-55:3, 45:4-20, 47:4-12. |
| PAF 45. | Even Mayer, Harrison, and the City's 30(b)(6) witness, Lieutenant Reynosa, concede that many felonies are nonviolent. | Perez Dep. at 21:8-15, 42:9-14; Harrison Dep. at 77:15-17; Reynosa Dep. at 55:1-3. |
| PAF 46. | Plaintiff's police practices expert, Scott DeFoe, concluded that Defendant Officers committed a cascading series of errors resulting in the unreasonable shooting of Mr. Smith. Specifically, DeFoe opined that the officers failed to follow standard police practices and act reasonably when (1) Mayer pointed his gun at Mr. Smith; (2) Perez and Harrison each failed to take a position of cover after stopping her vehicle and walking in an "open air environment" toward the SUV without cover or concealment; (3) Perez and Harrison failed to formulate a tactical plan to arrest Mr. Smith, including the possible use of less than lethal force options such as a taser or Oleoresin Capsicum (pepper spray); (4) Perez failed to warn Mr. Smith that he was going to shoot him; (5) Perez failed to consider less than lethal force options; (6) Perez failed to allow Mr. Smith to comply with his command to "put his hands up"; (7) Perez and Harrison used deadly force even though neither officer was facing what could be reasonably believed to be an imminent threat of death or serious bodily injury because Mr. Smith appeared to be unarmed; and (8) Perez and Harrison fired their guns without even considering their background and the presence of the other men in the car. | Ex. 9 at 6-11, 13. |
| PAF 47. | DeFoe also opined that SPD failed to adequately train Perez and Harrison on lethal force options and firearms; and that | Ex. 9 at 11-13. |

PLTF'S RESPONSIVE SEPARATE STATEMENT IN OPP TO DEFTS' MSJ -13-

| No. | Plaintiff's Additional Facts Material Facts ("PAF") | Plaintiff's Supporting Evidence |
|---|---|---|
|  | SPD's review of Perez's and Harrison's use of deadly force was problematic. |  |
| PAF 48. | At the time he performed the traffic stop, Mayer had no knowledge that Mr. Smith had injured two CHP officers and was facing a significant prison sentence. | Mayer Dep. at 44:20-46:14. |
| PAF 49. | Plaintiff maintains his claim regarding Mayer's use of his dog, which is supported by DeFoe's repeated assertion that Mayer's deployment of the canine was inappropriate. | Deposition of Scott A. DeFoe ("DeFoe Dep.) at 29:19-30:12; 30:24-31:4, 31:11-14. |
| PAF 50. | Here, the risk of injury Mayer created by deploying the dog was particularly high because Mayer had no effective way of recalling the dog had it bitten Mr. Smith as Mayer intended the dog to do. While pursuing Mr. Smith, the dog was "quite a distance" from Mayer, "at least . . . 50 yards" away. | Mayer dep. at 66:19-23. |
| PAF 51. | Plaintiff's expert DeFoe testified that because the dog was not equipped with an "e-collar," if "the dog did contact Mr. Smith, it would be almost impossible to take that dog off in a reasonable amount of time without injury to Mr. Smith." | DeFoe Dep. at 29:19-30:12. |
| PAF 52. | Mayer released the dog the instant that Mr. Smith turned to run, well before Mayer had any indication where Mr. Smith was headed. | Mayer Dep. at 61:9-25. |
| PAF 53. | Further increasing the severity of Mayer's use of force is the fact that he gave no warning prior to releasing the dog and commanding it to bite Mr. Smith. | Mayer Dep. at 61:9-25, 65:3-5. |
| PAF 54. | Harrison fired only in response to Perez's gunshots, not Mr. Smith's actions, and similarly endangered the bystanders who were in and around the SUV. In fact, Harrison testified that she did not even see or know where the shots came from. | Harrison Dep. at 117:18-20. |
| PAF 55. | Harrison made no statements prior to self-serving testimony given 3 years after the incident that she had any basis for believing Mr. Smith had a weapon, and, in her actions at the time of the incident indicated she in fact determined at the time it was safe to go in hands-on. | Perez Dep. at 79:11-17, 85:12-19; Harrison Dep. at 116:20-118:2, 143:11-145:1, Ex. 10. |

