**13-5535**     Supplement No **0042**



# STOCKTON POLICE DEPARTMENT

22 E MARKET ST.

STOCKTON, CA 95202

(209) 937-8495

Reported Date
**04/19/2013**
Rpt/Incident Typ
**215**
Member#/Dept ID#
**BURRELL, BRADLEY CHESTE**

## Administrative Information

| Agency | | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| STOCKTON POLICE DEPARTMENT | | 13-5535 | 0042 | 04/19/2013 | 17:07 | 130440302 |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| RTF INVESTIGATIONS | CARJACKING | | | | | |

| Location | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| 1617 W FREMONT ST | | | Stockton | | 95203 | 0141 |

| District | Sector | From Date | From Time | Member#/Dept ID# | | |
|---|---|---|---|---|---|---|
| CC | CS | 02/13/2013 | 10:18 | 2096/BURRELL, BRADLEY CHESTER | | |

| Assignment | Entered By | Assignment | Confidential | | | RMS Transfer |
|---|---|---|---|---|---|---|
| ROBBERY UNIT | 2096 | ROBBERY UNIT | Officer Involved Incident | | | Successful |

| Prop Trans Stat | Approving Officer | | Approval Date | Approval Time | | |
|---|---|---|---|---|---|---|
| Successful | 3800 | | 04/22/2013 | 11:58:46 | | |

| Route - DA Ready | | | | | | |
|---|---|---|---|---|---|---|
| Yes | | | | | | |

## Summary Narrative

**ATTENTION: DDA RICK PRICE**

### Narrative

**NOTIFICATION:**
On 02-13-2013, I, Detective Burrell (I-13), was assigned by Sgt Hutto to be the lead investigator into an officer-involved-shooting which occurred the same day in the area of 1617 W Fremont St.

**INVESTIGATION:**
After attending a briefing on the incident and observing the area of the crime scene, I responded to the SEB where I interviewed Officer Michael Perez with the other members of my protocol team (District Attorney Investigator Kerry Etcheberry and CHP Investigator Mark Petricevich. The interview with Officer Perez began at about 1931 hours and was held in interview room #C230 (which is equipped with audio and video recording equipment). The following is a transcript of that interview.

**STATEMENT OF Officer Michael Perez**
Det. Burrell: Okay, so right now it is about 1931 hours on the 13th of February. My name is Brad Burrell. I am a Detective in the Homicide Unit. Go ahead and introduce yourself.

Etcheberry: Kerry Etcheberry, DA Investigations.

Petricevich: Mark Petricevich, Stockton CHP.

Avloni: Navruz Avloni from Mastagni Law Firm.

Dervin: Erin Dervin, from Mastagni Law Firm.

Det. Burrell: Also present during the interview is Officer Esteban Arrieta as an investigator for the Stockton City Attorney's office representing Stockton and its employees with an anticipation of civil litigation. He will be observing but not be asking questions during the interview. His presence should not be construed as an order to answer questions and no punitive administrative actions will be taken against you if you choose not to answer any of his questions. If you don't feel like comfortable with his presence he will step out of the room. Do you understand this?

Perez: Yes.

Det. Burrell: Do you have any questions right now?

Perez: No

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL, BRADLEY CHESTER | 01/23/2015 09:40 | Page 1 of 15 |

EXHIBIT
73
8-3-16  SP
PENGAD 800-631-6989

COS007502

**Exhibit 1
Page 1**

**13-5535**  Supplement No 0042

## STOCKTON POLICE DEPARTMENT

**Narrative**

Det. Burrell: Okay.  Is it okay if he stays?

Perez: Yes.

Det. Burrell: Okay, very well.  Can you tell me what your full name is please?

Perez: Michael Perez.

Det. Burrell: And what's your ID number?

Perez: 1268

Det. Burrell: And how many years on the job do you have?

Perez: 17

Det. Burrell: Alright, and what's your currant rank?

Perez: I'm assigned to patrol.

Det. Burrell: Okay as a...

Perez: Police Officer.

Det. Burrell:  And how long have you been in that assignment?

Perez: Off and on through the years but I did patrol about five years, and I just started back on Patrol after working investigations.

Det. Burrell: Okay.  And so how long in this assignment total, in patrol?

Perez: As of the last, about two weeks.

Det. Burrell: But I mean in total.

Perez: Total years, 17 years as a Police Officer, and 10 in investigations.

Det. Burrell: Okay, so about 7 years on patrol?

Perez: Yes.

Det. Burrell: Great.  Do you have a particular shift that you normally work?

Perez: Yes.

Det. Burrell: And what is that?

Perez: Day Shift.

Det. Burrell:  Okay, and what are those hours?

Perez: The hours are 7 to 5.

Det. Burrell: Okay, and do you have a particular area...

Perez: Yes.

Det. Burrell: that you are normally assigned?

Perez: Yes.

Det. Burrell: And what's that?

Perez:  Today I was assigned to a different area.  It's Lakeview it's basically the west side, northwest side of Stockton.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 2 of 15 |

COS007503

Exhibit 1
Page 2

13-5535    Supplement No 0042

## STOCKTON POLICE DEPARTMENT

### Narrative

Det. Burrell: Okay so today you were assigned to Lakeview.  Where are you normally assigned?

Perez:  Valley Oak which would be the northeast section.

Det. Burrell:  Okay, do you have a normal call sign?

Perez:  Yes but today was different, today I was, my call sign was 2B66.

Det. Burrell:  Okay.  What were you dispatched to, or what type of call were you on when this all began?

Perez:  When it began I was on a call of a person under the influence of drugs.  I was at 1176 Rosemarie.  The call came in of a female who was under the influence.  Responded to that call, arrested the female for being under the influence, handcuffed her, put her in the back seat of the patrol car.  I checked with dispatch to see if our AVL was working in the patrol car, the GPS.  They stated it was, I gave my miles, and from there I proceeded to the jail.  I was just, my route that I was taking was to go west on Rosemarie, then south on Pershing to I-5.

Right about Pershing and El Monte I heard radio traffic of an officer giving out the call that he was on, that the vehicle in his call was south bound on Pershing from Harding.  As I listened to it more he stated the person, the occupant, had several outstanding warrants.  I believe he said they were out of, he had checked to make sure he had the warrants.  I believe it was Hayward, but they were, the driver had several felony warrants.

I continued south on Pershing trying to listen to the radio and pull up the call; the lady was under the influence and was talking and jabbering a lot, just not making since.  I continued down Pershing right about Calaveras or so I heard another, a second unit come up on the radio and say when dispatch was trying to reach the first one, the second unit responded and came on scene and stated the primary officer was in foot pursuit up the freeway.  I continued down Pershing still heading towards the freeway which is my original direction I was traveling,  At that point I heard the second officer say that the second suspect was going up on the freeway and crossing.  I thought knowing this person was resisting arrest by fleeing from this vehicle, he had several warrants, not knowing the nature of how he fled from the vehicle, the circumstances with, with the primary officer, I continued down Pershing to assist knowing that on either side of the freeway is busy AM/PM store, and there's a lot of traffic in and out during the day at the hours between 11 and 12.  I only heard two officers on the radio.  I understand that I have a prisoner in my car, my primary objective was to go around to the south side of I-5, on Fremont and step up, help set up a perimeter and keep my eyes on this person.

As I went south on Pershing I went west on Fremont to the AM/PM.  I hear Robin Harrison and on the radio she stated the suspect ran behind a Ford SUV, I believe she said Explorer.  She was, when I saw her she was along the north curbline of Fremont right at the furthest east entrance into the AM/PM parking lot.  There's kind of pumps and then further down to the west is AM/PM store.  I immediately saw Robin out of her vehicle going towards the SUV.  I saw people on the side of the SUV.  I felt Robin was taking the west end of that SUV, and just knowing that the person had already been on the run, the suspect, I took up the east side, further down; parking a distance away from the SUV since I had somebody in my backseat.  And also I figured he was going to be running in my direction that somebody was already to the west.  As I'm running closer I heard an officer yelling that the suspect was trying to carjack an occupied vehicle.

As I'm running closer I see just bodies on the inside of the SUV that's there's people inside, and it's obvious to me that there's a fight going on, with the officer saying that the suspect is trying to carjack them.  I wasn't sure if it was Robin, or another officer, but I only remember seeing Robin.  They had a better view as I'm running up, so they obviously saw something that I didn't because I'm running, I'm sorry, I'm running out.  I had that information that he's trying to carjack these people.  I get closer and with my gun drawn, the driver door was already open, and I immediately keyed on the suspect who was on his back on the front passenger floor board.  I couldn't see, since he was trying to carjack these people I didn't know if he had a weapon or not.  I didn't want to take my eye off of him to look in the back seat to see if the victims had left yet.  I immediately give him verbal commands to put his hands up.  It was, it was very brief, I was yelling at him to put his hands up; he did not put his hands up.

Soon after he looks at me and makes eye contact and says 'I have a gun, I'm going to shoot you.'  And as he's, as he's doing that or right before he's, he's moving his body.  To me it appeared he was going to get up.  And he's on his back and as soon as he moves his right arm to pull up his arm, I thought there still could be victims in the back seat.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL, BRADLEY CHESTER | 01/23/2015  09:40 | Page 3 of 15 |

COS007504

**Exhibit 1**
**Page 3**

13-5535    Supplement No
0042

## STOCKTON POLICE DEPARTMENT

### Narrative

Robin was right to my left which would be to the west of me. Knowing these bodies or these potential victims are in possibly in the car. Robin's next to me for my safety, I had my gun drawn, I'm telling this person, giving him verbal commands, to put his hands up. He clearly see's my gun, at that point when he makes his intent, or he tells me tells me he has a gun, and he is going to shoot. I felt that he did have a gun because he had every reason to give up and stop.

At that point once he starts to raise up his right hand that's when I fired two rounds into, at the suspect. During this time, I don't know if it was at the same time or soon after I hear a couple shots from another direction from the front side of the vehicle into the vehicle. As soon as I see his hands I immediately, I stopped. I just had my duty issued gun pointed at him and held him; I didn't fire more rounds once I saw his hands. They were up at that point. He didn't seem as aggressive, and he was just looking at the roof of the car, at the top. I held him there at gunpoint. Officer Wells came over and he and another officer went around to the other side to remove the suspect and handcuff him.

Det. Burrell: Okay, and then what happened after that?

Perez:  After that I walked back I believe Investigator Hector Alaniz arrived soon after, and was there pretty quick. I walked back to; I basically left the scene that way I could secure. Walked back to Fremont to one of the detective's cars and I was away from the scene.

Det. Burrell: Okay, so you walked to the detective's car and then, and then what?  How did you get, how did you end up getting here?

Perez: I jumped into two different cars because people were giving assignment, were being given assignments.  I believe I received a ride from, yeah it was Hector Alaniz.

Det. Burrell: Okay, Okay.  I like to kind of go through it again and ask you a couple of more.
Perez:  Sure.

Det. Burrell: Clarifying questions if I can. So you're at 1176 Rosemarie investigating a person under the influence.

Perez:  Yes.

Det. Burrell: You end up arresting that person.

Perez:  Yes.

Det. Burrell: Do you, and you said that was a female.

Perez:  Yes.

Det. Burrell: Do you know her name?

Perez:  I remember the last name of Lutge, L-U-T-G-E.

Det. Burrell: Okay.  So you take her into custody.  You're, and before I get too far into this, if I should misstate something please feel free to correct me or you know.

Perez:  Sure.

Det. Burrell: Okay.  So you take her from 1176 Rosemarie.  You go westbound Rosemarie, southbound Pershing. As that's occurring you said that you overheard the primary officer saying the vehicle in his call is is...

Perez:  Southbound Pershing from Harding.

Det. Burrell: Okay, and who is that officer that you heard on the radio talking at that time?
Perez: I don't recall.  I had this female that was pretty loud in the backseat and was talking to me about cars following us and I had her in the backseat and then listening to the radio and trying to pull up the call.  I don't remember which officer that was.

Det. Burrell: Okay, fair enough.  So you get to an area someplace along that route because you intend to get onto I-5 at Fremont and I-5.  Take Pershing all the way to Fremont.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 4 of 15 |

COS007505

**Exhibit 1**
**Page 4**

**13-5535**   Supplement No
**0042**

# STOCKTON POLICE DEPARTMENT

**Narrative**

Perez: Yes.

Det. Burrell: So you can get on right there.

Perez: Correct.

Det. Burrell: Right? Somewhere along the way you hear another officer come up on the air saying that there's something else going on.

Perez: Yes.

Det. Burrell: And what was that?

Perez: That the primary officer was in foot pursuit up toward the freeway.

Det. Burrell: Okay, and so you knew he was going onto I-5.

Perez: Yes.

Det. Burrell: Okay, did you know what the description of the person that was fleeing? Did you know what that person looked like?

Perez: I don't recall the description they put out. But I didn't, I was trying to pull up the call, I had, I don't, I didn't read the whole call.

Det. Burrell: Okay. And you say you tried to pull up the call, you mean on your computer?

Perez: Yes.

Det. Burrell: Okay so were you in a patrol car?

Perez: Yes.

Det. Burrell: Okay and presumably you were wearing the same thing then as you are now?

Perez: Yes.

Det. Burrell: Okay. As you're driving and all this is occurring, you're not yet in the area, are you, how are you driving? You're driving just normal vehicle operations?

Perez: Normal at the point of the second officer getting on the radio saying that the first officer is in foot pursuit. It to me sounded like it was it was just one officer and the second officer, and that was it. I did turn my lights onto, once I got to Pershing and right about to stop at the onramp, traffic was backed up.

Det. Burrell: Okay.

Perez: I did turn on my lights, and I turned on my sirens briefly just to get around the traffic to go around and get to Fremont.

Det. Burrell: Sure. So when you say the stop at Pershing, and on Pershing, where, where about is that taking place?

Perez: Well I initially heard it was it was northbound onramp to I-5 at Pershing.

Det. Burrell: Okay, but where did you, you I'm assuming you saw that there was a traffic stop that had taken place somewhere?

Perez: I didn't look to see what the discrip, I didn't see the vehicle. I just saw the traffic was stopped, and there was, there was I just out of the corner of my eyes I just saw cars at the onramp there. I was basically going around two lanes of traffic.

Det. Burrell: Okay. Out of those cars were any of them a police car?

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 5 of 15 |

**Exhibit 1**
**Page 5**

13-5535     Supplement No 0042

## STOCKTON POLICE DEPARTMENT

**Narrative**

Perez: I know there must have been a police car but I wasn't paying attention, I was more, my objective was just to get around the traffic...

Det. Burrell: Okay.

Perez: to the other side.

Det. Burrell: So I guess to be very direct you don't know where exactly the traffic stop occurred?

Perez: No, other then when (talkover).

Det. Burrell: That you saw I mean. You heard but as far as what your observations, you're not exactly sure where that was?

Perez: Correct.

Det. Burrell: Okay, and when you got to the area that you heard the traffic stop took place did you see any officers in that area? Did you see anyone if foot pursuit? Did you see any fighting? Did you see anything else?

Perez: I, once I went south bound Pershing and then west on Fremont when I pulled up to the AM/PM I saw Robin Harrison.

Det. Burrell: Okay.

Perez: And her unmarked vehicle. And I didn't see any other patrol cars. As I'm running up to to the to the Ford I didn't, I glanced and then parked. I didn't see any patrol cars in front.

Det. Burrell: Okay.

Perez: And...

Det. Burrell: I'm sorry to interrupt.

Perez: Yeah and at that point it was I just it was the only people I saw was just Robin and myself going to the car.

Det. Burrell: Okay. We mentioned Robin Harrison's unmarked car.

Perez: Yes.

Det. Burrell: What kind of car is that that you were referring to?

Perez: It was a silver Tahoe.

Det. Burrell: Okay, and it's some type of unmarked police car?

Perez: Yes.

Det. Burrell: Okay, did it have emergency equipment activated that you're aware of?

Perez: I just saw the back side of it. I didn't see the front.

Det. Burrell: Okay.

Perez: And I glanced, I saw her vehicle immediately because I had seen her earlier in the day in that vehicle and I just focused on, I was basically waiting for the foot pursuit to start coming my way.

Det. Burrell: Gotcha. And you talked about an SUV.

Perez: Yes.

Det. Burrell: Tell me about, about that SUV and what was what about it that drew your attention to it.

Perez: As I heard Robin, as I'm pulling up toward AM/ PM I heard Robin Harrison on the radio say he's hiding behind the Ford Expor, I believe she said Ford Explorer. And at that point I saw people on the, well I saw something going on on the side of it which would be the north side of the SUV. The SUV was parked facing

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 6 of 15 |

COS007507

**Exhibit 1
Page 6**

13-5535   Supplement No
0042

## STOCKTON POLICE DEPARTMENT

Narrative

northbound or north against the fence that divided the parking lot to the freeway.

Det. Burrell: Gotcha. Maybe this will make it a little easier for, for at least me to understand. Okay so this is a map I printed earlier today. As you can see this is Pershing, okay. This is Fremont. This is northbound I-5 onramp, southbound I-5 off ramp, and Interstate 5.

Perez: Yes.

Det. Burrell: Okay. This is 1617 W Fremont which is the AM/PM that we have been talking about.

Perez: Yes.

Det. Burrell: So maybe, I understand you drove southbound Pershing, made that westbound turn onto Fremont. At some place you stopped your patrol car.

Perez: Yes.

Det. Burrell: Okay maybe you can mark for me where, where about you stopped your patrol car.

Perez: This is the very east end of the parking lot.

Det. Burrell: Okay.

Perez: I jumped the curb, as I'm going west on Fremont I jumped the curb and parked, it was approximately thirty feet west of the SUV that was parked in this corner here.

Det. Burrell: Okay, so...I'm sorry go ahead.

Perez: I'll just write a '1' there where the SUV is.

Det. Burrell: Perfect, okay. So you circle with a '1' where the SUV is.

Perez: And my vehicle would be, I'll put that number '2'.

Det. Burrell: Perfect.

Perez: And my vehicle, I parked it pointed at the SUV facing north.

Det. Burrell: Okay. And, and which way is the SUV facing?

Perez: North. Or I'm sorry, it's the SUV was parked facing west.

Det. Burrell: Okay.

Perez: My vehicle is parked facing the same direction, west.

Det. Burrell: Okay so you guys are both, yeah you guys I should have pointed that out. So this is north you know north, east, south, west.

Perez: Got turned around.

Det. Burrell: That's okay. Alright. So you stop here.

Perez: Yes.

Det. Burrell: Okay. And Robin Harrison is already in the parking lot?

Perez: Yes. When I really see her, her, I'll put her in '3', at the very east end of the parking lot at the edge. That's where I first saw Robin's Tahoe.

Det. Burrell: Okay. So you made another circle there at the south east corner with a '3' and that's indicating where Robin's car was.

Perez: Right.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL, BRADLEY CHESTER | 01/23/2015 09:40 | Page 7 of 15 |

COS007508

**Exhibit 1**
**Page 7**

13-5535      Supplement No
             0042

## STOCKTON POLICE DEPARTMENT

**Narrative**

Det. Burrell: Okay.

Perez:  So when I exit I see Robin headed toward the like the front of the vehicle.  Headed toward the the SUV at the where the driver side.

Det. Burrell: Okay, and when you say head, you mean in her car or on foot?

Perez:  On foot, she's on foot.

Det. Burrell: Okay, and so what do you do?

Perez:  I looked at her, and she's the only person I saw out there so I basically was looking at his escape route. He came from the freeway, and I looked at her as she's taking the west side of the vehicle I wanted to be on the east side in case he ran toward my direction.  So I started, I parked east of the vehicle.  I exited and ran toward the vehicle.

Once I saw people fighting, and stuff going on inside the SUV at the point, right about that time I heard somebody yell, one of the officers, I'm not sure if it was Robin, yell out that the suspect's trying to carjack that vehicle.  At that point it went from he's not going run this way, he's actually trying to take the vehicle.  So I immediately ran straight to the driver side of the vehicle.  The driver door was open, and that's when I saw the suspect.

Det. Burrell: Okay, prior to seeing some type of altercation going on inside the vehicle, and prior to hearing an officer say he's trying to carjack the vehicle.  Did you see anyone standing around the vehicle or inside the vehicle?  The SUV I'm talking about?

Perez:  I saw somebody on at least one or two people, it might have been one, but from my point I saw at least one person sitting on the side of the vehicle which would be between the SUV and the freeway.  Which would be just north, on the passenger side of the SUV.

Det. Burrell: Okay and what, do you remember what race that person was?

Perez:  I couldn't see them from my angle I just, as I'm pulling I saw somebody there, and then as I'm getting closer I see, I see bodies inside the Ford.

Det. Burrell: Okay, and could you tell how many bodies were inside that Ford?

Perez:  No, no it, as I'm running toward (unintelligible) I don't know if the windows were tented or what but I couldn't see it clear.  I just saw something going on, and there was, there was, to me it appeared there was a fight. There's a big struggle and that combined with the, an officer saying this guy's trying to carjack somebody, I immediately ran toward the driver side.

Det. Burrell: Okay, and when you say a big struggle what was it that you observed to make you think a struggle was going on?

Perez:  Just bodies being moved around inside the SUV.  To me it appeared there was some sort of fight going on.

Det. Burrell: Okay, so you could see hands, and hands, or arms, or legs, or whatever.

Perez:  Right I mean they weren't standing still they were moving around and bodies were there was they were obviously fighting to me.

Det. Burrell: Okay could you hear anything that was being said from inside that that SUV?
Perez:  No, the only door that I saw open at the time was the driver door, the left rear door was closed.

Det. Burrell: Okay.

Perez:  So I couldn't hear.

Det. Burrell: Okay.  So you see some type of altercation going on inside the vehicle.  You think a fights going on. Seems obvious to you.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 8 of 15 |

13-5535     Supplement No 0042

## STOCKTON POLICE DEPARTMENT

Narrative

Perez: Yes.

Det. Burrell: You hear and officer yell that somebody's trying to carjack that vehicle.

Perez: Yes.

Det. Burrell: Right? And then I understood you just say that you moved kind of from the rear of the vehicle towards the open front driver door.

Perez: You know I never ran toward, I was never at the rear of the vehicle because I'm running toward the vehicle; I'm looking at cut off if he pops out. But as soon as I exit my car, my patrol car, and I start running, I immediately hear him trying to carjack him, and that's when I just ran straight toward.

Det. Burrell: Oh I see.

Perez: I didn't like...

Det. Burrell: You never actually go to the rear.

Perez: go the rear and come back here. I was just more of a direct.

Det. Burrell: Okay, I miss understood, okay. So you get to some place where you can, you have a clear line of sight into the car, is that right? Into the SUV.

Perez: Yes.

Det. Burrell: Okay, maybe you can make another mark for me where about you were standing in relation to the suspect vehicle which I think was the one you marked here with this circle, number '1' right?

Perez: Right.

Det. Burrell: It might be kind of, I realize that I'm asking you to do something that's kind of hard because you know it's a small picture.

Perez: I'll make a '4' where I would be.

Det. Burrell: Perfect, okay.

Perez: A first grade picture. The passenger floor board, that's this is where the suspect's at.

Det. Burrell: Okay.

Perez: Make an 'X'.

Det. Burrell: Okay.

Perez: This driver door is open, I'm about five, six feet from the driver seat here. I'm right here. I have a clear view of the suspect. I'm not standing you know the, nothing's blocking my view. The only thing that I cannot see is I don't recall if it was the center console in the center or if it was just a hump, but I could not see his right hand.

Det. Burrell: Okay.

Perez: And when I initially see him he's he, to me he appeared he was trying to get up and it in the mists and I'm giving him commands; you know let me see your hands, let me see your hands, and that's, and he just stares and he says 'I have a gun, I'm going to shoot you'.

Det. Burrell: Okay, so you run from your patrol car to about this position.

Perez: Yes.

Det. Burrell: Right? Where the suspect is, you said that, I believe you said he was lying on his back on the floor board?

Perez: Yes, with his head to the west and his feet to the east.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 9 of 15 |

**Exhibit 1**
**Page 9**

**13-5535**      Supplement No
0042

## STOCKTON POLICE DEPARTMENT

**Narrative**

Det. Burrell: Okay, so he's positioned in somewhat fashion as the car is as far as his head being (talkover).

Perez: His head closest to...

Det. Burrell: The engine.

Perez: The dashboard.

Det. Burrell: Yeah, okay. Where, was anybody else inside the car at that time?

Perez: That's what I was concerned about because I could not, he was obviously to me appearing to get up, and as soon as I get him, come in and I'm making eye contact with him. I wanted to look in the backseat but I, it was I felt he was he went through great lengths to escape from the officer. What he did at the stop, I do not know. Crossing several lanes of the freeway he, to me he was obviously a person that wanted to, he had escalated things to where he wanted to get away and he did not wanted to be taken into custody.

Det. Burrell: Um hum.

Perez: That's not a person I want to take my eyes off for a second to look in the backseat because I felt he was a threat.

Det. Burrell: Of course, okay. So he says, he says that to you, "I have a gun, and I'm going to shoot you."

Perez: Yes.

Det. Burrell: Okay. Can you see his left hand?

Perez: At some point when he's moving around I see it briefly.

Det. Burrell: Okay.

Perez: But at he looked like he was trying to get up and as soon as he made the statement that 'I have a gun, I'm going to shoot you' I was keyed on his right hand. I don't recall if I could see his left hand, but his right hand was closest to me. And there, my view of his hand, what he had down here, I could not see.

Det. Burrell: Okay. Before, during, or after the time he said 'I have a gun, I'll shoot you' did you say anything to him?

Perez: I'm yelling at him 'let me see your hands, let me see your hands', and he looked I mean he stared at me, and our conversation was not that long, it was very brief. And soon as soon as I told him 'let me see your hands, let me see your hands' he looked straight at me, he says 'I have a gun, I'm going to shoot you'...

Det. Burrell: Okay.

Perez: and that and in that instants he, my verbal commands, that he escalated things.

Det. Burrell: Sure, okay so that was in response to your command?

Perez: Yes.

Det. Burrell: Okay very well. So you can't see his right hand, and I believe earlier that you kind of demonstrated that he made some kind of motion.

Perez: Right.

Det. Burrell: Kind of kind of describe for me that motion that he made.

Perez: It was, he was on his back, and as he's trying to get up he's moving his body like this, and with his right hand he's coming up. And at that point I did feel that he's escalating things where he knows I have gun pointed at him. He's not going to, he's not trying to run at that point. He's had eye contact with me. He told me he was going to shoot me. I felt threated for my life, I felt threatened for Robin's life, possible victim in the backseat. One stray round, it could have hit somebody, one of us, that we're directly next to.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL, BRADLEY CHESTER | 01/23/2015 09:40 | Page 10 of 15 |

COS007511

Exhibit 1
Page 10

**13-5535**    Supplement No 0042

## STOCKTON POLICE DEPARTMENT

### Narrative

Det. Burrell: Sure. Where was Robin Harrison during all this? During this particular...

Perez: As soon as I came up, she was just to my left.

Det. Burrell: Okay.

Perez: When I'm giving commands, and I'm looking at his body language and his eyes I was, I don't know if she stays next to me, if she goes to the front, but I thought she was next to me when, well she was when I first got there.

Det. Burrell: Okay, and when you say next to me, how far away was she? In your best guess.

Perez: About two feet...

Det. Burrell: Okay.

Perez: To my left, which is to the west.

Det. Burrell: Okay. And were there any other officers there in the immediate area?

Perez: At that point...

Det. Burrell: That you know of.

Perez: At that point I don't know...

Det. Burrell: Okay.

Perez: because I was just keyed on the threat, and the, I felt he was, yeah, he escalated thing to carjack this vehicle and he was being violent at that point.

Det. Burrell: Sure, do you know if the SUV was running, the engine was running, or was it turned off?

Perez: I don't recall.

Det. Burrell: Okay.

Perez: I don't know.

Det. Burrell: Okay. So you see him make this motion, you said that your life was in danger, and is it at that point that you fired the two rounds?

Perez: Yes.

Det. Burrell: Okay. You fire the two rounds, and what happens immediately after you fire the two rounds?