| No. | Plaintiff's Additional Facts Material Facts ("PAF") | Plaintiff's Supporting Evidence |
|---|---|---|
| PAF 56. | Stockton Police Chief Eric Jones failed to discipline any officer involved in this case, nor did he establish any new procedures or trainings in response to this case for preventing future reoccurrences of the types of excessive force visited upon Mr. Smith, despite his authority to do so. | Deposition of Eric Jones ("Jones Dep.") at 48:15-50:9; Ex. 7 |
| PAF 57. | Chief Jones took actions "ratifying the investigation" into Mr. Smith's shooting, *id.*, by reviewing and approving the DA's and Protocol Review Committee's ("PRC") reports finding the officers acted appropriately and should not be prosecuted or disciplined. | Jones Dep. at 20:24-21:9, 22:24-23:11, 99:6-101:2; Deft's Exs. 23, 24. |
| PAF 58. | One of the primary investigators for the officer-involved shooting of Mr. Smith was the same California Highway Patrol Detective who had previously been assigned to Mr. Smith's case and had made threats about Mr. Smith turning himself in. | DeFoe Dep. 33:2-34:7. |
| PAF 59. | Jones did not review the PRC investigation of the shooting of Mr. Smith until 22 months after the shooting, and information produced in discovery reveals that investigations of many other officer-involved shootings remained open up to 5 years after the fact. | Dkt. No. 75 at 20 n.9; Jones Dep. at 106:14-109:3; Ex. 8. |
| PAF 60. | Even more concerning, only one of the City's 20 officer-involved shootings occurring over a five-year period (12 of which involved traffic stops), was determined to be "not in policy." | Ex. 8; Jones Dep. at 114:5-17, 104:21-105:1, 117:21-118:20; Harrison Dep. at 187:19-188:8; Ex. 11; Ex. 12 at 42-104. |
| PAF 61. | The one shooting was the "Bank of the West" shooting. This incident involved a bank robbery during which 32 SPD officers engaged in a "rolling gun battle" and fired more than 600 rounds, 10 of which struck a hostage, killing her. An independent review that SPD officers engaged in "excessive" and "unnecessary" force. | Ex. 12 |
| PAF 62. | SPD command staff failed to take any remedial steps after the 19 shootings, such as recommending discipline, making changes to or adding training, or revising policy. | Jones Dep. at 104:21-105:1, 117:21-118:20. |

PLTF'S RESPONSIVE SEPARATE STATEMENT IN OPP TO DEFTS' MSJ   -15-

| No. | Plaintiff's Additional Facts Material Facts ("PAF") | Plaintiff's Supporting Evidence |
|---|---|---|
| PAF 63. | Defendants affirm that Jones "independently reviewed" the investigation and "did not merely 'rubber-stamp' its final determination." | Mtn. at 20:7-8. *See also* Jones Dep. at 100:9-101:2, 104:21-105:1, 117:21-118:20. |
| PAF 64. | Chief Jones took actions "ratifying the investigation into" Mr. Smith's shooting by reviewing the San Joaquin County District Attorney's ('D.A.') report of the incident (finding the Officers acted appropriately and declining criminal prosecution), and the Protocol Review Committee's ('PRC') (finding the Officers acted within policy and would not be subject to discipline) and approved both. | Jones Dep. at 20:24-21:9, 22:24-23:11, 99:6-101:2, 104:21-105:1, 117:21-118:20; Defts' Exs. 23, 24. |
| PAF 65. | At that time, Mayer knew that Harrison was on the scene behind him in an unmarked car, and that a third SPD unit was on its way | Mayer Dep. at 51:18-21, 55:13-19. |
| PAF 66. | When she pulled into the gas station, Harrison could see that Mr. Smith was getting into the SUV. | Harrison Dep. at 105:1-11. |
| PAF 67. | Plaintiff's police practices expert testified that, consistent with California Police Officer Standards and Training (POST), Mayer should have pointed his gun at the ground in a "low ready" position rather than at Mr. Smith. | Ex. 9 at 13; DeFoe Dep. at 97:19-23. |

Dated: August 11, 2017

Respectfully Submitted,

HADSELL STORMER & RENICK LLP

By: /s/ - Brian Olney
Lori Rifkin
Dan Stormer
Brian Olney
Attorney for Plaintiff