Perez: At that point I believe there were, Robin who was to my left had fired some round from the front, or to the left of me at some point. It was very, to me everything was going on at the same time. As soon as I saw his hands clearly I stopped shooting. And I just continued to tell him 'keep your hands up, let me see your hands'. At that point he had a different look where he was just looking at the top of the car. And that's when Officer Wells and Officer Brown handcuffed him.

Det. Burrell: Okay, do you know at about what time Officer Wells, and the other officer arrived on scene?

Perez: I don't know when they arrived. I know after I fired rounds it was like seconds later I hear Officer Wells' voice, and he's like we're going to handcuff him. And, and he asked if I was okay, and if Robin was okay, and at that point he took another officer to handcuff the suspect.
Det. Burrell: Okay so, and did he in fact handcuff the suspect as far as you know?

Perez: Him or the other officer did. But I did see them moving the suspect to the rear of the vehicle.

Det. Burrell: Okay, so they remove they remove the suspect.

Perez: Yes.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL, BRADLEY CHESTER | 01/23/2015 09:40 | Page 11 of 15 |

COS007512

Exhibit 1
Page 11

13-5535     Supplement No
            0042

## STOCKTON POLICE DEPARTMENT

Narrative

Det. Burrell: And they, where do they take him?  Do you know?

Perez:  The last I saw was to the rear of the vehicle, and somebody asked me to go step to the side to away from the scene to, on actual on Fremont with next to the patrol cars and detectives was.

Det. Burrell: Okay.  Do you have any questions?

Etcheberry:  One question that comes to my mind.  When you arrived on scene, you saw Robin.  Did you and Robin have a conversation at all?

Perez:  No it was, it was instant as far as me exiting my patrol car.  It was just straight to the car, and as soon as I got there I'm giving commands and I see her to the left.  To me after I give commands that's when he's, he escalated things 'I have a gun, I'm going to shoot you' and it was it was pretty brief.

Det. Burrell: And I know one question I should have asked, I'm sorry.

Etcheberry:  No, no problem.

Det. Burrell: You kind of eluted to this earlier, that you know this is a busy gas station in the middle of the day.  In this particular case did you see other people around?  Beside police officers, and beside the people who were involved in this.  Just (talkover).

Perez:  When I first pulled up I did see, because I was looking to see if there were other officers nearby, and I just glanced.  I did not see no patrol cars, but I saw there were people out there.  It wasn't like 1:00 in the morning when there's nobody there; it was busy.

Det. Burrell: Okay.  Are you able to recall about how many people might have been there?

Perez:  No.

Det. Burrell: Okay.  Do you know, I'm assuming there was some cars also in the parking lot, or at the gas pumps, or somewhere on that property?

Perez:  Yeah, I just recall, there were people out there.  I couldn't tell you if there were one car, ten cars, I don't, my focus was as soon as I heard Robin and SUV that's, I scanned the parking lot for an SUV and I saw it right there by the east side of the parking lot, and from there I was there.  My focus was on the problem.

Det. Burrell: Fair enough.

Etcheberry:  I do have one more question.  When you came up to the vehicle, when you see the suspect can you describe what he was wearing?  Do you remember what he was wearing?

Perez:  I was thinking about that earlier.  I, maybe it was a bright colored shirt, but I couldn't tell you the color.

Etcheberry:  Okay, so you see the suspect on his, well you see what you said was an altercation in the vehicle.  And you see him on his back.

Perez:  Yeah.

Etcheberry:  Did you have and recollection what happened to the other people that were in the vehicle?  Do you remember, did you say anything to them?  Or did you give them any command?

Perez:  No, I, my contact was so brief from the time I got the to driver door to the time I fired shots.  Like I said, I wanted to glance at the backseat to see if there was actually somebody there...

Etcheberry:  Right.

Perez:  but as I'm running up I see bodies in here, and I did, I knew my line of fire was clear when I fired a couple of rounds.

Etcheberry:  And you were clearly concentrating on him...

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 12 of 15 |

13-5535    Supplement No
0042

## STOCKTON POLICE DEPARTMENT

**Narrative**

Perez:  Yes.

Etcheberry:  and his hands.

Perez:  Yes.

Etcheberry:  Okay.

Petricevich:  When you arrived at the scene and you drove over the curb and you come to a stop on the lawn, and you got out of your vehicle, you were slowly approaching.  You said you heard someone saying that they're trying to carjack, carjack the vehicle.

Perez:  Yes.

Petricevich:  Do you know who that was?

Perez:  No, no, yeah I don't want to assume it was Robin but I do remember hearing a voice saying 'he's trying to carjack him, block him in, block him in'.  At that point that was not an option for me because I had somebody in; I didn't see another patrol car in the front.  So at that point I, it was more a sense of urgency to remove this person from that vehicle and get him, he, to me was a big threat.

Petricevich:  Sure.

Perez:  I mean especially if he would have started driving and...

Petricevich:  Yeah.

Perez:  that was not an option for him to drive away.

Petricevich:  Okay, do you remember was that just verbal shouting at the scene, or did it come out over the air on your radio.

Devrin:  Which in terms of the carjack comment?

Petricevich:  Yeah, I'm sorry, yes the carjacking, he trying to carjack.

Perez:  I don't recall if it was, I want to say it was it was verbal, just out there.  But I don't recall if that was the radio or was Robin or somebody yelling, 'he's trying to carjack, pin him in' or 'block him in'.

Petricevich:  Okay, and again I might have missed this.  When you were describing how you shot him, it was with your handgun?

Perez:  Yes.

Petricevich:  Okay.  And actually did you get a good look at him at the scene or did you back away?

Perez:  I briefly.  A Black male, kind of thick, heavy.

Petricevich:  Did you recognize him from any previous contacts?

Perez:  I didn't look at him that long enough to...

Petricevich:  If it's okay, I'd like to show a picture just to make sure is, who we believe is the suspect, Nathaniel Smith, previous booking photos of him.  Do you recognize him from any previous arrest?

Perez:  No, that looks like him.

Petricevich:  Okay.  Do you recognize him from any previous contact you made had pursuant to your job or...?

Perez:  No, not off hand.

Petricevich:  Prior to this incident coming out over the radio, and alerting you to the situation, did you have any previous knowledge that he was wanted for anything?

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 13 of 15 |

**Exhibit 1**
**Page 13**

13-5535    Supplement No
0042

## STOCKTON POLICE DEPARTMENT

**Narrative**

Perez:  Other than the radio traffic I pulled up the call on my computer, and I saw the subject in the call was wanted for warrants.

Petricevich:  Sure.

Perez:  And...

Petricevich:  No...

Perez:  I didn't have no previous contact.

Petricevich:  No newspaper earlier article in the newspapers that police were looking for him or news broadcast, anything like that?

Perez:  Not off hand that I recall.

Petricevich:  That's all I have.

Dervin:  I have a question.

Det. Burrell:  Sure.

Dervin:  Mike, you made a reference to the fact that you could not block the SUV or did not block the SUV because out your, the woman you had in custody in your car.

Perez:  Yes.

Dervin:  Were there any concerns that you had about her when you were responding to this scene?

Perez:  Normally I wouldn't respond, but it was on my path to the freeway.  I saw urgency with as far as only two officers being out there at the scene.  This person to me appeared he could be violent crossing the freeway wanting to escape knowing he has warrants.  And to me there was more of a safety factor knowing on the other side of the freeway was a busy AM/PM store that, this likely could have happened where he would carjack somebody.

Dervin:  But in terms of when you pulled up and you talked about something over the, the curb and placing your car somewhere in what looks like a grassy area.

Perez:  Yes.

Dervin:  Was that out of concern for the woman that you had in custody?  Or is that where you parked it?

Perez:  Well because of her I parked a distance away.  It was not close up.  If I would have been by myself I would have been much closer to the vehicle.

Dervin:  Okay, and were you, as you were driving to this location, could you tell based on the radio traffic that you were probably the closest police officer to that location where this person was fleeing?

Perez:  Yes.

Dervin:  Okay.

Perez:  Yes. And knowing the, you know the distance from the northbound onramp to the other side, that's a big distance you know let alone the freeway being in between.  Two officers being able to, it's not enough, it's such a large area.

Dervin:  Did you know whether they were on foot or in their vehicles at the point you were starting to respond to it?

Perez:  Well I knew at least the primary was in foot pursuit.

Dervin:  Okay.

Perez:  And then the second one I did not know where she was until the conclusion.

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 14 of 15 |

COS007515

**Exhibit 1**
**Page 14**

13-5535   Supplement No 0042

## STOCKTON POLICE DEPARTMENT

### Narrative

Dervin:  Okay, that's all I have.

Det. Burrell: Okay, great.  We're going to step out, and I'm sure Arrieta may have some questions for you if that's okay?

Perez:  Okay.

Det. Burrell: Okay, great.  Thank you.  Before, before I take this from you, if you wouldn't mind signing your name and putting your badge number I would appreciate it.  And the time right now is about 2011 hours.
*(End of Statement)*

**INVESTIGATION (continued):**
I later produced a DVD of the interview with Officer Perez and booked it into evidence under property card #B89250.  I also booked the map and diagram used in the interview with Officer Perez under the same property card number.

Refer to supplemental report #33 for further details of my investigation into this incident.

**ATTACHMENTS** :
Copy of map and diagram

**EVIDENCE:**
Property card #B89250
- DVD of interview with Officer Perez
- Original map and diagram used in interview with Officer Perez

**DISPOSITION** :
Refer to original

| Report Officer | Printed At | |
|---|---|---|
| 2096/BURRELL,BRADLEY CHESTER | 01/23/2015 09:40 | Page 15 of 15 |

Exhibit 1
Page 15

**STATEMENT OF (W) OFFICER ROBIN HARRISON:**

**DR# 13-5535**

**Det. Burrell**

Burrell:    Okay, so the time is about 1800 hours on Wednesday, February 13th. My name is Brad Burrell; I'm a Detective in the Homicide Unit with Stockton Police. Sitting to my right is Kerry Etcheberry. She is an investigator with the District Attorney's office. Sitting to her right is Mark, and I'm again going to let you say your last name. He's an officer from the CHP.

Mark:    Petricevich.

Burrell:    Okay, ladies I'll let you introduce yourselves.

Attorney:    Erin Dervin from the Mastagni Law Firm, Navruz Avloni also from the Mastagni Law Firm.

Burrell:    Okay, and also present during the interview is Officer Esteban Arrieta. He is an investigator for the Stockton City Attorney's office representing Stockton and it employees in anticipation of civil litigation. He will be observing but not asking questions during the interview. His presence should not be construed as an order to answer questions and no punitive administrative action will be taken against you if you choose not to answer his questions. If you do not feel comfortable with his presence he will step out of the room. Do you understand that?

Harrison:    Yes.

Burrell:    Okay, do you have any questions about that?

Harrison:    No.

Burrell:    Okay, would you like him to step out of the room?

Harrison:    No.

Burrell:    Okay, very well. Maybe you can start by giving us your full name.

Harrison:    Robin Gail Harrison.

Burrell:    Okay, and what's your ID number?

Harrison:    1456.

COS003904

**Exhibit 2
Page 1**

Harrison:     Yes.

Burrell:      Okay, did you activate your lights?

Harrison:     Yes I did, because I was kind of out into the lane. The northbound on ramp. So I activated them just for that purpose so nobody would hit me.

Burrell:      Okay, so you, and when did you activate your lights?

Harrison:     When I arrived at the stop.

Burrell:      Okay.

Harrison:     Not prior.

Burrell:      Okay, so you activate your lights. You see Officer Mayer getting out of his vehicle and then what happens?

Harrison:     The guy gets out of the back seat and like I said, it was kind of nonchalant at first. I thought okay it's just going to be an easy stop. No big deal.

Burrell:      Um hum.

Harrison:     And then all of a sudden you could kind of see he was looking for a place to, he kind of took maybe 1 or 2 steps back and he was looking maybe for a place to run. And that's when Officer Mayer told him, you know, don't run or I'll have to deploy the dog. And then he, he ran westbound and jumped the fence into the ivy or whatever you want to call that. (Unintelligible).

Burrell:      Okay, when this person got out of the car, was this the same person, or do you know if it's the same person that you saw at the front door?

Harrison:     It's the same person I seen get into the vehicle. He had a red shirt on. Yeah, it was that same person. I don't know if it was the same person at the front door or that was inside the front door.

Burrell:      Okay, okay I understand. So you see this guy do something that makes you think he's going to run.

Harrison:     Yes.

Burrell:      Okay, and maybe you can help me understand a little bit more about his behavior that made you think he was going to run.

Exhibit 2
Page 2

| | |
|---|---|
| Harrison: | Young. |
| Burrell: | Okay, when you say young, what, help me kind of quantify that. |
| Harrison: | I would say early 20's. |
| Burrell: | Okay, do you remember what either of them were wearing? |
| Harrison: | I know one was wearing a white shirt. I think it was a jersey. |
| Burrell: | Okay, so you see them somewhere in the same vicinity as the person in the red shirt is hiding. |
| Harrison: | Yes. |
| Burrell: | Okay, and then what do you see? What happens next or what do you see next, or what do you do next? |
| Harrison: | Well I'm yelling for him to come out, and then he, like I said, I believe he gets in the backseat. |
| Burrell: | Okay. |
| Harrison: | And at first I thought he was just going to leave with these guys. You know, I didn't realize what was really going on. I just thought they were going to give him a ride. But then I, as he's crawling over, then I see them start to try to pull him out. |
| Burrell: | Okay, when you say you start to yell at him, what are you saying, what words are you saying? |
| Harrison: | I'm just telling him to come out. |
| Burrell: | Okay, and is that what you're saying, come out? Or what. |
| Harrison: | Yeah, I'm just yelling at him, come on out, come out I see you. |
| Burrell: | Okay, and at that point did you have your gun drawn? |
| Harrison: | Yes, at that point I did. |
| Burrell: | Okay, so and I think I understood you to say earlier, that when you initially arrived on scene, you pulled out your gun pretty much right away. |
| Harrison: | Pretty quick, yeah. |
| Burrell: | Okay, as, I mean, as soon as you got out of your car type of thing. |

COS003924

**Exhibit 2**
**Page 3**

**13-5535**

Supplement No
0036

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
03/08/2013

Rpt/Incident Typ
215

Member#/Dept ID#
FARTHING,JAMES KENNETH

## Administrative Information

| Agency STOCKTON POLICE DEPARTMENT | DR 13-5535 | Supplement No 0036 | Reported Date 03/08/2013 | Reported Time 13:37 | CAD Call No 130440302 |
|---|---|---|---|---|---|

| Status RTF INVESTIGATIONS | Rpt/Incident Typ CARJACKING | | | | |
|---|---|---|---|---|---|

| Location 1617 W FREMONT ST | | City Stockton | ZIP Code 95203 | Rep Dist 0141 |
|---|---|---|---|---|

| District CC | Sector CS | From Date 02/13/2013 | From Time 10:18 | Member#/Dept ID# 1331/FARTHING,JAMES KENNETH | |
|---|---|---|---|---|---|

| Assignment CRIMES AGAINST PERSON/PROPERTY | | Entered by 1331 | Assignment CRIMES AGAINST PERSON/PROPERTY | |
|---|---|---|---|---|

| Confidential Officer Involved Incident | RMS Transfer Successful | Prop Trans Stat Successful | Approving Officer 1007 |
|---|---|---|---|

| Approval Date 03/20/2013 | Approval Time 21:18:29 | | |
|---|---|---|---|

| Route - DA Ready Yes | | | |
|---|---|---|---|

| # Offenses 1 | Offense PC215 (A) | Description CARJACKING | Complaint Type |
|---|---|---|---|
| # Offenses 1 | Offense HS11377 (A) | Description POSSESS CONTROLLED S | Complaint Type |
| # Offenses 1 | Offense PC148 (A)(1) | Description OBSTRUCT/RESIST PUBL | Complaint Type |
| # Offenses 1 | Offense PC69 | Description OBSTRUCT/RESIST EXEC | Complaint Type |

## Summary Narrative

**Synopsis:** This subsequent report is the interview of Jose Hermosillo Contreras.

**Attachments:**

Landmaster map of the AM-PM area
Vehicle sketch used by Contreras to show the positions of officers.

## Narrative

**Notification:** On February 13, 2013 at approximately 1923 hours, DAI Garcia, SPD Officer C. Martin and I interviewed Jose Hermosillo Contreras at the SEB relating to this attempted carjacking and officer involved shooting.

**Investigation:** I met with Contreras who was waiting in the SEB quiet room. I walked him to an interview room and had him take a seat while we prepared for our interview.

I audio/video recorded this interview and later burned a copy to DVD, which I booked as evidence.

This interview began at approximately 1923 hours. The following is a transcription of Contreras' interview.

**Statement of Jose Hermosillo Contreras 09 24 1993:**

Det. Farthing:  My name's Jimmy Farthing.

DAI Garcia: I'm Albert Garcia.

Det. Farthing: This is Chris Martin. I'm a Detective with Stockton Police Department's robbery/homicide unit, Mr. Garcia is an investigator with the DA's office and Officer Martin is one of our officers, okay. What we're going to do is kind of run it down to you real quick. I'm going to start off and get some basic information from you. Name, birth date and stuff like that. Then we'll talk about today and everything that happened, okay? So let's start with your

| Report Officer 1331/FARTHING,JAMES KENNETH | Printed At 03/14/2016 14:16 | Page 1 of 22 |
|---|---|---|

13-5535

# STOCKTON POLICE DEPARTMENT

## Narrative

that behind the little buildings right there and little trailer house and went all straight to the AM PM.

Det. Farthing:  Okay what happened from there?

Contreras:   From there we just made a U-Turn and went into the store. I got off. I went to go ask for the code for the air pump and I came back. My cousin was putting in the air, so I went around the truck to check the front or back ones on the other side cause they were getting low. And I went all the way back like this.

I was just helping him and then that's when I saw African American male right there behind the fence. He was like, "Hey, you think I could get a ride down the street? I'll pay for it. We were like okay.

So, he hopped the fence and when he was getting closer to the truck, he hid behind the door and I saw blood right here.

*Contreras pointed to his knuckles.*

I was like wait what's going on. He went inside, which was the back passenger seat. He went in through there, that's when I saw the cop rolling up through this side and another one through the entrance of the gas station. And that's when he tried to hop over and turn on the truck and leave and that's when my cousin jumped in. I jumped in through the front passenger seat. I was holding him down and my cousin turned off the truck and he took the keys and then that's when the cop told us to get away from him.

Det. Farthing:  Okay well stop right there real quick so you pulled up to AM PM correct?

Contreras: Yes.

Det. Farthing:  Okay this is a map of AM PM. I know it's a little far away, but this is Fremont, this is Pershing, this is the AM PM building itself.  Here's the gas pumps. Where do you think you parked?

*I showed Contreras a copy of the landmaster map showing the area around AM-PM. I had Contreras write his name on this map, and I booked the map as evidence. I also made a copy of the map, which I listed as an attachment to this report.*

Contreras:   Who, my cousin?

Det. Farthing:  Yeah.

Contreras:   About right there.

Det. Farthing:  Okay, and so you are actually pointing there's a concrete square.

Contreras:   It was somewhere right about here. This area right here that's where the air pumps are at.

Det. Farthing:   Okay. Can you draw a star right there where you think you were parked okay and do me a favor write your name right there. Okay, so your cousin parks.

*Contreras looked at the map and put an asterisk near the concrete pad where the air and water pumps are located.*

Contreras:   Yes.

Det. Farthing:  What do you do?

Contreras:   He parks. I get off to go ask for the code.

Det. Farthing:  Okay.

Contreras:   And that's when I walk into the store.

Det. Farthing:  Okay, and when you got out of the car did anybody else get out of the car too?

Contreras:   I think Gabriel got off for, yeah I think he got off, and that's when my other cousin got off.

Det. Farthing:  Okay, and you went inside?

| Report Officer | Printed At | |
|---|---|---|
| 1331/FARTHING,JAMES KENNETH | 03/14/2016 14:16 | Page 6 of 22 |

Exhibit 3
Page 2

1

COPY  Filed  FEB 2 7 2014

ROSA JUNQUEIRO, CLERK

By  LISA GRAYSON
DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

(CRIMINAL GRAND JURY)

---o0o---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) | D.A. Number GJ-2014-4064793 |
| ) Plaintiff, ) | INDICTMENT |
| vs. ) | CR Number SP13-05535 |
| NATHANIEL ALEXANDER SMITH, ) | Case Number SF127013A |
| ) Defendant. ) | |

February 11th, 2014

APPEARANCES OF COUNSEL

        RICK PRICE, Deputy District Attorney, County of San Joaquin, 222 East Weber Avenue, Room 202, Stockton, California  95202, appeared as counsel for and on behalf of the People.

Reported by:  KELLIE A. GAFF, C.S.R. No. 7567

```
1    A.    Yes.
2    Q.    Where are you sitting?
3    A.    In the passenger seat.
4    Q.    Front?  Back?
5    A.    Front.
6    Q.    So you're sitting in the front right passenger seat?
7    A.    Yes.
8    Q.    Sergio is driving?
9    A.    Yes.
10   Q.    Where is Jose?
11   A.    He went -- when we are at AM/PM?
12   Q.    Before you got to AM/PM where is he sitting?
13   A.    In the back behind me.
14   Q.    You guys get to AM/PM.  Do you get out of the car?
15   A.    No.
16   Q.    What are you doing?
17   A.    Listening to music inside the car.
18   Q.    Do you recall is the car on or off?
19   A.    It was on.  It was on.
20   Q.    And the music is going?
21   A.    Yeah.
22   Q.    And what did Sergio do, if anything?
23   A.    He was outside the car to put air in his tire.
24   Q.    Where did Jose go, if anywhere?
25   A.    To turn on the air, the air thing.
26   Q.    Did he have to go inside the AM/PM?
27   A.    Yes.
28   Q.    I'll ask you to keep your voice up.
```

KELLIE A. GAFF. C.S.R. 7567    *    SUPERIOR COURT REPORTERS
222 East Weber Ave., Room B69, Stockton, CA 95202 (209) 468-2840
PLF000128

Exhibit 4

1   opened?

2   A.   He wanted a ride.

3   Q.   Was there any response to that?

4   A.   Yes.  Sergio -- Sergio said, "For what?"

5        He said he'll give him gas money to give him a ride.

6   That is when he hopped over the fence.

7   Q.   Did Sergio tell him he could have a ride?

8   A.   He said -- after he hopped over the fence, he said,

9   "No."  Then after he seen the cop, like undercover cops,

10  coming --

11  Q.   I'll stop you there.

12       There is some type of conversation between Sergio and

13  Mr. Smith, correct?

14  A.   Yes.

15  Q.   And at some point Mr. Smith jumps the fence?

16  A.   Yes.

17  Q.   Okay.  When you say "undercover cop," are you talking

18  about another undercover SUV?

19  A.   Yeah, like a silver.

20  Q.   Did that SUV come into the parking lot before or after

21  Mr. Smith jumped the fence?

22  A.   After.

23  Q.   All right.  So Mr. Smith jumps the fence.

24       How soon after the undercover cop comes in?

25  A.   Couple seconds.

26  Q.   So almost instant?

27  A.   Yeah.

28  Q.   When Mr. Smith was over the fence and the undercover cop

KELLIE A. GAFF. C.S.R. 7567      *      SUPERIOR COURT REPORTERS
222 East Weber Ave., Room B69, Stockton, CA 95202 (209) 468-2840
PLF000133

Exhibit 4

16

```
 1    Q.    Which are described in the photo above, correct?
 2    A.    Yes.
 3    Q.    Okay.  Where was Sergio when he dove into the --
 4    A.    He was behind him.
 5    Q.    He followed him in?
 6    A.    Yeah.
 7    Q.    Or was that Jose?
 8    A.    That was Sergio.
 9    Q.    Where was Jose when this was going on?
10    A.    Right behind Sergio.
11    Q.    They followed him on his back?
12    A.    Yeah.
13    Q.    And then you said you guys began fighting?
14    A.    Yeah.
15    Q.    Was somebody striking somebody?
16    A.    We were all hitting him.
17    Q.    What was Mr. Smith doing?
18    A.    Trying to steal/take the car.
19    Q.    When you say trying to steal the car, take the car, why
20    do you say that?
21    A.    Because he had -- when I tried to take the keys out, he
22    was trying to take the keys too.
23    Q.    Let me back up to make this straight.
24          You were trying to take the keys out of the ignition?
25    A.    Yeah.
26    Q.    What was Mr. Smith trying to do?
27    A.    Hit my hand off.
28    Q.    Trying to keep you from taking the keys out of the
```

KELLIE A. GAFF. C.S.R. 7567     *     SUPERIOR COURT REPORTERS
222 East Weber Ave., Room B69, Stockton, CA 95202 (209) 468-2840
PLF000135

**Exhibit 4**

```
 1   A.   Yes.
 2   Q.   Do you recall what was said before they got out?
 3   A.   No.
 4   Q.   Okay.  Once they got out, do you recall anything being
 5   said between Officer Perez and Mr. Smith?
 6   A.   No.
 7   Q.   Okay.  What happened next, if anything?
 8   A.   As we're walking up, I continued to yell at him to put
 9   his hands up, put his hands up.
10        The subjects that were fighting with Mr. Smith backed
11   out of the vehicle.  So I put my weapon away thinking we're
12   going in and having to go hands on with the subject.  As
13   we're walking up, he yelled something.  And I do hear Officer
14   Perez, but I have no idea what he is saying because I'm
15   yelling at the same time.  I hear a gunshot.  I take my
16   weapon back out and get out of the line of fire.
17        The guy was laying over the vehicle, still in the
18   passenger seat, but laying over --
19   Q.   Center console?
20   A.   Yeah, that area.  I thought I seen a barrel of a weapon
21   and I went to the front of the vehicle and fired three
22   rounds.
23   Q.   You put those through the top of the hood, correct?
24   A.   Yes.
25   Q.   Downward motion?
26   A.   Yes.
27   Q.   Toward where you thought he would be laying?
28   A.   Yes.  I think I hit the engine.
```

1   Q.   Where are the other people in this vehicle?

2   A.   As soon as I saw him, I -- I had seen one or two people

3   on the passenger side.  Once I saw him, he immediately made

4   eye contact with me.  He was -- he posed a threat at that

5   point.

6        I didn't look in the backseat to see if the victims,

7   whoever was inside, had exited yet.  Investigating numerous

8   carjackings, I know they often use force and/or fear and

9   often use weapons.  At that point I didn't want to take my

10  eyes off the suspect and look in the backseat.

11  Q.   You're not clear where the other people in the vehicle

12  are at this point?

13  A.   Correct.

14  Q.   You only see the African gentleman who's laying, you

15  said, on his back?

16  A.   Yes.

17  Q.   You said he makes eye contact with you.

18       Are you yelling commands at him at this point?

19  A.   Yes.

20       When I approached the car, I had my duty-issued pistol

21  drawn.  As soon as I made contact with him, I pointed my

22  pistol at him and I gave him verbal commands to put his hands

23  up and stop.

24  Q.   Okay.

25  A.   I told him repeatedly.  He did not do that.

26  Q.   You say "repeatedly," you said it more than twice?

27  A.   Yes.

28  Q.   You're wearing a uniform?

```
1   A.   Yes.

2   Q.   You believe you had eye contact with him while you're

3   pointing the gun at him?

4   A.   Yes.

5   Q.   Despite these commands, what does he do next, if

6   anything?

7   A.   He tells me he has a gun and he's going to shoot me.

8   Q.   Okay.  Was he still on his back or was he moving?

9   A.   He was still -- he was moving around, but his hand was

10  covered from my view.  It was a center console or raised area

11  between the front passenger seat and the driver's seat.  I

12  believe it was a center console.  So his right hand, as he's

13  on his back, is -- my view is blocked.  I can't see his

14  hand.

15  Q.   Okay.  He specifically says to you, "I have a gun, I'm

16  going to shoot you"?

17  A.   Yes.

18  Q.   He's looking at you when he says this?

19  A.   Yes.

20  Q.   And do you know where his left hand is?

21  A.   I don't recall where his left hand is.  But I was paying

22  attention to his right hand because he's on his back and he's

23  moving his right hand after he says "I have a gun and will

24  shoot you," that is when he starts raising it.

25  Q.   Once he starts raising his arm, what do you do next?

26  A.   I overcame his resistance and I shot him twice.

27  Q.   Okay.  You pulled the trigger twice?

28  A.   Yes.
```

PLF000204

**Exhibit 4**

```
 1
 2
 3   STATE OF CALIFORNIA    )
                            )  ss.
 4   COUNTY OF SAN JOAQUIN  )
 5
 6
 7
 8              I, KELLIE A. GAFF, Official Court Reporter
 9   of the Superior Court of the State of California, do hereby
10   certify:
11              That I was present in the Superior Court,
12   County of San Joaquin, State of California, at the Grand Jury
13   hearing of the above-entitled matter, that at said time and
14   place, I took down in shorthand notes all the testimony given
15   and proceedings had; that I thereafter caused said shorthand
16   notes to be transcribed into longhand typewriting by
17   computer-aided transcription, the above and foregoing being a
18   full, true and correct transcript of all testimony taken and
19   proceedings had.
20
21
22
23
24              Official Court Reporter, C.S.R. No. 7567
25
26
27
28
```

⏱ 08/03/2013 12:02 PM          Fax Services              → Detective Bradley Burrell                                    ▯ 2



# AMERICAN MEDICAL RESPONSE
## SAN JOAQUIN
### Patient Care Report

Case #: 02088442                           Unit ID: 8S24                                    Date: 2/13/2013

## Dispatch Information          02088442

| | | | |
|---|---|---|---|
| Time Call Received: | 12:13:41 | Disposition: | Transpo ted-To Hospital ER/ED |
| Time Dispatched: | 12:13:47 | From Location: | |
| Time Enroute: | 12:13:50 | | |
| Time at Scene: | 12:15:20 | W Fremont St / N Pershing Ave, STOCKTON, CA  95203 | |
| Time at Pt Side: | 12:17:00 | Incident Location Type: | Roadway |
| | | To Location: | |
| Time Transporting: | 12:25:17 | San Joaquin General Hospital | |
| Time Transport Arrived: | 12:32:06 | | |
| Time Available: | 13:30:00 | Floor/Dept/Room: | ER 2 |
| Final Response Mode: | Lights and Siren | 500 W. Hospital Rd., French Camp, CA  95201 | |
| Final Transport Mode: | Lights and Siren | Destination Type: | |
| | | Nature of Call: | Stab/Gunshot/Penetrating traum |
| Responder On Scene: | Stockton Police Department , , Stockton | Caller Name: | _911STOCKTON POLICE DEPT |
| | Fire Department , , AMR , | | |
| ALS Assessment: | AMR Paramedic | | |

## .Patient Demographics          02088442

| | | | |
|---|---|---|---|
| Name: | Smith, Torrus | DOB: | 6/28/1965 |
| Address: | Unkown | Age: | 47 years |
| City, State, Zip: | STKN, CA  95202 | | |
| Phone: | | Cell: | Gender: | Male |
| SSN: | XXXX-XX- | Weight: | 130 Kg |
| Pt. # | 1 of 1 | | |
| | | Ethnicity: | Black/African American |

## Physical Findings          02088442

| | |
|---|---|
| Head | Head: Unremarkable |
| Neck | Neck: Unremarkable |
| Chest | Right Axillary: Penetrating |
| Abdomen | Abdomen: Unremarkable |
| Pelvis | Pelvis: Unremarkable |
| Back | Back: Unremarkable |
| Extremities | Left Elbow: Penetrating |

## History Of Present Illness          02088442

| | |
|---|---|
| Patient's Complaint: | GSW to chest and left arm |
| Chief Complaint: | Acute onset Sharp   Gunshot wound   provoked by Movement   since 5 Minutes .   GSW to the right upper chest and left elbow |
| Secondary Complaint: | Wound |
| Physician: | |
| Mechanism of Injury: | Intentional, Other (Assaulted)  Shooting - Assault .          SPD shot Pt . |

---

Case # 02088442                                    Page 1 of 4                              Printed 8/3/2013 1:00:55 PM
PCR ID:20130213131160659991     Date 2/13/2013     Pt Smith, Torrus
                                Device Name
Pt# 1 of 1
2 1

COS003798

**Exhibit 5**
**Page 1**

🕐 08/03/2013 12:02 PM          Fax Services                    → Detective Bradley Burrell                    🗅 3

## Past Medical History          02088442

| | |
|---|---|
| History Obtained From: | Patient |
| History: | None Stated |
| Allergies: | None , No Known Drug Allergies |
| Medications: | |
| Advanced Directives: | |

## Impression          02088442

| | |
|---|---|
| Primary Impression: | Trauma - Penetrating |
| Secondary Impression: | Other - No Secondary Impression , |
| Other Impression: | |

## Narrative          02088442

M-24 responded code 3 to the parking lot of the AM/PM market on Fremont St for a GSW. Arrived on scene to find several SPD officers on scene and a 37 year old male lying on the ground in the parking lot, in hand cuffs with a GSW to the upper right chest and 2 penetration wounds to upper and lower left arm proximal to the elbow. Pt was alert and oriented with a GCS of 15. Pt had positive CSM to all his extremities.There was a noticeable bulge in his upper back midline possibly the bullet from the chest wound. An ACS was applied to the GSW in the chest and lung sounds were assessed. Cervical collar was applied to Pt and he was secured on a back board with spider straps. His head was secured using head pad and blocks in the neutral position. Pt was moved onto the gurney and secured. He was then moved to the MICU, given Oxygen at 15 lpm via NRB and connected to the cardiac monitor. Pt was transported code 3 to SJCGH with one SFF and one SPD. IV's X 2 were placed 16 gauge in the right AC and 18 gauge in the left AC. A sterile dressing was placed on the wounds to Pt's left elbow and bleeding was controlled. Secondary assessment showing Pt's lung sounds clear in all fields. Blood pressure and pulse remained stable and no additional injuries noted. Upon arrival at the hospital, pt was moved from the MICU and taken to the ER RM 2. Pt care was transferred to the trauma team and M-24 went AOR.

## Vitals

| Time | BP | Pulse | RR | SPo2 % | GCS | Performed By |
|---|---|---|---|---|---|---|
| 12:17 | | | | | 15 | Ousley, Thomas,AMR |
| 12:26 | 160/102 (121) | 128 | 28 | | | Ousley, Thomas,AMR |
| 12:32 | 152/92 (112) | 124 | 24 | | | Ousley, Thomas,AMR |

## Treatment and Response          02088442

| PTA | Time | Medic | Procedure |
|---|---|---|---|
| | 12:17:00 | Ousley, Thomas,AMR | Glasgow Coma Scale - Eyes: 4 , Verbal: 5 , Motor: 6 . Total : 15 . |
| | 12:18:00 | Ousley, Thomas,AMR | Pain Scale - 10 on a scale of 10 . |
| | 12:19:00 | C.Goodnight | Lung Sounds - Upper Right Lung: Clear , Upper Left Lung: Clear , Lower Right Lung: Clear , Lower Left Lung: Clear . |
| | 12:19:00 | Stockton Fire Department | Spinal Precautions - Full Spinal Precautions . Indication: Mechanism of Injury . Sensation, Motor, Pulse. Result After: Unchanged . |
| | 12:24:00 | C.Goodnight | OXYGEN - 15.000 LPM Non-Rebreather Mask , Result: Unchanged . Medication Authorization: Protocol(Standing Order) . |
| | 12:25:00 | Ousley, Thomas,AMR | EKG - Indication: Protocol/Standing Order , Type 4 Lead , Clinical Interpretation: Sinus Tachycardia , Ectopy: None , Elevation: No , Depression: No , |
| | 12:26:00 | C.Goodnight | Vascular Access - 16 gauge Peripheral IV Wide Open Antecubital - Right with 1000 ml cc bag. in 1 attempts. Indication: Per Protocol . Total Volume: 250 . Solution: Normal Saline . Result: Unchanged . Number of Bags: 1 ,. Successful Yes |
| | 12:26:00 | Ousley, Thomas,AMR | Vital Signs - BP: 160 / 102 , Patient Position: Supine . Pulse at: Radial , Pulse Rate: 128 , Pulse Regularity: Regular , Pulse Strength: Normal Respirations: 28 , Respiration Depth: Normal , Respiration Effort: Normal , |
| | 12:28:00 | C.Goodnight | Vascular Access - 18 gauge Peripheral IV Wide Open Antecubital - Left with 1000 ml cc bag. in 1 attempts. Indication: Per Protocol . Total Volume: 200 . Solution: Normal Saline . Result: Unchanged . Number of Bags: 1 ,. Successful: Yes |
| | 12:30:00 | Ousley, Thomas,AMR | Wound Care - Indication: Penetrating Wound Elbow-Left Arm .Type: Pressure Bandage , |
| | 12:32:00 | Ousley, Thomas,AMR | Vital Signs - BP: 152 / 92 , Patient Position: Supine . Pulse at: Radial , Pulse Rate: 124 , Pulse Regularity: Regular , Pulse Strength: Normal Respirations: 24 , Respiration Depth: Normal , Respiration Effort: Normal , |

Case # 02088442
PCR ID 20130213131606599991     Date: 2/13/2013
                                Device Name:
Pt# 1 of 1
2:1

Page 2 of 4
Pt: Smith, Torus

Printed: 8/3/2013 1:00:55 PM

COS003799

**Exhibit 5**
**Page 2**



NAME

(sus) Torus Smith

LOCATION

500 W County Hospital

REQUESTED BY

Detective Burrell

CHARGE

FRAME NUMBER—SUBJECT MATTER

LAB USE—FILE NO.

02/15/13

DATE

13-5535

CR. NUMBER

ROLL NUMBER

#1

PHOTOGRAPHER

A. Chelli

DEPARTMENT        P.D. 1593

COS010493

Exhibit 5
Page 3



COS010494

Exhibit 5
Page 4

COS010495

Exhibit 5
Page 5

COS010496

Exhibit 5
Page 6

COS010497

Exhibit 5
Page 7

COS010498

Exhibit 5
Page 8



COS010499

Exhibit 5
Page 9



COS010500

Exhibit 5
Page 10



COS010501

Exhibit 5
Page 11



COS010502

Exhibit 5
Page 12



COS010503

Exhibit 5
Page 13



COS010504

Exhibit 5
Page 14

COS010505



Exhibit 5
Page 15



COSO10506

Exhibit 5
Page 16



COSO10507

Exhibit 5
Page 17

COSO10508



Exhibit 5
Page 18

Anthony Hung. Chau, MD, PGY-II

**SAN JOAQUIN GENERAL HOSPITAL**

**REPORT OF OPERATION**

PATIENT: SMITH, TORRUS
MR#: 1102179
ADMIT DATE: 02/13/2013
LOCATION: ICU/CCU
DOB: 06/28/1965

OPERATION PERFORMED:

1. Right chest tube placement with a 36-French chest tube.

2. Exploratory laparotomy.

3. Hemostasis of liver laceration.

4. Washout of the left upper extremity gunshot wounds.


DATE OF OPERATION: 02/13/2013

SURGEON: DeAndrea Sims, MD

TEAM: ATTENDING: DeAndrea Sims, MD
RESIDENT: Anthony Hung Chau, MD, PGY-II
RESIDENT: Gustavo Fernandez-Ranvier, MD, PGY-V.

PREOPERATIVE DIAGNOSES:

1. Gunshot wound to the right chest, hemothorax.

2. Gunshot wound to the left forearm.

3. Possible intra-abdominal injury.


POSTOPERATIVE DIAGNOSES:
1. Gunshot wound to the right chest, hemothorax, diaphragmatic injury
with posterior laceration in the right lateral segment of the liver,
approximately 6-cm laceration.

2. Gunshot wound to the left forearm.


ANESTHESIA: General endotracheal intubation plus 20 cc of 0.25% Marcaine
with epinephrine.

EBL: 150 cc

IV FLUIDS: 2 L crystalloid and 2 units PRBC

URINE OUTPUT: 100 cc

COMPLICATIONS: None

Defendant's Exhibit 1
Depo of _Smith_
Date: _6-13-16_
RR Cuda, CA CSR 2652

**REPORT OF OPERATION**
Page 1 of 3

Electronically signed by CHAU, ANTHONY HUNG, MD, PGY-II on 2013-02-13 18:59:34
Electronically signed by SIMS, DEANDREA, MD on 2013-02-25 15:12:26

PLF000001

**Exhibit 6**

# STOCKTON POLICE DEPARTMENT



# RULES & REGULATIONS
# MANUAL

COS050452

**Exhibit 7
Page 1**

**2.5   Chief of Police- Authority**

The Chief of Police is the chief executive officer of the Department in all matters of policy, operations, and discipline.  The Chief exercises all the lawful powers of that office and issues such lawful orders and directives as are necessary to ensure the effective performance of the Department.

**2.6   Chief of Police- Responsibility**

The powers and duties of the Police Department are fixed with the Chief of Police, under Section 5, to Article XI, of the City Charter.  It states, in part:

> "Subject to the approval of the City Manager and the rules and regulations of the Civil Service Commission, the Chief of Police shall direct and supervise the personnel of the Department and have charge of the property and equipment thereof.  In addition, the Chief of Police shall have the following duties:  full power to detail any officer or member of the Department to such public service as may be necessary; recommend in writing to the City Manager that disciplinary action be taken against members of the Department pursuant to Article XXXII hereof, when in the judgment of the Chief of Police, it is deemed necessary, stating reasons therefor, and shall immediately file a copy of said recommendations with the Civil Service Commission."

**2.7   Authority to Adopt Policies and Procedures**

The Chief of Police shall have the authority to adopt policies and procedures for the administration of the Department.  This authority shall include fixing duties and providing for their enforcement, and prescribing penalties for violations for such directives, policies, or procedures.

**2.8   Policy and Procedure Changes**

Policies and procedures and written orders shall not be canceled, amended, or issued without the approval of the Chief of Police or the Chief's designee.

**2.9   Chief of Police (Acting)**

In the case of absence or disability of the Chief of Police for an extended period of

COS050471

**Exhibit 7**
**Page 2**

# CHAPTER IV

# DEPARTMENTAL DISCIPLINE

**4.1    Who is Subject to Disciplinary Action**

Members who violate their trust by committing any offense punishable under federal, state, or local statute or who violates any provision of the Rules and Regulations or other lawful written or oral order shall be subject to appropriate disciplinary action.

**4.2    Department Authority to Discipline**

Final Department disciplinary authority rests with the Chief of Police and/or the City Manager.  Except for informal discipline (Oral Reprimands and Memorandums of Correction), all Department discipline shall be taken or approved by the Chief of Police.

**4.3    Levels of Disciplinary Action**

Disciplinary action within the Department shall be divided into two levels:

1. Informal Discipline

    This level of disciplinary action shall be as the title indicates, informal, and will be handled within the respective divisions.  It will consist of the Oral Reprimand and the Memorandum of Correction.  No record will be made in the member's formal personnel file of such actions.  The Memorandum of Correction will be retained in the division files for a period of 13 months, then destroyed, unless other action is pending.

41

**Exhibit 7**
**Page 3**

# OIS 2010-2014

| Date | Report # | Location | Suspect | S- Status | D.A. Review |
|------|----------|----------|---------|-----------|-------------|
| 05/04/10 | 10-18774 | 1119 S. Madison | Martin Hernandez | Deceased | Cleared 06/15 |
| 07/22/10 | 10-29672 | 9559 Bankcroft | James R. | Deceased | Cleared 07/12 |
| 03/10/11 | 11-8814 | Spanos/Thornton | Neahmiah Johnson | Deceased | Cleared 06/15 |
| 12/08/11 | 11-42410 | 400 E. Bianchi | Jamal Mack | Survived Received 10yr/8mo sentence | Under Review |
| 12/10/11 | 11-42642 | 700 N. Commerce | Marie Giacoma | Survived Case Dismissed | Cleared 10/14 |
| 03/21/12 | 12-9853 | 1929 Colt | Chomrean Meas | Deceased | Under Review |
| 04/06/12 | 12-11919 | 2748 Burlington | Luther Brown | Deceased | Under Review |
| 04/12/12 | 12-12492 | 1633 E. Bianchi | James Cooke **In-Custody Death** | Deceased | Under Review |
| 07/11/12 | 12-23783 | Pixie/Pinetree | Joseph Brooks | Deceased | Under Review |
| 08/27/12 | 12-30118 | 99/Woodbridge **S/O Jurisdiction** | Edward Delasnieves **S/O Protocol** | Deceased | Under Review |
| 01/05/13 | 13-613 | 522 Cimarron | Jeremy Jephthah | Survived Pled to 17 years | Under Review |
| 02/13/13 | 13-5535 | 1617 W. Fremont | Nathaniel Smith | Survived Pled to 4yr/6mo | Under Review |
| 02/23/13 | 13-6971 | 254 S. Adelbert **S/O Jurisdiction** | Gary Hawkins **S/O Protocol** | Survived Unknown | Under Review |
| 07/10/13 | 13-25076 | 3939 EWS Woods | Deandre Adams | Survived Case Open and ongoing | Under Review |
| 11/05/13 | 13-40248 | 7322 Tristan Cir | Juan Ruiz | Survived Sent to Mental Hospital for 3 years | Under Review |
| 12/05/13 | 13-43793 | I5/Alpine | Robert Perry | Deceased | Under Review |
| 12/31/13 | 13-47031 | 834 E. Second | Ignacio Hernandez | Survived Pled to 3 years | Under Review |
| 02/09/14 | 14-5346 | 1658 S. Airport | Donald Haynes | Deceased | Under Review |
| 05/15/14 | 14-18035 | 443 Glendora | Christian Hof | Survived Pled to 8 years | Under Review |
| 07/16/14 | 14-26068 | Thornton/Otto | Alex Martinez Gilbert Renteria | Deceased Deceased | Under Review |

COS005296

Exhibit 8
Page 1

**Recordnet.com**

1 of 3 premium clicks used this month



Between 2009 and 2014, Stockton police officers shot at least 27 people, killing 16. The use of lethal force has raised concern throughout the community and police department. RECORD FILE 2012

OFFICER-INVOLVED SHOOTINGS

## Deadly force: a serious issue
**By Joe Goldeen**
**Record Staff Writer**
February 28, 2015 - 8:04 PM

STOCKTON — Police officers have shot at least 27 people, including 16 fatally, between 2009 and 2014, according to the Stockton City Attorney's Office.

That's an average of 2.7 fatal officer-involved shootings per year over that six-year span.

The information was obtained by The Record through a Public Records Act request. When asked for additional information and outcomes on those officer-involved shootings, the city attorney provided police reports on only five of the oldest cases — an indication the rest of those cases remain under investigation going back as far as May 2010.

COS050531

Exhibit 8
Page 2

Of those 16 subjects fatally shot by police, seven were armed with firearms ranging from an AK-47 assault rifle to various shotguns and handguns, according to official accounts. Police say others used vehicles in a threatening manner, knives, even a bayonet that prompted officers to use lethal force.

In one instance in 2012, an unarmed Luther Brown Jr., 32, was shot and killed after initially fleeing on foot from a traffic stop, then stealing an officer's baton during a struggle. Two years ago this month, Gary Allen Hawkins, 33, was shot and killed inside a stolen Mercedes that authorities say he used in an attempt to run them down. Only after they examined his body did they discover a loaded handgun in his waistband.

One omission from the city attorney's report was the name of Misty Holt-Singh, the 41-year-old Bank of the West customer who was taken hostage July 16 by three armed robbers and used as a human shield during a final standoff with police. During a news conference less than a month later, Stockton Police Chief Eric Jones revealed that she was shot 10 times by his officers.

In December, a criminal grand jury indicted one of the alleged robbers, Jaime Ramos, and a man who allegedly drove the gunmen to the bank, Pablo Ruvalcaba, on a host of felonies, including the murder of Holt-Singh.

During an interview last week, Jones said that officer-involved shootings are the most serious incidents he must deal with.

"It's the top priority on my mind, … the impact on the lives involved and on our staff," Jones said.

The decision by an officer to use lethal force is based on the state of mind of the officer at that time, often "a matter of seconds or milliseconds. Their life or the life of someone else is in danger," Jones said.

"We take very seriously the use of deadly force."

Based on the situations they face every day, an officer must call upon his training and the equipment at his disposal to determine how to proceed: no force; minimal force, or hands on; less lethal force, such as a Taser; or deadly force, a firearm.

Noting that no two officer-involved shooting cases are the same, Jones said that after each incident his department conducts an internal debriefing with the personnel involved to determine what led to the officer's decisions and actions.

Much is learned from those debriefings that later might be incorporated into police training officers receive at the police academy and at annual advanced sessions.

In addition to the internal debriefing, after every officer-involved shooting a multiple-agency protocol investigation is launched involving the Stockton Police Department, San Joaquin County Sheriff's Office and the California Department of Justice. It is supervised by the county District Attorney's Office.

COS050532

Exhibit 8
Page 3

According to Deputy District Attorney Robert Himelblau, "A protocol investigation focuses on whether an officer is legally justified in his or her use of force in a particular incident that results in the death of a person. The investigation is of an event, and a single report is generated regardless of whether there are multiple officers or multiple decedents."

Jones said it is the district attorney's job to look into the findings. He would not disclose what the results of those findings were in the 27 officer-involved shootings.

Citing specific government codes, Deputy City Attorney Ted Wood explained that information on the incidents still under investigation is protected from public disclosure. He also cited Government Code 6255 that states: "The public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record."

"In addition, as there are potential criminal repercussions in the cases still under review by the district attorney, disclosure could violate the constitutional rights to a fair trial and the right against self-incrimination," Wood wrote in response to a Record inquiry.

Many critics of police actions believe race plays a role in officer-involved shootings. Of the 16 individuals killed, six (38 percent) were identified as African-American; five (31 percent) as white; four (25 percent) as Latino; and one (6 percent) as Asian.

With just 12 percent of the city's population of more than 300,000, civil rights activist Ralph Lee White continues to be troubled by the high number of African-American casualties.

It was White, a longtime bail bondsman and former City Council member who serves as president of the Stockton Black Leadership Council, who first made a public records request late last year for information from City Hall on all officer-involved shootings going back to 2009.

He now intends to call for a federal investigation regarding Stockton police practices, calling into question the existing protocol investigation procedures and citing events following the police shooting of Michael Brown in Ferguson, Missouri, last year.

"I'd send this to the FBI to investigate these cases that aren't complete. They don't have to send us 100 (special agents) like they did in Ferguson," White said. "And we don't want no local FBI that already work with the locals."

White said fewer Latinos — Stockton's largest ethnic group with 40 percent of the population — are shot by police because they are represented on the force by more than 90 sworn officers. There are currently fewer than 10 African-American officers, down from more than 30 several years ago, according to White.

A retired FBI agent and criminal justice professor emeritus who has made an in-depth study of officer-involved shootings nationwide has concluded that they are more common now than ever before.

COS050533

Exhibit 8
Page 4

"I collected this data myself because the U.S. government doesn't. There is no national database dedicated to police-involved shootings," Jim Fisher wrote in his True Crime blog of Dec. 25, 2013. "Since the government keeps statistics on just about everything, why no national stats on something this important? The answer is simple: they don't want us to know. Why? Because police shoot a lot more people than we think, and the government, while good at statistics, is also good at secrecy."

Fisher's understanding of the topic helps explain why it has been difficult for the public to obtain information and answers on police shootings in Stockton.

The statistics Fisher cites in his research parallel what The Record has learned about officer-involved shootings in Stockton: many of those shot were men much older than the typical first-time arrestee, and often with a history of criminal activity. In Stockton, they ranged from 16 to 60.

What brought the police and the shooting subjects together most often included domestic and other disturbances; crimes in progress such as robberies, assaults and carjackings; arrest warrants; drug raids; gang activities; traffic stops; vehicle pursuits; and standoff and hostage events.

Fisher told KQED News last April that, based on his research of officer-involved shootings occurring nationwide in 2011: "I noticed a lot of mentally ill people were shot, and a lot of people didn't have guns. With regard to how these cases are investigated, if someone shoots a cop, I guarantee you a thorough investigation, but when a police officer shoots someone, you really can't trust the result, and they're really not that thorough."

He went on to say that he "was also surprised by the high percentage of justifications for the shootings under circumstances I consider questionable. In other words, it seemed to me the police were killing people unnecessarily."

Many of the families and others with connections to the subjects shot by Stockton officers continue to question police actions years after the fact.

Gary Hawkins' mother, Pamela Hawkins, said she has yet to get a straight answer from law enforcement about details of that night in 2013 when her son was shot to death by members of a multiagency task force.

He was in a stolen car when he was killed and wasn't pointing a gun at officers. If he posed a threat, Hawkins asked, "so why didn't you take his tires out?"

She said that his body suffered "defensive wounds," as if he was attempting to protect himself.

"I don't think he deserved to die that way. The cops snuck up on either side and opened fire — boom, boom, boom. The bullet holes were only through the windows," Hawkins said, basing her statements on what witnesses told her.

Jones made it clear that every encounter his officers have in the field is unique.

COS050534

**Exhibit 8**
**Page 5**

"No one can guarantee any particular type of situation," he said. "If everybody was cooperative and compliant, but that is not the case."

He agrees with the national dialogue around accountability and oversight of police work and improvements in police/community relations. He sees the need for upgrading officer training and providing proper equipment.

But Jones said he also believes there need to be discussions around "the expectations of the public in a police contact. The expectation is to be cooperative and compliant. In that case, force would never be required. Unfortunately, compliance is not always present."

The statistics back him up. His department — fielding 1,000 calls a day for service — annually makes around 400 arrests for resisting, more than one per day. Also annually, some 100 officers out of a current force of 372 sworn personnel, are injured while on duty.

"People need to be educated on the expectations of when you are pulled over by police. If an officer tells you to put a weapon down, that is very important. It's also very important to get people mental health help before their behavior escalates," Jones said.

And while there is action under way to provide wider mental health crisis-intervention coverage around the county, Jones said those teams aren't allowed — for safety reasons — to intervene until a scene is secure.

*— Contact reporter Joe Goldeen at (209) 546-8278 or jgoldeen@recordnet.com. Follow him at recordnet.com/goldeenblog and on Twitter @JoeGoldeen.*

**Popular Today**

Motorcycle clubs open fire outside strip club

County truck takes out high-voltage line; driver faces DUI charge

Three stabbed with razor; two hospitalized

COS050535

**Exhibit 8
Page 6**

# On-Scene Consulting

March 30, 2017

Ms. Lori Rifkin, Esq.
Hadsell Stormer Renick LLP
128 North Fair Oaks Avenue
Pasadena, California 91103

**Regarding**:  **Nathaniel Smith v. City of Stockton, et al.**
**Case No. 5:15-CV-01603-JGB-(DTBx)**

Dear Ms. Rifkin,

Thank you for retaining me to analyze and render opinions regarding the February 13, 2013, officer-involved shooting incident of Mr. Nathaniel Alexander Smith by Stockton Police Department Police Officer Michael Perez, No. 1268 and Stockton Police Department Detective Robin Harrison, No. 1456.  Pursuant to the requirements of Rule 26, I have studied reports, Stockton Police Department documents, Transcriptions of Digitally Recorded Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case. Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

**Materials Reviewed:**
1.  Stockton Police Department, General Order Manual (Revised 4/10) (COS0001-0618).
2.  Stockton Police Department Detective Robin Harrison's Training Files (COS3425-3438).
3.  Stockton Police Department Police Officer Patrick Mayer's Training Files (COS3439-3449).
4.  Stockton Police Department Police Officer Michael Perez's Training Files (COS3450-3458).
5.  Investigation File of Nathaniel Smith, File No. 13-5535 (COS3459-3975).
6.  Stockton Police Department Training Outlines (COS4287-4559).
7.  Photographs (COS9986-10508).
8.  San Joaquin County, Law Enforcement Agencies, Officer-Involved Critical Incident Protocol Manual (October 2008) (COS50073-50117).
9.  Stockton Police Department Field Training Manual (August 2012) (COS50254-50451).
10.  Stockton Police Department Rules and Regulations Manual (COS50452-50515).
11.  Deposition Transcript and Exhibits of Stockton Police Department Lieutenant Eric Kane.
12.  Deposition Transcript and Exhibits of Stockton Police Department Lieutenant Michael Reynosa.
13.  Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison.
14.  Deposition Transcript and Exhibits of Stockton Police Department Officer Michael Perez.
15.  Deposition Transcript and Exhibits of Stockton Police Department Officer Patrick Mayer.
16.  Deposition Transcript and Exhibits of Mr. Nathaniel Smith.
17.  Audio Recording Interview of Witness Alfred Reali.
18.  Audio Recording Interview of Witness Amy Fry.
19.  Audio Recording Interview of Witness Lynne Austin.

**Exhibit 9**

On-Scene Consulting

20. Audio Recording Interview of Witness Sharon Ross.
21. Audio Recording Interview of Witness Somari Thunder.
22. Audio Recording Interview of Witness Tish Bullock.
23. Dispatch Recording (13-5335-CRO-1).
24. Dispatch Recording (13-5335-Radio).
25. Video and Audio Recording (I/5 Freemont/CHP 4).
26. Audio Recording, Natasha Lasel, (16-2494-CRO), (16-2494 Radio).
27. Audio Recording of Mr. Nathaniel Smith.
28. Closed Circuit Television (CCTV) of Arco AM/PM on 2-13-13.
29. California Highway Patrol Officer Involved Shooting (OIS) scene video (3:36).
30. Deposition Transcript and Exhibits of Sergio Contreras.

**California POST Basic Learning Domains as Follows:**
   1. #1: "Leadership, Professionalism and Ethics."
   2. #2: "Criminal Justice System."
   3. #3: "Policing in the Community."
   4. #20: "Use of Force."
   5. #21: "Patrol Techniques."
   6. #23: "Crimes in Progress."
   7. #33: "Arrest and Control."
   8. #35: "Firearms/Chemical Agents."

**Overview of the Events that Transpired and Commentary:**

According to Stockton Police Department K9 Officer Patrick Mayer, No. 1999, on February 13, 2013, he was on-duty and with his assigned partner, K-9 Toro. According to Officer Mayer, he was assigned to patrol the Seaport area, Unit 2K94. According to Officer Mayer, he checked the calls for service and noticed that there was a call holding regarding a suspect that was wanted for an outstanding warrant(s). According to Officer Mayer, he checked Mr. Nathaniel Smith's name via the California Law Enforcement Telecommunications System (CLETS), and the results of the inquiry revealed that Mr. Nathaniel Smith had a "No Bail" Felony Warrant that was generated out of San Joaquin County and there was also a "Caution Flag" on the warrant that a Detective out of Hayward, California wanted to speak to Mr. Smith, but it did not specify any additional information.

According to Officer Mayer, he contacted Stockton Police Department Detective Robin Harrison, No. 1456, who was assigned to the California Highway Patrol (CHP) DELTA Regional Auto Theft Detail (RATT) and requested that she drive-by the address listed (1200 block on west Harding) on the warrant in her unmarked police vehicle to ascertain if Mr. Smith was at the location. According to Officer Mayer, Detective Harrison advised that the vehicle (Oldsmobile Bravada, California License No. 6DVJ050), was still at the location and it appeared that the possible male suspect, a female and a small child were getting ready to leave the location in the vehicle. According to Officer Mayer, Detective Harrison advised him that the vehicle was coming off of Harding south of Pershing. According to Officer Mayer, he had pulled to the west curb line of Pershing next to Victory Park. According to Officer Mayer, the aforementioned Oldsmobile vehicle passed him. According to Officer Mayer, he observed the male in the back seat of the vehicle turning around and looking at him and he was able to see there was a car seat positioned to the right of the male in the back seat and a female driving the vehicle. According

**Exhibit 9**

On-Scene Consulting

to Officer Mayer, he followed the vehicle for about (3) city blocks until it stopped at a traffic light.  According to Officer Mayer, he activated his emergency lights and siren on his police vehicle and the vehicle quickly pulled over to west curb line just south of the on-ramp to the I-5 freeway.  According to Officer Mayer, he stopped his vehicle approximately (2) car lengths behind the Oldsmobile and he observed Detective Harrison stopped her vehicle "kitty corner" to his vehicle.  According to Officer Mayer, he exited his vehicle and observed the male moving around inside of the vehicle.  According to Officer Mayer, he rolled down the vehicle's window in the event that he had to deploy K-9 Toro.  According to Officer Mayer, he pulled out his firearm as the rear door of the vehicle opened.  According to Officer Mayer, the suspect, later identified as Mr. Nathaniel Smith exited the vehicle, faced him for approximately a second or two, and then took off running.  According to Officer Mayer, Mr. Smith was wearing a red shirt and blue jeans and was not carrying anything in his hands.  According to Officer Mayer, he removed K9 Toro from his marked police vehicle and yelled to Mr. Smith that he was going to deploy his K9.  According to Officer Mayer, Mr. Smith climbed over a chain link fence. According to Officer Mayer, he deployed his K9 underneath the fence and he followed K9 Toro. According to Officer Mayer, Mr. Smith was half way up the embankment when K9 Toro approached Mr. Smith him but did not engage Mr. Smith.  According to Officer Mayer, Mr. Smith made it across the northbound lanes of the I-5 and then eventually down the other side of the embankment. According to Officer Mayer, the foot pursuit lasted for approximately (5) minutes.

According to Officer Mayer, he observed Mr. Smith jump inside of a Ford Expedition that was parked at the air-pump at the Arco AM/PM located at 1617 W. Fremont Street.  According to Officer Mayer, he observed an unknown male Hispanic who was standing outside of the Ford Expedition putting air in the vehicle's tire, go inside of Ford Expedition after Mr. Smith. According to Officer Mayer, it appeared that there was a struggle emanating from inside of the vehicle and he advised Dispatch that he believed that Mr. Smith may have been "carjacking" the occupants inside of the vehicle.  According to Officer Mayer, he believed that Mr. Smith was now laying inside of the vehicle.  According to Officer Mayer, he observed that a male Hispanic was trying to pull Mr. Smith out of the vehicle.  According to Officer Mayer, he observed Detective Harrison was outside of her unmarked police and "pretty much" perpendicular to the driver's side of the Ford Expedition.

According to Officer Mayer, he observed Stockton Police Department Police Officer Michael Perez, No. 1268, standing to the right of Detective Harrison and parallel with the driver's door. According to Officer Mayer, Detective Harrison and Officer Perez had their firearms out. According to Officer Mayer, he heard Detective Harrison and Officer Perez yelling and then heard gun shots.  According to Officer Mayer, at the time that the gunshots were fired, Detective Harrison positioned herself approximately 10-15 feet to Officer Perez's left side towards the front of the vehicle. According to Officer Mayer, he observed the officers firing and estimates that the officers fired approximately 4-5 rounds from their handguns.

According to Officer Mayer, he later observed Mr. Smith positioned behind the Ford Expedition until the medics arrived and took him away.

According to Witness Jose Hermosillo Contreras, he was picked up from school by Subject Sergio Camarena and Subject Gabriel Michael Sanchez.  According to Mr. Contreras, Subject Camarena was driving the 1997 Ford Expedition, California License 6RJC456 and Subject

Exhibit 9

On-Scene Consulting

Sanchez was seated in the front passenger's seat.  According to Mr. Contreras, he was seated in the rear passenger's seat behind Subject Sanchez.  According to Mr. Contreras, they drove to the AM/PM to put air in the tires of the vehicle.  According to Mr. Contreras, while they were putting air in the vehicle's tires, he observed Mr. Smith standing behind the fence.  According to Mr. Contreras, he described Mr. Smith as a black male, approximately 5'7," heavy set, and wearing a red shirt with blue jeans.  In addition, Mr. Contreras stated that Mr. Smith looked tired, out of breath and was bleeding from both knuckles. According to Mr. Contreras, Mr. Smith asked him if he could get a ride down the street and that he (Smith) will pay for it.  According to Mr. Contreras, they said, "Ok."  According to Mr. Contreras, Mr. Smith hopped the fence and got into the back passenger's seat.  According to Mr. Contreras, at the time Mr. Smith made the request for the ride, Subject Sanchez was seated in the front passenger's seat with his door partially open and Subject Camarena was located at the rear back tire putting air in while in a crouched position.  According to Mr. Contreras, Mr. Smith observed police in the area and then Mr. Smith jump from the back seat of the vehicle to the front seat of the vehicle and start the vehicle's engine with his right hand on as Subject Camarena was entering the front driver's seat of the vehicle.  According to Mr. Contreras, he jumped through the front passenger area and attempted to hold Mr. Smith down with a "bear hug."  According to Mr. Contreras, Subject Camarena was able to turn the truck off.  According to Mr. Contreras, Mr. Smith was lying on the console with his feet on the rear passenger seat and his stomach was down.

According to Mr. Contreras, he observed a police vehicle drive up and park on the grass and an unmarked police vehicle park at the eastern driveway of the AM/PM parking lot.  According to Mr. Contreras, he observed Detective Harrison standing in front of their vehicle and Officer Perez standing at the passenger's side of their vehicle. According to Mr. Contreras, Officer Perez told them to get out of the vehicle.  According to Mr. Contreras, Subject Sanchez ran towards the front of the Ford Expedition and he and Subject Camarena ran to the back of the Ford Expedition.  According to Mr. Contreras, he heard two to three gunshots while he was at the rear passenger side corner of the vehicle and believes that they gunshots came from Officer Perez.

According to Mr. Contreras, he was advised by Subject Camarena that Mr. Smith told him that he had a gun, though Mr. Contreras did not hear it.

According to Stockton Police Department Police Officer Michael Perez, No. 1268, on February 13, 2013, he was on-duty, and his call sign was 2B66.  According to Officer Perez, he was on a call at 1176 Rosemarie, for a suspect under the influence of drugs, later identified as Tracy Lutge.  According to Officer Perez, he arrested Ms. Lutge for being under the influence of a controlled substance.  According to Officer Perez he handcuffed Ms. Lutge and placed her in the back seat of his marked police vehicle and began to transport her to be booked at jail.  According to Officer Perez, while at Pershing and El Monte, he heard radio traffic of an officer following a vehicle southbound Pershing from Harding.  According to Officer Perez, the suspect that was being followed had several outstanding felony warrants.  According to Officer Perez, he heard that an officer was in foot pursuit of the suspect on the freeway.  According to Officer Perez, he continued down Pershing to assist knowing that on one side of the freeway is the AM/PM.  According to Officer Perez, he was aware that he had a prisoner inside of his police vehicle but his primary objective was to go around the south side of the I-5 freeway, on Fremont and assist with establishing a perimeter.

Exhibit 9

# On-Scene Consulting

According to Officer Perez, he drove in a southerly direction on Pershing and then in a westerly direction on Fremont until he reached the AM/PM. According to Officer Perez, he heard Detective Harrison advising that she observed Mr. Smith run behind a Ford SUV. According to Officer Perez, when he first observed Detective Harrison, she was on the along the north curb line of Fremont right at the furthest east entrance to the AM/PM parking lot and was driving a Chevrolet Tahoe. According to Officer Perez, he observed Detective Harrison out of her vehicle and going towards the SUV *(See Opinion No.1)*.

According to Officer Perez, he observed people on the side of the SUV. According to Officer Perez, he parked his police vehicle fifty feet from the SUV because he had someone in the back seat of his police vehicle and that he believed that the suspect was going to be running in his direction *(See Opinion No.2)*.

According to Officer Perez, he exited his vehicle and began running towards the SUV *(See Opinion No.3)*. According to Officer Perez, he had information that the suspect was trying to carjack the people in the SUV. According to Officer Perez as he got closer to the SUV, he could see there were occupants inside of the vehicle and it was obvious to him that there was a fight occurring. According to Officer Perez he had his gun drawn and as he got closer he could see that the driver's door was open and he immediately noticed that Mr. Smith was on his back on the front passenger floor board of the SUV with his head facing west and his feet facing east. According to Officer Perez, Detective Harrison was standing on his left. According to Officer Perez, he did not have a conversation with Detective Harrison when he reached the driver's side door of the SUV *(See Opinion No.4)*. According to Officer Perez, he did not know if Mr. Smith had a weapon or not. According to Officer Perez, he did not want to take his eyes off Mr. Smith to look into the back seat to see if the victims had left yet. According to Officer Perez, he immediately gave Mr. Smith verbal commands to put his hands up, but Mr. Smith did not put his hands up. According to Officer Perez he was positioned approximately 5-6 feet from the open door to the SUV.

According to Officer Perez, Mr. Smith looked at him and stated, "I have a gun, and I am going to shoot you." According to Officer Perez, Mr. Smith is moving his body and it appears that he is trying to get up. According to Officer Perez, Mr. Smith was on his back and as soon as Mr. Smith moved his right arm to pull up his arm, he fired two rounds at Mr. Smith *(See Opinions 5-8)*. According to Officer Perez, about the same or soon after, he heard a couple of shots emanating from the front side of the vehicle into the vehicle. According to Officer Perez, Mr. Smith put his hands up and didn't seem as aggressive and was looking at the roof of the car. According to Officer Perez, he held Mr. Smith at gunpoint until Officer Wells and another officer removed Mr. Smith from the SUV and handcuffed him.

According to Stockton Police Department Detective Robin Harrison, No. 1456, on February 13, 2013, she was assigned to the California Highway Patrol (CHP), DELTA RATT, Unit Valley 383. According to Detective Harrison she received a message from Officer Mayer to drive by a location at the 1200 block of west Harding to ascertain if a vehicle was still at the location. According to Detective Harrison, she drove-by the location in her 2003 unmarked tan Chevrolet Tahoe and observed a female carrying a young child in a car seat and a bald male black that resembled the suspect in the photograph that she looked at on her computer. According to Detective Harrison, she advised Officer Mayer of her observations. According to Detective Harrison, Officer Mayer conducted a traffic stop of the vehicle (Oldsmobile Bravada-SUV) on

**Exhibit 9**

On-Scene Consulting

Pershing just past the entrance of the I-5 freeway.  According to Detective Harrison, she stopped her vehicle, activated the police lights and put on her tactical ballistic vest.  According to Detective Harrison, Mr. Smith exited the vehicle and started looking around. According to Detective Harrison, Officer Mayer advised Mr. Smith not to run or he would deploy his K-9.  According to Detective Harrison, Mr. Smith fled on foot and jumped over the fence.  According to Detective Harrison, Officer Mayer threw his K-9 over the fence.

According to Detective Harrison, she drove over towards the AM/PM when she observed Mr. Smith hiding behind the Ford Expedition.  According to Detective Harrison, she observed two Hispanic males attempting to prevent Mr. Smith from entering the Expedition.  According to Detective Harrison, she believed that Mr. Smith entered the vehicle via the rear seat and then climbed over to the front seat.  According to Detective Harrison she parked her vehicle and approached the SUV on foot *(See Opinion No.1)*.  According to Detective Harrison, as soon as she arrived at the Expedition, she already has her firearm out.  According to Detective Harrison, she advised Mr. Smith to get out of the vehicle. In addition, the two Hispanic males that "belong" to this car start fighting Mr. Smith inside of the vehicle.  According to Detective Harrison, Officer Perez arrived at this time and they approached the Expedition.  According to Detective Harrison, she and Officer Perez did not communicate at all *(See Opinion No. 9)*.

According to Detective Harrison, she advised Mr. Smith to stop fighting and she then re-holsters her firearm and believed that they were going to go "hands on" with Mr. Smith.  According to Detective Harrison, she observed Mr. Smith laying across the seat and was messing with the ignition and they told Mr. Smith to stop.  According to Detective Harrison, the two Hispanic males got off Mr. Smith and got out of the vehicle.  According to Detective Harrison, as she walked up towards the vehicle she observed something that looked like a barrel of a gun that was white or "silver looking."

According to Detective Harrison, that's all she could see and then she heard a gunshot.  According to Detective Harrison, she ran to the front center of the vehicle, pulled out her firearm and fired (3) rounds into the hood of the vehicle in a "downward thing" from approximately 2-3 feet from the bumper *(See Opinions 10-13)*.

According to Detective Harrison, the (2) Hispanic males were behind the Ford Expedition, to the east when she fired her rounds from her firearm *(See Opinion No.14)*.

According to Detective Harrison, she and Officer Perez held Mr. Smith at gunpoint until Officer David Wells arrived and took Mr. Smith out of the vehicle.

American Medical Response Personnel Tom Ousley (8S24) and Carl Vigneau (8S24) responded to the location.  Mr. Smith was transported to San Joaquin General Hospital at 500 W. Hospital Road, French Camp, California for multiple gunshot wounds.

**Opinions:**

1. It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would have immediately taken a position of cover after stopping her vehicle.   It is my opinion that Detective Harrison exercised poor tactics when after she parked her unmarked

Exhibit 9

**On-Scene Consulting**

police vehicle she did not remain at the vehicle or seek a position of cover instead of walking in an "open air environment" that did not afford her any cover or concealment.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 21-Basic Concepts of Law Enforcement Patrol, Officer Safety While on Patrol.</u>

The element of officer safety refers to the practical application of tactically sound procedures to perform law enforcement activities in a safe and effective manner to include the utilization of available resources.

2.  It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would not have parked his police vehicle that contained an arrestee in direct line of sight with a vehicle that may be involved in a carjacking incident.  It is my opinion that Officer Perez exercised poor decision making when he parked his police vehicle in a position directly east of the Ford Expedition.  I base my opinion on Officer Perez's statements that he believed that he parked the vehicle at that location as the suspect may run in his direction.

3.  It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would have immediately taken a position of cover after stopping his police vehicle.   It is my opinion that Officer Perez exercised poor tactics when after he parked his police vehicle he did not remain at the vehicle or seek a position of cover instead of walking in an "open air environment" that did not afford him any cover or concealment.   In addition, Officer Perez exercised poor tactics when failed to notify Stockton Police Department Dispatch that he was responding to the call (<u>Deposition Transcript and Exhibits of Stockton Police Department Officer Michael Perez, Page 61</u>).

Lastly, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 21-Basic Concepts of Law Enforcement Patrol, Officer Safety While on Patrol.</u>

The element of officer safety refers to the practical application of tactically sound procedures to perform law enforcement activities in a safe and effective manner to include the utilization of available resources.

4.  It is my opinion that a reasonable officer acting consistent with standard police practices would have formulated a tactical plan with Detective Harrison before approaching the opened driver's side door of the Ford Expedition.  According to POST Learning Domain No. 21, "Officers must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."  It is my opinion that Officer Perez and Detective Harrison should have formulated a tactical plan to effectuate an arrest of Mr. Smith that included the possible deployment of less than lethal force options such as an 870 Remington Bean-Bag shotgun. X26 Taser, impact weapon (baton/asp), Oleoresin Capsicum (OC) spray, Team Take Down, control holds, and defensive tactics (martial arts, ground fighting).   According to Officer Perez, when he arrived at scene, he did not have any communication at all with Detective Harrison (<u>COS 003674</u>).

5.  It is my opinion that a reasonable officer acting consistent with standard police practices and outlined in the <u>California Commission on Peace Officers Standards and Training, Student</u>

**Exhibit 9**

# On-Scene Consulting

<u>Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4</u>, would have given a verbal warning to Mr. Smith that he was going to fire his service weapon. The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible…*"

Officer Perez failed to give Mr. Smith a warning that he was going to shoot him before he fired his two rounds from his Sig Sauer, Model P226, .40 caliber, semi-automatic pistol. I base my opinion on Officer Perez's statement, "From the time I got to the driver's door until the time that he fired his weapon was "so brief" (<u>COS 003674</u>).

According to witness Gabriel Sanchez, "when the officers came up, they just started shooting" (<u>COS 003582</u>).

According to witness Gabriel Sanchez, "the male officer did not say anything, he just started shooting" (<u>COS 003584</u>).

6. It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would have considered using less than lethal force options at this time. I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 20-Use of Force.</u>

**<u>Chapter 2-Force Options (20.02. E03)</u>**
**<u>Subject's Actions;</u>**

**<u>Active Resistance-</u>** Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling and intention to avoid or prevent being taken into or retained in custody.

**<u>Possible Force Option(s)-</u>**
- Control holds and techniques to control the subject and situation.
- Self-defense techniques to gain advantage over the subject.
- Use of devices to secure compliance and ultimately gain control over the situation.

In addition, it is my opinion that the deployment of the X-26 Electronic Control Device (ECD) Taser with an effective range of 21-25 feet or the deployment of the Remington 870 Bean Bag Shotgun would have been appropriate from a position of cover. The Remington 870 Bean Bag Shotgun is a proven Less than Lethal Force Option that has been effectively used on individuals from an effective distance of 45 feet, who are non-compliant, pose a threat to self, others or officers resulting in no serious injuries to the subject.

7. It is my opinion that a reasonable officer acting consistent with standard police practices would not have used lethal force in this situation. The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of Graham v. Connor, 490 U.S. 386 (1989).

When an officer uses deadly force in self-defense, standard police practices and most agencies polices dictate that the officer must be facing what is reasonably believe to be an imminent or immediate threat of death or serious bodily injury.

**Exhibit 9**

On-Scene Consulting

8.  <u>It is my opinion that Officer Michael Perez's Use of Deadly Force in this matter was excessive and unreasonable based on my review of the following below facts and testimony</u>:

A.  Officer Michael Perez failed to allow Mr. Smith to comply with his verbal commands to "put his hands up."  According to Officer Perez, "From the time I got to the driver's door until the time that he fired his weapon was "so brief" (<u>COS 003674</u>).  According to witness Gabriel Sanchez, "the male officer did not say anything, he just started shooting" (<u>COS 003584</u>).

B.  According to Officer Mayer, "Mr. Smith did not appear to be carrying anything when he got out of the car (<u>Deposition Transcript and Exhibits of Stockton Police Department Officer Patrick Mayer, Page 59</u>).

C.  According to Detective Harrison, "When she saw Mr. Smith prior to the initial traffic stop, she did not see him with a gun (<u>Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Page 82</u>).

D.  According to Detective Harrison, "She did not see Mr. Smith with a weapon during the foot pursuit (<u>Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Page 97</u>).

E.  According to Detective Harrison, "When she observed Mr. Smith inside of the Ford Expedition, she didn't see anything in either of his hands (<u>Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Page 126</u>).

9.  It is my opinion that a reasonable officer acting consistent with standard police practices would have formulated a tactical plan with Officer Perez before approaching the opened driver's side door of the Ford Expedition.  According to POST Learning Domain No. 21, "Officers must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."  It is my opinion that Officer Perez and Detective Harrison should have formulated a tactical plan to effectuate an arrest of Mr. Smith that included the possible deployment of less than lethal force options such as an 870 Remington Bean-Bag shotgun. X26 Taser, impact weapon (baton/asp), Oleoresin Capsicum (OC) spray, Team Take Down, control holds, and defensive tactics (martial arts, ground fighting). According to Detective Harrison, "She and Officer Perez did not have any communication at all (<u>Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Pages 119-120</u>).

10.  It is my opinion that a reasonable officer acting consistent with standard police practices and outlined in the <u>California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4</u>, would have given a verbal warning to Mr. Smith that he was going to fire his service weapon.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible*…"

Based on my review of the material in this matter, Detective Harrison heard a gunshot and ran to the front of the Ford Expedition and fired (3) rounds from her Sig Sauer Model P226, .40 caliber semi-automatic pistol.

**Exhibit 9**

On-Scene Consulting

According to witness Gabriel Sanchez, "when the officers came up, they just started shooting" (COS 003582).

11.  It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would have considered using less than lethal force options at this time.  I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 20-Use of Force.
**Chapter 2-Force Options (20.02. E03)**
**Subject's Actions;**

**Active Resistance-** Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling and intention to avoid or prevent being taken into or retained in custody.

**Possible Force Option(s)-**
- Control holds and techniques to control the subject and situation.
- Self-defense techniques to gain advantage over the subject.
- Use of devices to secure compliance and ultimately gain control over the situation.

In addition, it is my opinion that the deployment of the X-26 Electronic Control Device (ECD) Taser with an effective range of 21-25 feet or the deployment of the Remington 870 Bean Bag Shotgun would have been appropriate from a position of cover. The Remington 870 Bean Bag Shotgun is a proven Less than Lethal Force Option that has been effectively used on individuals from an effective distance of 45 feet, who are non-compliant, pose a threat to self, others or officers resulting in no serious injuries to the subject.

12.  It is my opinion that a reasonable officer acting consistent with standard police practices would not have used lethal force in this situation. The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of Graham v. Connor, 490 U.S. 386 (1989).

When an officer uses deadly force in self-defense, standard police practices and most agencies polices dictate that the officer must be facing what is reasonably believe to be an imminent or immediate threat of death or serious bodily injury.

13.  It is my opinion that Detective Robin Harrison's Use of Deadly Force in this matter was excessive and unreasonable based on my review of the following below facts and testimony:

A.  According to Detective Harrison, "When she saw Mr. Smith prior to the initial traffic stop, she did not see him with a gun (Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Page 82).

B.  According to Detective Harrison, "She did not see Mr. Smith with a weapon during the foot pursuit (Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Page 97).

**Exhibit 9**

On-Scene Consulting

C.  According to Detective Harrison, "When she observed Mr. Smith inside of the Ford Expedition, she didn't see anything in either of his hands (<u>Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Page 126</u>).

D.  According to Detective Harrison, when she ran Smith's warrant prior to the traffic stop, she does not recall that it involved violence (<u>Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Page 77</u>).

E.  According to Detective Harrison, she does not recall if the warrant stated that Smith was suspected of carrying weapons (<u>Deposition Transcript and Exhibits of Stockton Police Department Detective Robin Harrison, Page 77</u>).

14. It is my opinion that a reasonable officer acting consistent with standard police practices would have considered their background prior to firing any rounds.  According to witness Jose Hermosillo Contreras, "he heard gun shots while he was at the rear passenger side corner of the vehicle."  According to witness Gabriel Sanchez, "When Sergio and Contreras came out of the passenger's side of the vehicle and began walking back towards the rear of the vehicle, they started shooting" (<u>COS 003582</u>). According to Detective Harrison, the (2) Hispanic males are behind the Ford Expedition, to the east when she fired her rounds from her firearm.  According to Detective Harrison, she did not know if anyone else was in the car.  According to Officer Perez, he did not confirm if anyone was in the back seat of the vehicle at the time he fired his duty weapon.  According to Officer Perez, he recalls at least (1) person on the side of the Ford Expedition when he fired his duty weapon.

15.  It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident.  It is also my opinion that there was a departure of from POST Standards Use of Force and Use of Deadly Force Training.  It is my expert opinion that a similarly trained Stockton Police Department Police Officer and or Detective would not have considered Mr. Smith to be a lethal threat in this set of facts. As such, Officer Michael Perez and Detective Robin Harrison's actions constituted unreasonable, excessive, and deadly force, which did not comply with established training and standards.

16.  It is my opinion that the Stockton Police Department failed to ensure that Officer Michael Perez and Detective Robin Harrison received lethal force options and firearms training.  Based on my review of the material, Officer Michael Perez did not receive firearms training since 11/08/2006 (<u>COS 003454</u>) and Detective Robin Harrison did not receive firearms training since 12/13/2006 (<u>COS 003433</u>).   It is my opinion that if this training was conducted it may have revealed Officer Perez's and Detective Harrison's deficiencies in their basic understanding of the less than lethal options at their disposal such as the baton, X26 Taser, OC Spray, Defensive Tactics, Ground Fighting, Weapon Retention Techniques, Team Take Downs, and control holds.

<u>California Police Officer Standards and Training (POST), Learning Domain No. 20-Use of Force.</u>
**<u>Considerations Regarding the Use of Deadly Force</u>**

The use of deadly force is the most serious decision a peace officer may ever have to make. Such a decision should be guided by ***the reverence for human life*** and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation

**Exhibit 9**

On-Scene Consulting

on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy that the use of force must meet an "*Objectively Reasonable"* standard.  The following quote from POST typifies the training (emphasis added): *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner." (Learning Domain #20; "<u>Introduction to the Use of Force</u>," pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1.  The power of arrest and
2.  The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint*.  Therefore, it is important to emphasize that peace officers do with the utmost care and restraint, *not confer* "*police powers*" *on themselves*.  These powers come to the criminal justice system from the people they serve.  (Learning Domain #2: "<u>Criminal Justice System,</u>" page s 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "<u>Use of Force</u>," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (<u>Learning Domain #20</u>, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (<u>Learning Domain #20</u>, Chapter 3).

**Exhibit 9**

On-Scene Consulting

17.  The Stockton Police Department should have determined through their review process that the use of deadly force by Stockton Police Department Police Officer Michael Perez and Detective Robin Harrison was unreasonable and violated <u>Stockton Police Department General Order, Use of Firearms-Subject, Deadly Force, Q-1n, Use of Firearm</u>

<u>B.  Firearms will not be discharged under the following circumstances:</u>

(3). When capturing or preventing the escape of a person believed to have committed a felony that did not involve use or threat to use deadly force when all other reasonable means have failed.

In addition, the ratification of the use of deadly force and Officer Perez's and Detective Harrison's conduct prior to the use of deadly force in this matter can be seen as endorsing violations of Mr. Smith's constitutional rights and perpetuating inadequate training and practices of unreasonable use of deadly force.

18.  It is my opinion that a reasonable officer acting consistent with standard police practices would not have pointed their firearm at Mr. Smith during the traffic stop or pursuit of Mr. Smith and could only do so if Mr. Smith's actions necessitated the use of lethal force.  Lieutenant Michael Reynosa, Stockton Police Departments Person Most Knowledgeable (PMK), stated that officers are trained that they may "point" their firearms at vehicles and people (<u>Deposition Transcript and Exhibits of Stockton Police Department Lieutenant Michael Reynosa, Pages 56-57</u>).  In addition, I believe based upon my review of Officers Mayer, Harrison and Perez's POST and Stockton Police Department Training Records, there was a failure by the Stockton Police Department to train officers on: Felony Vehicle Stops, The Use of Less than Lethal Force Options, The Use of Deadly Force, and tactical scenario based training.  This resulted in a policy or practice of Stockton Police Department officers unreasonably pointing their firearms at vehicles and people in the absence of imminent or immediate threat.  In addition, I base my opinion on:

<u>California Police Officer Standards and Training (POST), Learning Domain No. 35: Chapter 1-Firearms Safety:</u>

<u>Rule No. 2:</u>  Always keep the firearm pointed in the safest possible direction:
- Always be aware of where the firearm is pointing
- A "safe direction" is one where an unintentional discharge of the firearm will not hurt the person handling the firearms or others
- ***A firearm should only be pointed at a target if the officer is willing and prepared to shoot***

<u>California Police Officer Standards and Training (POST), Learning Domain No. 35: Chapter 1-Firearms Safety:</u>

<u>Unintentional Discharges:</u>  Safe firearm handling is every officer's personal and professional responsibility.  Accidents do not just happen.

<u>Unintentional discharges are the result of</u>:

**Exhibit 9**

On-Scene Consulting

- Violating the rules of firearms safety
- Inadequate knowledge or skill regarding the operation and use of the firearm
- Improper or inadequate care and maintenance
- ***Poor judgement or lack of common sense***

## My Qualifications for Reviewing This Case:

My opinions are based on my education, training and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was employed by the United States Customs Service and assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the United States Customs Service Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989.  While in the Los Angeles Police Department Academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), and Northeast Division C.R.A.S.H (Gang Detail).  I was selected to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau which included Rampart Division, Hollenbeck Division, Central Division, and Northeast Division.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. *I received the Purple* Heart in 2010 for the injuries associated with being ambushed.  Upon return from my injuries, I attended mandated Field Training Officer (FTO) School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basic Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section (FES), where I functioned as an investigator in an undercover capacity.  As a Detective I wrote and served search and arrest warrants to include large-scale multiple search warrant services. I addition, I managed and utilized Confidential Reliable Informants (CRI's) during hundreds of street-level narcotic transactions and search warrant services.

**Exhibit 9**

# On-Scene Consulting

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training daily on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, administrative projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  In addition, I provided and supervised uniformed assistance with Operations Central Bureau Narcotics during street level narcotic transactions as well as during narcotic related search warrants.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police.  I completed numerous in depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice.  I directly supervised ten undercover officers and four uniformed officers.  I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer.  I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police. I assisted with the completion of final document presented to the Board of Inquiry overseeing the Rampart Corruption Task Force.

**Exhibit 9**

# On-Scene Consulting

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1.  I directly supervised (18) K9 Handlers.  Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units.  I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School.   While at K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents.  *I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.*

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers with (6) other SWAT Sergeants and (2) Lieutenants.  I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis.  In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting).  I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation Team.  I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified Crisis Negotiation Team (CNT) School, and suicide prevention training.  I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Center.  In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counter-Terrorism following the terrorist attack in November 2008.  I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

Attached are my curriculum vitae, listing of testimony and fee schedule.

I declare under penalty of perjury under the laws of the Unites States that the foregoing is true and correct, and that this declaration is executed at Huntington Beach, CA on March 30, 2017.



_____/s/ Scott A. DeFoe*_____
Scott A. DeFoe

* original signature is on file with counsel

**Exhibit 9**

# Exh. B

**Exhibit 9**

# Scott DeFoe

PO Box 4456, Huntington Beach, California 92605-4456
Cell: 714-655-4280 - sdefoe313@msn.com

## Executive Profile

*CURRICULUM VITAE*

**Caruso Affiliated Vice President of Security**
**June 2010-April 2013**

## Skill Highlights

- Identified and conducted risk and vulnerability assessments for all Caruso Affiliated Developments, projected developments/investments, and residences.
- Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated.

- Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.
- Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include: on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies.
- Conducted all facets of training for the company and employees.
- Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests.
- Conducted ongoing audits and internal investigations.

## Core Accomplishments

**Purple Heart** (LAPD), **Medal of Valor** (LAPD), **Police Star** (LAPD) and over 100 Los Angeles Police Department and citizen commendations.

## Professional Experience

**Deputy Sheriff (Lateral)**
June 2013 to June 2014
**Riverside County Sheriffs Department** - Riverside, California
**April 2014-June 2014-** Assigned to Jurupa Valley Station Field Deputy Training Program. Conducted all facets of patrol service to include: calls for service, self-initiated field activity, arrests, citations, and court testimony.
**June 2013-April 2014-** Assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriff's as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC.

**Exhibit 9**

**Sergeant II-I Special Weapons and Tactics (SWAT) Supervisor**
August 2005 to June 2010
**Los Angeles Police Department** - Los Angeles, California
Supervised the response and tactical intervention during barricaded subject incidents. Supervised the coordination and facilitation of high risk warrant services. Supervised the Crisis Negotiation Team (CNT) during barricaded and suicidal subject incidents. Provided all aspects of tactical and crisis negotiation training to federal, state and local law enforcement agencies. Developed SWAT's Counter-Terrorism and Training Cadre to include the preparation and submission of federal and state grants for the acquisition of equipment. Responded and trained Mumbai local and state police officers following the 2007 terrorist attack in Mumbai India. Developed tactics involving multiple venue, multiple attackers. Completed audits, employee performance reviews, investigative reports and internal investigations. Conducted use of force investigations on SWAT incidents and submitted reports to the Officer-in-Charge for his review and approval. Testified in court, depositions and at administrative hearings.

**Training (Received and Provided Training):**
Weapons Training/Qualification on Monthly Basis-M-4, MP-5, Benelli Shotgun, Kimber/.45/1911, Remington 870 Shotgun, Glock Force Option Simulator (Quarterly). Quarterly mandatory weapons certification from November 1989-June 2010.

**Additional Training/Certification(s): (11/1989-06/2010)**

**Supervisor Training:** Incident Command System 100-800. Sexual Harassment Training for Supervisors, Career Development for Supervisors, Standards Based Assessments for Supervisors, Supervisors Consent Decree Training, Vehicle Pursuit Policy Supervisor Training, Watch Commander School, Retaliation Training, RMIS TEAMS II (Non-Categorical Use of Force Supervisor Training), Ethics in Law Enforcement, Career Survival Workshops, Problem Oriented Policing and the SARA Model, Cultural Diversity Tools for Tolerance, ICI Instructor, Instructor Development Course (IDC), Officer Involved Shootings Administrative Investigations Training, Prop 115-Hearsay Evidence Training, Managing Workplace Conflict, CLETS-NCIC, Re-training, Racial Profiling, West Point Leadership School for Supervisors, Basic Supervisor School.

**HAZMAT Training:** Advanced Chemical and Biological Integrated Response, LAFD Hazardous Materials Technical Specialist (A-D)-Certified HAZMAT Technician, Technical Emergency Response Training, Law Enforcement Protective Measures

**Crisis Negotiations/Mental Health Training**, Hostage Negotiations- Advanced, Behavioral Sciences Services Section, Officer-Involved Shooting/Barricaded Subject Services Debriefs, Crisis Negotiation Training and Curriculum Development for West Point Military Academy, Didi Hirsch Suicide Prevention Training (Volunteered and Supervised on an ongoing basis), Mood Disorders/Post Traumatic Stress Disorder Training, Communicating with People with Disabilities, Mental Health Introduction MEU-SMART Orientation, Mental Illness Update, Drug Recognition Expert Training and Certification, Under the Influence-11550 Health and Safety Code Training,

**Tactical Training:** Crowd Management Control, Search and Arrest Warrant Tactics, Less than Lethal Use of Force Training and Certification TASER MX-26 Train the Trainer (Trainer/Instructor Certification), Tactics Against Hostile Dogs, End of Pursuit Tactics Overview, Communication-Keeping Your Edge, Crowd Management and Control, Officer Rapid Deployment, Arrest and Control Trainer Certification, Animal Shootings, Mobile Field Force Supervisor Train the Trainer, Officer Survival-Shooting, PPE Update, Pursuit Intervention Techniques for Supervisors, Baton/Impact Weapon, Canine Handler Course, Advanced Canine Supervisor Course, Basic Metro School, Collapsible Baton, Special Operations Training, Officer Safety Field Tactics, Mobile Field Force Training, Narcotics/Tactical Entry Update, Field Training Officer Update, Standard Emergency Management System, Detective School, CPR-First Aid Recertification, Basic Arrest and Control Techniques, Driver Awareness Training, Undercover Operations, Interrogation Techniques, VICE School, 37mm Baton Round Training, Civil Unrest Response Training, Hobble Training, Advanced Field Officer Course, Oleoresin Capsicum (OC) Gas Training, Search Warrant Counter Measures, Riverside Sheriffs Department Jail Operations Course Course to include Title XV.

**Exhibit 9**

**California Peace Officer Standards and Training (P.O.S.T.) Commission: Basic, Intermediate, Advanced and Supervisory Certificates.**

**Outside Training**: Dale Carnegie 12-week Public Speaking School, Americans for Effective Law Enforcement (AELE) Certified Litigation Expert Courses, Use of Force By The Numbers: 4, 8, 14 (Institute for the Prevention of In-Custody Deaths-IPICD), California Specialized Training Unit Hazardous Materials First Responder Operations Weapons of Mass Destruction Law Enforcement Field Support Course, Louisiana State University Screening of Persons by Observational Techniques (SPOT), Subconscious Communication for Detecting Danger by International Academy for Linguistics and Kinesics, Department of Homeland Security WMD Radiological/Nuclear Course of Hazardous Materials Technicians, UNLV WMD Radiological/Nuclear Awareness Train-The Trainer Course, FEMA Advanced Chemical and Biological Integrated Response Course Mobile Training Event, FEMA WMD Law Enforcement Threat, Hazard Recognition, and Emergency Actions Training, CSTI Technician/Specialist 1A-D, DHS WMD Tactical Commander Management and Planning.

**ASSOCIATIONS:**
Peace Officers Association of Los Angeles County (POALAC)
Americans for Effective Law Enforcement (AELE)
Los Angeles Police Protective League (1989-2010)
Public Administration Advisory Committee (1996-1998)
California Peace Officers Association

**Sergeant II+1 Metropolitan Division K9 Platoon Supervisor**
April 2000 to September 2005
**Los Angeles Police Department** - Los Angeles, California
Supervised and conducted all facets of K9 training. Ensured that all K9 deployments conformed to the K9 deployment criteria, through training of personnel and supervision of K9 searches. Provided on-scene command during critical incidents at Command Posts. Completed all requisite administrative reports to include audits, K9 Deployment Reports, Training Records and other administrative duties. Conducted use of force investigations and K9 contacts. Submitted all reports to Officer-in-Charge for his review and approval. Testified in court, depositions and at administrative hearings.

**Sergeant II-77th Division Vice, Officer-in-Charge**
February 1999 to March 2000
**Los Angeles Police Department** - Los Angeles, California
Supervised investigations involving pimping, pandering, prostitution, bookmaking, gaming, gambling and other vice related activities. Conducted audits and administrative reports. Prepared and served search warrants for the above-mentioned crimes. Supervised twelve undercover officers and six uniformed officers on a daily basis. Worked in conjunction with other Department entities on sensitive investigations. Completed rating reports for subordinates assigned to the Unit. Conducted use of force investigations, audits, personnel complaints and other administrative tasks. Submitted all reports to the Officer-in-Charge for his review and approval. Testified in court, depositions and at administrative hearings.

**Management Services Division Supervisor-Sergeant**
November 1997 to March 1999
**Los Angeles Police Department** - Los Angeles, California
Conducted research projects, directives and correspondence at the direction of the Chief of Police. Reviewed staff work by subordinates. Conducted follow-up investigations as required to ensure that policies and procedures were adhered to by all organizational units within the Department. Conducted large scale audits and investigations. Served a six-month loan on the Rampart Corruption Task Force investigating and auditing use of force reports.

**Hollenbeck Division Special Enforcement Group Officer-in-Charge**
November 1996 to November 1997
**Los Angeles Police Department** - Los Angeles, California
Provided supervisory oversight of eighteen police officers and detectives during gang investigations, crime

**Exhibit 9**

suppression and the service of high-risk search warrants. Provided all aspects of tactical training. Completed audits, employee ratings and administrative duties. Monitored and reviewed gang and narcotic investigations to ensure compliance with Department policy. Conduced use of force investigations. Submitted all investigative and administrative reports to the Commanding Officer for his review and approval. Testified in court , depositions and at administrative hearings.

**Police Officer**
October 1989 to March 1995
**Los Angeles Police Department** - Los Angeles, California
Functioned in numerous roles as a Police Officer I, II, and III to include: Patrol, Field Training Officer (FTO), Vice, Special Enforcement Group, Divisional CRASH (gangs) and Operation Central Bureau CRASH (gangs). Selected to Specialized Units based on high performance and ability to work well in small cohesive units throughout the Department. Testified in court on a multitude of matters. Certified in court as a narcotic, gang, and vice expert.

**Special Agent-Organized Crime Drug Task Force (OCDETF)**
June 1988 to October 1989
**Department of Treasury** - San Francisco, California
Special Agent assigned to a multi-agency narcotics task force. Investigated major suppliers of narcotics and dangerous drugs who were engaged in illegal activities on an organized and commercial basis in an undercover capacity. Prepared and served search warrants. Worked in conjunction with the Assistant United States Attorney in San Francisco. Testified in Federal and at Asset Forfeiture Hearings.

**United States Army Reserve**
June 1983 to June 1989
Honorable Discharge as E-4. Military Occupational Skill (MOS)-72E-Combat Infantry Communications

## Education

**Master of Arts** : **Public Administration**, 1998
**California State University** - Long Beach, California, United States

**Bachelor of Science** : **Criminal Justice**, 1988
**Northeastern University** - Boston, Massachusetts, United States

**Exhibit 9**

# Scott A. DeFoe
# On-Scene Consulting, LLC
### P.O. Box 4456
### Huntington Beach, California 92605-4456
### (714) 655-4280 (Cell)
### Email: sdefoe@msn.com


## RECORD OF TRIAL TESTIMONY/DEPOSITION CASES

**1. Deposition:** April 15, 2010, Dorman, et al. **v.** State of California (CHP) Case No. INC058224.

**2. Deposition:** August 28, 2014, L.H. (Henning) v. County of Los Angeles, et al., Case No. CV13-1156-GW (JCGx)

**3. Deposition:** September 15, 2014, A.D., (De La Torre) et al. v. City of Los Angeles, et al., Case No. CV13-6510-JFW (Asx)

**4. Deposition:** October 28, 2014, Goodlow v. City of El Cajon, Case No. 13cv1542 DMS NLS

**5. Deposition**: February 3, 2015, Castro v. County of Los Angeles, et al., Case No. CV13-6631.

**6. Deposition:** April 10, 2015, James Gallegos v. Havana House, Gilardo Lopez, Donald Bernard, Joseph Escandon and DOES 1-100, Case No. BC508561.

**7. Trial Federal Court:** April 29, 2015, Goodlow v. City of El Cajon, Case No. 13cv1542 DMS NLS.   United States District Court, Southern District of California, Judge Dana S. Sabraw.

**8. Deposition**: May 14, 2015, Eloy Jacobo v. City of Palm Springs, a Government Agency, DOES 1 though 50, inclusive, Case No. INC 1302171.

**9. Deposition**:   August 14, 2015, Valine Gonzalez (Santibanez Matter) v. City of Visalia; Tim Haener; and DOES 2-10, inclusive, Case No1:13-cv-01697.

**Exhibit 9**

Page 2/5

**10.   <u>Trial State Court:</u>** August 18, 2015, James Gallegos, Plaintiff v. Havana House; Gilardo Lopez; Donald Bernard; Jose Escandon and DOES 1-100, inclusive, Defendants. Case No. BC 508561

**11**.   <u>Deposition</u>: September 1, 2015 (Part 1) and September 4, 2015 (Part 2), Frederick Ronald Thomas; JR., individually and as successor-in-interest of Kelly James Thomas, deceased, Plaintiff, vs. City of Fullerton, et al. Case No. 30-2012-00581299

**12**. <u>Deposition:</u>   September 15, 2015, Anthony Del Real, individually and as successor-in-interest to John Del Real, Jr; Brittany Del Real Davis, individually and as successor-in-interest to John Del Real Jr.; and Shirley Lowery, Plaintiff vs. City of Long Beach; et al., Defendants.

**13.** <u>Deposition</u>:   September 23, 2015, R.A., a minor, by and Through his guardian ad Litem Adrianne Penrose, Individually and as successor in interest of John Armes, deceased, and Adrianne Penrose, individually, Plaintiffs vs. County of Riverside, Et al., Defendants.

**14.** <u>Deposition</u>:   October 19, 2015. Tara Garlick, individually; M.L.S., C.J.S., C.R.S., and E.Z.S., minors, by and through their guardian ad litem, Judy Silva, in each case individually and as successors in interest to David Silva, deceased; J.S., individually and as successor in interest to David Silva, by and through her guardian ad litem Adriane Dominguez; Merri Silva, individually; and Salvador Silva, individually, vs. County of Kern, Et al., Defendants, Lead Case No. 1:13-CV-01051-LJO-JLT.

**15**.   <u>Deposition</u>:   November 20, 2015, Gonzalo Martinez, Plaintiff vs. County of Los Angeles; Cuauhtemoc Gonzalez and Does 1 through 10, inclusive. Defendants.

**16**.   <u>Deposition</u>: December 1, 2015, Mindy Losee, individually and as successor in interest to Breanne Sharpe, deceased, Plaintiff vs. City of Chico, Scott Zuschin, Damon Selland, Nick Vega, Jared Cumber, David Quigley; and DOES 1-10, inclusive. Defendants.

**17**.   <u>Deposition:</u> December 17, 2015, Stanley Jordan, an individual, Plaintiff vs. City of Hawthorne, Officer Matthew Manley, and DOES 1-10, inclusive.

**Exhibit 9**

Page 3/5

**18.   <u>Deposition:</u>**   February 10, 2016, Bridget Wiseman, individually and as successor-in-interest of Dean Gochenour, deceased, Plaintiff vs. City of Fullerton, Vincent Mater, Carlos Medina and DOES 1 to 50, inclusive.

**19. <u>Deposition:</u>**   April 1, 2016, N.W., a minor by through his guardian ad litem Tkeyah Boyd, individually and as successor-in-interest to Tyler Damon Woods, Plaintiffs vs. City of Long Beach, Officer John B. Fagan; Officer Daniel A. Martinez, and DOES 1-10, inclusive, Defendants. Case No. EDCV14-01569-VAP (SP).

**20.   <u>Deposition:</u>**   April 7, 2016, R.D.C., a Minor, by and through his Guardian ad Litem, Maria Teresa Penaloza, Plaintiffs vs. County of Los Angeles, a public entity; Jerry Powers, Booker Waugh, Les Smith, and DOES 1 through 10, individually and in their official capacity as Probation Officers for the County of Los Angeles, Defendants (Case No. CV14-6014 DMO SHX).

**21.   <u>Trial State Court:</u>**   April 20, 2016, Eloy Jacobo v. City of Palm Springs, A Government Agency and DOES 1-50, inclusive, Case No. INC 1302171.

**22.   <u>Deposition:</u>**   April 28, 2016, Ledesma vs. Kern County, Case No.14-CV-01634-LJO-JLT.

**23.   <u>Deposition:</u>** May 16, 2016, Dennis Dean Sr., Susannah Hardesty, and Amy Dean, Plaintiff's vs. Salvador Robles; Daryl Meadows; Randy Moya and DOES 4-25, Case No. 2:13-cv-00730 JAM KJN.

**24.   <u>Trial Federal Court:</u>** June 16, 2016, N.W., a minor by through his guardian ad litem Tkeyah Boyd, individually and as successor-in-interest to Tyler Damon Woods, Plaintiffs vs. City of Long Beach, Officer John B. Fagan; Officer Daniel A. Martinez, and DOES 1-10, inclusive, Defendants. Case No. EDCV14-01569-VAP (SP).

**25.   <u>Deposition:</u>** June 27, 2016, Robert J. Zambrano JR., Kathleen Zambrano, and Jillian Zambrano, a Minor and through her Guardian ad Litem, Robert J. Zambrano JR., Plaintiffs vs. Andrew Drobot, Redondo Beach Police Department, City of Redondo Beach, and DOES 1 to 50, Inclusive, Defendants.

**Exhibit 9**

Page 4/5

**26. <u>Deposition:</u>** July 5, 2016, NONA OPSITNICK AND LINDA STERETT, Plaintiffs vs. CITY OF LONG BEACH; ERIC BARICH, SALVADOR ALATORRE, ABRAM YAP, and DOES 4-10, inclusive Defendants.
Case No. 14-9370-PLA.

**27.   <u>Deposition:</u>**   July 7, 2016, Leslie Laray Crawford, individually and as Successor in Interest to Michael Laray Dozer, deceased, Plaintiff, vs. City of Bakersfield, a municipal entity, Officer Aaron Stringer, an individual, Michael Eugene Dozer (as a nominal defendant) and DOES 1 through 10, inclusive, Defendants, Case No. 1:14-CV-01735-SAB.

**28. <u>Trial Federal Court:</u>** August 19, 2016, Anthony Del Real, individually and as successor-in-interest to John Del Real, Jr; Brittany Del Real Davis, individually and as successor-in-interest to John Del Real Jr.; and Shirley Lowery, Plaintiff vs. City of Long Beach; et al., Defendants.

**29.   <u>Deposition:</u>**   September 19, 2016, D.G., a minor, by and through his guardian ad litem, Denise Bonilla, individually and as successor-in-interest to David Garcia, deceased; D.E.G., a minor, by and through her guardian ad litem, Denise Bonilla, individually and as successor-interest to David Garcia, deceased; G.D., a minor, by and through her guardian ad litem, Denise Bonilla, individually and as successor-in-interest to David Garcia, deceased; RAMONA RAMIREZ NUNEZ, individually; Plaintiffs, vs. COUNTY OF KERN; ROBERT REED; DOES 2 THROUGH 10; Defendants.

**30**. <u>**Deposition**</u>: October 4, 2016, Regarding: J.M., a minor by and through his guardian ad litem Celine Lopez, individually and as successor-in-interest to Hans Kevin Arellano, Plaintiff vs. CITY OF SANTA ANA, OFFICER JESSICA GUIDRY; OFFICER STEPHEN CHAVEZ; and Does 1-10, inclusive, Defendants. Case No. 8:15-cv-00432.

**31**.   <u>**Trial Federal Court**</u>: October 20, 2016, Leslie Laray Crawford, individually and as Successor in Interest to Michael Laray Dozer, deceased, Plaintiff, vs. City of Bakersfield, a municipal entity, Officer Aaron Stringer, an individual, Michael Eugene Dozer (as a nominal defendant) and DOES 1 through 10, inclusive, Defendants, Case No. 1:14-CV-01735-SAB.

**Exhibit 9**

5/5

**32.  Deposition**: November 30, 2016, Brian Bunnak, Plaintiff, vs. KION JAMES MOSBAT, an individual, and DOES 1 through 10, inclusive, Defendants. Case No. BC571975.

**33**.  **Deposition:** February 13, 2017, Abraham Valentin, Alejandro Francisco Peralta, Michael Dominguez, Frank Margarito Escobedo, Plaintiffs vs. ROBERT JACKSON, and DOES 1-50, Inclusive, Defendants. Case No. CV 15-09011-BRO (AFMX).

**34.  Deposition:** March 3, 2017, ARTURO GONZALEZ, Plaintiff, vs. CITY OF BAKERSFIELD, GARY CARRUESCO, DOUG BARRIER, KASEY KNOTT, JUAN OROZCO, and DOES 5-10, Defendants. Case No. 1:16-CV-00107-JLT.

**35.  Trial:** March 9, 2017, LUIS ARIAS, an individual, Plaintiff, vs. COUNTY OF LOS ANGELES, a municipal entity; DEPUTY KENNETH FITCH, an individual and DOES 1 through 10, inclusive, Defendants. Case No. 2:15-CV-02170-AB-AS.

**36.  Deposition:** March 10, 2017, FREDRICK THOMAS and ANNALESA THOMAS, as Co-Administrators of the Estate Leonard Thomas, and its statutory beneficiaries, Plaintiffs, vs. BRIAN MARKERT; MICHAEL WILEY; NATHAN VANCE; MICHAEL ZARO; SCOTT GREEN; JEFF RACKLEY; CITY OF FIFE; CITY OF LAKEWOOD; PIERCE COUNTY METRO SWAT TEAM; and JOHN DOES 1 through 10, Defendants. (Case No. 3:16-cv-05392).

**37.  Deposition:** March 16, 2017, DENNIS BLOCH, an individual and JENNIFER BLOCH, an individual, Plaintiff vs. STANFORD HOTELS CORPORATION, HARBOR VIEW HOLDINGS, Inc., A CALIFORNIA CORPORATION, MARRIOT INTERNATIONAL INC; A DELAWARE CORPORATION, SAN DIEGO HOTEL COMPANY, LLC; PORTER GREER, and DOES 1 through 25, Defendants. Case No. 37-2015-000028814-CV-PO-CTL.

**Depositions**: 31
**Trial Testimony**: 6

**Exhibit 9**



Exhibit 10

| REQUESTING AGENCY CASE NO. | **CALIFORNIA DEPARTMENT OF JUSTICE** | BFS CASE NUMBER |
|---|---|---|
| SPD 1029672 | **BUREAU OF FORENSIC SERVICES** | CV-10-006215-0001 |
| SJCSO 1020638 | CENTRAL VALLEY CRIMINALISTICS LABORATORY | |
| | 1306 Hughes Lane Ripon, CA  95366 | |
| | Phone No. (209) 599-1400  FAX No.  (209) 599-1240 | |

ATTN: Detective A. DeSimone      COPIES: DDA T Verber
Stockton Police Department        San Joaquin County District Attorney's Office
22 East Market Street
Stockton, CA  95202

## FIELD INVESTIGATION REPORT

| | | | |
|---|---|---|---|
| SUSPECT: | JAMES RIVERA | OFFENSE: | OFFICER-INVOLVED SHOOTING |
| OFFICER: | ERIC AZARVAND | OFFENSE DATE: | 07/22/10 |
| | GREG DUNN | | |
| | JOHN NESBITT | | |

*I, the undersigned, declare under penalty of perjury: (1) I am employed by the State of California, Department of Justice (DOJ), Bureau of Forensic Services; (2) I conducted an examination of the material described below in the ordinary course of my work as a qualified examiner, according to approved laboratory procedures that include creation of contemporaneous documentation and the technical review of my work; (3) The observable data is set forth in the associated laboratory case record; (4) Any opinions, interpretations, or conclusions in this report are based upon data in the associated laboratory case record and findings listed below.*

*Note: This laboratory report has been prepared and retained by DOJ in the normal course of business according to DOJ's regular practices and procedures.*

## BACKGROUND

On July 22, 2010 at approximately 1140 hours, the Command Center contacted Assistant Laboratory Director K. Ciula and relayed a request from the Stockton Police Department Communications Center for assistance in processing the scene of an officer-involved shooting.  The county's Critical Incident Protocol was being invoked.  One suspect was shot.  Three officers, one from the sheriff's office and two from the police department, reportedly discharged their firearms.  A briefing was scheduled for 1300 hours.  ALD Ciula contacted the Stockton Police Department to gain additional information.  It was learned that the suspect's vehicle drove into a house at 9559 Bancroft Way.  Officers were behind the vehicle with firearms drawn when the suspect put the vehicle into reverse.  Officered ordered the suspect to stop, but as the suspect started to back up, officers fired.  The suspect was transported to a hospital.

I was assigned to process the scene.  I took Criminalist M. Gallagher for assistance.  I asked Sr. Criminalist S. Bauer to scan the scene with the Scan Station 2.  Criminalist Gallagher and I went to the briefing, while Sr. Criminalist Bauer went directly to the scene.

## FIELD ACTIVITIES

Criminalist Gallagher and I arrived at the Stockton PD administration building at approximately 1315 hours. The briefing started at approximately 1335 hours.  The suspect was identified as James Rivera.  He had escaped from a juvenile detention facility in May.  Officers believe the suspect had been involved in eight cases since his escape, including a carjacking the previous night, July 21.  A shotgun had been used in the carjacking.  On July 21, a vandalism victim identified the suspect and reported the suspect was driving a blue minivan.  Officers checked and learned about the carjacked vehicle which had the same description.

On July 22 at approximately 1016 hours, it was reported that a Chevrolet Astro van was parked on Kelley Drive.  Officers responded but the van was not located.  Stockton PD personnel and Delta RATT members

BFS 6           Page 1 of 17

COS005379

Exhibit 11
Page 1

Stockton Police Department                                                          CV-10-006215-0001

scouted the area. At approximately 1034 hours, Deputy Nesbitt saw the van near Cody Way and Comstock
Drive and a pursuit was initiated, led by Officer Hughes. Additional units became involved in the pursuit and a
ike strip was deployed but did not appear to deter the van. As the van traveled down Bancroft Way towards
Salters Drive, Officer Dunn used intervention with his patrol unit and struck the driver's side of the van. The
van went onto the southwest corner of Salters Drive and Bancroft Way, striking a parked vehicle and a mailbox.
As the van was trying to move, Officer Dunn circled around and again struck the van. This caused the van to
crash completely through the garage of a triplex located at the corner. Other units, marked and unmarked, fell
into place behind Officer Dunn's marked unit. The suspect attempted to back up the van despite officers'
commands to stop. At some point, Officer Azarvand, Officer Dunn, and Deputy Nesbitt opened fire on the van.
Officer Azarvand had attempted to deploy his M16 rifle, but it malfunctioned so he resorted to his sidearm.
Officers then approached the van. There was no response from the suspect, who appeared to be the van's sole
occupant. The suspect appeared to have sustained multiple gunshot wounds and was transported to a hospital
after treatment by Stockton Fire personnel. Officer Dunn backed his vehicle away from the van sometime after
the shooting. There were four men from an air conditioning work crew working outside the triplex at the time
of the shooting. At least one of the workers was on the roof during the shooting. The van had not been
searched because of its position in the garage.

After the briefing, Criminalist Gallagher and I processed the pistols of Officer Azarvand, Officer Dunn, and
Deputy Nesbitt. Officer Azarvand's rifle was still at the scene. The firearms of other officers at the scene were
checked for indications of having been fired. Delta RATT included officers from CHP, San Joaquin County
Probations Department, and Deputy Nesbitt from the San Joaquin County Sheriff's Department. Firearms from
Officer Azarvand, Officer Dunn, Deputy Nesbitt, and CHP Officer Benatar were retained. The barrel of Officer
Benatar's pistol contained powder particles. The following table is a summary of the firearms examined:

| Officer, Agency | Firearm | Caliber | SN | Magazine | Spare Mags | DOJ # |
|---|---|---|---|---|---|---|
| Nesbitt, SJCSO | SigSauer P226 | 40 S&W | U 601 690 | left at scene empty, replacement 11+1 | at capcacity | 1 |
| Azarvand, SPD | SigSauer P226 | 40 S&W | U 627 473 | 9+1 | 2 at capcacity | 2 |
| Dunn, SPD | SigSauer P226 | 40 S&W | U 630 842 | left at scene empty, replacement 11+1 | 1 at capacity | 3 |
| Nhem, SPD | SigSauer P226 | 40 S&W | U 630 892 | capacity +1 | 2 @ capacity | |
| Stickels, CHP | S&W 4013TSW | 40 S&W | MSF4680 | capacity +1 | 2 @ capacity | |
| | S&W 60-9 | 357 Mag | CCA9086 | 5-shot revolver, full | | |
| Inskip, CHP | S&W 4013TSW | 40 S&W | MSF5143 | capacity +1 | 2 @ capacity | |
| Correll, SJCPD | SigSauer P226 | 40 S&W | AL 14990 | capacity +1 | 2 @ capacity | |
| Benatar, CHP | S&W 4013TSW | 40 S&W | MSF5794 | capacity +1 | 2 @ capacity | 4 |
| | Glock 27 | 40 S&W | DVN631 | capacity | | |
| Knoll, SJCPD | SigSauer P229 | 40 S&W | AL 22728 | capacity +1 | 2 @ capacity | |

Criminalist Gallagher and I left the administration building at approximately 1500 hrs. We arrived at the scene
at approximately 1520 hours. Sr. Criminalist Bauer was already present at the scene. He had arrived at
approximately 1330 hours.

The junction of Bancroft Way and Salters Drive is a 3-way intersection. Bancroft Way runs north/south.
Salters Drive is a one block long east/west street with Kelley Drive at its west end and Bancroft Way at its east
nd. At the southwest corner of the Bancroft Way and Salters Drive intersection is a triplex consisting of 9555,
9557, and 9559 Bancroft Way. The garages face Bancroft Way and take up the northeast corner of the triplex.
The garage to 9559 is the most north of the three garages and is directly at the southwest corner of the
intersection. The north wall of the 9559 garage faces Salters Drive. The suspect's van had gone through the

COS005380

Exhibit 11
Page 2

Stockton Police Department                                                CV-10-006215-0001

north wall of this garage, taking out some of the bushes that were in front of the wall. There are no doors that allow direct access from the triplex's garages to their respective living areas. All of the garage doors were 'osed when we arrived. There was an older vehicle parked in the driveway in front of the 9559 garage. There was no damage observed on this vehicle. There was a ladder leaning against the north wall of the triplex near the west end of the building. The ladder was associated with the air conditioning crew.

At the northeast corner of the triplex lot (southwest corner of intersection) was Officer Azarvand's Stockton PD unit 3760. It was parked diagonally across the lawn. Next to this patrol unit was a red sedan, CA 4AOU510, reportedly associated with the air conditioning crew. The sedan was facing northeast. It crossed the sidewalk with its front end on Salters Drive and its rear end on the lawn. Officer Dunn's marked patrol unit 3700 was parked west of the sedan and behind (north) the van. The patrol unit was parked perpendicular to the curb, facing south towards the triplex's 9559 garage wall. Officer Dunn's unit blocked the eastbound lane of Salters. There was front end damage to Officer Dunn's unit. A crane, CA 2T06977, associated with the air conditioning crew was parked along the south side of Salters, north of the triplex. Three standing mailbox units were along the north edge of the property across from the crane's cab. Each unit contained numerous individual boxes. The mailbox units were labeled C, D, and E. At the east end of the mailbox units was an empty concrete space for units A and B. One of the missing mailbox units was on the lawn by the right rear tire of the van and the other was underneath the van in the garage. There were two work trucks associated with the air conditioning work crew, CA 5M45029 and CA 5A09207, parked along the south side of Salters Drive behind the crane. Sgt. Reynosa had stopped his marked Stockton PD patrol unit 3802 in the street next to the crane. His unit faced east towards Bancroft Way. In front of the red sedan was Deputy Nesbitt's unmarked Chevrolet Tahoe, CA 8S25154. The Tahoe faced east. Officer Hughes had stopped his marked Stockton PD unit 3757 behind Officer Azarvand's unit. Officer Hughes's unit was in the middle of Salters Drive at Bancroft Way. Officer Nunez had stopped his marked Stockton PD unit 3691 behind Officer Hughes's unit. Officer Nunez's unit was at the ortheast corner of the intersection. Along the west side of these two Stockton PD units was Officer Benatar's .nmarked Chevrolet Silverado pickup truck, CA 8L06141, with a camper shell. Officer Benatar's truck faced the northeast corner of the triplex. See Figures 1-3 for scaled representation of the Salters Drive and Bancroft Way intersection and vehicle positions.

Officer Dunn's unit had front end damage. The lower bar of the push bumper was bent upward and inward. There were blue "paint" smears on the push bumper. The area above the grill was cracked and pieces were broken. On the left side of the grill was a speaker and the area behind the speaker was broken. There were some bluish "paint" smears on the left corner of the front fender. The left front signal light was broken with pieces missing. The front license plate was missing. The plate (Placard 21) was found in the driveway of the triplex on the northwest corner of the intersection. This triplex contained the residences of 3805, 3807, and 3809 Salters Drive. The driveway is on Salters Drive. The entire right side of the patrol unit had been sprayed with mud that came from a direction in front of the unit deposited decreased as the spray went to the rear of the unit. There was more mud spatter on the hood, windshield, and right front quarter panel than on the trunk and right rear quarter panel. This is consistent with this patrol unit being directly behind the van as the van's right rear tire spun forward while in the mud along the north side of the 9555/9557/9559 triplex.

COS005381

**Exhibit 11**
**Page 3**

Stockton Police Department

CV-10-006215-0001



Figure 1: Salters Drive and Bancroft Way intersection



COS005382

**Exhibit 11**
**Page 4**



Figure 2: Salters Drive and Bancroft Way intersection

Broken pieces of plastic were on the sidewalk at the right rear corner of the red sedan. The plastic included clear amber pieces. These were most likely from Officer Dunn's broken left front signal lights. All headlights and tail lights on the sedan were intact. The headlights and tail lights on the van were not broken and did not include any clear amber pieces. The sedan's right rear quarter panel was damaged with several dents and "paint" smears. Some of the smears appeared light and bluish.

The suspect's van had gone through the north wall of the 9555/9557/9559 triplex. The van is a metallic blue Chevrolet. It did not have license plates. The rear license plate area read "BARGAIN A Dollar A Day Donor." There were three rows of seats inside; front seats consisting of two bucket seats, a middle bench seat, and a rear bench seat. There was a cargo area behind the rear seat. The rear cargo door opened three ways; window portion opened upward leaving lower right and left doors that opened accordingly. Although the van was only through the wall up to its rear axle, the garage was narrow enough that the front of the van penetrated the south wall of the garage, creating damage in the 9557 garage. The front of the van was tilted upward with the mailbox unit and bushes beneath it. The van also was tilted downward right to left with the left rear of the van being lower than the right rear of the van. This appeared to be caused by the left rear tire being flat.

The area under the van's rear tires was muddy. There was mud spatter on the mailbox unit by the right rear tire. This tire would have had to be spinning forward to spray mud onto this mailbox unit. There was also some mud spatter on the garage siding in front of the right rear tire. The tire would have had to be spinning in reverse to spray mud on the wall.

COS005383

Exhibit 11
Page 5

Stockton Police Department                                             CV-10-006215-0001



Figure 3: Salters Drive and Bancroft Way intersection

There was damage to each of the rear doors of the van. The dent to the left rear door was deeper than the dent in the right rear door. The right door damage contained light colored smears or scrapes. The back window of the van was broken out. It was reported that officers first broke out the window to gain access to the suspect. The right middle side window was completely broken out. A bullet strike was observed along the lower moulding. This damage was designated Trajectory G. The right rear side window had three holes in it, one large and two small. The more forward small hole was the area of the first impact to that window, based on the fracture pattern around the hole. All other strikes were subsequent to the front strike. After the first strike, the window shattered but stayed intact. Subsequent impacts only pushed out glass around the area of the strikes. The two other holes indicated the window took at least two additional impacts. The larger hole occurred along the lower moulding and damage was observed to the area behind the moulding, including the interior plastic liner. The damage to this area of the window was designated Trajectory F. The smaller holes were strung in an attempt to be able to identify their locations if more of the glass was lost during transport or processing. The front passenger window was intact although the side mirror was turned inward. The left rear side and middle side windows were also broken out. There were two strikes on the remaining portion of the back window, one at the top edge and one at the left edge; however, they did not appear to be bullet holes. The strike on the left edge appeared to be associated with an impact in the interior plastic. The two impacts together appeared to indicate an exiting bullet strike; however, it was more likely damage from an asp used to break the window. Although the left middle side window was reportedly broken out to remove the suspect from the van, a series of bullet strikes were observed on the rear edge of this window indicating it had been shot. This series of strikes on the C post and moulding were designated Trajectory B. The driver's window also had a low hole. The glass fracture pattern showed the first impact to the driver's window was low, although no moulding or metal was

COS005384

Exhibit 11
Page 6

Stockton Police Department                                                                                           CV-10-006215-0001

struck. This impact was designated Trajectory E. The cratering at the bottom of the impact site showed the bullet was coming from the interior of the van and not the exterior. It is possible that the bullet came from the ght exterior of the van, traveled through the van, and exited the driver's window. There was a bullet hole at the bottom of the windshield near the middle. The cratering around the hole indicated this bullet was exiting the van when it went through the windshield. Like Trajectory E, it is possible the bullet came from the right exterior of the van, traveled through and exited this window. This hole was designated Trajectory I. Trajectories E and I would later be found to be associated with other trajectories or bullet holes in the van.

There were two bullet entry holes on the left side of the van. One was above the rear side window. The bullet entered from the rear at an acute angle. An associated interior strike was observed as a protrusion near the top of the B post in front of the left middle side window. This was designated Trajectory A. Another bullet entry hole was observed in the B post immediately in front of the left middle side window. No associated strike or exit hole was found. The location of the hole at the edge of the window shows that the bullet was traveling from the back to front. The hole was designated Trajectory D. There was a third bullet hole with a deep indentation that could be a ricochet or entry hole. The hole was in the side panel below the front corner of the middle side window. The shape of this hole indicated the bullet was traveling back to front and struck the van at a very acute angle. No additional holes or strikes were found to be associated with this entry hole. The hole was designated Trajectory C.

Numerous bullet holes were observed in the middle seat, the driver's seat, and the front passenger's seat. The middle seat had several entry holes in the back of the seat across the top; however, associated exit holes were observed only on the front of the right side of this seat. The driver's seat had numerous entry holes in the back and numerous exit holes in the front. The front passenger seat had a single entry hole in the back of its right edge and an exit hole in the front.

ror safety concerns, it was decided that the van would be transported to the Laboratory for additional processing. The only access to the interior of the van was climbing through broken out windows and the stability of the van may be affected by people moving about inside.

There were no bullet holes observed in the exterior wall around the van. There were some apparent bullet holes in the south wall of the 9559 garage to the left (southeast) of the van. The shapes of the holes indicated these were not primary impacts and the bullets had likely gone through the van before striking the wall.

Several pieces of firearms evidence were found in the vicinity of the southwest corner of the intersection. There were twelve expended cartridge cases (Placards 13-15, 19, 20, and 38-44) on the ground west of the mailbox units. Near the base of the mailbox unit at the west end was an empty magazine (Placard 12). The bottom of this magazine had a "JTN" sticker which was also observed on the magazines associated with Deputy Nesbitt. Nine expended cartridges cases (Placards 1-8 and 17) were in the street and gutter between Officer Dunn's unit and the crane. One expended cartridge case (Placard 47) was found under Officer Dunn's unit and another one (Placard 18) was under the left front corner of the unit. One expended cartridge case (Placard 10) was in the gutter between Officer Dunn's unit and the red sedan. Another expended cartridge case (Placard 9) was immediately behind the left front tire of the red sedan. Two additional expended cartridge cases (Placards 35 and 36) were under the red sedan. On the ground under the left rear corner of the sedan was an empty Sig Sauer P226 .357/.40 magazine (Placard 11). A sticker on the side of this magazine read "DUNN 1587" and was reportedly associated with Officer Dunn. A fired bullet (Placard 37) was found in the grass east of the van. Medical trash and clothing were also in this area.

One damaged 9mm Luger cartridge (Placard 16) was east of the left front tire of Officer Hughes's patrol unit. It is unlikely associated with this incident because of its condition and no known 9mm Luger caliber firearms were found in association with the suspect at the scene or the officers at the scene.

COS005385

**Exhibit 11**
**Page 7**

Stockton Police Department                                                                    CV-10-006215-0001



Figure 4: Bancroft Way at Salters and Otto Drive intersections

Page 8 of 17



COS005386

**Exhibit 11**
**Page 8**

Stockton Police Department                                                                CV-10-006215-0001



Figure 5: Bancroft Way and Otto Drive intersection

One damaged expended cartridge case (Placard 46) was in the street at the northwest corner of the intersection. Based on its condition, it is unlikely this cartridge case is associated with this incident.

There was a rifle against the front passenger seat of Officer Azarvand's unit.  A 223 caliber cartridge was on the seat.

While at the scene, it was brought to our attention that the suspect's van had knocked over a fence and a stop sign at the four way intersection of Bancroft Way and Otto Drive, which was one block north of the Bancroft Way and Salters Drive intersection.  Traffic on Otto Drive does not stop, but Bancroft Way traffic has stop signs.  The residence on the southeast corner of the intersection is 3724 Otto Way.  The west side yard was lined with a low cyclone fence.  The stop sign for northbound Bancroft Way traffic was also on this corner.  The cyclone fencing and three fence posts around the corner were knocked to the ground.  The stop sign was also knocked to the ground at its base and the sign laid face up on Bancroft Way.  There were blue smears observed on the stop sign post and two of the fallen fence posts.  The direction the posts fell indicates the force came westbound from Otto Drive.

There were some black skid-like marks on the asphalt that appeared to be from a vehicle facing east on Otto Drive just east of the intersection that then made a u-turn to go west on Otto, then south down Bancroft Way.  In addition, we observed another set of skid marks made so hard on the east side of Bancroft that the paint from the top of some of the "STOP" letters was worn away.

Page 9 of 17

COS005387

**Exhibit 11**
**Page 9**

Stockton Police Department                                                CV-10-006215-0001

See Figures 4 for a scaled representation of Bancroft Way between Otto and Salters Drives.

See Figure 5 for a scaled representation of the Bancroft Way and Otto Drive intersection.

Sr. Criminalist Bauer scanned the scene from eight different locations.

Stockton PD personnel collected and retained all evidence from the scene. It was arranged with Detective DeSimone to have the van transported to the Laboratory at a later date for additional processing. We left the scene at approximately 2025 hours.

Van:

The suspect's van was processed from July 27 to July 29. Detectives DeSimone, Jimenez, Harris, Martin, Ming, and Pettitt, and DAI Garcia were present during some of this time.

Prior to processing the van, Detective Martin related the following information from the autopsy:

> There were a total of nine bullet entrance wounds. One bullet entered the back of the head and was found inside the head. There were four entries in the left side of the back. There were two entry holes in the upper right side of the back and a third just below these two entrances. There was an apparent bullet trajectory that entered the left arm, exited the arm, and then entered the left chest. A total of six bullets were removed from the suspect.

ᵈditional glass had fallen out of the broken windows during transport. The string marking the holes in the right rear side window and the driver's window was sagging but still gave a rough estimate of where the holes were observed at the scene. Three of the van's tires were inflated. The left rear tire was flat. A spike from a spike strip was removed from the tire and handed to Detective DeSimone. The right side mirror was folded inward and the mirror glass was broken. There were some scrapes on the back of the mirror. There was a wide white smear on the top edge of the right front quarter panel. The smear stopped at the side mirror. There were also some smaller smears on the front of this quarter panel starting just behind the right signal lights. The right side of the hood also had similar white smears. The top of the hood just right of center had more white smears and the front of the hood had some dents. The left side of the grill was broken. A piece of vegetation was stuck in the left side of the grill. Numerous scrapes and smears were observed all across the front bumper. Some of these smears included some red and green "paint" smears. The headlights and front signal lights were intact.

There was mud spatter in front of and behind the right rear tire. The presence of the mud spatter in both places indicates the tire had spun forward and backward in mud. There was also mud spatter in front of and behind the left rear tire although the amount was significantly less than the amount observed on the right side.

Several bullets and fragments were found inside the van. A copper jacket (Item 5) was visible in a hole in the upper right corner of the middle seat. Two copper jacketed bullets (Items 6 and 7), a portion of copper jacket (Item 11), and a bullet core (Item 8) were on the floor in front of the middle seat. Another portion of copper jacket was found on the floor between the front seats (Item 10). Another copper jacket was under the middle seat (Item 9) and a bullet core (Item 25) was under the back of the middle seat. A bullet core was observed adhering to an exit hole on the front of the driver's seat (Item 12).

COS005388

**Exhibit 11**
**Page 10**

Stockton Police Department                                              CV-10-006215-0001

Just inside the exterior entry hole above the left rear window (A1) was a portion of copper jacket (Item 13).

No further information was gained examining the exterior bullet holes (A-G).

Trajectory poles were used to determined bullet trajectories through the van. None of the exterior holes were probed at the lab. Because glass was broken out of most of the windows, it can't be determined which incoming shots were fired through glass. Some deflection may occur when a bullet passes through a window. The vertical observations noted (upward or downward) are in reference to the van's position in the Laboratory garage. This is different than the position of the van at the scene.

There were five trajectories (Trajectories K, L, M, N, and O) that passed through the upper right side of the middle seat, then through the back of the driver's seat on the right side. Trajectory K did not exit the driver's seat. These trajectories went downward and right to left. Another trajectory (Trajectory J) followed a similar line but it was below the grouping of Trajectories K-O. The bullet core (Item 12) found in the front of the driver's seat had been adhering to the exit hole (J4) of this trajectory. "Lead" fragments (Item 17) were removed from the driver's seat inside K3.

One trajectory (Trajectory I) entered the back of the front passenger seat (I1), exited the front passenger seat (I2), and exited the van through the windshield (I3). This trajectory (Trajectory I) went downward and right to left.

There were five downward trajectories (Trajectories P, Q, R, S, and T) that passed through the back of the driver's seat without going through the middle seat. Four of these trajectories (Trajectories Q-T) went left to right. Three of these trajectories (Trajectories R-T) were on the left half of the back of the driver's seat, while the fourth (Trajectory Q) went through the lower right portion of the driver's seat. Trajectories Q-T entered the van through the area of the left middle side window area. It was noted that entry points (Q1, R1, S1, and T1) for these trajectories have circular "lead" wipes around them. Trajectory T may be associated with Trajectory B, the strikes and holes observed at the back of the left middle side window. Only Trajectory P went right to left. The entry (P1) and exit (P2) holes associated with this trajectory were on the right side of the driver' seat but above the holes from the group of trajectories (Trajectories J-O) that had gone through the middle seat.

There were additional small entry holes in the back of the middle seat along the top edge. Three of these (CC1, DD1, and EE1) were just left of the grouping of Trajectories K-O. One of these holes (GG1) was in the middle of the seat, while three others (X1, Y1, and Z1) were near the left corner. No exits were found associated with these holes; however, bullet components were found to be associated with some of the holes. A copper-jacketed bullet (Item 14) was removed from a hole on the left side (X1) and another (Item 19) was removed from a hole on the right side (DD1). Copper jacket portions (Items 15, 16, 22, and 24) were removed from four holes (Y1, Z1, EE1, and GG1).

There were additional entry holes (U1, V1, AA1, BB1, and FF1) in the back of the driver's seat. Two of the holes (BB1 and FF1) were on the right side and one (U1) was near the middle just left of entry O3. Two of the holes (V1 and AA1) were on the left side. One of these (AA1) was under the entry hole of Trajectory R (R1) while the other (V1) was lower and on the back corner. A copper jacket, bullet core, and bullet fragments (Item 23) were removed from V1. A copper jacket (Item 18) was removed from BB1, and copper and "lead" fragments (Item 21) were removed from AA1. One bullet core (Item 20) was removed from the driver's seat. It could not be determined if this bullet came from inside U1 or O3. No fragments were found inside FF1.

COS005389

Exhibit 11
Page 11

Stockton Police Department                                                      CV-10-006215-0001

An entry hole (II1) was observed in the console below the dash between the front seats.  The hole was irregular shape indicating there was at least one intermediate target before the bullet struck the console.  There was no secondary impact found associated with this hole and the plastic was not thick enough to give an indication of the entry angle.  A copper-jacketed bullet (Item 26) was removed from inside the console.

A hole (HH1) was observed in the ceiling above the driver's seat. No secondary point or bullet components were found associated with this hole.  This hole may not be firearm related.

The van was photographed and measurements of the bullet strikes were recorded.  All bullet components collected (Items 5-26) were retained by Laboratory personnel.  There was no attempt to recover bullets or components that may have been inside the left wall of the van from Trajectories A, C, or D.

The van was scanned with the Scan Station with trajectory rods in place.  During the scanning, the trajectory rod for Trajectory P tilted to an upward angle and was recorded at this incorrect position.  The azimuth (side to side) angle did not appear affected.

Reconstruction:

The van was scanned in place at the scene, but because of the van being inside the garage it was not possible to do trajectory reconstruction or scan all sides of the van.  Once removed from the scene and at the Laboratory, the sides of the van were scanned with trajectory rods in place.  This scanning of the van with trajectory rods was inserted into the scene scans.  The trajectories were reconstructed in the scene scans.

The right to left trajectories (Trajectories I-P) appear to come from an area between the van and the mailbox units, while the left to right trajectories (Trajectories Q-T) appear to come from an area between the rear of the red sedan and Officer Azarvand's unit.  The vertical component of these trajectories was close to horizontal.  Most of the reconstructed trajectories (Trajectories J-T) appear to be angled slightly downward.  Trajectory I was indicated to be horizontal.  See Figures 6-8 for scaled presentations of the trajectories through the van and at the scene.  The indicated trajectories are approximations based on scanning data.

COS005390

Exhibit 11
Page 12

Stockton Police Department                                            CV-10-006215-0001



Figure 6: Right to Left Trajectories
Van as positioned at scene



Figure 7: Left to Right Trajectories
Van as positioned at scene

Page 13 of 17

COS005391

**Exhibit 11**
**Page 13**

Stockton Police Department                                   CV-10-006215-0001



Figure 8: Reconstructed Trajectories in Scene

Page 14 of 17

COS005392

Exhibit 11
Page 14

Stockton Police Department                                    CV-10-006215-0001

EVIDENCE

The following evidence was received by laboratory personnel from Deputy J. Nesbitt of the San Joaquin County Sheriff's Office on July 22, 2010:

   1A)    One 40 S&W Sig Sauer P226 semi-automatic pistol, serial number U 610 690.
   1B)    One Sig Sauer P226 .357/.40 magazine containing 11 Federal 40 S&W cartridges.
   1C)    One Federal 40 S&W cartridge, chambered round.
   1D)    One Sig Sauer P226 .357/.40 magazine filled to capacity.

Test-fired components (Items T1-T6) were generated during the examination of this pistol (Item 1A).

The following evidence was received by laboratory personnel from Officer E. Azarvand of the Stockton Police Department on July 22, 2010:

   2A)    One 40 S&W Sig Sauer P226 semi-automatic pistol, serial number U 627 473.
   2B)    One Sig Sauer P226 .357/.40 magazine containing 9 Winchester 40 S&W cartridges.
   2C)    One Winchester 40 S&W cartridge, chambered round.

Test-fired components (Items T7-T12) were generated during the examination of this pistol (Item 2A).

The following evidence was received by laboratory personnel from Officer G. Dunn of the Stockton Police Department on July 22, 2010:

   3A)    One 40 S&W Sig Sauer P226 semi-automatic pistol, serial number U 630 842.
   3B)    One Sig Sauer P226 .357/.40 magazine containing 11 Winchester 40 S&W cartridges.
   3C)    One Winchester 40 S&W cartridge, chambered round.

Test-fired components (Items T13-T18) were generated during the examination of this pistol (Item 3A).

The following evidence was received by laboratory personnel from Officer A. Benatar of the California Highway Patrol on July 22, 2010:

   4A)    One 40 S&W Smith & Wesson 4013TSW semi-automatic pistol, serial number MSF5794, control number S0645.
   4B)    One Smith & Wesson 40 S&W magazine containing 9 Remington-Peters 40 S&W cartridges.
   4C)    One Remington-Peters 40 S&W cartridge, chambered round.

Test-fired components (Items T19-T24) were generated during the examination of this pistol (Item 4A).

The following evidence was submitted to the Laboratory by Detective A. Simone on July 27, 2010:

   V)     One blue metallic Chevrolet Astro van, VIN 1GNDM19WOSB241428.

The following evidence was submitted collected by laboratory personnel from the van on July 27, 2010:

   5)     One copper jacket from right back corner of middle seat.

   6)     One copper-jacketed bullet from floor in front of middle seat.

COS005393

**Exhibit 11**
**Page 15**

Stockton Police Department                                          CV-10-006215-0001

    7)     One copper-jacketed bullet from floor in front of middle seat.

    8)     One bullet core from floor in front of middle seat.

    9)     One copper jacket from floor under middle seat.

   10)    Portion of copper jacket from floor between front seats.

   11)    Portion of copper jacket from floor in front of middle seat.

   12)    One bullet core from J4, driver's seat.

   13)    One copper jacket fragment from A1.

   14)    One copper-jacketed bullet from X1, middle seat.

   15)    Portion of copper jacket from Z1, middle seat.

   16)    Portion of copper jacket from Y1, middle seat.

   17)    "Lead" fragments from K3/K4, driver's seat.

   18)    One copper jacket from BB1, driver's seat.

   19)    One copper-jacketed bullet from DD1, middle seat.

   20)    One bullet core from U1/O3, driver's seat.

   21)    Copper jacket and fragments from AA1, driver's seat.

   22)    One copper jacket from EE1, middle seat.

   23)    Copper jacket, bullet core, and fragments from V1, driver's seat.

   24)    Copper jacket fragment from GG1, middle seat.

   25)    One bullet core from under middle seat.

   26)    One copper-jacketed bullet from inside console.

One DVD (Item P) of photographs taken by Laboratory personnel at the scene was generated.

One DVD (Item PA) of photographs taken by Laboratory personnel of the van was generated.

One DVD (Item S) of Scan Station data was generated.

COS005394

Exhibit 11
Page 16

Stockton Police Department                                              CV-10-006215-0001

DISPOSITION

Items 1A-1D were released to Detective K. Ming of the San Joaquin County Sheriff's Office on July 27, 2010.

Items 2A-2C and 3A-3C were released to Detective A. DeSimone on July 27, 2010.

Items 4A-4C were released to Officer Schiesser of the California Highway Patrol, Stockton Office, on July 26, 2010.

Item P was released to Detective A. DeSimone on July 29, 2010.

The Chevrolet van was released to A. Sarisuk of Delta Valley Tow on August 8, 2010.

Items PA and S will be retained by the Laboratory until called for by a member of your agency.

The remaining evidence (T1-T24, 5-26) will be retained by the Laboratory pending examination.

EXAMINED BY: _Sarah Lw Yoshida_

Date of Report:   September 23, 2010                SARAH L. W. YOSHIDA
                                                    Senior Criminalist

Technical review by: _____  Date: _9-23-10_
Administrative review by: _____  Date: _9-23-10_
SLWY : slwy

COS005395

Exhibit 11
Page 17

**11-8814**

Supplement No
ORIG



# STOCKTON POLICE DEPARTMENT

22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
03/16/2011
Rpt/Incident Typ
245
Member#/Dept ID#
NASO,LARRY VERNON

## Administrative Information

| Agency | | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| STOCKTON POLICE DEPARTMENT | | 11-8814 | ORIG | 03/16/2011 | 10:30 | 110690939 |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| RTF INVESTIGATIONS | ASSAULT WITH A DEADLY WEAPON | | | | | |

| Location | | City | Rep Dist | District | Sector |
|---|---|---|---|---|---|
| THORNTON RD/A G SPANOS BL | | Stockton | 0471 | BC | BW |

| From Date | From Time | To Date | To Time | Member#/Dept ID# | |
|---|---|---|---|---|---|
| 03/10/2011 | 23:33 | 03/10/2011 | 23:33 | 1720/NASO,LARRY VERNON | |

| Assignment | Entered by | Assignment | Confidential | RMS Transfer |
|---|---|---|---|---|
| ROBBERY UNIT | 1210 | HOMICIDE UNIT | Officer Involved Incident | Successful |

| Approving Officer | Approval Date | Approval Time | | |
|---|---|---|---|---|
| 1208 | 03/21/2011 | 15:04:34 | | |

| # Offenses | Offense | | Description | Complaint Type |
|---|---|---|---|---|
| 1 | PC245(A)(2) | | ASSAULT W/FIREARM ON | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| SUS | 1 | I | JOHNSON,NEAHMIAH | 1143137 | B | M | |
| VIC | 1 | P | WELTER,KENNETH | 870043 | W | M | ▮▮▮▮▮ |
| VIC | 2 | P | LE,SAT THAN | 402831 | V | M | ▮▮▮▮▮ |
| WIT | 1 | I | VAR,PHIRUN | 970316 | D | M | ▮▮▮▮▮ |
| WIT | 2 | I | ZALUNARDO,RONALD | 735298 | H | M | ▮▮▮▮▮ |

## Summary Narrative

**SYNOPSIS:**  On 03-11-11 at approximately 2334 hours, Stockton Police Officers V-Kenneth Welter and V-Sat Le responded to an armed robbery of a person.  The officers conducted a traffic on a vehicle they saw leaving the area of the robbery with its lights off.  During the car stop the suspect (Neahmiah Johnson) was shot after he reached for a handgun that was sitting on the center console.  S-Neahmiah Johnson was transported to Lodi Memorial Hospital where he later died.

| Report Officer | Printed At | |
|---|---|---|
| 1720/NASO,LARRY VERNON | 01/23/2015 09:15 | Page 1 of 3 |

COS006375

**Exhibit 11**
**Page 18**

**12-11919**           Supplement No
                        **ORIG**

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
**04/06/2012**
Rpt/Incident Typ
**245**
Member#/Dept ID#
**NANCE,KATHRYN**

## Administrative Information

| Agency | | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **STOCKTON POLICE DEPARTMENT** | | **12-11919** | **ORIG** | **04/06/2012** | **19:39** | **120970765** |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| **REPORT TO FOLLOW** | **ASSAULT WITH A DEADLY WEAPON** | | | | | |

| Location | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| **2748 BURLINGTON PL** | | | **Stockton** | | **95209** | **0306** |

| District | Sector | From Date | From Time | Member#/Dept ID# | | |
|---|---|---|---|---|---|---|
| **BC** | **BW** | **04/06/2012** | **19:39** | **1302/NANCE,KATHRYN** | | |

| Assignment | | | | Entered by | | |
|---|---|---|---|---|---|---|
| **FIELD SERVICE SEAPORT 1ST WATCH PHASE 2** | | | | **1302** | | |

| Assignment | | | | Confidential | | |
|---|---|---|---|---|---|---|
| **FIELD SERVICE SEAPORT 1ST WATCH PHASE 2** | | | | **Officer Involved Incident** | | |

| RMS Transfer | Prop Trans Stat | Approving Officer | | Approval Date | | Approval Time |
|---|---|---|---|---|---|---|
| **Successful** | **Successful** | **1208** | | **05/03/2012** | | **09:27:32** |

| # Offenses | Offense | | Description | | Complaint Type | |
|---|---|---|---|---|---|---|
| **1** | **PC245 (A)(2)** | | **ASSAULT WITH FIREARM** | | | |

## Summary Narrative

****** This report was initially Supplement #20; however, it was changed to the original report as an original report was not completed. ******

---

| Report Officer | Printed At | |
|---|---|---|
| **1302/NANCE,KATHRYN** | **01/23/2015 09:32** | **Page 1 of 3** |

**12-11919**

Supplement No
ORIG

# STOCKTON POLICE DEPARTMENT

| Modus Operandi |
|---|
| Crime Code(s) |
| **ASSAULTS** |

| Narrative |
|---|

**NOTIFICATION:**
On 04-06-12, at approximately 1939 hrs. I (Sgt. K. Nance) G20, was in the area of Wagner Heights and Blue Fox Way. I was in full uniform and was driving a marked police vehicle. I responded to 2747 Burlington and arrived at approximately 1941 hrs.

**INVESTIGATION:**
A few minutes prior, I heard Officers Taiariol and Grinder (G22) advise on Channel 3, which is the radio channel we were operating on during that shift, that they were on a traffic stop on Burlington.  At 1939 hrs. I then heard Officer Grinder and Taiariol advise on Channel 1, the primary radio channel, of "Shots Fired" and they requested a Code 3 ambulance.

I responded Code 3, to 2747 Burlington Place, and arrived at approximately 1941 hrs.

Upon my arrival, I located Officer Taiariol and Grinder in front yard in between 2747 and 2741 Burlington.  The suspect, who was later identified by his California ID, was on the grass area at the north end of the yard.  I could see he had multiple gunshot wounds, blood on his face, and a broken right arm.  He was not responsive or breathing and Officer Grinder stood by with him until medics arrived.

I directed responding Officers to begin contacting people who were outside and inside the residences, to determine who lived in the area and to identify any witnesses. I directed other officers to begin securing the crime scene with crime scene tape and patrol cars.  The suspect was transported to St. Joseph's Hospital, via ambulance.  On the way to the hospital, the suspect was pronounced deceased.

I spoke to Officers Taiariol and Grinder.  They both had dirt on their uniforms.  Officer Taiariol had blood on his left knuckle and scrapes on his arm.  He also said he had been hit in the back.  Officer Grinder had dirt on his hands, arms and uniform.  He later told me that the little finger, on his left hand was injured, but he did not notice that injury when I first contacted him.

I took a public safety statement from Officers Grinder and Taiariol.  Officer Taiariol said he did not discharge his weapon and that Officer Grinder was the only one who shot.

Officer Grinder said they had stopped the suspect in a silver Toyota Camry. The driver, who was the only occupant fled from them, on foot.  After a foot pursuit and a physical altercation with the suspect, Officer Grinder said he shot several times at the suspect, because the suspect was attempting to hit Officer Taiariol with Officer Taiariol's baton.  He said immediately past the suspect, in the line of fire, was the residence of 2747 Burlington.

**\*\*\*\*\*\* *It should be Noted* \*\*\*\*\*** The statements made by the Officers were not a complete statement about the incident.  The purpose of the statement was only to determine if there was an ongoing threat or any immediate danger to the public. \*\*\*\*\*\*

There were what appeared to be bullet holes in the east side and south side of 2747 Burlington. I was unable to determine if the damage to the east side of the residence occurred during this incident or at a previous time.  Based on this possibility of someone being injured inside of the residence, I assigned several officers to make contact with the occupants of 2747 Burlington Place.  There was no answer at the door and dispatch was not able to locate any contact numbers for the residents of that location.  Officer forced entry to the residence, and did not locate anyone inside.

Officers Grinder and Taiariol were transported to the SEB where they were interviewed.  Witnesses to the incident were also transported to the SEB.  I briefed Lieutenants Howard and Reynosa about the incident.

I remained at the scene until I had briefed the Protocal teams and was relieved by Sgt. Reynolds.

I later responded to the SEB, where I met with Officer Grinder.  He showed me the little finger on his left hand. The nail bed and tip were discolored and bruised as was the underneath side of the finger.  Officer Grinder did not request medical attention at that time.

| Report Officer | Printed At | |
|---|---|---|
| 1302/NANCE,KATHRYN | 01/23/2015  09:32 | Page 2 of 3 |

COS006671

Exhibit 11
Page 20

12-11919

Supplement No
ORIG

# STOCKTON POLICE DEPARTMENT

## Narrative

Refer to other involved Officers and Detectives' reports for further details of statements made, the scene and evidence obtained.

**EVIDENCE:** None

**ATTACHMENTS:** None

**CASE DISPOSITION:** Refer to original report

| Report Officer | Printed At | |
|---|---|---|
| 1302/NANCE,KATHRYN | 01/23/2015 09:32 | Page 3 of 3 |

COS006672

**Exhibit 11**

**Page 21**

12-12492    Supplement No
              0014

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
04/12/2012
Rpt/Incident Typ
148
Member#/Dept ID#
HARRIS,CHARLES AARON

## Administrative Information

| Agency | | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| STOCKTON POLICE DEPARTMENT | | 12-12492 | 0014 | 04/12/2012 | 01:45 | 121030044 |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| RTF INVESTIGATIONS | RESISTING ARREST | | | | | |

| Location | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|
| 1633 E BIANCHI RD | | Stockton | 95210 | 0364 |

| District | Sector | From Date | From Time | Member#/Dept ID# | | |
|---|---|---|---|---|---|---|
| VA | VS | 04/12/2012 | 01:45 | 1558/HARRIS,CHARLES AARON | | |

| Assignment | 2nd Member#/ID# | Assignment | | Entered by |
|---|---|---|---|---|
| HOMICIDE UNIT | HESS,KEVIN | FIELD SERVICE LAKEVIEW FIRST WATCH PHASE 1 | | 1558 |

| Assignment | Confidential | RMS Transfer | Prop Trans Stat |
|---|---|---|---|
| HOMICIDE UNIT | Officer Involved Incident | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 1007 | 04/18/2012 | 07:53:00 |

| Attach - Other |
|---|
| Yes |

## Summary Narrative

Assisted in this investigation as a member of Team # 2.

## Narrative

NOTIFICATION :
On 4/12/2012 (Thursday) at approximately 0305 HRS, I, Detective Harris (I-16) received a phone call at home from the Stockton Police Department's Command Center. Subsequent to the call, I was advised that someone had died while in the custody of officers from the Stockton Police Department (SPD), and a Protocol Investigation was pending. I responded to the Stewart - Eberhardt Building (SEB) to assist with this investigation. I arrived on scene at approximately 0353 HRS.

INVESTIGATION :
On my arrival, I made contact with my supervisor, Sgt. Ridenour. I was told that due to JAMES COOKE dying while in police custody, there would soon be a briefing regarding the incident at the SEB.

Due to the Protocol Investigation, teams were formed to assist in this investigation. The teams would consist of officers from our department, as well as investigators from the San Joaquin County District Attorneys Office.

The briefing began at approximately 0550 HRS and it took place in the conference room of the SEB. The briefing was led by Lt. Sajor, who proceeded to give myself and other briefing attendees a synopsis of the investigation, up to that point.

Lt. Sajor stated that at approximately 0145 HRS on 4-12-12, SPD Officers Edens and Hess conducted a traffic enforcement stop on a vehicle in the area of Bianchi Road and West Lane, within the City of Stockton. The stop was initiated due to the unlawful speed of the suspect vehicle.

While conducting that traffic stop, the driver, (later identified as James Cooke, 7-6-54) parked his vehicle in a parking stall at the apartment complex located at 1633 E. Bianchi Road. Cooke then ran from the vehicle on foot, into the apartment complex and into a breeze-way area which did not have an exit, other than locked doors within the complex. The area where officers were able to catch up to Cooke was described as a "dark, grassy area".

Lt. Sajor stated that Cooke struggled with officers and would not submit to arrest. Either Officer Edens or Officer Hess (unknown which officer) spoke on the police radio, requesting more units to assist them at their location during the struggle.

| Report Officer | Printed At | |
|---|---|---|
| 1558/HARRIS,CHARLES AARON | 01/23/2015 09:34 | Page 1 of 7 |

**12-12492**    Supplement No
0014

# STOCKTON POLICE DEPARTMENT

<span style="background-color:darkred;color:white">**Narrative**</span>

Lt. Sajor stated that shortly after the last radio transmission, there was another radio transmission which stated the officers were taking one into custody. Soon after, there was another radio transmission which stated the officers would be deploying The Wrap on the suspect.

Known at that point, was that during the struggle to arrest the suspect, an officer had delivered baton "jabs" to the suspect's body until the suspect submitted to being taken into custody by police.

Due to the police vehicle's computer not functioning correctly, Lt. Sajor said he knew the officers went en route to San Joaquin County Hospital at some point between 0200 and 0220 HRS with the suspect for pre-booking.

Lt. Sajor said that at approximately 0220 HRS, he became aware that (SUS) Cooke had gone into full cardiac arrest while at the county hospital. Reportedly, Cooke was on a hospital gurney within the hospital when he stopped breathing. Despite efforts to revive him, Cooke expired and was pronounced deceased at approximately 0238 HRS.

Lt. Sajor stated that Sgt. Cantwell was the primary Sergeant assigned to this call.

After the teams were formed, I became aware that I was assigned to Team #2, which consisted of the following individuals:

**TEAM #2**
- SPD Det. C. Harris
- DAI R. Moreno
- CII D. Mosher

Team #2 was assigned to conduct interviews of the following SPD Officers:

- Sgt. D. Cantwell #1054
- Officer G. Guerrero #2270
- Officer E. Webb #2204
- Officer E. Gonzalez #2234

Prior to beginning any interviews, myself and Team #2 responded to the area where this occurred (1633 E. Bianchi Road) to see the location of occurrence ourselves. After visually inspecting the area, we returned to the SEB to begin interviews.

**Note:** Sgt. Cantwell, Officer Guerrero, Officer Webb and Officer Gonzalez all had legal counsel present with them while interviews were conducted.

Prior to any questions being asked and prior to the interview beginning, Sgt. Cantwell, Officer Guerrero, Officer Webb and Officer Gonzalez were all advised of the following:

**Referred to as "Attachment D"** - Introduction of Employer Agency Civil Investigator present during the Task Force Interviews of Employer Agency Employee:

**I read the following:**

**- Present during the interview is Dana Mosher as an investigator for the Stockton City Attorney's Office representing the City of Stockton and its employees in anticipation of civil litigation. He will be observing but not asking questions during the interview. His presence should not be construed as an order to answer questions and no punitive administrative action will be taken against you if you choose not to answer my questions. If you don't feel comfortable with his presence, he will step out of the room.**

**After I read the attachment to the Sergeant and each Officer, each Officer said they had no objection to CII Officer Dana Mosher being present during the interview.**

**Interview Began: 4-12-12 at approximately 0759 HRS**

**STATEMENT OF SERGEANT DUANE CANTWELL #1054:**
Cantwell stated his full name and his badge number which is #1054. He told me he has twenty-one (21) years

| Report Officer | Printed At | |
|---|---|---|
| 1558/HARRIS,CHARLES AARON | 01/23/2015 09:34 | Page 2 of 7 |

**12-12492**

# STOCKTON POLICE DEPARTMENT

**Narrative**

with the Stockton Police Department and his current rank is Sergeant. Cantwell said he is a patrol supervisor who is assigned to the Bear Creek District and he is assigned to work 4th watch on phase 1. That shift consists of the hours of 5pm - 3am. Cantwell's call sign is 4S54. He does not work with a partner.

Cantwell told me that earlier in the morning, he was sitting in his marked police vehicle in the area of March Lane and West Lane. It was not currently raining at this time.

Cantwell heard who he believed was Officer Edens, speak over the police radio. During that radio transmission, Cantwell said Officer Edens sounded like he was out of breath. Cantwell said this left him with the impression that Officer Edens was in a struggle. Officer Edens advised he was in an apartment complex, on Bianchi, east of West Lane.

Cantwell told me he responded to the call location Code 3 (lights and sirens). He said he did not advise dispatch of his Code 3 response because there were multiple units utilizing the police radio.

While en route, Cantwell said he saw two marked police vehicles traveling through the intersection of Bianchi Road and West Lane. Those marked vehicles were traveling with lights and sirens and they were traveling east bound.

After the roadway was clear, Cantwell said he followed those two marked police vehicles to the area of 1633 E. Bianchi Road. Cantwell parked behind those two vehicles, on the north side of the street, facing east bound.

Cantwell estimated that from the time he heard the radio traffic from officers who were requesting assistance, to the time he arrived on scene, approximately forty-five (45) seconds had elapsed.

Once on scene, Cantwell said he didn't know where Officers Edens and Hess were located within the complex. He exited his police vehicle and saw four (4) officers struggling with the suspect through a fence at the north curb line of Bianchi Road.

Due to the lighting conditions of this area, Cantwell said he used his flash light and shined it through the fence, into the area where officers were struggling with the individual. In doing so, Cantwell said he saw a black male on the ground. Cantwell heard an unknown officer yelling, "Give us your arms!"

Cantwell told me he noticed the suspect's head was facing to the east and the suspect's feet were facing to the west.

Cantwell estimated that he was approximately 7'-8' away from the officers while he was standing at the fence with his flash light. Cantwell said he didn't see any of the officers inside the apartment complex using a flash light. Cantwell stated the Officers were busy struggling with the suspect.

Cantwell said that from what he could see, he saw officers trying to hold down the suspect by trying to control the suspect's waist, legs and shoulder areas.

While this was occurring, Cantwell said he didn't remember the suspect verbally saying anything to the officers.

Cantwell said that approximately ten to fifteen (10-15) seconds after his arrival to the scene, the suspect was placed in handcuffs.

Cantwell said he saw an officer run to a police vehicle to get The Wrap. Cantwell said he was present during the application of The Wrap. While officers were applying The Wrap, Cantwell said the suspect wasn't fighting with them any longer.

Cantwell told me that while observing the suspect, he noticed the suspect had blood on his hands. He said he knew the suspect was alert and conscious because he heard the suspect moaning and groaning.

Cantwell said he made the decision for Officer Edens and Officer Hess to transport the suspect to the county hospital. Cantwell said he arranged for a Field Evidence Technician (FET) to obtain photographs of the suspect at San Joaquin County Hospital prior to the suspect being booked into county jail.

Cantwell said that while he was en route to speak with the Watch Commander about this incident, be received a

| Report Officer | Printed At | |
|---|---|---|
| 1558/HARRIS,CHARLES AARON | 01/23/2015 09:34 | Page 3 of 7 |

COS006804

**Exhibit 11
Page 24**

**12-12492**   Supplement No
0014

# STOCKTON POLICE DEPARTMENT

call from either Officer Edens or Officer Hess (Cantwell believes it was Officer Hess). During that phone call, the officer advised Cantwell that the suspect had gone into full cardiac arrest.

Cantwell said he advised the Watch Commander of the update and requested Sgt. Lane meet him (Cantwell) at the county hospital. When Cantwell arrived at the county hospital, he learned from Officers Edens and Hess that the suspect had died. He also spoke with a nurse from the County Hospital who advised the suspect had died at approximately 0234 HRS.

Cantwell told me that Lt. Sajor also arrived at the San Joaquin County Hospital. Cantwell said he transported Officer Hess to the SEB and Lt. Sajor transported Officer Edens to the SEB.

Cantwell said he himself has been trained in using The Wrap. Cantwell told me that based on his observations of SPD Officers applying The Wrap to the suspect, the Officers applied The Wrap in the appropriate manner as trained.

Cantwell said that while looking around the area during this incident, he did not observe any witnesses (citizens) who could have seen what had occurred, other than possibly a uniformed security guard who Cantwell saw standing at the location.

The Officers who Cantwell said he remembered seeing at this incident were Officer Webb, Officer Manor, Officer Hess and Officer Edens.

Cantwell told me that usually, vehicle traffic stops are aired to dispatch so that dispatch knows the location of the officer. Due to the frequency of traffic stops by SPD motorcycle units, their traffic stops are not usually aired. Cantwell added that it was not against SPD policy for a unit to conduct a traffic stop and not advise the dispatch center.

*(End of Statement) - Interview Concluded on 4-12-12 at approximately 0842 HRS -*

**INVESTIGATION  (continued)**:
After speaking with Sgt. Cantwell, I then conducted an interview of Officer G. Guerrero. During that interview, Officer G. Guerrero told me the following:

**Interview Began: 4-12-12 at approximately 0913 HRS**

**STATEMENT OF OFFICER GABRIEL GUERRERO #2270**:
Guerrero stated his full name and told me his badge number was #2270. Guerrero said he has been with the Stockton Police Department for approximately four (4) years and is currently assigned to the patrol division. Guerrero said he is a K9 Officer within the department and he has a regularly assigned partner, Officer Muhammad. Officer Muhammad was working with Officer Guerrero tonight during this incident. Guerrero told me he (GG) was driving the police vehicle tonight and he and his partner were in police vehicle #3620.

Guerrero told me that at about 2:00am, he and his partner were driving west bound Bianchi Road at Claremont. Guerrero said he heard either Officer Hess or Edens on the police radio, requesting a fill (back up). He said the officer sounded out of breath during the radio transmission. Guerrero said the unit advised they were on Bianchi Road, east of West Lane.

Guerrero said he turned his police vehicle around and began driving east bound on Bianchi Road. Once they arrived at the call location, Guerrero said he saw a flashing light on the north side of the street. He noticed this was at an apartment complex and that it was dark around the area.

Guerrero said he parked on the north side of Bianchi Road, at the apartment complex, west of the entrance. He said his vehicle was facing east on Bianchi Road.

Guerrero said he exited his vehicle and saw that Officer Edens and Officer Hess were in a struggle with the suspect on the other side of the fence. Guerrero said he asked them what the easiest way to enter the complex was. Guerrero said he and his partner ran east and found their way into the complex so they could assist Officers Edens and Hess.

When Guerrero arrived within the complex to assist with the arrest of the struggling suspect, he noted that the

| Report Officer | Printed At | |
|---|---|---|
| 1558/HARRIS,CHARLES AARON | 01/23/2015 09:34 | Page 4 of 7 |

**12-12492**   Supplement No
0014

# STOCKTON POLICE DEPARTMENT

suspect was pushing his way upwards from being on the ground. Officers were still struggling with the suspect.

Guerrero told me that Officer Hess was on the suspect's back, while Officer Edens was near the area of the suspect's head. The suspect was facing to the east and was approximately 3'-4' from the fence.

Guerrero said he got on the right side of the suspect and tried to get the suspect's hand. The suspect had his hands underneath him, and was pushing himself upwards, trying to get up. Guerrero also told me that he believed the suspect could have had his hands underneath him in order to obtain a weapon.

Guerrero told me he yelled, "Give me your hand!" to the suspect while he tried to pull the suspect's hand from underneath him. Guerrero told me he ordered the suspect to give him his hand approximately four to five (4-5) times. The suspect did not comply.

Due to the suspect continuing to resist and the fact that the suspect was not complying with Guerrero's commands, Guerrero said he struck the suspect in the lower back two times with his closed right fist, in hopes that using pain compliance would make the suspect stop resisting.

Doing this had no affect on the suspect.

Guerrero saw that Officer Hess was grabbing the suspect's left arm. Guerrero said he removed his (GG) handcuffs and cuffed the left hand of the suspect. Guerrero stated he was still giving the suspect verbal commands and the suspect's right hand was still underneath him. Guerrero described the suspect as being very tense.

Again, in an effort to gain compliance from the suspect, Guerrero stated he struck the suspect one time in the lower back with his closed right fist, while still giving verbal commands.

Guerrero said there were a few seconds between the first two strikes he delivered to the suspect's back, and the third (solo) strike he delivered to the suspect's back.

Guerrero said that at this time, he saw a baton come within his view and strike the suspect approximately two times. Guerrero said he saw that the suspect released his right hand, and then quickly pulled it back under him. Guerrero said he tried to grab the suspect's hand during that time, but was unsuccessful.

Guerrero said he saw another baton strike on the right side of the suspect. Guerrero said the baton strike came in at a different angle. Guerrero didn't know if the strike came from the same baton or the same officer.

At this point, Guerrero said the suspect's right arm came out and Guerrero was able to handcuff the suspect's right hand.

Guerrero said that after the suspect was handcuffed, the suspect was still kicking his feet and trying to roll his body.

Guerrero told me that officers were still having to hold down the suspect's hands and feet due to the suspect's continuing to kick his feet and roll his body. During this time, Guerrero said he heard someone say, "Do we need to Wrap him?" He later heard someone say, "We're gonna Wrap him."

Guerrero said he noticed that Officer Manor crossed the suspect's feet and held the suspect until The Wrap was deployed.

Guerrero said that after the leg restraining from the Wrap was applied to the suspect, he (GG) searched the front waistband of the suspect. At this point, Guerrero said the suspect didn't put up much resistance. Guerrero said he could still feel the suspect slightly rocking his body.

Guerrero said he supported the suspect's head and guided him to the seated position so that the rest of The Wrap could be deployed. Guerrero said an unknown officer applied the upper portion of The Wrap on the suspect. Guerrero said he asked Officer Webb to hold the suspect up while he (GG) locked the handcuffs to the "D" ring which was located at the back of the suspect.

*I asked Guerrero if the suspect had been saying anything during this incident.*

| Report Officer | Printed At | |
|---|---|---|
| 1558/HARRIS,CHARLES AARON | 01/23/2015 09:34 | Page 5 of 7 |

**12-12492**

# STOCKTON POLICE DEPARTMENT

## Narrative

Guerrero told me that the suspect was speaking rapidly, however it sounded like the suspect was mumbling. Guerrero said he couldn't understand what the suspect was saying.

Guerrero said three to four (3-4) Officers carried the suspect to the police car after The Wrap was applied. Guerrero said he doesn't know who those Officers were.

Guerrero noticed there was a shirt on the lawn area, and he noticed that the suspect did not have a shirt on. Presuming the shirt belonged to the suspect, Guerrero said he picked up the shirt and handed it to an Officer. Guerrero said he believes that person who he handed the shirt to was Officer Webb.

Guerrero said he asked if anyone needed anything else. When he found he was no longer needed, he advised Sgt. Cantwell of his use of force and went in-service.

Guerrero told me he has been trained on the application of The Wrap. While watching The Wrap being deployed on the suspect, and having assisted in it's deployment, Guerrero told me that The Wrap had been deployed correctly.

*Guerrero was asked about witnesses, injuries and the shirt he located.*

Guerrero said he does not remember seeing any witnesses (other than officers) to this incident. When looking at the suspect, Guerrero said he saw blood on the hands of the suspect, but he didn't know where the blood was coming from. Guerrero said when he collected the shirt that was on the ground, he did not examine the shirt. He said he handed it over to another officer.

*(End of Statement) - Interview concluded on 4-12-12 at approximately 0951 HRS.*

**INVESTIGATION  (continued)**:
After speaking with Officer G. Guerrero, Team #2 had an opportunity to speak with Officer Webb and Officer Gonzalez. The statements of Officer Webb and Officer Gonzalez were documented by DAI R. Moreno. Refer to DAI Moreno's subsequent report for more information regarding the statements of these officers.

*The above mentioned interviews were recorded and have been summarized above. The purpose of the summary is to render an overview of what was described; however, they are not transcriptions of the recorded interviews. The summary should not be viewed as containing only the important facts of the interview. They are intended to provide the reader with a general understanding of what was said; therefore, refer to the recording itself for the exact wording.*

After all interviews were completed, I transferred copies of those video recorded interviews to DVD. I later booked that DVD into the Stockton Police Department's Property Room, within the SEB. That DVD was booked under property record #B82552 and it is Item #1.

During the above mentioned interviews, I showed each officer an aerial view of 1633 E. Bianchi Road, within the City of Stockton. Each officer either reviewed the color copy of the aerial view, and / or made marks on the copy, illustrating either where they approached from, where their patrol vehicle was parked, or where they saw the location of the struggle with James COOKE.

After each Officer viewed and / or made marks on the color copies, the name of the Officer being interviewed at that time was then written on the bottom left hand side of the paper, along with the date. I later booked those four (4) color copies into evidence at the Stockton Police Department's Property Room, within the SEB. They were booked on property record #B82615 as Item #1.

On 4-17-2012, Sgt. Ridenour gave me a Field Investigation Report from the Department of Justice. This report appeared to have been written by Senior Criminalist, S. Yoshida. I made a photo copy of the DOJ report and I attached that copy with this report. I gave the original report to Detective Faine (Team #1), to be retained in his case file.

**ATTACHMENTS** :
Department of Justice (DOJ) Field Investigation Report

**EVIDENCE** :

| Report Officer | Printed At | |
|---|---|---|
| 1558/HARRIS,CHARLES AARON | 01/23/2015 09:34 | Page 6 of 7 |

**12-12492**

# STOCKTON POLICE DEPARTMENT

## Narrative

Video Disk - Property Record #B82552, Item #1
Illustrated Images - Property Record #B82615, Item #1

**DISPOSITION** :
Refer to Original and Subsequent Reports for further information.

| Report Officer | Printed At | |
|---|---|---|
| 1558/HARRIS,CHARLES AARON | 01/23/2015 09:34 | Page 7 of 7 |

COS006808

**Exhibit 11**
**Page 28**

**12-23783**   Supplement No
                **0009**

# STOCKTON POLICE DEPARTMENT



**22 E MARKET ST.**

**STOCKTON,CA 95202**

**(209) 937-8495**

Reported Date
**07/11/2012**
Rpt/Incident Typ
**245**
Member#/Dept ID#
**KWAN,JIMMY MON HING**

## Administrative Information

| Agency | | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **STOCKTON POLICE DEPARTMENT** | | **12-23783** | **0009** | **07/11/2012** | **23:38** | **121930984** |

| Status | Rpt/Incident Typ | | | | |
|---|---|---|---|---|---|
| **REPORT TO FOLLOW** | **ASSAULT WITH A DEADLY WEAPON** | | | | |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| **6851 PLYMOUTH RD #36** | **Stockton** | **95207** | **0266** |

| District | Sector | From Date | From Time | Member#/Dept ID# |
|---|---|---|---|---|
| **LA** | **LW** | **07/11/2012** | **23:38** | **1087/KWAN,JIMMY MON HING** |

| Assignment | 2nd Member#/ID# |
|---|---|
| **FIELD SERVICE PARK THIRD WATCH PHASE 2** | **GENEST, MARGARET** |

| Assignment | Entered by |
|---|---|
| **Field Service Civic Center 2nd Watch Ph 2** | **1087** |

| Assignment | Confidential |
|---|---|
| **FIELD SERVICE PARK THIRD WATCH PHASE 2** | **Officer Involved Incident** |

| RMS Transfer | Prop Trans Stat | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| **Successful** | **Successful** | **1159** | **07/12/2012** | **13:30:26** |

| Route - Crimes vs Persons |
|---|
| **Yes** |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| **1** | **PC245 (A)(2)** | **ASSAULT WITH FIREARM** | |

## Modus Operandi

| Premise Type | Crime Code(s) |
|---|---|
| **RESIDENCE** | **ASSAULTS** |

## Narrative

**NOTIFICATION** :

I (Officer Kwan/3B27) assisted on this call at 2350 hrs.

**INVESTIGATION** :

I was originally at the area of Wilson/Scotts when Sgt. Garlick and his team (CRT) were responding to a shooting call at the listed location.  Officer Garlick told dispatch he was following a vehicle that was possibly related to this shooting as well as a shooting a few days ago.

The vehicle they were following was southbound on I-5 approaching the Fremont Street exit.  He requested additional units to assist with a high risk vehicle stop.  Several units came up for the call and he stated he would make the stop near the Downtown transition.

A unit came back on the radio and stated the vehicle was failing to stop and was now fleeing from them.  The vehicle was south on I-5 at this time and was exiting the Charter Way/MLK exit.  I went south on Wilson and west on MLK.  Sgt. Garlick stated the vehicle was occupied by at least four occupants and he requested additional units to assist him with this pursuit.

The suspect vehicle got back onto I-5 and was now traveling north.  The suspect vehicle took the Monte Diablo exit and a gun was thrown out of the vehicle.  Units in the pursuit stated they were being shot at by the occupants of the fleeing vehicle.  I exited the Monte Diablo off ramp and went west as the pursued vehicle went west.  The suspect vehicle was now in the area of Peachtree/Pinetree.  Officers came up on the radio and stated they had returned fire at the occupants.

I went west to Occidental and north to Shimizu.  I went east Kingsley and south to Pixie Drive.  I saw Officer Donaldson standing on the southwest corner of the block.  He waved his flashlight at me.  I stopped at the intersection and asked him where did he need me.  Officer Donaldson stated the suspect had fled into the block and he needed me to stay at this intersection to establish a perimeter.

| Report Officer | Printed At | |
|---|---|---|
| **1087/KWAN,JIMMY MON HING** | **01/23/2015 09:35** | **Page 1 of 2** |

**12-23783**                    Supplement No
                                0009

# STOCKTON POLICE DEPARTMENT

## Narrative

My position was the northeast perimeter.  I could see several police cars west of me.  This was the area where the pursuit ended.  I had responding units take positions along the south and east portions of the block.  A perimeter was established at this time.

Sgt. Cantwell had me stand by with an arrest/response team in case the suspect fled out of the perimeter. Responding SWAT Officers responded and searched the area.  I secured from the location at 0640 hrs.

**DISPOSITION** :
Refer to Original Report

| Report Officer | Printed At | |
|---|---|---|
| 1087/KWAN,JIMMY MON HING | 01/23/2015 09:35 | Page 2 of 2 |

COS006914

**Exhibit 11**
**Page 30**

**12-23783**   Supplement No **0010**

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
**07/11/2012**
Rpt/Incident Typ
**245**
Member#/Dept ID#
**WEBER, TRAVIS**

## Administrative Information

| Agency | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| STOCKTON POLICE DEPARTMENT | 12-23783 | 0010 | 07/11/2012 | 23:38 | 121930984 |

| Status | Rpt/Incident Typ |
|---|---|
| REPORT TO FOLLOW | ASSAULT WITH A DEADLY WEAPON |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 6851 PLYMOUTH RD #36 | Stockton | 95207 | 0266 |

| District | Sector | From Date | From Time | Member#/Dept ID# |
|---|---|---|---|---|
| LA | LW | 07/11/2012 | 23:38 | 2424/WEBER, TRAVIS |

| Assignment | 2nd Member#/ID# |
|---|---|
| FIELD SERVICE SEAPORT 2ND WATCH PHASE 2 | MAYO,BOYD ROSS |

| Assignment | Entered by |
|---|---|
| FIELD SERVICE SEAPORT 3RD WATCH PHASE 1 | 1554 |

| Assignment | Confidential | RMS Transfer |
|---|---|---|
| BEAR CREEK FOURTH WATCH PHASE TWO | Officer Involved Incident | Successful |

| Prop Trans Stat | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|
| Successful | 1159 | 07/12/2012 | 13:32:30 |

## Summary Narrative

SUBSEQUENT REPORT

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

**NOTIFICATION** :
On 071112 at approx. 2348 hours, Officer Ven and I, Officer Hiland responded to the area of I-5 and Charter Way to assist Officers in pursuit of a possible suspect vehicle that had been involved in a shooting earlier at/near 6851 Plymouth Rd. We responded from Pacific Ave./March Ln.

**INVESTIGATION** :
While enroute S/B on I-5, the suspect vehicle (Red van) continued to evade Officers into the Pixie/Pinetree area. Shots had been reported to have been exchanged at this location and a short time earlier as well.

Ven and I arrived at this location at approx. 2354 hours. I assisted other Officers on the inner perimeter of Doray Ct. I cleared from the crime scene at approx. 0600 hours.

**ATTACHMENTS** :
None.

**EVIDENCE** :
None relating to this report.

**DISPOSITION** :
Forward with Original Report.

| Report Officer | Printed At | |
|---|---|---|
| 2424/WEBER, TRAVIS | 01/23/2015 09:35 | Page 1 of 1 |

**12-30118** Supplement No
ORIG

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
08/27/2012
Rpt/Incident Typ
10851
Member#/Dept ID#
REYNOLDS,MARK ALLAN

## Administrative Information

| Agency | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| STOCKTON POLICE DEPARTMENT | 12-30118 | ORIG | 08/27/2012 | 00:02 | 122400002 |

| Status | Rpt/Incident Typ |
|---|---|
| RTF SPECIAL ENFORCEMENT TEAMS | STOLEN VEHICLE |

| Location | City | ZIP Code | Rep Dist |
|---|---|---|---|
| 2110 E SONORA ST | Stockton | 95205 | 0193 |

| District | Sector | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| PA | PN | 08/26/2012 | 21:00 | 08/27/2012 | 00:01 |

| Member#/Dept ID# | Assignment | Entered by |
|---|---|---|
| 6432/REYNOLDS,MARK ALLAN | COMMUNITY RESPONSE TEAM | 6432 |

| Assignment | Confidential | RMS Transfer | Prop Trans Stat |
|---|---|---|---|
| COMMUNITY RESPONSE TEAM | Officer Involved Incident | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 2958 | 08/27/2012 | 08:26:08 |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | VC10851 (A) | TAKE VEHICLE WITHOUT | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| VIC | 1 | I | HERNANDEZ,EDUARDO | 422963 | H | M | 12/15/1977 |

## Vehicle Summary

| Invl | Type | License No | State | Lic Year | Year | Make | Model | Style | Color |
|---|---|---|---|---|---|---|---|---|---|
| STN | A | 4NVK337 | CA | 2013 | 1994 | HOND | CIV | 4D | WHI |

## Summary Narrative

**SYNOPSIS:**

The victim vehicle was stolen from the street in front of the victim's residence. Officers from SPD initiated a pursuit of the vehicle and turned it over to CHP. SPD officers following the pursuit to its termination point and CHP officers were involved in a shooting when the pursuit ended in the area of Woodbridge / E Hwy 99 Frontage in Lodi.

**FCN:**
4751224000640

HQ Clerk 1593 advised

| Report Officer | Printed At | |
|---|---|---|
| 6432/REYNOLDS,MARK ALLAN | 01/23/2015 09:37 | Page 1 of 3 |

**13-6971**          Supplement No
                     **0007**

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
**02/23/2013**
Rpt/Incident Typ
**957**
Member#/Dept ID#
**HOFFMAN,CLIFFORD EARL**

## Administrative Information

| Agency | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| STOCKTON POLICE DEPARTMENT | 13-6971 | 0007 | 02/23/2013 | 21:33 | 130540730 |

| Status | Rpt/Incident Typ | | | | |
|---|---|---|---|---|---|
| SIGNIFICANT INCIDENT REPORT | DISCHARGE OF FIREARMS | | | | |

| Location | | | City | ZIP Code | Rep Dist |
|---|---|---|---|---|---|
| 254 S ADELBERT AV | | | SAN JOAQUIN C | 95215 | 7237 |

| District | Sector | From Date | From Time | Member#/Dept ID# | |
|---|---|---|---|---|---|
| OUT | OUT | 02/23/2013 | 21:33 | 2080/HOFFMAN,CLIFFORD EARL | |

| Assignment | 2nd Member#/ID# | |
|---|---|---|
| COMMUNITY RESPONSE TEAM | WEBB, EDWARD | |

| Assignment | | Entered by | Assignment |
|---|---|---|---|
| Field Service Civic Center 3rd Watch Ph 1 | | 2080 | COMMUNITY RESPONSE TEAM |

| Confidential | RMS Transfer | Prop Trans Stat | Approving Officer |
|---|---|---|---|
| Officer Involved Incident | Successful | Successful | 6267 |

| Approval Date | Approval Time |
|---|---|
| 04/22/2013 | 06:47:24 |

## Narrative

**NOTIFICATION** :
On 022313 at approximately 2133 hours, Officer Sepulveda and I, Officer Hoffman (Y10), responded to assist Officer Sensabaugh of the Stockton Police Department and Deputy Taiariol of the San Joaquin Sheriff's Office with a traffic stop. We arrived at approximately 2137 hours. We were wearing plain clothes with raid vest clearly labeled with "Police" patches, driving an unmarked vehicle and assigned to the Community Response Team.

**INVESTIGATION** :
While we were enroute to the traffic stop, I heard "shots fired, shots fired, shots fired" on the radio. When we arrived, we parked on S. Adelbert Ave just south of Washington St. I saw a silver Mercedes that had backed into a fence on the east side of S. Adelbert Ave. There were multiple bullet holes on the driver side of the Mercedes. The driver side door was open and the engine was on. The rear driver side tire was elevated off the ground and was spinning as if the vehicle was still in gear. I reached inside the vehicle and turned the key to the "off" position because the tires were still spinning and to prevent the vehicle from moving.

The driver side door was open and there was a male on the ground next to the Mercedes. Officer Martin, Officer Gonzalez, Officer Morrison and Officer Gomez were providing first aid to the male. I saw a silver colored handgun with black pistol grips on the ground next to the male.

Sgt Smith called me to sit with Officer Sensabaugh at his patrol vehicle while the scene was processed. Several minutes later, Sgt Nance told me to transport Officer Sensabaugh to the SEB and to secure his K9. Officer Sepulveda and I transported Officer Sensabaugh and his K9 to the police department. Officer Sensabaugh's K9 was secured and we then transported him to the SEB to be interviewed. I stayed at the SEB with Officer Sensabaugh until I was told to secure.

**ATTACHMENTS** :
None

**EVIDENCE** :
None

**DISPOSITION** :
Refer to Original

| Report Officer | Printed At | |
|---|---|---|
| 2080/HOFFMAN,CLIFFORD EARL | 01/23/2015 09:40 | Page 1 of 1 |

COS007604

**Exhibit 11**
**Page 33**

**13-25076**    Supplement No
0025

# STOCKTON POLICE DEPARTMENT

| Type | Address | | | City | State |
|------|---------|---|---|------|-------|
| HOME | 1358 KIMIYO ST | | | Stockton | CALIFORNIA |

| ZIP Code | Date | | | | |
|----------|------|---|---|---|---|
| 95206 | 07/11/2013 | | | | |

| Type | ID No | | | | |
|------|-------|---|---|---|---|
| FBI number | 625505TD8 | | | | |

| Type | | ID No | | OLS | |
|------|---|-------|---|-----|---|
| Operator License | | F2424703 | | CALIFORNIA | |

| Type | | ID No | | | |
|------|---|-------|---|---|---|
| Social Security Number | | 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 | | | |

| Involvement | Arrest Type | Arrest Date | Arrest Time | Book Date | Book Time | Status | Dispo |
|-------------|-------------|-------------|-------------|-----------|-----------|--------|-------|
| ARREST | Arrested | 07/10/2013 | 11:20:00 | 07/10/2013 | 11:20:00 | BOOK | FELONY |

| Arrest Location | | | | City | Rep Dist | Fingerprt Taken? | Mug? |
|-----------------|---|---|---|------|----------|------------------|------|
| 3939 EWS WOODS BL | | | | Stockton | 0436 | Yes | Yes |

| Place of Birth | City of Birth | Sector | |
|----------------|---------------|--------|---|
| CALIFORNIA | Oakland | SW | |

| Charge | Level | Charge Literal |
|--------|-------|----------------|
| PC664-189 | F | ATTEMPT MURDER |
| PC626 9(D) | F | DISHCARGE FIREARM IN |
| PC29800 (A)(1) | F | EX-FELON WITH A FIRE |
| PC25400 (A)(1) FEL | F | CONCEALED WEAPON IN |
| PC32310 | F | POSS/MFG/SELL LRG CA |
| PC30605 (A) FEL | F | POSSESS ANY ASSAULT |
| PC25850 (A) FEL | F | CARRY LOADED FIREARM |

## Narrative

**NOTIFICATION:**

On 071013 at about 1840 hrs I, Detective Reeder was contacted at my residence by Stockton Police Dispatch that there was a call out for a officer involved shooting. I arrived at the SEB at about 1915 hrs.

**INVESTIGATION:**

The following people were detained at the scene. A investigation found evidence that arrested persons Juan Barnes, Terrance Adams, Diandre Adams, and Jose Gonzalez were in a vehicle together and did not immediately yield when San Joaquin Sheriff Deputies attempted to stop the vehicle for speeding. The vehicle, driven by Jose Gonzalez drove several blocks before stopping in the parking lot of August Knodt Elementary School at which point two occupants, Diandre Adams (R/F passenger) and Juan Barnes (R/R passenger) fled the vehicle. Deputies gave chase to Barns and Diandre Adams. Diandre Adams fired several rounds from an assault rifle with a high capacity magazine at three deputies and one Stockton Police Officer. The deputies and officer returned fire wounding Diandre Adams. Diandre Adams was transported to San Joaquin General Hospital and is being treated for his wounds.

Juan Barnes was located hiding on a roof and taken into custody. During the foot chase with Barnes he discarded a black handgun with a high capacity magazine which extended beyond the grip of the gun.

I collected cell phones from Jose Gonzalez and Terrance Adams.

Juan Barnes was found to have the following warrant:

Warrant #:  67436
Issue Date: 02/21/2012
Court:      San Joaquin Superior Court-Juvenile
Judge:      W. Stephen Scott
Bail:       No Bail
Charges:    625(b) PC

Diandre Adams was still being treated at San Joaquin County Hospital at the time of this writing. Juan Barnes, Terrance Adams, and Jose Gonzalez were processed before being booked into the San Joaquin County Jail.

COS007677

Exhibit 11
Page 34

13-43793  Supplement No
ORIG

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
12/05/2013
Rpt/Incident Typ
187
Member#/Dept ID#
ALANIZ,HECTOR

## Administrative Information

| Agency | | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| STOCKTON POLICE DEPARTMENT | | 13-43793 | ORIG | 12/05/2013 | 01:04 | 133390040 |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| RTF INVESTIGATIONS | MURDER | | | | | |

| Location | | | City | | Rep Dist | District | Sector |
|---|---|---|---|---|---|---|---|
| SB I5 OFF RAMP/MONTE DIABLO AV | | | Stockton | | 0136 | CC | CS |

| From Date | From Time | To Date | To Time | Member#/Dept ID# | |
|---|---|---|---|---|---|
| 12/05/2013 | 01:04 | 12/05/2013 | 01:04 | 2081/ALANIZ,HECTOR | |

| Assignment | Entered by | Assignment | Confidential |
|---|---|---|---|
| ROBBERY PHASE 1 | 2081 | ROBBERY PHASE 1 | Officer Involved Incident |

| RMS Transfer | Prop Trans Stat | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | Successful | 1492 | 01/07/2014 | 16:24:23 |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | PC187 (A) | MURDER | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| SUB | 1 | P | GUERRERO,GABRIEL | 579914 | H | M | 12/04/1979 |
| SUB | 2 | P | ADAMS,AARON | 1251678 | W | M | 06/22/1983 |
| SUB | 3 | P | MCCLURE,KIRSTEN | 1211412 | W | F | 09/05/1990 |
| SUS | 1 | I | PERRY,ROBERT CRAIG | 1295420 | W | M | 10/03/1970 |
| VIC | 1 | I | PERRY,ROBERT CRAIG | 1295420 | W | M | 10/03/1970 |

## Summary Narrative

S/V-Robert Craig Perry was wanted for attempted homicide in San Jose California. CHP officers on patrol located Perry's vehicle and attempted to stop it. S/V-Perry led CHP officers on a high speed pursuit that covered highway 99, the city streets of Stockton and southbound Interstate 5. CHP officers in active pursuit requested a K-9 unit to assist with the stop. S/V-Perry's vehicle subsequently came to a stop on southbound I-5 just south of County Club Blvd. Pursuing CHP officers conducted a felony stop with the assistance of Stockton Police Department officers. During the stop, S/V-Perry refused to comply with officers orders to exit the vehicle. As S/V-Perry sat in his vehicle, he was observed throwing lighted objects out the vehicle as well as waving a large knife. Stockton Police Department officers consisting of a K-9 officer subsequently approached the vehicle and attempted to remove S/V-Perry from the vehicle. The K-9 was deployed and engaged Perry who continued to resist. During the attempted arrest of S/V-Perry an arresting officer felt threatened and fired their duty weapon striking S/V-Perry who fell to the asphalt. He would then succumbed to his injuries.

| Report Officer | Printed At | |
|---|---|---|
| 2081/ALANIZ,HECTOR | 01/23/2015 09:44 | Page 1 of 3 |

COS008107

**Exhibit 11**
**Page 35**

**14-5346**                          Supplement No
                                      **0001**

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

Reported Date
**02/09/2014**
Rpt/Incident Typ
**245**
Member#/Dept ID#
**TALAMANTES,LUIS ARMAND**

(209) 937-8495

## Administrative Information

| Agency | | DR | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **STOCKTON POLICE DEPARTMENT** | | **14-5346** | **0001** | **02/09/2014** | **10:41** | **140400237** |

| Status | | | | | | |
|---|---|---|---|---|---|---|
| **REPORT TO FOLLOW** | **ASSAULT WITH A DEADLY WEAPON** | | | | | |

| Location | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|
| **1547 CARPENTER RD** | | | **Stockton** | | **95206** | **0245** |

| District | Sector | From Date | From Time | To Date | To Time | |
|---|---|---|---|---|---|---|
| **PA** | **PS** | **02/09/2014** | **10:41** | **02/09/2014** | **10:41** | |

| Member#/Dept ID# | | | | | | |
|---|---|---|---|---|---|---|
| **2076/TALAMANTES,LUIS ARMANDO** | | | | | | |

| Assignment | | | | Entered by | | |
|---|---|---|---|---|---|---|
| **FIELD SERVICE SEAPORT 2ND WATCH PHASE 1** | | | | **2076** | | |

| Assignment | | | | Confidential | | |
|---|---|---|---|---|---|---|
| **FIELD SERVICE SEAPORT 2ND WATCH PHASE 1** | | | | **Officer Involved Incident** | | |

| RMS Transfer | Prop Trans Stat | Approving Officer | | Approval Date | | Approval Time |
|---|---|---|---|---|---|---|
| **Successful** | **Successful** | **1293** | | **02/10/2014** | | **00:19:56** |

## Summary Narrative

Subsequent report.

## Modus Operandi

Crime Code(s)
**ASSAULTS**

## Narrative

**NOTIFICATION** :
On 02/09/14 at about 1108 hours, I, Officer Talamantes (2A35) was dispatched to Airport/Folsom to assist on a traffic stop with reported shots fired. I arrived at about 1110 hours.

**INVESTIGATION** :
Upon arrival, I met with SGT Cantwell who advised I was no longer needed. I cleared the scene at about 1123 hours.

At about 1136 hours I was advised via radio to return to the scene to assist. I arrived at about 1146 hours.

Upon arrival, I assisted with canvassing the scene for any expended shell casings. I located one shell casing along the east side walk of Airport which had already been marked with a white flash card over it.

I searched a pair of blue jeans that were torn off of the suspect by AMR. I was searching for an identification card to identify the suspect. I was unable to locate any identification. I took a position about 400 feet north from the traffic stop along the north bound lanes. I made sure no foot traffic nor vehicle traffic went through the scene.

I later located a second shell casing on the east side of a black iron fence that runs North and South along the east curb of Airport way. I used a flash card to mark it and I advised SGT Telly and FET Chelli where the casing was located. I assisted Detective Donaldson in towing the suspect vehicle by filling out the MVR. I gave it to Detective Donaldson. I secured the scene at about 1832 hours.

**ATTACHMENTS** :
See original

**EVIDENCE** :
See original

| Report Officer | Printed At | |
|---|---|---|
| **2076/TALAMANTES,LUIS ARMANDO** | **01/23/2015 09:47** | **Page 1 of 2** |