UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

NATHANIEL SMITH,

                    Plaintiff,

        vs.                          No.
                                     2:16-CV-00363-KMJ-AC
CITY OF STOCKTON, et al.,

                    Defendants.
_____/

DEPOSITION OF SERGIO CONTRERAS

Friday, November 18, 2016

9:38 a.m.

Taken in the offices of:

Herum Crabtree Suntag

5757 Pacific Avenue, Suite 222

Stockton, California 95207

REPORTED BY:  VALERYANNA SKIPPER, CSR #9868

**Contreras Dep.**

1     Q.  Who told you to do that?

2     A.  Well, we went because we -- we didn't hear

3 nothing about the truck, so we were kind of worried, you

4 know.  It's still our car.  We went and then they told us

5 that there's no tow truck, we have to drive it home.

6     Q.  And I know I saw in the interview that the

7 officers did with you after the incident you were asking

8 are they going to fix the damage to the car.

9     A.  Yeah.

10     Q.  Did you ever follow up on that and ask them?

11     A.  I asked them that day and after that it just --

12 I left it like that because I just thought it was -- I

13 thought it was over.  So I just took it as a loss.

14     Q.  Okay.  And why did you sell that truck later?

15     A.  My mom had bought a new Expedition and then just

16 didn't really need it no more.

17     Q.  Did you ever clean the blood off of it?

18     A.  Yes.

19     Q.  I imagine that was unpleasant.

20     A.  It was horrible.

21     Q.  Had you ever been present when gunshots were

22 fired prior to that day?

23     MR. STEVENS:  Vague.  Ambiguous.

24     THE WITNESS:  I've -- I've heard -- yeah, I've

25 been around stuff like that, just not that close.

**Contreras Dep.**

```
 1    BY MS. RIFKIN:
 2         Q.   When you say "not that close" what do you mean?
 3         A.   Like as in me almost getting striked.
 4         Q.   Why do you say that you almost got striked?
 5         A.   My butt was still in the car when they started
 6    shooting and when I picked up the truck there was two
 7    bullet holes in the seat I was in.
 8         Q.   When you say there are two bullet holes in the
 9    seat you were in, which seat are you talking about?
10         A.   The back -- the back passenger seat where I came
11    in -- where Mr. Smith came in.
12         Q.   All right.  So I'm showing you Exhibit 82 again.
13    This is the last picture in it.  And it shows sort of the
14    front seat, the one with the blood in it.  Are you saying
15    that you were -- the gunshots were in the seat directly
16    behind the seat with the blood?
17         A.   Yes.
18         Q.   Okay.  And there were bullet holes in that seat?
19         A.   Yes.
20         Q.   Did the incident shake you up?
21         A.   Yes.  But I was playing football at the time, so
22    it kind of just faded away.  Just -- I was distracted
23    also, you know, so it worked out.
24         Q.   Football for your school?
25         A.   Yeah.
```

Contreras Dep.

1       A.   The office phone.

2       Q.   An officer using the phone at the department --

3       A.   Yeah.

4       Q.   -- talked to your mom?

5       A.   Yes.

6       Q.   Okay.  All right.  So I'm going to ask you some

7    questions about what happened during the incident and go

8    back over some of that.  You talked -- you said that you

9    were the one putting air in the tire, right?

10      A.   Yes.

11      Q.   Okay.  Did you have -- were you kind of facing

12   the tire when you were putting the air in it?

13      A.   I was -- this was the door.  This was the tire

14   right here.  So I was putting air like this.

15      Q.   Okay.  And so you -- did you have your back to

16   the fence?

17      A.   I had my back to the back of the truck at the

18   moment that I was putting air on it.

19      Q.   So was your body kind of turned towards the

20   front of the truck?

21      A.   Kind of.

22      Q.   When Mr. Smith -- you said he was on the other

23   side of the fence when he first came up to the car?

24      A.   Uh-huh.

25      Q.   Okay.  Is that a "yes"?

**Contreras Dep.**

1    A.   Yes.

2    Q.   Okay.

3    A.   My bad.

4    Q.   Did you see him come up?

5    A.   I didn't.

6    Q.   Who did he first talk to?

7    A.   Me and Jose.

8    Q.   And what did he -- what did he say?

9    A.   He yelled, "Give me a ride."

10   Q.   And who responded to him?

11   A.   He said it in Spanish, it looks like he's

12   running away from the police or something.  I told him no

13   and then he just -- that's when everything else happened.

14   Q.   Okay.  So when you said he said in Spanish it

15   looks like he's running away from the police --

16   A.   My cousin, Jose, said in Spanish.

17   Q.   Okay.  So -- so Mr. Smith comes up and says,

18   "Can I get a ride?"

19   A.   Uh-huh.

20   Q.   And then Jose says to you in Spanish it looks

21   like he's running away from the police?

22   A.   Yes.

23   Q.   And then you said no?

24   A.   No.

25   Q.   And did you say that to Jose or to Mr. Smith?

**Contreras Dep.**

1      A.   Well, I said it towards them and then my cousin

2   repeated it and said no.

3      Q.   Okay.  Were there -- and was there any other

4   part of the conversation that happened?

5      A.   No.

6      Q.   Do you remember Jose saying anything else to

7   Mr. Smith?

8      A.   No.

9      Q.   And did you and Jose exchange any more words?

10     A.   No, not at all.

11     Q.   Okay.  So you said no and you heard Jose repeat

12   that?

13     A.   Yes.

14     Q.   Okay.  And then what's the next thing you

15   remember?

16     A.   Him rushing in the truck.

17     Q.   Okay.  And you didn't see him -- how he got from

18   being on the other side of --

19     A.   No, because --

20     Q.   -- the fence to the truck?

21     A.   No, because at that time I had finished putting

22   air, so I had actually went like this to put the cap and

23   let the -- the -- the air thing pull by the time he was

24   already jumping in.

25     Q.   Okay.  So you're -- I just kind of want to

**Contreras Dep.**

1    describe what you did for the --

2        A.  Yeah.

3        Q.  -- for the record.  So you're saying you kind of

4    turned to put the cap back on the --

5        A.  The tire.

6        Q.  The tire.

7        A.  Yes.

8        Q.  And you were kind of hunched over doing that

9    and -- and that's, as far as you know, when he kind of

10   came up and into the car?

11       A.  Yes.

12       Q.  Okay.  So you became aware -- what's the next

13   thing you became aware of?  That Mr. Smith was going into

14   the car?

15       A.  Yes.

16       Q.  And that was through the back door?

17       A.  Yes, through the back door.

18       Q.  Okay.  Can you -- about how long a time period

19   passed between when you remember saying no to -- to him

20   having a ride and when he came in the door?

21       A.  A couple seconds.

22       Q.  A couple seconds?

23       A.  Yeah.

24       Q.  Okay.  And was Gabriel still in the car?

25       A.  Yes.

**Contreras Dep.**

1       A.   I ran for cover towards the green.

2       Q.   Towards the green metal object we talked about

3  before?

4       A.   Yes.

5       Q.   Did you get out of the rear --

6       A.   The same -- the same way Mr. Smith and I came

7  in.

8       Q.   Okay.  Did you see either of the officers shoot?

9       A.   No.

10       Q.   Did you hear it?

11       A.   Yes.

12       Q.   And did you see Gabriel leave the car?

13       A.   I remember seeing him just take off towards the

14  front of the vehicle, which is towards the front of the

15  store.

16       Q.   Did you see them -- did you see where they ran

17  to?

18       A.   Just towards the front of the store.

19       Q.   Had you ever seen the video of your -- the

20  questioning before today?

21       A.   No.  Today's my first day, actually.

22       Q.   Had you ever seen any written transcript of what

23  you'd said?

24       A.   Not at all.

25       Q.   Okay.  You didn't have a license at the time of

**Contreras Dep.**

1     this incident, right?

2          A.   I still don't.

3          Q.   Okay.   Were you -- when you were being

4     interviewed at the police station were you worried at all

5     about that you had been driving without a license?

6          A.   Still am.

7          Q.   All right.   At the time that the -- that they

8     were questioning you were you worried you might get in

9     trouble for that?

10         A.   Yes.

11         Q.   Did they say anything to you about that?

12         A.   No.   Which I thought too I wasn't driving at the

13    moment, so I couldn't really get in trouble for it.   The

14    car was parked.

15         Q.   Sometimes in the -- in the video, at least as I

16    watched it and heard it, it -- it sounded like you used

17    the phrase "get off," "get off the car."   Does that --

18    does that sound familiar?

19              MR. STEVENS:   Hold on.   Leading, vague,

20    ambiguous, and misstates prior testimony.

21              THE WITNESS:   I just remember, "Get out of the

22    car," the cops.

23    BY MS. RIFKIN:

24         Q.   Okay.   Do you -- do you ever use the phrase --

25    you yourself use the phrase like "I got off the car" to

**Contreras Dep.**

1       A.   I was --

2            MR. STEVENS:  Do you want him to draw -- I'm

3       sorry.  Just to clarify, do you want him to draw on the

4       photo?

5            MS. RIFKIN:  Well, no, I asked you to point it

6       out.

7            MR. STEVENS:  Okay.

8            THE WITNESS:  Okay.  I was -- actually, my feet

9       weren't even on the ground.  In the passenger seat.  In

10      the back passenger seat.

11      BY MS. RIFKIN:

12      Q.   Okay.  So you're saying that your body minus

13      your feet were still located in the back passenger seat?

14      A.   Yes.

15      Q.   Okay.  When you first heard a shot?

16      A.   Yes.

17      Q.   And then you -- you jump out of the car?

18      A.   Yeah.  That was the right thing to do.  That

19      would have been me right there too.

20      Q.   Do you know at that moment that you're kind of

21      in the back seat with your feet hanging out of the

22      passenger seat -- toward the ground, right?

23      A.   Uh-huh.

24      Q.   Do you know whether Gabriel was still in the

25      car?

**Contreras Dep.**

STATE OF CALIFORNIA     )
                        )  ss.
COUNTY OF SAN JOAQUIN   )




     I, VALERYANNA SKIPPER, Certified Shorthand

Reporter, do hereby certify:

     That prior to being examined, the witness in the

foregoing proceedings was by me duly sworn to testify to

the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time

and place therein set forth and were taken down by me in

shorthand and thereafter transcribed into typewriting

under my direction and supervision;

     I further certify that I am neither counsel for,

nor related to, any parties to said proceedings, nor in

any way interested in the outcome thereof.

     In witness whereof, I have hereunto subscribed my

name.


Dated:     December 8, 2016



_____
VALERYANNA SKIPPER, CSR NO. 9868

**Contreras Dep.**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | | |
|---|---|---|
| NATHANIEL SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2:15-cv-00363-KJM-AC |
| CITY OF STOCKTON, OFFICER | ) | |
| PATRICK MAYER, OFFICER ROBIN | ) | |
| HARRISON, AND OFFICER MICHAEL | ) | |
| PEREZ IN THEIR INDIVIDUAL | ) | |
| CAPACITIES; AND CHIEF OF POLICE | ) | |
| ERIC JONES, IN HIS OFFICIAL AND | ) | |
| INDIVIDUAL CAPACITIES, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

DEPOSITION OF SCOTT A. DEFOE

LOS ANGELES, CALIFORNIA

THURSDAY, JUNE 8, 2017

Reported By:  Shirley Q. Casilan, CSR No. 12361

L.A. Reporters
(800) 675-9700    www.LAReporters.com

**DeFoe Dep.**

1   will take responsibility for the typo of 2015 instead of

2   2013.

3           THE WITNESS:  Not unless I get additional

4   discovery material that I review.

5   BY MR. STEVENS:

6       Q    Better way of asking that:  In your experience,

7   you understand the whole purpose of today is to avoid

8   surprises at trial.  Is there anything else that you

9   anticipate that is not included in that list provided by

10   counsel in your disclosure?

11       A    If I was asked a question about the deployment of

12   a K9, I may have an opinion on that.  I didn't include

13   that in my original Rule 26 report.

14       Q    I will ask you about that.

15           MR. STEVENS:  So let's go off the record then.

16           (Off the record.)

17           MR. STEVENS:  Let's go back on.

18   BY MR. STEVENS:

19       Q    And we will get to it in more detail later, but

20   you had mentioned as another broad topic the deployment of

21   the K9.  What opinions do you have regarding the

22   deployment of the K9 in this case?

23       A    Well, there's a directed deployment of the K9 by

24   Officer Mayer.  Obviously, it didn't work, as based on the

25   review of the testimony.  I do have some concern about the

**DeFoe Dep.**

1    use of the dog on the hillside without the use of an

2    E-collar because if you're concerned that someone may be

3    armed or hasn't been searched and they're running away and

4    the dog makes contact on a directed deployment, the

5    officer or officers are still going to need to go to that

6    person to remove the dog off if the dog will not call off.

7            So, tactically speaking, it kind of put him at a

8    disadvantage to send the dog underneath the fence where he

9    wouldn't have control of the dog.  In the event that the

10   dog did contact Mr. Smith, it would be almost impossible

11   to take that dog off in a reasonable amount of time

12   without injury to Mr. Smith.

13       Q    Okay.

14            And I understand the tactical concern here, but

15   you would agree that it's undisputed the dog never made

16   contact with Mr. Smith.

17            Correct?

18       A    That's correct.

19       Q    All right.

20            Mr. Smith was never injured in any capacity

21   related to the dog.

22            Correct?

23       A    That's correct.

24       Q    All right.

25            So other than the potential tactical issue, is it

**DeFoe Dep.**

1   your opinion that the use of the dog in some way

2   constituted an excessive degree -- excessive use of force?

3       A    Just the deployment part of -- or just the

4   tactical deployment concerns I have.

5       Q    Okay.

6            So no -- is it fair to say that no, you do not

7   consider the deployment of the dog here to be an excessive

8   use of force?  Is that accurate?

9       A    It is, because the dog didn't make contact.

10      Q    And why did you not include that in your report?

11      A    I just didn't.  After the fact, after looking at

12  it, I looked and -- I looked at the actual deployment of

13  the K9 and realized that the way in which the K9 was

14  deployed, it was problematic for me in some respect.

15      Q    And that's because you yourself had K9 officer

16  experience.

17           Right?

18      A    K9 supervisor experience.

19      Q    Okay.

20           You mentioned an E-collar.  What is that?

21      A    An E-collar -- like in the Los Angeles Police

22  Department, we use where -- it basically emits a --

23  transmits a shock, it emits bolts.  So in the event that

24  something, like here, on a hillside, if you deploy a dog

25  and you can't readily get to someone to take the dog off

**DeFoe Dep.**

1    list.

2            In addition to what's listed there in

3    paragraph -- the first paragraph plus the information you

4    provided to me regarding the K9 unit, any additional areas

5    of opinion that you intend to express at trial?

6        A    Give me one second, please.

7        Q    Sure.

8            (Witness perusing documents.)

9            THEW WITNESS:   I have a concern with the

10   actual -- the actual investigation itself, investigation

11   into the actual shooting by Mr. -- Detective Petrosevich,

12   I believe it is.

13           Am I pronouncing -- is that right?

14   BY MR. STEVENS:

15       Q    Okay.

16       A    And the fact that these investigations, from my

17   experience, have been typically independent investigative

18   units such as robbery-homicide division from the

19   Los Angeles Police Department.  If you, as a detective,

20   are investigating a matter and then there's a shooting or

21   lethal use-of-force incident, critical incident, the

22   independent body comes in to do the investigation to make

23   sure that it's done independently, to make sure that

24   there's collusion, to make sure that there's no

25   interference into the investigation.

**DeFoe Dep.**

1        So I am critical of the fact that he was involved

2   in the interview process, even with Mr. Smith in a

3   custodial situation, because he had access to the person

4   or that individual, the CHP officer, in some way that he

5   may have been injured based on the traffic collision.  So

6   I am critical of the fact that it should have been done by

7   an independent body without his assistance at all.

8        Q    But it is correct that Mr. Petrosevich -- and I

9   will butcher his name because I don't know how to

10  pronounce it either -- he works for the California Highway

11  Patrol.

12       Correct?

13       A    Yes.

14       Q    And the officers involved in this action were the

15  Stockton Police Department.

16       Correct?

17       A    That's correct.

18       Q    Do you have any information or understanding that

19  the Stockton Police Department had any say as to what role

20  Mr. Petrosevich would or wouldn't play?

21       A    Of course.

22       Q    How?

23       A    Because they're officers -- they're the officers

24  that used force.

25       Q    So what are you relying on that the Stockton

**DeFoe Dep.**

1   the circumstances.  Some people are okay with not drawing

2   their gun, some people do.  It depends on the

3   circumstances.  It just depends on the situation.

4        Part of the issue is once you take your firearm

5   out of your holster, it limits some of the other options

6   that are available.  So depending on what the facts of the

7   matter are, the totality of the circumstances, sometimes

8   it's appropriate.  Sometimes it's appropriate for one of

9   us to have lethal cover on a vehicle or people while the

10  other person, maybe it's your contact person, is not going

11  to have their firearm out.  They use words to try to

12  influence behavior and consider less-lethal-force options.

13       Q    Okay.  Let's just -- instead of speaking about

14  generalities, let's cut to the chase, the facts of this

15  case, as you understand them.

16       Was it appropriate for Officer Mayer to withdraw

17  and exhibit his gun during this felony stop procedure?

18       A    Withdraw from the holster, yes.

19       Q    And it would have been appropriate for him to

20  point it down at a 45-degree angle, as you previously

21  stated.

22       Right?

23       A    Yes.

24       Q    Would it have been appropriate, based on your

25  experience, your training, your work as an expert, to have

**DeFoe Dep.**

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, SHIRLEY Q. CASILAN, CSR No. 12361, Certified

 4  Shorthand Reporter licensed in the State of California do

 5  hereby certify:

 6               That the foregoing proceedings were taken before

 7  me at the time and place therein set forth, at which time

 8  the witness was duly sworn by me;

 9               That the testimony of the witness, the questions

10  propounded, and all objections and statements made at the

11  time of the examination were recorded stenographically by

12  me and were thereafter transcribed;

13               That the foregoing is a true and correct

14  transcript of my shorthand notes thereof.

15               I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action or the outcome thereof.

18               IN WITNESS WHEREOF, I have subscribed my name

19  this _____ day of _____, 20_____.

20

21

22          _____

23          SHIRLEY Q. CASILAN, CSR
            Certification No. 12361
24          Expiration Date:  4/2018

25
```

**DeFoe Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                     SACRAMENTO DIVISION

 4                        -   -   -

 5   NATHANIEL SMITH,              )
                                   )
 6          Plaintiff,             )
                                   )
 7      vs.                        )    No.
                                   )    2:15-cv-00363-
 8   CITY OF STOCKTON, et al.,     )    GEB-AC
                                   )
 9          Defendants.            )
                                   )
10   _____)

11                      DEPOSITION OF

12              OFFICER ROBIN HARRISON

13                 STOCKTON, CALIFORNIA

14                    July 11, 2016

15

16

17

18

19

20

21   ATKINSON-BAKER, INC.
     CERTIFIED COURT REPORTERS
22   500 North Brand Boulevard, Third Floor
     Glendale, California 91203
23   (800) 288-3376

24   REPORTED BY:  GILBERT E. MARTINEZ, CSR NO. 7460

25   FILE NO.:  AA073AD
```

                                                           1

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   to?

2       A.  Yes.

3       Q.  Did that involve hands-on training or

4   training on how to remove somebody hands-on?

5       A.  Yes.

6       Q.  And what's your understanding of how you're

7   supposed to do that?

8       A.  By hands-on?

9       Q.  Yeah.

10      A.  Well, there's no set answer for that.  It

11  could be numerous ways.

12      Q.  Have you received training -- I guess during

13  the training that you've received on how to remove

14  someone from a car, what are the -- what types of

15  information are you supposed to consider, assess in

16  deciding how to do that?

17      A.  The safety for you and others.

18      Q.  And what factors go your assessment of the

19  safety for you and others?

20      A.  The person that we're trying to have exit the

21  vehicle, his demeanor usually dictates what we're

22  going to do.

23      Q.  What kind of signs are you looking for about

24  the person's demeanor?

25      A.  If he's aggressive, we're not going to

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    approach the vehicle if we can't see clearly what's

2    going on.

3          Q.   And how do you determine if someone is being

4    aggressive or not?  What are the signs that you look

5    for?

6          A.   Normally, verbal.  Very agitated, if you can

7    see that they're agitated in the car.

8          Q.   Any others?

9          A.   I'm sure there is.  I couldn't say offhand

10   because it dictates what that person is doing.

11         Q.   What's your understanding of the guidelines

12   for when you are allowed to use force?

13         A.   The guidelines?

14         Q.   The policies.

15         A.   You mean -- well, you're -- if other lives

16   are in danger, police officers' lives in danger or you

17   believe somebody will be injured or somebody -- or he

18   could cause death or she could cause death if they

19   leave the area.

20         Q.   And in what situations is it your

21   understanding that policy allows you to use deadly

22   force?

23         A.   In them situations.

24         Q.   The situations you just described are for

25   deadly force?

40

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   out.  If he complies to all the commands then that

2   dictates what we do.

3       Q.  What the suspect does dictates what you do?

4       A.  Yes.

5       Q.  When you're training, again, using vehicle

6   stops, that's what we were talking about.

7       A.  Uh-huh.

8       Q.  When you're training, is there any discussion

9   of situations in which one officer, the officer giving

10  commands, might have one idea about how to conduct a

11  stop, but an additional officer, you know, if there's

12  the other officers present have different ideas about

13  what to do, how to deal about that situation?

14      A.  Normally, like I said, we all get the same

15  training so we all know what is needed from each of

16  us.  Now, if it's something out of the ordinary, an

17  officer might step up and say, "Hey, let's do it this

18  way," rather than, you know, take them out which side

19  of the car.  It just depends -- it dictates what

20  happens in the vehicle in front of us that we're

21  stopping.  And the area, how we had to make the stop

22  where you are stopped.

23      Q.  You said, I think, because I had asked about

24  a lead officer and you said there's one officer giving

25  commands and then there's additional officers.  Is it

63

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1    appropriate for multiple of the officers to be giving
 2    commands simultaneously?
 3         A.   No.  We try to only have one give commands.
 4         Q.   Why?
 5         A.   Normally, if conditions are perfect.
 6         Q.   Why?
 7         A.   Then there's no confusion.  There's only one
 8    person giving commands, he's not trying to -- he or
 9    she in the vehicle is not having to try to listen to
10    different people.
11         Q.   Other than this incident with Mr. Smith in
12    February of 2013, have you been involved in any other
13    shooting incidents during your time as a police
14    officer?
15         A.   Yes.
16         Q.   About how many?
17         A.   One other one.
18         Q.   When was that?
19         A.   Thirteen years ago.  I'm not sure.
20         Q.   That was in Stockton?
21         A.   Yes.
22         Q.   And can you generally describe that
23    situation?
24         A.   We had received information a vehicle was
25    coming out of San Jose to do a robbery here in
```

64

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1     Q.  But it's your understanding of what the
2  general practice is?
3     A.  Yes.
4     Q.  About how often does that happen for you?
5     A.  A few times a week.
6     Q.  What's your understanding of why Officer
7  Mayer -- well, what was the call for service?
8     A.  It was a call -- a citizen was calling in, I
9  believe a neighbor, about a subject that, if I
10  remember right, that police were looking for and the
11  citizen called in and said the person the police were
12  looking for was at the location and that he had
13  warrants.
14     Q.  Did the caller say warrants for what?
15     A.  I don't recall.
16     Q.  When you saw the call on your screen, did it
17  identify what the warrants were for?
18     A.  I don't recall, but I ran the subject for
19  warrants.
20     Q.  After you received the call from Officer
21  Mayer or before?
22     A.  I don't remember.
23     Q.  When you say you ran the subject for
24  warrants, you mean on the computer in your car?
25     A.  Yes.

76

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      Q.   And is that in the CLETS system?

2      A.   Yes.

3      Q.   Is there something --

4      A.   Well, the warrants and the rap sheet are kind

5   of two different things, but it's still all in the

6   same system.

7      Q.   Okay.  Do you recall finding open warrants?

8      A.   Yes.

9      Q.   Did the system -- did the computer say what

10  they were for?

11     A.   That it was a felony warrant.

12     Q.   Was that it?

13     A.   It might have said more, but I don't

14  remember.

15     Q.   Is it accurate that felony warrant doesn't

16  necessarily involve violence, right?

17     A.   No, not always.

18     Q.   Was there any information that you recall

19  seeing in the computer indicating whether this felony

20  warrant was connected to violence?

21     A.   I don't remember.

22     Q.   Was there any information about whether

23  Mr. Smith was suspected to be carrying weapons?

24     A.   I don't remember.  I don't recall it saying

25  that.

77

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    getting into the car and they'd be leaving soon and

2    that's probably all I communicated at that time.

3        Q.  How were you communicating with him?

4        A.  I believe on our phones.

5        Q.  When you saw the man, you said you saw the

6    woman put the child into the car and then the man came

7    out.  Did you see him carrying anything?

8        A.  I don't remember.

9        Q.  Did you see him with a gun?

10       A.  No.

11       Q.  Do you recall forming any opinion as to

12   whether he was acting aggressively at that -- during

13   those five minutes?

14       A.  No.  He wasn't.

15       Q.  Okay.  So you and Officer Mayer were talking

16   on the phone and you were letting Officer Mayer know

17   it looked like they were about to leave, is that

18   right?

19       A.  Yes.

20       Q.  And then what happened?

21       A.  They left and I advised them they had turned

22   northbound onto Pershing and he probably stopped the

23   vehicle to ID the suspect or the subject at that time.

24       Q.  He was the subject at that time, not a

25   suspect?

82

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      Q.  Did you guys stop your cars at about the same
2  time?
3      A.  Yes.
4      Q.  Prior to Officer Mayer getting out of his
5  car, did he give any orders or commands or communicate
6  to the people in the car?
7      A.  I don't know.
8      Q.  Are the standard police cars in Stockton
9  equipped with like a loud speaker?
10     A.  Yes.
11     Q.  Do you know, if he had used that, would you
12 have been able to hear it?
13     A.  Yes.
14     Q.  And did you hear him use that?
15     A.  No.  If I was out of my car.  If I was inside
16 my car and he used it, I wouldn't have been able to
17 hear him.
18     Q.  Okay.  Did Officer Mayer get out of his car
19 before you got out of your car?
20     A.  He probably got out a second, you know,
21 before me.
22     Q.  And did the black male get out of the car
23 that was stopped before or after you got out of your
24 car?
25     A.  As I got out of my car and started to

87

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.  At this point.

 2        Q.  Okay.  So at the point where you're walking

 3   up towards Officer Mayer and Officer Mayer is standing

 4   still and you see Mr. Smith, when you first saw him,

 5   was he -- which direction was he facing?

 6            MR. WILSON:  By "him," you mean Mr. Smith?

 7            MS. RIFKIN:  Yes.

 8            MR. WILSON:  Okay.  Good.

 9            THE WITNESS:  I believe he was facing Pat --

10   or I'm sorry.  Officer Mayer.

11            MS. RIFKIN:  Q.  Did you see him take any

12   steps toward Officer Mayer?

13        A.  I don't recall.

14        Q.  Was he holding anything?

15        A.  No.

16        Q.  Did you see a gun?

17        A.  No.

18        Q.  Did you see any type of weapon?

19        A.  No.

20        Q.  On Mr. Smith?

21        A.  No.

22        Q.  When -- while you were out of the car

23   approaching the situation, could you hear whether

24   Officer Mayer said anything?

25        A.  I could hear him giving commands, but I
```

90

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1     Q.   Yes.

2     A.   We're to the north of his vehicle.

3     Q.   You're to the north?

4     A.   (Witness nods head.)

5     Q.   Okay.  So he starts running in the -- does he

6  cross in front of his car?

7     A.   No.  I believe it was in between his car and

8  Pat's -- Officer Mayer's car.

9     Q.   Okay.  Okay.  So he started somehow, goes

10  around the corner of the car and then takes off on a

11  diagonal in the opposite direction?

12     A.   Yes.

13     Q.   Okay.  In the moments when you could see him

14  before he takes off running, did you make any other

15  observations about him?

16     A.   No.

17     Q.   Do you recall anything that Officer Mayer

18  said to Mr. Smith before he took off?

19     A.   No.

20     Q.   And were you giving any commands?

21     A.   No.

22     Q.   What's the next thing that you remember once

23  Mr. Smith took off?

24     A.   He goes over the fence that goes into like

25  where the -- it's the off -- what would you call it,

94

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      Q.  When you say Officer Mayer put his dog over

2  the fence, does he literally throw the dog up in the

3  air?

4      A.  Yes, he assisted him up over the fence.  He

5  don't throw them, but he assists, drops them over it,

6  let's say.

7      Q.  Does the dog land on four feet?

8      A.  That's what I mean, he assists the dog all

9  the way over, he don't toss him over the fence like

10  you're throwing a ball over the fence.  You kind of

11  just hold their collar and assist them over.

12      Q.  Did Officer Mayer then end up on the other

13  side of the fence with the dog?

14      A.  Eventually.

15      Q.  But --

16      A.  He came -- there's a hole in the fence also

17  right there, he came through the hole.

18      Q.  Were either of you yelling anything at

19  Mr. Smith at this point?

20      A.  Officer Mayer was still giving commands at

21  this point.

22      Q.  Was Mr. Smith -- did you see him with a

23  weapon during this chase?

24      A.  No.

25      Q.  Would it be fair to say he seemed pretty

97

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1      Q.  So both front doors of the car are open?

2      A.  Yes.

3      Q.  So you've pulled your vehicle in facing kind

4   of the side of their vehicle?

5      A.  Yeah, I'm somewhat -- I'm kind of -- I'm not

6   facing directly towards their vehicle, but I'm that

7   direction.

8      Q.  Okay.  So could you see Mr. Smith -- is what

9   you're saying that you could see Mr. Smith trying to

10  get in the car through the open doors?

11     A.  Yes.

12     Q.  Were any of the rear doors open on the car?

13     A.  I don't recall.

14     Q.  Where did he start trying to get into the

15  vehicle?

16     A.  When I first saw him, he was trying to get in

17  through the front passenger.

18     Q.  Is that when you were still in your car

19  driving?

20     A.  Yes.

21     Q.  Like that's when you first spotted?

22     A.  No.  I'm pulling in.

23     Q.  Uh-huh.

24     A.  As I'm pulling in, I can see him starting to

25  try to get in.

105

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      Q.  When you saw Officer Perez, you said when

2   you -- by the time you get out of your vehicle, you're

3   seeing him walking towards the vehicle, towards the

4   car where Mr. Smith is?

5      A.  He's -- I don't want to say he's walking

6   straight up to the vehicle.  He's more or less walking

7   to where I'm at so we could approach together.

8      Q.  Did he have his gun out?

9      A.  I believe so.

10     Q.  Did he come meet you where you were at?  I'm

11  sorry.  Did Officer Perez come meet you where you were

12  at when you got out of your vehicle?

13     A.  I don't want to say he came to meet me.  Like

14  I was walking, I got out of my vehicle, took my gun

15  out, started walking towards Mr. Smith's -- where he's

16  at.  Perez is walking over and we just kind of meet up

17  as we're both walking.

18     Q.  And then are you kind of side by side?

19     A.  Yes.

20     Q.  And you both have your guns out?

21     A.  Yes.

22     Q.  And at what point do you see Mr. Smith --

23  them pulling Mr. Smith from the vehicle?

24     A.  When I got out of my vehicle -- as I pull up,

25  like I said, I could see him in the passenger side.

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   part of his body in the front seat and another -- and

2   one of the Hispanic males sort of over the top of him?

3        A.  Yes.

4        Q.  And the other Hispanic male trying to assist

5   somehow?

6        A.  Yes.

7        Q.  And you don't recall exactly how?

8        A.  No.

9        Q.  Okay.  Then what happened?

10       A.  The one gentleman is still fighting with

11  Mr. Smith.  So at this time, I'm thinking we're going

12  to have to go hands-on.  So I reholster my gun, we

13  start to approach and the suspect or Mr. Smith is

14  yelling something.  I can't hear because I'm yelling,

15  but I know he's yelling because I could see -- he's

16  looking right at us and he's yelling something.  Then

17  at this time, the citizen moves away, gets off

18  Mr. Smith and is now outside the car.  And him and the

19  other guy move out of the way of the vehicle.  I don't

20  know where they go.  I think they went like towards

21  the back of the vehicle.

22       Q.  Did you yell anything to the other -- to the

23  guys in the car, the Hispanic males?

24       A.  I don't recall if I yelled anything at them.

25       Q.  When you parked your car to get out, about

112

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1    how far would you say from when you sort of got out

2    the door, about how far would you say you were away

3    from the vehicle Mr. Smith was getting into?

4         A.   This is an estimate, but somewhere around 50,

5    maybe 40, somewhere right there.  I don't know.

6         Q.   Feet or meters?

7         A.   Feet.

8         Q.   Okay.  40 or 50 feet.  And how -- about how

9    far towards the -- that vehicle, the vehicle he was

10   getting into, had you gone when you reholstered your

11   gun, do you think?

12        A.   We were probably 20 feet away.

13        Q.   And when you said he was looking right at

14   you, is that outside the driver's -- because the

15   driver's door is open?

16        A.   Yes.

17        Q.   And about how far away were you, do you

18   think, when the male who was over the top of him got

19   out of the car?

20        A.   Between 15 and 20 feet.

21        Q.   And you said that you were thinking that you

22   were going to have to go in hands-on.  Why did you

23   think that?

24        A.   Because the citizen was fighting with

25   Mr. Smith.

113

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      Q.   Did you assess the situation and think it was

2   appropriate to go in hands-on?

3      A.   Yes.

4      Q.   When you say the citizen appeared to be

5   fighting with Mr. Smith, what do you mean by that?

6      A.   Well, he was on his back and you could see he

7   was trying to pull him, pull him out.  So when I say,

8   "fighting," they're not like physically punching each

9   other, he's just on him trying to physically get him

10   out.

11      Q.   Was Mr. Smith grabbing anything to try and --

12   was he grabbing anything?

13      A.   I couldn't see as far as that, what was going

14   on between them two like underneath.

15      Q.   And are you during this time, this time that

16   you're approaching, you know, from 40 to 50 feet

17   closing in on that space, are you seeing what

18   Mr. Smith is doing?

19      A.   He's reaching over trying to -- and I don't

20   remember which he was doing.  He was either trying to

21   start the vehicle or put the vehicle in gear, but I

22   believe he was trying to start the vehicle.

23      Q.   Was he actually sitting in the front seat?

24      A.   He was laying over the passenger -- like

25   here's the center console, he's laying over the

114

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1  passenger seat, so his body is like half of -- his

2  head is like over the console right here -- no, his

3  chest is over the console.

4       Q.  So his feet, his legs and feet aren't in the

5  driver area?

6       A.  No.

7       Q.  His arms and hands are?

8       A.  Yes.

9       Q.  And with one or both of his hands is he going

10  for either the keys or the gears?

11       A.  With one of his hands.

12       Q.  Was the car on?

13       A.  I don't know.

14       Q.  At this point, is there any way he could have

15  turned -- if he'd been able to turn the keys or shift

16  the gear, whichever one he was going for, that he

17  could have driven the car?

18       A.  Yes, there probably is a way.

19       Q.  How?

20       A.  If he could get the -- get it in gear, it

21  would move.

22       Q.  Okay.  So he's going for -- to the ignition

23  or the gear with one of his hands.  Could you see what

24  he was doing with his other hand?

25       A.  No.

115

Atkinson-Baker Court Reporters
www.depo.com

1      Q.   Could you see his other hand?

2      A.   I don't remember if I could see it.

3      Q.   And you see one guy over the top of him

4  pulling and the other guy somewhere in the passenger

5  area?

6      A.   Outside, but yes -- well, he isn't all the

7  way in.

8      Q.   And the next thing is that the guy's clear

9  out?

10     A.   Yes.  He gets off of him and then that area

11 is clear.

12     Q.   And is this when you're about 15, 20 feet

13 away?

14     A.   It's an estimate, but I might have been a

15 little closer, but it was right in that area.

16     Q.   And you still got your gun holstered at this

17 point?

18     A.   Yes.

19     Q.   And then what happens?

20     A.   Then after the guys get out, Mr. Smith -- I

21 don't know if he's readjusting now that the guy isn't

22 on him so he's going to try to come over, but he pulls

23 his hands back and then I hear a gunshot and then

24 inside the car under Mr. Smith, I can see what I

25 believe is a barrel to a gun like right here around

116

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   his chest area.  (Indicating.)

2        Q.  When you say he pulls his hands back, what do

3   you mean?

4        A.  He had his -- one, I don't know if it was his

5   right or left, he had it over towards let's say the

6   steering wheel.

7        Q.  Uh-huh.

8        A.  And then after the gentleman got off him,

9   then he pulled his hands -- he brought it back to his

10  body.  (Indicating.)

11       Q.  Do you remember if -- you said you think you

12  see a barrel of a gun beneath him?

13       A.  Yes.

14       Q.  Do you remember if you saw this before or

15  after the gunshot?  Before hearing the shot?

16       A.  I probably saw it about the exact same time

17  as the shot.

18       Q.  Can you see where the shot comes from?

19       A.  Well, no, I didn't see where it came from,

20  but I knew it was close.

21       Q.  So once you hear the shot, what do you do?

22       A.  I draw my weapon.  I run to the front of the

23  vehicle.

24       Q.  Why did you run to the front of the vehicle?

25       A.  Use the engine compartment as cover.

                                                        117

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1    Q.  Okay.

2    A.  And I fired three rounds.  I have to fire

3    them low due to I know there's -- remember I told you,

4    you have to know your area, I knew there was people

5    back here and so I had to fire them almost straight

6    down into the engine.  (Indicating.)

7    Q.  When you say you know there's people back

8    here, where are you referring to?

9    A.  The citizens that had been fighting with

10   Mr. Smith, like I said, went to the east of the car,

11   let's say, the northeast end of the car.  So I know

12   there's citizens in the area so I can't fire my weapon

13   up in case a stray bullet goes somewhere, so I have to

14   fire it down.

15   Q.  Could you see them, the citizens at this

16   point?

17   A.  I could see a group of citizens.  I can't say

18   which ones they were, but there was a group to the

19   east, the northeast of the bumper, the rear bumper.

20   Q.  At the point you heard the gunshot, did you

21   know whether anyone else was in the car other than

22   Mr. Smith?

23   A.  I didn't see anybody else in the car at that

24   time.

25   Q.  Do you recall checking to see if there was

118

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    there anyone else, I think you referred to it as

2    background, understanding of the background, is there

3    anyone else that's relevant to the background at this

4    point?

5        A.  Not that I recall.

6            MS. RIFKIN:  Can we have this marked as

7    Exhibit 49.

8            THE COURT REPORTER:  Yes.

9                (Plaintiff's Exhibit 49

10               marked for identification.)

11           MS. RIFKIN:  Q.  All right.  So 49 shows a

12   picture looking inside the car from the passenger's

13   front door, is that fair?

14       A.  Yes.

15       Q.  Okay.  Looking at this picture, there is a --

16   there's an object that appears between the two

17   armrests of the driver's seat and the front passenger

18   seat.  Is it possible that that object is what you

19   were seeing beneath Mr. Smith?

20       A.  Is it silver?

21       Q.  Are you asking me?

22           MR. WILSON:  Well, what object are you

23   referring to, first of all?

24           MS. RIFKIN:  Q.  Let me -- okay.  I'm going

25   to draw the circle.

143

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      A.  Oh.  No.

2      Q.  So that, what I just drew the circle around

3   on Exhibit 49, that cannot be what you saw under

4   Mr. Smith?

5      A.  No.

6      Q.  Okay.  Do you see anything in 49 that you

7   think is the object that you saw beneath Mr. Smith?

8      A.  I do not see it, but it would have been in

9   this area.  (Indicating.)

10     Q.  And can you -- all right.  So my pen was

11  black.  Can you draw with your blue pen a circle

12  around the area you're talking about?

13     A.  (Witness complies.)

14     Q.  Is it your testimony that the area that you

15  just drew the circle around, that Mr. Smith's chest

16  was over that area when you -- at the point that you

17  were approaching the driver's side door?

18     A.  Yes.  His chest probably extended from the

19  armrest to -- close to the armrest to the front.

20  (Indicating.)

21     Q.  Can you tell, looking at that picture,

22  whether the boxy object within your circle is light

23  colored or silver?

24     A.  No, I cannot.

25         MS. RIFKIN:  Can we mark this as the next in

                                                      144

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    order.

2                    (Plaintiff's Exhibit 50

3                 marked for identification.)

4         MS. RIFKIN:  Q.  All right.  So you've been

5    handed what's been marked as Exhibit 50.

6         A.  Uh-huh.

7         Q.  I realize that this picture appears -- I

8    didn't take it, but it appears to have been taken up

9    from the grassy area.  So that wouldn't have been --

10   you weren't driving in the grassy area, correct?

11        A.  No.

12        Q.  Is this the angle from which you were --

13        MR. WILSON:  Well, excuse me.

14        MS. RIFKIN:  Sure.

15        MR. WILSON:  Let's just clarify.  You said

16   you weren't driving in the grass and she said, "No."

17   Let's clarify that.  Okay?

18        MS. RIFKIN:  Okay.

19        Q.  So you're saying you were not -- is it

20   correct that you -- I'm going to ask this with a

21   double negative.

22           It's correct that you were not driving in the

23   grassy area?

24        A.  Correct.

25        Q.  Okay.

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1  about any conversation she may have had with the

2  lawyer, correct?

3       MS. RIFKIN:  Q.  Excluding any conversation

4  you may have had with your lawyer.

5       A.  No.  I believe the lawyer was the only one.

6       Q.  So your testimony today is that you did not

7  previously say -- describe a barrel of a gun that

8  looked either white or silver looking to the folks

9  during the interview prior to the statement we're

10  looking at?

11       A.  If it's not in there then I believe I didn't

12  say it to them prior.

13       Q.  Okay.  And so you're not sure what you were

14  referencing with that?

15       A.  It could have been -- well, I'm not --

16       MR. WILSON:  It could have been what we're

17  not going to talk about.

18       MS. RIFKIN:  Q.  Okay.  All right.  So if you

19  can turn to the page that's marked at the bottom there

20  COS003914.  You said about kind of the middle of the

21  page that -- describing when Mr. Smith got out of the

22  back seat of the car at the first stop.  "It was kind

23  of nonchalant at first.  I thought, okay, it's just

24  going to be an easy stop.  No big deal."  Is that

25  accurate?

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1       A.   Yes.

2       Q.   At that time, did you have any reason to

3   believe that Mr. Smith was armed?

4       A.   No.

5       Q.   All right.  So if you can turn to the page

6   that's COS003924.  Again, sort of in the second, third

7   of the page you state that you were yelling for him to

8   come out -- just to situate.  This is when you're

9   getting to the gas station now and feel free to let me

10  know if you want to review any of the stuff that we

11  skipped.  Okay.  You said you're yelling for him to

12  come out.  Was that Mr. Smith?

13      A.   Yes.

14      Q.   So earlier -- and I know you weren't looking

15  at this then, you testified that you were yelling at

16  him to put his hands up.

17      A.   Yes.

18      Q.   Were you also -- were you also yelling for

19  him to come out of the car?

20      A.   Like I said, I just remember saying, "Put

21  your hands up."  At this time it was directly after so

22  that's probably what else I was saying.

23      Q.   Okay.  And you said, "At first I thought he

24  thought he was just going to leave with these guys.

25  You know, I didn't realize what was really going on.

163

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1    I just thought they were going to give him a ride."

2         What made you think that they were going to

3    give him a ride?

4         A.   Because when we initially get there, he's

5    trying to get in.  At first, nobody is doing something

6    when he's trying to get into the front seat.  And then

7    he -- like I said, I didn't remember seeing him get in

8    the back seat, but it's in the report so I must have

9    seen him get in the back seat.  And then the guy

10   starts fighting him and then I realize what's going

11   on.

12        Q.   Okay.

13        A.   They're not giving him a ride.

14        Q.   Okay.  So are you saying that at first when

15   you first saw him trying to get in, they weren't doing

16   anything to him and then after that, that's when they

17   start trying to pull him out?

18        A.   Yes.

19        Q.   Okay.  So at first it looks like they're

20   giving him a ride and then at some point, they try to

21   pull him out?

22        A.   Yes.

23        Q.   Do you think that once they realized there

24   was police?

25        A.   Maybe, I don't know.  I can't answer that.

                                                    164

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.  Okay.  So I guess over pages 23 and 24, if
 2   you look at page 23, you started saying, "It's almost
 3   like they got a little bit of control of him, is what
 4   it appeared."
 5        And then later Detective Burrell is asking
 6   you about it and he says, "It looks like these guys
 7   have kind of gotten control of this guy in the red
 8   shirt."
 9        And you say, "Yes."
10        What did you mean by that when you were using
11   the phrase that they got -- kind of got control or
12   "got a little bit of control of him"?
13        A.  It appears they got ahold of him where he
14   was, he couldn't move any further forward.
15        Q.  Could you see how they were holding him?
16        A.  Like I said, one was on his back, the other
17   guy, I'm not sure what he was doing so --
18        Q.  Okay.  Did it seem like -- could you tell if
19   either of them had him in a headlock?
20        A.  I don't know.  They might have.  I just don't
21   know.
22        Q.  Okay.  As far as your perspective was, they
23   appeared to have him restricted enough that he
24   couldn't move farther towards the front of the car, is
25   that accurate?
```

167

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1       A.   Yes.

2       Q.   Okay.   At that point, did you believe that he

3   still posed a threat of being able to move the car?

4       A.   At that point, that's why I put my gun away

5   and that's when we started to approach.   So I believe

6   he was still a threat.   Until he's in handcuffs, he's

7   a threat, but I felt we could go up there because we

8   couldn't do anything else.   We had to assist the

9   citizens so we were making our approach.

10      Q.   And would it be fair -- well, did you feel

11  like he was -- was the hold that they had over him was

12  sufficient to contain him until you guys could go

13  there and put hands-on?

14      A.   At that moment, it appeared they did.

15      Q.   Okay.   Is there any kind of signal that

16  you're trained to use with each other, officers are

17  trained to use with each other for hands-on, hands-on

18  approach?

19      A.   No, no.

20      Q.   Is there any kind of signal that you use in

21  practice with each other to indicate hands-on?

22      A.   No.

23      Q.   Is holstering your gun generally understood

24  to be a signal let's go hands-on?

25      A.   It could be.   But the thing an officer --

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   just like I don't know what Officer Perez is doing the

2   whole time because my focus is on the vehicle or the

3   subject.  I don't turn and look at what he's doing.

4   So he probably didn't see that I holstered.  I didn't

5   know he still had his gun out.  You don't have time to

6   look each way, you're focused on one thing and you try

7   to do the same thing together.

8       Q.  Okay.  If you turn to -- and again, I'm

9   referring to the page numbers in the upper right-hand

10  corner, number 30.  In the middle of the page

11  Detective Burrell asks you about other people at the

12  gas station and you said you think they're quite

13  numerous other people.  Are those the people at the --

14  around the gas pumps that you were talking about

15  earlier?

16      A.  I was talking about the gas station in

17  general.

18      Q.  Okay.  After reviewing this, is there

19  anybody -- are there any people that you recall seeing

20  in that immediate vicinity of the citizens' car other

21  than the people we've already talked about today?

22      A.  Like I said, there was -- right where the air

23  pumps were, there was people.  I don't know how many

24  were back there.  I think there was a female back

25  there and then I remember the two guys.  Like I said,

169

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1    we don't keep looking out because you gotta stay
 2    focused on the one thing.
 3         Q.  Okay.
 4         A.  But yes, there was people back there, but I
 5    don't know how close they were or if they were even
 6    with the other people, the citizens that owned the
 7    vehicle, I don't know if they were all together.
 8         Q.  Okay.  And to be clear, we've talked about
 9    Mr. Smith's body position in the vehicle as you were
10    approaching.
11         A.  (Witness nods head.)
12         Q.  And you said his chest was over sort of the
13    center console towards the front of the car, is that
14    right?
15         A.  Yes.
16         Q.  And he was -- was he facing downward?
17         A.  Yes.
18         Q.  Okay.  And then you could see the front half
19    of his body with his arms and his chest in the front
20    half of the vehicle, correct?
21         A.  Yes.
22         Q.  Did you believe his feet were still in the
23    rear of the vehicle?
24         A.  I really don't know where his feet were.
25         Q.  Okay.
```

170

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      A.   I don't remember where they were now.  I
2  might have known then.
3      Q.   Okay.  From the vantage point that you had,
4  were you able to tell whether he could have operated
5  the gas pedal and brake with his feet?
6      A.   He could probably push it -- not with his
7  feet, no.
8      Q.   With his hand?
9      A.   He probably could push it if he could get it
10 in gear with his hand.
11     Q.   Okay.  All right.  If you turn to the last
12 page of the interview.  You make a comment that you
13 were missing Southland.  Were you referring to the TV
14 show?
15     A.   Yes, I was.
16     Q.   Was that like a joke?
17     A.   Yes.
18     Q.   Okay.  Did you know Detective Burrell before
19 this interview?
20     A.   Through work, but not real well.
21     Q.   Okay.
22     A.   Just associates.  I know him better now, but
23 at that time it was more in passing.
24     Q.   Okay.
25     A.   But we're still not friends like outside the

171

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1  this point you were describing what was happening

2  after the individuals or while the individuals were

3  getting out of the vehicle.  And you said, "As we're

4  walking up, I continued to yell at him to put his

5  hands up, put his hands up.  The subjects that were

6  fighting with Mr. Smith backed out of the vehicle.  So

7  I put my weapon away thinking we're going in and

8  having to go hands-on with the subject.  As we're

9  walking up, he yelled something.  And I do hear

10  Officer Perez, but I have no idea what he's saying

11  because I'm yelling at the same time."

12          Is that accurate as you're sitting here

13  today?  Do you think that that was an accurate

14  statement?

15      A.  Yes.

16      Q.  So at that point you know that Officer Perez

17  was yelling, but you don't know what he was yelling?

18      A.  He was saying something, yes.  If that's what

19  it says, because that was closer to the date it

20  happened, then he must have been saying something.

21      Q.  Okay.

22      A.  But I wouldn't know.

23      Q.  Okay.  I can't remember if I already asked

24  you this so tell me if I did.  In this situation where

25  you and Officer Perez are both approaching the

174

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      A.  I don't know.

2      Q.  Have you ever heard the term "blue wall" or

3  "blue line"?

4      A.  I've hear the term blue line because that's

5  the newspaper for LAPD.  But the other one, no, I've

6  never heard of it.

7      Q.  Okay.  Do you have an understanding of what

8  the term "blue line" refers to other than the

9  newspaper?

10      A.  No, I do not.

11      Q.  Okay.  Have you ever heard anyone talk about

12  a code of silence at the Stockton Police Department?

13      A.  No.

14      Q.  Are you aware of any officer at the Stockton

15  Police Department during the time that you've been

16  with the department facing criminal charges in

17  relation to an officer involved shooting?

18      A.  No.

19      Q.  Are you aware, again, during the time that

20  you've been at the Stockton Police Department, of any

21  officer being referred to IA in connection with an

22  officer involved shooting?

23      A.  No.

24      Q.  During the time that you've been with the

25  department, are you aware of any officer who has

187

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

1    received discipline or corrective action in connection

2    with an officer involved shooting?

3        A.  No.

4        Q.  Are you aware of any officer, during your

5    time at the Stockton Police Department, who's been

6    involved in an officer involved shooting where that

7    shooting was found to be not justified?

8        A.  No.  But I also don't know how every incident

9    ends.  If it's not my business, I don't really pry

10   into what is happening to other officers.  If there

11   is, I don't know about it.

12          MS. RIFKIN:  All right.  Let's just take a

13   couple, three-minute break and I'll figure out what

14   else I've got.

15                  (Recess taken.)

16          MS. RIFKIN:  All right.  Let's go back on.

17       Q.  I just have a couple more questions.  Prior

18   to this incident referring to sort of the whole scope

19   of what happened on February 13th, 2013, had you ever

20   had any interactions with Mr. Smith before?

21       A.  No.

22       Q.  Had you ever worked a case, to your

23   knowledge, that he was involved with?

24       A.  No.

25          MS. RIFKIN:  That's all my questions.

188

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1          REPORTER'S CERTIFICATION OF CERTIFIED COPY

 2

 3

 4

 5

 6

 7          I, GILBERT E. MARTINEZ, CSR No. 7460, a

 8   Certified Shorthand Reporter in the State of

 9   California, certify that the foregoing pages 1 through

10   191, constitute a true and correct copy of the

11   original deposition of OFFICER ROBIN HARRISON, taken

12   on July 11, 2016.  I declare under penalty of perjury

13   under the laws of the State of California that the

14   foregoing is true and correct.

15

16          Dated this 20th day of July, 2016.

17

18

19          _____

20              GILBERT E. MARTINEZ, C.S.R. NO. 7460

21

22

23

24

25
```

Officer Robin Harrison
July 11, 2016

**Harrison Dep.**

**CERTIFIED COPY**

1            UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

3                                    )
4                                    )
     Nathaniel Smith,                )
5                                    )
                 Plaintiff,          )
6                                    )
        vs.                          )Civil Action No.
7                                    )2:15-cv-00363-KJM-AC
     City of Stockton; Officer       )
8    Patrick Mayer, Officer Robin    )
     Harrison, and Officer Michael   )
9    Perez, in their individual      )
     capacities; and Chief of        )
10   Police Eric Jones, in his       )
     official and individual         )
11   capacities,                     )
                                     )
12               Defendants.         )
     _____)
13

14

15

16            DEPOSITION OF CHIEF ERIC JONES

17                   APRIL 3, 2017

18

19

20

21

22

23

24   EMILY RICHARDSON, CSR No. 14043
     422580
25

SINCE 1972 ⊕

**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco   (949) 955-0400 Irvine        (858) 455-5444 San Diego
(310) 207-8000 Century City      (408) 885-0550 San Jose        (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento        (800) 222-1231 Martinez        (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside         (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City     (347) 821-4611 Brooklyn        (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago           00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

**Jones Dep.**

```
 1    protocol binder, are there any other materials that you
 2    typically look over when reviewing a case to determine
 3    whether you concur with the recommendation of the
 4    protocol review committee?
 5    A.        Not that I recall.
 6    Q.        Okay.  Do you receive a memorandum similar to
 7    this from the protocol review committee from every
 8    officer-involved shooting that goes through a protocol
 9    review?
10    A.        Yes.  That's the process.
11    Q.        Do you know if you received memoranda like this
12    from the protocol review committee with recommendation
13    regarding any other officer-involved shootings other than
14    Mr. Smith's from January 1, 2010, to present?
15    A.        Could I -- if I have this correctly, are you
16    asking if I received any other similar memos in other
17    cases since 2010?
18    Q.        Correct.
19    A.        Yes.
20    Q.        Do you know why those weren't provided to
21    plaintiff in response to the requests for production that
22    we just reviewed?
23    A.        I do not.
24    Q.        Do you also receive memoranda like the one we
25    were looking at for Mr. Smith from the district attorney
```

20

CHIEF ERIC JONES

BARKLEY
Court Reporters

**Jones Dep.**

1    regarding the outcome of the district attorney's

2    investigation for all officer-involved shootings that go

3    through a protocol review?

4    A.        Can you repeat it one more time?

5    Q.        Sure.  So do you receive memoranda like this

6    from the district attorney's office like this for all the

7    officer-involved shootings that go through a protocol

8    review?

9    A.        That is the standard process.

10   Q.        Okay.  To your knowledge, have you received

11   protocol review memos for all officer-involved

12   shootings -- I'm sorry.

13             To your knowledge, have you received protocol

14   review memos for all officer-involved shooting

15   investigations that have taken place since you became

16   chief?

17   A.        I've received some.

18   Q.        Do you know if there are protocol review memos

19   that were produced that you didn't -- I'm sorry.  I

20   shouldn't use the words "were produced."

21             Do you know if there are protocol review memos

22   that were generated that you did not receive during your

23   time as chief?

24   A.        I don't know.

25   Q.        Would that concern you if there were protocol

21

BARKLEY
Court Reporters

**Jones Dep.**

```
 1   review memos generated by the protocol review committee
 2   for officer-involved shootings during your time as chief
 3   that you didn't receive?
 4   A.      Yes.  And my apologies.  I thought you were
 5   referring to this other document from the district
 6   attorney.  So you're talking about the protocol review
 7   committee?
 8   Q.      I am.  Sorry.  I did switch back.
 9   A.      Okay.  Can we go back?
10   Q.      Yes.
11   A.      Okay.
12   Q.      All right.  So to your knowledge, have you
13   received protocol -- I'm calling it a protocol review
14   memo.
15   A.      Okay.  Yes.
16   Q.      -- for all of the officer-involved shooting
17   investigations that have taken place while you've been
18   chief?
19   A.      No.
20   Q.      And why not, if you know?
21   A.      I know some are still under review.
22   Q.      Okay.
23   A.      And have not been completed.
24   Q.      Okay.  For those officer-involved shooting
25   investigations that have been completed during your
```

CHIEF ERIC JONES

BARKLEY
Court Reporters

**Jones Dep.**

1   tenure as chief, to your knowledge, have you received

2   protocol review memos for all of those?

3   A.      I believe so.

4   Q.      Okay.  And then basically the same question for

5   the other type of document, which I'll call the district

6   attorney officer-involved shooting memo.

7           To your knowledge, have you received memos from

8   the district attorney's office for all officer-involved

9   shooting investigations that the district attorney has

10  completed during your tenure as chief?

11  A.      I believe so.

12  Q.      And would it concern you if there were memos

13  regarding completed investigations that you hadn't

14  received?

15  A.      Yes.

16  Q.      Is there any information regarding

17  officer-involved shootings that you typically receive

18  other than the type of memo we've looked at from the

19  protocol review committee -- the protocol review binder

20  and the type of memo we looked at from the district

21  attorney?  Is there any other information you typically

22  receive about officer-involved shootings?

23  A.      Not that I recall.

24  Q.      Okay.  So I know you've been in law enforcement

25  for a long time.  I don't want to have us spend hours

23

CHIEF ERIC JONES

BARKLEY
Court Reporters

**Jones Dep.**

1            MR. STEVENS:  It's an incomplete hypothetical.

2            THE WITNESS:  Departmental directives are the

3    only that meets that criteria, I think.

4    BY MS. RIFKIN:

5    Q.       And is it possible to give an estimate of how

6    often departmental directives are issued?  Like these are

7    things that happen every day or every week or very

8    occasionally?

9    A.       Every day.

10   Q.       Is there a certain type of report that they're

11   contained in or memo or daily something or other?

12   A.       They are just kept in a directive database.  And

13   if they don't become policy, then they're -- I think they

14   expire after six months.

15   Q.       Oh, okay.  All right.  Is it accurate that, as

16   chief, you have ultimate authority for department

17   discipline?

18   A.       No.

19   Q.       What authority do you have over department

20   discipline?

21   A.       Up to a certain level of suspension.  The city

22   manager's authorization requires things above that.

23   Q.       Are you the highest level person in the police

24   department who has authority over discipline of officers?

25   A.       Correct.

48

BARKLEY
Court Reporters

**Jones Dep.**

1    Q.      Okay.  If you can turn to page 41 in this

2    document.  Looking at the section labeled 4.2,

3    "Department Authority to Discipline," is this accurate,

4    to the best of your knowledge?

5    A.      Yes.

6    Q.      Okay.  Is it accurate that -- so I understand

7    you to mean that, up to a certain level of suspension,

8    you are the final authority on that.  And then past that

9    level of suspension, it requires approval of both you and

10   the city manager?

11   A.      Correct.

12   Q.      And is there a name for that level of

13   suspension?

14   A.      Well, that's going to be suspension or

15   termination.

16   Q.      That requires approval of the city manager?

17   A.      Yes.

18   Q.      Is there a lower level of suspension?

19   A.      No.

20   Q.      Okay.  What levels of discipline require your

21   authorization but not the city manager's authorization?

22   A.      Anything up to, I believe, 45-day suspension.

23   Q.      I'm sorry to get picky here, but does that

24   include -- so for a 45-day suspension, does it require

25   the city manager's approval?

49

CHIEF ERIC JONES

BARKLEY
Court Reporters

**Jones Dep.**

1   A.      No.

2   Q.      So more than a 45-day suspension, that requires

3   a city manager's approval?

4   A.      Yes.   Which equates to termination.   So we max

5   out at 45 days.

6   Q.      I see.   Okay.

7           In order for a termination recommendation to go

8   to the city manager, does it have to be approved by you?

9   A.      Yes.

10  Q.      Can you -- well, first of all, this section,

11  4.2, refers to informal discipline, which it refers to as

12  oral reprimands and memorandums of correction.

13          Are those things that actually exist in

14  practice?

15  A.      Yes.

16  Q.      Are there any levels of discipline between

17  memorandums of correction and 45-day suspension?

18  A.      Yes.

19  Q.      Who are those?

20  A.      Letter of written reprimand.

21  Q.      I see.   So you're -- so looking at the next

22  page, 42.

23  A.      Yes.

24  Q.      Are these -- forfeiture of time off and

25  reduction in pay would be the other options between

1    then simulating or acting like he was pointing a gun and

2    was shot.  Basic information like that.

3    Q.      Any other information you remember learning

4    about the incident on that day?

5    A.      No.

6    Q.      And so up until the time that you received memos

7    about the outcome of the protocol review committee, do

8    you recall receiving any additional information about the

9    shooting of Mr. Smith?

10   A.      No.

11   Q.      Can you say one way or the other?

12   A.      Cannot say one way or the other definitively.

13   Q.      And are there any documents that would refresh

14   your recollection as to whether you received any

15   additional information about the shooting of Mr. Smith

16   between the day of his shooting and when you received the

17   protocol review committee memo?

18   A.      Not that I know of.

19   Q.      So if you can turn back to Exhibit 104, looking

20   at the July 16, 2014, memo.

21   A.      What page is that on?  Oh, that's right.  I know

22   this.  I'm sorry.

23   Q.      All right.  Yes.  That's right.  All right.  So

24   that's COS1000134.

25           Did you ever make a determination about whether

                                    99

CHIEF ERIC JONES

BARKLEY
Court Reporters

**Jones Dep.**

1   the information contained in this memo was accurate?

2   A.      Yes.

3   Q.      And what did you do in order to make that

4   determination?

5   A.      Review the binder itself.

6   Q.      Did you review the interviews of the officers

7   and witnesses that were in the binder?

8   A.      Yes.

9   Q.      So would it be accurate that you made your own

10  independent determination of the circumstances of the

11  shooting?

12  A.      Yes.

13  Q.      And did you agree with the protocol review

14  committee that the officers acted within policy?

15  A.      Yes.

16  Q.      Did you make any recommendations regarding any

17  corrective action, informal or formal, related to this

18  incident?

19  A.      No.

20  Q.      Did you consider any corrective action?

21  A.      I don't recall.

22  Q.      And why didn't you -- well, why did you

23  determine that the actions of the officers were within

24  policy?

25  A.      I agreed with the summary here and that the

CHIEF ERIC JONES

BARKLEY
Court Reporters

Jones Dep.

```
 1   officers involved were in fear of their life for

 2   themselves or in defense of others.

 3   Q.      Is an officer's subjective fear sufficient to

 4   justify the use of deadly force?

 5           MR. STEVENS:  It's an incomplete hypothetical.

 6   Calls for a legal conclusion.  Calls for an expert

 7   opinion.  It's vague.  It's ambiguous.

 8           If you can answer, go ahead.

 9           THE WITNESS:  The totality of the circumstances

10   sort of dictates the subjectivity.

11   BY MS. RIFKIN:

12   Q.      Did you conclude from your review of the

13   shooting of Mr. Smith that the officers had reasonable

14   basis to be in fear for their lives?

15   A.      Yes.

16   Q.      And what was the basis for that?

17   A.      Well, quite a few things leading up.  But the

18   most specific were his active carjacking, then his

19   statements and actions with his hands.

20   Q.      Did you make a determination about whether

21   Mr. Smith was raising his hands in response to orders

22   from one or more officers to put his hands up?

23   A.      That was sort of a long question, but I never

24   came to that determination.

25   Q.      Okay.  You said that Mr. Smith's statements and
```

CHIEF ERIC JONES

BARKLEY
Court Reporters

**Jones Dep.**

```
 1   Detective Harrison had holstered her gun and was

 2   preparing to go hands-on in order to take control of

 3   Mr. Smith?

 4   A.       I don't recall.

 5   Q.       Do you recall whether you reviewed information

 6   that Officer Harrison had observed -- Detective Harrison

 7   had observed Mr. Smith while he was running with nothing

 8   in his hands?

 9   A.       I don't recall that.

10   Q.       Did you take any actions with respect to the

11   shooting of Mr. Smith after you received this memo?

12   A.       So, if I may, the question was did I take any

13   action?

14   Q.       Correct.

15   A.       Other than approving, I do not recall any other

16   action being taken.

17   Q.       Okay.  So you approved the memo and

18   recommendation -- or memo and determination, I should

19   say.

20   A.       Yes.

21   Q.       Did you recommend any policy changes related to

22   the shooting of Mr. Smith?

23   A.       None I remember.

24   Q.       Did you direct any training changes related to

25   the shooting of Mr. Smith?
```

104

CHIEF ERIC JONES

**Jones Dep.**

```
 1   A.        None I remember.

 2   Q.        At any point when you were reviewing the

 3   information about the shooting of Mr. Smith, did you

 4   become aware of his race?

 5   A.        Yes.

 6   Q.        In assessing the shooting of Mr. Smith, did you

 7   consider whether implicit bias may have been a factor in

 8   the shooting of Mr. Smith?

 9   A.        Did I consider it?  Not that I recall.  Actions

10   were key here.

11   Q.        Have you ever -- are you familiar with a

12   California Highway Patrol detective named Mark

13   Petricevich?

14   A.        Sounds familiar.

15   Q.        Besides sounding familiar, do you have any

16   recollection of Mr. Petricevich?  Maybe it's Petricevich.

17   I'm not sure.

18   A.        No.

19   Q.        All right.  If you can turn to the December 16,

20   2014, memo.  In the second paragraph on the page, the

21   memo states that "The investigation was jointly conducted

22   by investigators from the San Joaquin County District

23   Attorney's Investigation Unit, the Stockton Police

24   Department, the California Highway Patrol, and the

25   Department of Justice."
```

CHIEF ERIC JONES

BARKLEY
Court Reporters

**Jones Dep.**

```
 1   Q.        And did you make any recommendations for changes

 2   in policy or training connected with the shooting of

 3   Luther Brown?

 4   A.        None I recall.

 5   Q.        Looking at the list of officer-involved

 6   shootings on this chart dated from the beginning, which

 7   is May 4th, 2010, through January 5th, 2013 -- that's the

 8   shootings up until Nathaniel Smith -- do you know if the

 9   protocol review committee made determinations for all of

10   those officer-involved shootings?  So I'm not asking

11   which determination they made, but do you know if they

12   came to a point of making determination for all of those

13   shootings?

14   A.        Yes.  I believe they did.

15   Q.        And are you aware of whether they found any of

16   those shootings out of policy?

17   A.        I'm not aware of any of those out of policy.

18   Q.        And for those shootings for which -- for those

19   protocol investigations for which you were chief, to the

20   best of your recollection, did you receive memoranda from

21   the protocol review committee stating what determination

22   they made?

23   A.        That would be the routine process, but I just

24   can't say for each one.  My memory wouldn't be there for

25   those.
```

114

CHIEF ERIC JONES

BARKLEY
Court Reporters

Jones Dep.

1  shootings by Stockton Police Department officers in

2  connection with traffic stops?

3  A.      Again, always reviewing.  That specificity is

4  not ringing a bell with me.

5  Q.      If I represented to you that, out of the

6  shootings listed on this chart, 12 of them involved

7  traffic stops, would that information surprise you?

8  A.      It would not.

9  Q.      And why is that?

10 A.      Out of the 800 to 1,000 guns we get off the

11 street every year, most of them are in traffic stops or

12 pedestrian stops.  It's also one of the most risky and

13 common things that police officers do.  "Common" is a bad

14 word -- one of the most risky yet high frequency things

15 that we do.

16 Q.      And have you ever looked specifically at the

17 issue or directed others to look specifically at the

18 issue of officers using deadly force in connection with

19 fleeing suspects?

20 A.      Not that I recall.

21 Q.      Have there been any protocol review committee

22 determinations as to whether officer-involved shootings

23 were within policy or outside policy that you disagreed

24 with?

25 A.      In my career?

117

BARKLEY
Court Reporters

1   Q.      I'm sorry.  In your role as chief.

2   A.      I don't believe so.

3   Q.      And have there been any recommendations for

4   discipline or not to discipline relating to

5   officer-involved shootings made by the protocol review

6   committee that you have disagreed with in your role as

7   chief?

8   A.      Not that I recall.

9   Q.      Other than in connection with the Bank of the

10  West shooting, as we talked about regarding the

11  sympathetic fire issues, have you recommended any or

12  directed any policy changes connected to any other

13  officer-involved shootings in your time as chief?

14  A.      I don't believe so.

15  Q.      And, again, other than the Bank of the West

16  shooting, with respect to the sympathetic fire, as we

17  talked about, have you ever recommended or directed any

18  changes to training in connection to any officer-involved

19  shootings in your role as chief?

20  A.      Not that I recall.

21          MS. RIFKIN:  Why don't we take a couple-minute

22  break.

23          (Break taken.)

24  BY MS. RIFKIN:

25  Q.      I'm going to hand you what's previously been

118

BARKLEY
Court Reporters

**Jones Dep.**

```
1                    DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA     )
                             ) ss.
3    COUNTY OF SACRAMENTO    )

4

5

6        I, Emily Richardson, hereby certify:

7        I am a duly qualified Certified Shorthand Reporter

8    in the State of California, holder of Certificate Number

9    12806 issued by the Court Reporters Board of California

10   and which is in full force and effect.  (Fed. R. Civ. P.

11   28(a)).

12       I am authorized to administer oaths or affirmations

13   pursuant to California Code of Civil Procedure, Section

14   2093(b) and, prior to being examined, the witness was

15   first duly sworn by me.  (Fed. R. Civ. P. 28(a),

16   30(f)(1)).

17       I am not a relative or employee or attorney or

18   counsel of any of the parties nor am I a relative or

19   employee of such attorney or counsel nor am I financially

20   interested in this action.  (Fed. R. Civ. P. 28).

21       I am the deposition officer that stenographically

22   recorded the testimony in the foregoing deposition and

23   the foregoing transcript is a true record of the

24   testimony given by the witness.  (Fed. R. Civ. P.

25   30(f)(1)).
```

137

CHIEF ERIC JONES

```
 1        Before completion of the deposition, review of the

 2   transcript [XX] was [  ] was not requested.  If requested,

 3   any changes made by the deponent (and provided to the

 4   reporter) during the period allowed are appended hereto.

 5   (Fed. R. Civ. P. 30(e)).

 6

 7   Dated:  April 17, 2017

 8

 9

10

11

12        _____

13        EMILY RICHARDSON, CSR NO. 14043

14

15

16

17

18

19

20

21

22

23

24

25


                              138
```

BARKLEY
Court Reporters

**Jones Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF CALIFORNIA
 2                   SACRAMENTO DIVISION
                       ---oOo---
 3

 4

   NATHANIEL SMITH,                       )
 5                                        )
                    PLAINTIFF,            )
 6                                        )
   vs.                                    ) 2:15-cv-00363-GEB-AC
 7                                        )
   CITY OF STOCKTON, OFFICER              )
 8 MAYER, OFFICER ROBIN HARRISON,         )
   and OFFICER MICHAEL PEREZ, in          )
 9 their individual capacities;           )
   and Chief of Police Eric               )
10 Jones, in his official and             )
   individual capacities,                 )
11                                        )
                    DEFENDANTS.           )
12                                        )

13

14

15                  DEPOSITION OF

16              OFFICER PATRICK MAYER

17              STOCKTON, CALIFORNIA

18                 JULY 18, 2016

19

20

21

22

   ATKINSON-BAKER, INC.
23 COURT REPORTERS
   (800) 288-3376
24 www.depo.com
   REPORTED BY:  MICHELLE SAVAGE, CSR NO. 12957
25 FILE NO:  AA0798C
```

1

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    some sort of -- if it evolves into a threat where

2    myself, other officers, or the public could be in danger

3    of any type of serious bodily harm or death, obviously,

4    I'm going to go to use of deadly force.  And there is

5    simply the range in between types of force, such as K-9,

6    tasers, batons, in between that whole spectrum.

7        Q.   Do you have an understanding of whether it's

8    the policy that you use the least amount of force

9    possible in a situation?

10       A.   Yes, always.

11       Q.   Were there different kinds of traffic stops

12   under the procedures for the Stockton Police Department?

13       A.   Well, there's essentially two types of traffic

14   stops, low risk and high risk.  Both of these traffic

15   stops, obviously, can -- the low risk, obviously, can

16   turn into a high risk.  But, yes, that's pretty much the

17   two different type of traffic stops.

18       Q.   And understanding that they can change from

19   one to another?

20       A.   Right.

21       Q.   How do you generally define low risk versus

22   high risk?

23       A.   I would say low risk is usually a traffic stop

24   for a vehicle code infraction.  It's the way you

25   approach the traffic stop and obviously the car.

21

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1     A.     It all depends on the situation.  I have --

2     most of the time you don't have to use a PA, because

3     either someone has their window down, or they can hear

4     you simply by yelling.  So most of the time, no.

5     Q.     When you're giving those commands in a high

6     risk stop, are you usually out of your car and next to

7     it?

8     A.     Standing with the driver's door open, in

9     between the driver's door and the vehicle.

10    Q.     So besides whether a vehicle code infraction

11    or a felony want, are there any other factors that make

12    the traffic stop low risk or high risk?

13    A.     Well, I would say that, like I said earlier,

14    if I go to pull somebody over and they're acting

15    suspicious, such as immediately once I pulled them over

16    they start moving around in the vehicle or doing

17    something like that to maybe raise my awareness that

18    this might be more than just someone in that vehicle,

19    you know, maybe more than just a traffic stop at this

20    time.  But usually, like I said, that's just how it

21    flows from start to finish.

22    Q.     And when you said for a felony warrant, is any

23    felony warrant considered a high risk traffic stop?

24    A.     I would say, yes.

25    Q.     You said for the low risk -- for the high risk

23

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    traffic stop you stay by your vehicle?

2        A.    Yes.

3        Q.    For the low risk traffic stop, what do you

4    generally do?

5        A.    Well, in a typical traffic stop for a vehicle

6    code violation we are going to initiate the traffic

7    stop.  Once the person is pulled over, we are going to

8    approach the vehicle and have a discussion about why the

9    traffic stop was issued.

10        Q.    Assuming a low risk traffic stop that does not

11    immediately elevate, do you have your gun out?

12        A.    No.

13        Q.    And what about a typical high risk traffic

14    stop, do you get out of the car with your gun out?

15        A.    Yes.

16        Q.    And that's what you were trained to do?

17        A.    Yes.

18        Q.    And how are you holding your gun?

19        A.    Point it at the vehicle.

20        Q.    Do you hold it with one hand or both hands?

21        A.    Both hands.

22        Q.    And is there a specific place that you point

23    it, or is there a specific target area for the vehicle

24    that you point it at?

25        A.    Well, it usually depends on the occupants of

24

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    the vehicle.  If I know where the occupant of the

2    vehicle is, that's where I would essentially point it,

3    but it also depends on why we are doing the traffic

4    stop.

5        Q.    What do you mean by that?

6        A.    Well, if the traffic stop is -- if the high

7    risk stop is for a stolen vehicle, obviously you're

8    targeting -- I mean, the driver of the vehicle is the

9    person you're most worried about, but the occupants of

10   the vehicle can also be a threat.  You don't know who or

11   what's in the vehicle at the time.

12       Q.    I see.  So is it accurate, you're saying that

13   in determining sort of which occupant you're pointing

14   the gun at, that's related to why you're stopping the

15   car and which occupant you are particularly stopping the

16   car for?

17       A.    Yes.

18       Q.    Okay.  And is it accurate that you generally

19   try to point at the occupant you're concerned about?

20       A.    I would say for the most part in initiating a

21   felony traffic stop, depending on so many different

22   factors, such as the occupants of the vehicle, location

23   of the person is where I'm either going to point my gun

24   at the person or point my gun -- what we call like a low

25   ready, which is kind of at the ground, would be in

25

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   that was actually trained or just part of learning on

2   the job.

3       Q.      One way or the other during your experience

4   with the Stockton Police Department, did you learn how

5   to do that?

6       A.      I believe during my time in Stockton I had --

7   we had physically moved people out of the vehicles.

8       Q.      So we talked about how a low risk and high

9   risk traffic stop might go in general.  Are there

10  anything -- any different procedures being with a K-9

11  Unit?

12      A.      It all depends on the type of stop and the

13  want on the stop.  And like you had said in your

14  previous question, with a K-9, if there is someone in

15  the vehicle and they're refusing to come out of the

16  vehicle, we have the option to, instead of approaching

17  the vehicle and putting ourselves in harms way, we have

18  the option and the training to use the dog to attempt to

19  take somebody out of the vehicle.

20      Q.      When you said it depends on the type of want,

21  what do you mean by that?

22      A.      Well, I wouldn't use the dog on a minor

23  vehicle code violation.

24      Q.      Do you differentiate, again in the context of

25  traffic stops, between the different types of felony

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    wants that might be out there?

2        A.    No.  If it's a felony want, it's usually a

3    felony want.  If there are other factors, it can depend

4    on the want as far as if this person is known to carry

5    firearms, or has been known in the past to fight with

6    officers, or any different factors that could change the

7    dynamics of the stop.

8        Q.    Where would you typically find that

9    information prior to making the stop?

10       A.    Usually a person's history, contact with law

11   enforcement.

12       Q.    And where is that -- is that --

13       A.    Usually the arrests within the city or any

14   type of warrants, possibly for the subject.

15       Q.    They would typically have that information?

16       A.    "Typically" is pretty strong word for that

17   kind of stuff.  A lot of stuff is left out

18   unfortunately.  We go into situations where we don't

19   have all the information that is necessary, which makes

20   the situation kind of a fluid situation.

21       Q.    And where, sort of physically or technically,

22   how do you look that information up?

23       A.    In the computers, under the person's name.

24       Q.    In the computers in the cars?

25       A.    Yes.

30

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    someone designates who is going to verbally contact, as

2    in commands.

3            And once the person is brought out of the

4    vehicle as the situation unfolds, the person giving the

5    commands, obviously, tells the person where to go, what

6    to do.

7            At that point sometime during the stop and the

8    commands, another person can take over the commands as

9    they progressively get closer to that person.  So

10   depending on if there are other people still in the car,

11   the original contact person can start giving them

12   commands.

13       Q.    Okay.  Do you have an understanding based on

14   policy and procedure of whether more than one officer

15   should be giving commands to a target at once?

16       A.    Well, you say "based on policy and procedure."

17   I can't recall the exact -- if there is an exact policy

18   and procedure that states who or what or when, but

19   usually you're only -- depending on the situation, there

20   is usually only one person giving the commands.

21       Q.    Why is that?

22       A.    To avoid confusion.

23       Q.    And, I guess, are you trained, or is it

24   something that you learned through experience?  You said

25   that, as the situation evolves, the person giving

                                                          35

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    area and the next area over, which they're on street

2    boundary, there's a call holding that obviously needs

3    the attention of an officer which, you know, someone

4    wanted on a warrant would be a more important call that

5    I could respond to from another area, so...

6        Q.    Did Stockton use any system to designate

7    priorities of calls, for example, numbers or letters

8    indicating high or lower priorities?

9        A.    They do, but I don't recall what it is

10   anymore.

11       Q.    What -- do you recall what priority this call

12   was considered?

13       A.    No, I do not.

14       Q.    Are felony wants always considered the same

15   priority?  Let me explain.  So, for example, would some

16   felony wants be categorized as one priority and other

17   felony wants at another priority depending on what the

18   underlying felony is, or is it your understanding that

19   all felony wants are the same priority?

20       A.    No, because I believe the call was very vague

21   as far as -- as what the warrant was for or anything

22   else like that.  It was upon further investigation that

23   it was discovered by me that it was discovered that it

24   was a felony warrant in the system for the subject who

25   was seen at this residence.

44

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    Q.    Okay.  So is it accurate that the call came in

2    saying there's a warrant, that was vague, you looked it

3    up and found a felony warrant?

4    A.    I believe the call stated that there was a

5    subject that was wanted by officers who had been at the

6    residence on a prior occasion.  There wasn't a lot of

7    information in the call as far as that.

8         So I believe it was -- I don't recall how I

9    got to whether I ran the address or situation of how I

10   found the warrant.

11   Q.    Okay.  Had you, prior to seeing this call

12   holding, had you been involved in any other assignments

13   involving Nathaniel Smith?

14   A.    Not that I recall, no.

15   Q.    Had you been looking for him specifically?

16   A.    No, I do not believe so.

17   Q.    Okay.  So you see the call holding.  Is the

18   next thing you do look it up in the computer?

19   A.    Yes.  I did the research as far as for the

20   call and figuring out what the possible want could be on

21   the person at the house.

22   Q.    And that's when you identified the felony

23   warrant?

24   A.    Yes.

25   Q.    And did that include information on what the

45

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1  warrant was for?

2      A.    I believe the warrant states what the offense

3  is.  It's not real specific.  It's not like it's a

4  report that you read about -- it's pretty basic.

5      Q.    Would it say, for example, DUI?

6      A.    It would say what the charge was for, what the

7  felony charge was for.

8      Q.    Do you remember, is there a name for that

9  screen that you call up on the computer that says what

10  the felony is for?

11      A.    I believe it's the CLETS hit for the warrant.

12      Q.    All right.  And you don't remember in this

13  instance what it said?

14      A.    No.

15      Q.    Okay.  So you look up the CLETS hit, you see

16  it, then what do you do?

17      A.    I contact an officer or Detective Harrison who

18  works for DELTA RATT, which is the undercover auto theft

19  unit.  I had her look at the call because she is in an

20  unmarked vehicle.  And I had her -- asked her to drive

21  by the house and see if the vehicle in the call were

22  still there.

23      Q.    Had you communicated with dispatch that you

24  were taking this call?

25      A.    No.

46

**Mayer Dep.**

1      A.    I don't recall if there was or not.

2      Q.    Do you recall if at the time you decided to

3   make the stop you had any information saying that

4   Mr. Smith might be armed?

5      A.    I don't recall seeing anything at this point.

6   No, I don't remember if there anything that said that.

7      Q.    Do you recall whether you had any information

8   saying that he was likely to be violent or resist

9   officers?

10     A.    I don't recall if there was or not, no.

11     Q.    When you said -- you said you were waiting for

12  another unit, marked car unit; is that right?

13     A.    Yes.

14     Q.    Why is that?

15     A.    Well, usually when we're going to conduct, we

16  don't conduct high risk traffic stops with just one

17  patrol vehicle.  So it's always the more the better,

18  especially when you have a situation where there is more

19  than one person in the car.  So you don't -- I mean, I'm

20  not going to take into account the fact that there is a

21  women and a child, but there is more than one occupant.

22  So the more officers the better.

23     Q.    And why did it -- why did you feel that a

24  marked car rather than Detective Harrison's unmarked car

25  would be needed?

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

1    A.    It was more of the fact that it was just also

2    another unit as opposed to just me and her.   Not

3    necessary -- like I said, the unmarked car, but not

4    necessarily -- I mean, if there was another unmarked car

5    in the area, that would suffice because obviously I was

6    driving a fully marked patrol vehicle.

7    Q.    So is it your general understanding that for a

8    high risk stop, you want more than two units there?

9    A.    It's -- yes, I mean, I would always want more

10   than two units there, if possible.   Like I said, you

11   never know what the situation is going to evolve into.

12   Q.    So you said you followed the car for about

13   three city blocks until it stopped at a light?

14   A.    Yes.

15   Q.    Then what happened?

16   A.    Due to the fact that I didn't know if they

17   were going to get on the freeway or continue through

18   town, I initiated a traffic stop since there was -- I

19   knew there was another officer on their way.   And

20   obviously I had officer -- or Detective Harrison with me

21   at the time.

22   Q.    And what did the freeway have to do with it?

23   A.    Just that it changes the type of traffic stop.

24   Doing a traffic stop on the freeway is a lot more

25   dangerous than a city street.

51

**Mayer Dep.**

1      Q.    So you initiated the stop while you were at

2  the red light?

3      A.    I don't recall if I waited until the light

4  turned green or prior to.  But I know it was initiated

5  at that point because we stopped just on the other side

6  of the intersection.

7      Q.    How did you initiate the stop?

8      A.    Activated my overhead emergency lights.

9      Q.    Does that also activate sirens?

10     A.    No.  I activated my siren after.  Usually when

11  we're doing a traffic stop, we activate our lights

12  first, and then depending on if the person sees the

13  lights or not, I'll activate the siren for a short

14  second to get someone's attention.

15     Q.    So in this case you activated your lights, and

16  then what happened?

17     A.    We proceeded through the intersection.  I

18  activated my siren, and the vehicle pulled to the curb.

19     Q.    Would you say that the vehicle was immediately

20  responsive to the siren?

21     A.    From my recollection, I believe it was.

22     Q.    In other words, the vehicle pulled to the curb

23  pretty quickly?

24     A.    Yes.

25     Q.    And did the car pull to the curb on the right

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

1   the car because you never know if someone is going to

2   take off once they pull over and you step out of your

3   vehicle.

4           Within seconds, I would say, there was a lot

5   of movement in the car.  I step out of my vehicle, and

6   as I step out of my vehicle, the rear driver side

7   passenger door opens.

8       Q.     When you say "a lot of movement," could you

9   describe that more?

10      A.     Well, there was movement in the car prior as

11  far as Mr. Smith was -- kept looking back at the patrol

12  vehicle because I was directly behind them at the light.

13  Just, you know, not -- just movement as far as not just

14  sitting there.  Shuffling around in the vehicle, leaning

15  over towards the front of the vehicle, that type of

16  stuff, towards the driver compartment.

17      Q.     In your experience is it unusual for a

18  passenger in a car directly in front of a police car who

19  witnesses a police car behind them to keep looking at

20  it?

21      A.     Yes.  Yeah, usually people don't keep looking

22  back at a police car, especially a passenger.  I mean,

23  you will catch drivers obviously looking in the

24  rear-view mirror, kind of keep looking back.  But

25  usually you don't get people, back seat passengers kind

54

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

1   of checking behind the vehicle several times in a matter

2   of 15 to 20 seconds.

3       Q.     Other than Mr. Smith looking back at your car,

4   as you said, several times in 15 to 20 seconds, were

5   there any other specific movements of his that you

6   specifically noticed?

7       A.     Like I said, he was leaning towards -- into

8   the driver's area between the two seats, kind of

9   leaning, looking like he was bent over on the floor.

10  Like I said, he was seated behind the driver, and there

11  was a car seat directly next to his right.  So just

12  movements in the vehicle.

13      Q.     Before we go on, I guess, Detective Harrison's

14  car, did she stop behind you?

15      A.     She stopped off to my passenger side, I

16  believe.  I don't remember her exact angle or whatever

17  it was, but we're not very far through the intersection

18  when the car pulled over.  So she was probably pretty

19  close to being in the intersection when she stopped.

20      Q.     And so she was further towards the curb than

21  your car was?

22      A.     Yes, I believe so.

23      Q.     Okay.  All right.  So you said stop.  You

24  opened your door and get out, and at the same time the

25  rear passenger door of the target vehicle opened?

                                                          55

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      A.      Yes.

2      Q.      And when you got out, did you have your gun

3  out?

4      A.      No.  I had not even had a chance to do that

5  yet.

6      Q.      So were you in the process of getting out of

7  your car when the rear passenger door opened, or would

8  you say you were out of the car?

9      A.      I would say it happened at probably the same

10  -- about the same time as my door opened.  As I opened

11  my car, the door opened in the car.

12      Q.      Okay.  And had you given any commands yet?

13      A.      No.

14      Q.      Okay.  So you're getting out of your vehicle,

15  the car door in front of you opens?

16      A.      Right.

17      Q.      Then what?

18      A.      Mr. Smith exits the vehicle.  I exit my

19  vehicle.  Obviously now the situation has become

20  heightened because I don't what he's doing now.  Most of

21  the time people don't -- if somebody swings open the

22  door after a traffic stop, it usually means they're

23  going to run or do something.

24          So I exit my vehicle.  He exits his vehicle.

25  I go to pull out my gun.  At the same time I begin to

56

**Mayer Dep.**

1    had happened this time.

2         Q.    You're saying this was very unusual?

3         A.    Yes.

4         Q.    So he faced you when he got out of the car?

5         A.    Yes.

6         Q.    And is it the fact that he faced you and said

7    something that was challenging, or was it what he

8    actually said?

9         A.    It was -- I don't remember the exact words he

10   said.  It was "come get me" or something to that effect.

11   Like I said, it was the way he came out of the car.  At

12   the time I knew what he said, obviously, but trying to

13   recall after the whole situation happened was I didn't

14   know what he said word for word.

15        Q.    But you took it as a challenge?

16        A.    Yes.

17        Q.    A challenge to what?

18        A.    To try and come get him.  That's what he

19   essentially said, from what I recall.

20        Q.    When Mr. Smith was getting out of the car, did

21   you see if he was carrying anything?

22        A.    No, I did not.

23        Q.    You couldn't tell?

24        A.    He didn't appear to be.  Like I said, it

25   happened so fast.

59

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1       Q.     Did you see anything in his hands?

 2       A.     Not that I recall.

 3       Q.     So after he turned and faced you and said

 4  something, then did he take off?

 5       A.     Yes.

 6       Q.     Did he turn his back to you then?

 7       A.     Yes.

 8       Q.     And where did he -- which direction did he

 9  take off in?

10       A.     He ran around the open door towards the front

11  of the vehicle.

12       Q.     He ran around to the open passenger seat --

13  door towards the front of his vehicle?

14       A.     Yes.

15       Q.     And then crossed in front of his vehicle?

16       A.     Yes.

17       Q.     Towards the curb?

18       A.     Yes.

19       Q.     Did you have -- I understand while this was

20  happening, you said when you first saw him getting out,

21  you went to pull your gun out and open the window for

22  your dog.

23              At any point did you have your gun pointed at

24  him?

25       A.     I don't believe in that amount of time that I
```

60

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    had the opportunity to point my gun at him.

2        Q.    About -- can you estimate how long passed

3    between the time the car stopped and the time he ran?

4    In other words, the amount of time in which the door

5    opened he got out and ran?

6        A.    Seconds.  The car pulled to the curb.  As soon

7    as the car, essentially, came to a stop is when the door

8    opened and he exited the vehicle.

9        Q.    And so the events -- the portion that we have

10   been specifically talking about, you getting out, him

11   getting out, him turning facing you, you're pulling out

12   your gun, unrolling the window, that was within seconds?

13       A.    Within seconds.

14       Q.    And when you say "within seconds," just a few

15   seconds, 30 seconds?

16       A.    If I had to guesstimate, under five seconds.

17   It was a very fluid motion.

18       Q.    And in that five seconds, did you say anything

19   to him?

20       A.    I believe when he -- to my recollection, when

21   he turned and took off running, I told him to stop.

22       Q.    Do you recall saying anything else to him at

23   that time?

24       A.    I don't believe I had the time to do it.  It

25   was -- it evolved very fast.

61

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1       A.      No.

2       Q.      Is it considered less lethal force?

3       A.      Yes.

4       Q.      And was it your understanding, are you

5    permitted to use K-9 force for --

6       A.      Never heard it called that.

7       Q.      Are you allowed to use K-9 when -- a K-9 in

8    pursuit of a suspect from a felony want traffic stop

9    fleeing on foot?

10       A.      Yes.

11       Q.      And is there a specific type of command or

12    type of action that you're trained to use a K-9 to do in

13    that type of situation?  So K-9s have different

14    commands, right?

15       A.      Yes.

16       Q.      And you can command them to bite somebody,

17    right?

18       A.      Yes.

19       Q.      What other kinds of commands can you give for

20    them to do to somebody?

21       A.      Or you can command them to search for them if

22    the suspect is hidden.  You can command them to chase

23    after someone, which essentially is using the same

24    command as the bite command.

25               So in a case of a fleeing suspect where the

64

**Mayer Dep.**

1   person is out in the open, obviously you're going to use

2   that command.

3       Q.    So pretty much the option is to have them

4   chase after and try and essentially secure that person

5   by biting them?

6       A.    Yes.

7       Q.    And is that the command that you gave your

8   dog?

9       A.    Yes.

10      Q.    All right.  So I think we're at the point

11  where you -- Mr. Smith is taking off, you're running

12  after him in his flight path, you've given the dog the

13  command.  Is the dog ahead of you?

14      A.    Yes.

15      Q.    Okay.  I assume that's why we use them.  And

16  so then what happened?

17      A.    Mr. -- as I came around the front of the

18  vehicle, Mr. Smith had jumped a chain link fence that

19  was along the curb line leading to kind of an open area

20  next to the freeway onramp.  And he was actually running

21  through this open area, and the dog was essentially

22  paralleling him down the sidewalk so the fence was in

23  between Mr. Smith and the dog.

24      Q.    Okay.  And then what happened next?

25      A.    I called the dog back -- well, tried to find a

65

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   way through the fence.  I believe Officer Harrison

2   called to me that there was a way to get around the

3   fence.  I'm not sure.  All I know is that I had to call

4   the dog back in order to get -- there was a way to get

5   under the fence.

6          So once we were able to get under the fence

7   and on the same side as Mr. Smith, I again deployed the

8   dog to chase after Mr. Smith.

9      Q.    So you and the dog went under the fence?

10     A.    Yes.

11     Q.    And was Harrison on the same side of the fence

12  as you and the dog and Mr. Smith?

13     A.    I believe so.  I don't exactly recall where

14  she was.  I know she was obviously behind us.

15     Q.    And so what happened after you got under the

16  fence and deployed the dog again?

17     A.    Well, Mr. Smith was quite a distance away from

18  us.

19     Q.    About how far would you say?

20     A.    I could estimate at least, I would say,

21  50 yards.  It was quite a distance.  So the dog is in

22  pursuit.  The dog gets probably halfway between myself

23  and where Mr. Smith was at the time, and we were running

24  through ice plant, so something happened with the dog

25  where he crashes; he tumbles.  I don't know what he got

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   she was at.  I know obviously that she drove to the

2   other side of the freeway.

3       Q.    Right.

4       A.    But I don't recall if I was aware of her

5   location at the time.

6       Q.    Okay.  So based on what you remember, what

7   happened?  What's the next thing that happened after --

8   when Mr. Smith went over the guardrails and out of your

9   sight?

10      A.    So I get to the top of the embankment.

11  There's a sound wall next to the guardrails, which is

12  where he went out of sight behind.  Once I get to the

13  top, I kind of come around.  I don't know where he is

14  now.  He's out of my sight.  So I cautiously come around

15  the sound wall.  And at this point I can see him.  He is

16  now in the center median of the highway.

17      Q.    So he's crossed traffic going one of the

18  directions?

19      A.    Yes.

20      Q.    Okay.  All right.  And then what?

21      A.    He goes out of my sight again because there's

22  oleanders in between the lanes.  I have to wait for

23  traffic, and I, myself, and my dog make our way across

24  the first set of lanes and then through the oleanders on

25  to the other side.

69

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1                          .

 2                 REPORTER'S CERTIFICATE

 3

 4          I, Michelle Savage, CSR No. 12957, Certified

 5    Shorthand Reporter, certify;

 6          That the foregoing proceedings were taken

 7    before me at the time and place therein set forth, at

 8    which time the witness was put under oath by me;

 9          That the testimony of the witness, the

10    questions propounded, and all objections and statements

11    made at the time of the examination were recorded

12    stenographically by me and were thereafter transcribed;

13          That the foregoing is a true and correct

14    transcript of my shorthand notes so taken.

15          I further certify that I am not a relative or

16    employee of any attorney of the parties, not financially

17    interested in the action.

18          I declare under penalty of perjury under the

19    laws of California that the foregoing is true and

20    correct.

21

22          Dated this 29th day of July

23

24    _____
      MICHELLE SAVAGE, C.S.R. NO. 12957
25              (Signature requested.)
```

129

Officer Patrick Mayer
July 18, 2016

**Mayer Dep.**

1         UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

3             ---oOo---

4   Nathaniel Smith,        COPY

5       Plaintiff,

6   vs.            No.2:15-cv-00363-GEB-AC

7   City of Stockton; Officer
   Patrick Mayer, Officer Robin

8   Harrison, and Officer
   Michael Perez, in their

9   individual capacities; and
   Chief of Police Eric Jones,

10   in his official and
   individual capacities,

11

12       Defendants.
    _____/

13

14             Deposition of

15             Michael Perez

16            August 3, 2016

17

18

19

20

21

22   Reported by:
   Susan M. Portale, CSR No. 4095

23   Registered Merit Reporter
   Job No.:   080316

24

25

Perez Dep.

1    trainings about the use of force against fleeing felons?

2    A.        As far as what kind of training?

3    Q.        In terms of how to determine what level of

4    force might be reasonable to use in the case of a

5    fleeing felon.

6    A.        We had several trainings.  I'm sure that was

7    included in many of the trainings that we had.

8    Q.        What is your understanding of when it is

9    permissible to use deadly force in a situation where

10   there is a fleeing felon (anyone)?

11   A.        Well, a felon could be many felonies.  It

12   depends what the felony is.  You are not going to use it

13   -- that force, deadly force, for a property crime.

14            Assaulting a citizen or a police officer you

15   are not going to use deadly force.

16            My interpretation of that is if it's a serious

17   felony where there is violence being used, there is an

18   immediate threat to lives around you or your life.

19   Q.        And so what you just described as your

20   interpretation that would be -- that would describe a

21   situation in which you understand that it would be okay

22   to use deadly force?

23   A.        A violent situation where there is -- there is

24   -- it would be the totality of circumstances

25   (indicating).

**Perez Dep.**

1    (indicating).   It's not written in stone because --

2    because as I just explained, things change and you can't

3    have a policy that says only contact officers speak to

4    this person (indicating).

5    Q.        As part of that training does that involve you

6    as an officer learning to read the situation and, like

7    you said, you don't tag each other, so to read the

8    situation who is going to be the sort of lead or

9    contact?

10   A.        Yeah, it just depends on the situation.

11   Q.        Are you given or were you given any training

12   about whether it's appropriate for multiple officers to

13   be giving commands to one person at the same time?

14   A.        I have received training on not to do multiple

15   commands, yes.

16   Q.        And why not?

17   A.        Well, depending on the situation, if you have a

18   person who is -- a volatile situation where -- you may

19   not want multiple people speaking to him.

20   Q.        Why not?

21   A.        As to confuse him (indicating) but that's not

22   always the situation depending on what the call is.

23   Q.        Are you familiar with the Stockton Police

24   Department policies and procedures regarding transport

25   of prisoners?

**Perez Dep.**

1   A.      Yes.

2   Q.      Specifically is it accurate that there were

3   also specific policies and procedures for the transport

4   of female prisoners?

5   A.      Yes.

6   Q.      What is your understanding of the general

7   policies and procedures for Stockton about responding to

8   other calls when transporting a prisoner in your car?

9   A.      It's -- there is not a policy that says under

10  exigent circumstances you cannot do that (indicating).

11          In my situation I did it.  There were exigent

12  circumstances due to a solo officer being in foot

13  pursuit toward a very busy interstate freeway and it was

14  a very -- my understanding that was exigent.  That was

15  -- there was some sense of urgency in the system.

16  Q.      Would it be accurate that your understanding is

17  that the general procedure is not to respond to another

18  call when you are transporting a prisoner except if

19  there are exigent circumstances?

20  A.      Generally, it would be not to respond to calls

21  but what I did it's not in there to say "You cannot do

22  this" (indicating).

23  Q.      What is your understanding of why it would be

24  generally you don't respond to calls when transporting,

25  again, setting aside a situation in which there are

**Perez Dep.**

```
1              In other words, what are you doing differently?
2    A.        Well, again, it just depends on what situation
3    you are talking about.  If you are doing a regular
4    traffic stop and they don't have a -- you don't have
5    knowledge that they have a felony warrant or a
6    misdemeanor warrant and you are making a contact with
7    them and they could have a misdemeanor felony warrant.
8    I've dealt with people that have misdemeanor warrants
9    that have been violent.  I wouldn't necessarily
10   categorize it where felony are more violent and
11   misdemeanor are never violent.  It's -- it's dealing
12   with -- with suspects through my training I've learned
13   that misdemeanor they can hurt you just as much as
14   somebody with a felony warrant.
15   Q.        I had asked you previously about training on
16   hands-on approaches to handle somebody.
17             As part of those were you trained on how to
18   physically remove a suspect from a car using a hands-on
19   approach?
20   A.        Yes, part of it, yes.
21   Q.        Is there something -- when you said part of it
22   what do you mean?
23   A.        Well, we weren't necessarily like our training
24   proceeded in a car.  It was part of our use of force or
25   tactics.  Each training situation is different
```

**Perez Dep.**

1    Q.      Okay.

2            And you were trained on using pepper spray?

3    A.      Yes.

4    Q.      All right.

5            So I think you already mentioned you had picked

6    up an individual earlier prior to encountering Mr. Smith

7    on February 13th, 2013, is that right?

8    A.      Yes.

9    Q.      Okay.

10           Was that -- were you dispatched to that call?

11   A.      Yes.

12   Q.      And what was the call for?

13   A.      A female under the influence of drugs.

14   Q.      Do you remember who that call came from?

15   A.      It was reported by a citizen.

16   Q.      Was it a house that you reported to?

17   A.      It was in front of an apartment complex at 1176

18   Rosemarie Lane.

19   Q.      Is that an address you remembered prior to

20   reviewing your report?

21   A.      Yes.  It was a frequently visited apartment

22   complex.

23   Q.      Got it.  Okay.

24           And do you know if the call came from someone

25   at the complex?

**Perez Dep.**

```
1    A.       That I don't recall.

2             MR. ROME:  Calls for speculation.

3             THE WITNESS:  I don't know who made the call.

4             MS. RIFKIN:  Okay.

5    Q.       Did you -- at the time that you responded to

6    that call did you have information about what substance

7    the individual was suspected to be under the influence

8    of?

9             MR. ROME:  Calls for speculation.

10            Answer if you know.

11            THE WITNESS:  I don't recall what drug it was.

12            MS. RIFKIN:  Q.  Do you remember if that

13   information had been included in the call for service?

14   A.       I don't remember.

15   Q.       Okay.

16            Did you respond to that address by yourself?

17   A.       Yes.

18   Q.       And where was the -- the individual that you

19   ultimately arrested when you first went to that address?

20   A.       Her last name was Lutge, L-u-t-g-e.

21   Q.       And --

22   A.       She was in front of the complex on the south

23   side of the street (indicating).

24   Q.       And what was she doing?

25   A.       Acting irrational, very -- not making any
```

**Perez Dep.**

1    sense, very excited state, yelling, screaming, and she
2    appeared to be under the influence of drugs and at that
3    point I arrested her.
4    Q.       Based on your experience and training at that
5    point did you have a -- did you form any opinion about
6    what substance she might be under the influence of?
7    A.       I don't recall what I put in the -- I don't
8    recall what the drug was.
9    Q.       Did you fill out an arrest report?
10   A.       It was a booking slip.  Basically she was
11   unable to care for her own safety due to her intoxicated
12   being under the influence.
13   Q.       Did you do any kind of assessment of this
14   individual in terms of whether she needed medical
15   attention or not?
16   A.       From what I recall, she did not need medical
17   attention.  She just was unable to care for her own
18   safety.
19   Q.       What does that mean, that she was unable --
20   A.       I could not leave her there (indicating) for
21   fear she'd walk into traffic.  She -- her state of mind
22   she was very yelling and screaming and then calm and
23   very irrational.
24   Q.       Did you feel she was unpredictable?
25   A.       Yes.

**Perez Dep.**

1   Q.      So is that where sort of the approximate time

2   of the arrest, is that the place that it would be

3   documented?

4   A.      Correct.

5   Q.      Okay.

6           Prior to -- prior to arresting Miss Lutge had

7   you heard anything about a call for service involving

8   Mr. Smith?

9           Had you already heard that on the radio?

10  A.      No.

11  Q.      So that happened after you had already arrested

12  Miss Lutge?

13  A.      Yes.  That I recall, yes.

14  Q.      So where were you or what were you doing when

15  you heard information about the situation involving

16  Mr. Smith?

17  A.      I was -- I left the location where I had Lutge.

18  I went west on Rosemarie.  I went -- I turned south on

19  Pershing Avenue, and as I'm approximately two blocks is

20  El Monte -- actually less than two blocks is El Monte --

21  at that point I heard over the radio that an officer was

22  following a vehicle and that the person wanted -- or the

23  person in the vehicle was wanted for several felony

24  warrants.

25  Q.      At that time was there any other information

**Perez Dep.**

1    you recall hearing involving that situation?

2    A.       That's what sticks out in my mind.  That's what

3    I recall hearing as far as the vehicle and then the

4    felony warrants.

5    Q.       Okay.

6            About how far -- you remember the address

7    offhand -- the Rosemarie address -- about how far is

8    that from the jail?

9    A.       Oh, mileage, I don't know.  Possibly six -- six

10   miles, eight miles.

11   Q.       About how long does it usually take, the drive?

12   A.       It depends where you are coming from.  If

13   you're coming from the opposite side of town, much

14   longer.  If you're in traffic, it can -- there is no

15   really set time on transportation as far as how long it

16   takes.

17   Q.       When you said if you're come from the opposite

18   side of town, I don't live in Stockton, so is the

19   Rosemarie address the opposite side of town from the

20   jail?

21   A.       Yes.  It's not the -- it's not the south end of

22   town.

23   Q.       All right.

24           So to go back to where you are, you are driving

25   and it's around El Monte where you hear the call about

**Perez Dep.**

1   the officer following a vehicle, is that right?

2   A.      Yes.

3   Q.      Okay.

4           Do you recall whether there was any more

5   specific information about what those felony warrants

6   were for?

7   A.      No.  Not that I recall, no.

8   Q.      Was there any information broadcast at that

9   point that the subject was suspected to be armed or

10  dangerous?

11  A.      Not that I recall hearing.  I had a difficult

12  time hearing the radio because Lutge was screaming in

13  the patrol car (indicating) but information, I'm sure,

14  was broadcast but I did not catch all of that.

15  Q.      At that point that you just described when you

16  -- when you heard that information about the call did

17  you make any kind of decision to respond to it?

18  A.      No.  It was actually on my way to the jail --

19  it's not out of the ordinary for somebody to be

20  following a vehicle with a wanted person and I had -- I

21  had somebody in custody.

22  Q.      Okay.  So that was just sort of you are

23  driving, you hear the call, someone is screaming, you

24  just sort of are aware of what's going on, is that --

25  A.      Yes.

**Perez Dep.**

1           It can indicate the officer is not listening to
2      the radio.  It can indicate they are in a fight.  It
3      could indicate they are dealing with a violent situation
4      and they are not able to get on the radio so . . .
5      Q.      It could be sort of the whole range?
6      A.      Yeah.
7      Q.      Okay.  Okay.
8              And so what happened next?
9      A.      As I'm continuing south on Pershing I'm
10     listening and I do not hear any other additional
11     officers in that area to assist him.
12     Q.      At that time were you aware that both -- that
13     there were two officers following the car?
14     A.      I am not sure how many were following him.  I
15     did hear a second officer on the radio.
16     Q.      So you are aware that there were two officers
17     involved in this call?
18     A.      A second one had got on the radio and broadcast
19     information.
20     Q.      Is that different from being involved in the
21     call?
22     A.      No.  They are involved.  That would be
23     appropriate.
24     Q.      Okay.
25             Okay.  So you are aware that there is these two

**Perez Dep.**

1    freeway by AM/PM.

2    Q.        When you -- once you made the decision to get

3    involved and set up on the other side of the freeway did

4    you inform dispatch?

5    A.        No.  I wanted to stay off the radio to let the

6    officers who were in foot pursuit -- it was important to

7    give them the radio (indicating) to put out information.

8    I didn't want -- if I get on the radio and start

9    talking, they are not able to trans -- to relay

10   information that's pertinent to apprehending this person

11   (indicating).

12   Q.        And is that -- is that something that's part of

13   the typical procedure if there is a situation --

14   A.        It's not a procedure.  It's just based on my

15   experience.  If this officer is in foot pursuit

16   (indicating) it's not necessarily for two officers to

17   get on the radio saying "I'm on my way.  Put me

18   on-scene".  I felt it was important to leave him to deal

19   with the radio.

20   Q.        Were there any other mechanisms other than

21   radio that you used to contact dispatch at that time?

22   A.        No -- well, there is the radio and then there

23   is -- I don't recall if I sent a message that I was

24   going to assist.  I don't believe I did but if I did,

25   there would be some documentation on it.

**Perez Dep.**

1    at a distance so as to protect the person I had in

2    custody (indicating).

3    Q.       And so at the point that you were driving up to

4    the gas station your lights were no longer on, is that

5    right?

6    A.       Correct.

7    Q.       Okay.

8             And why did you decide to park -- to jump the

9    curb and park in that grassy area?

10   A.       There is no -- on Fremont at that particular

11   area there is no -- it's just one lane in each direction

12   (indicating).  Parking on the street would not have been

13   suitable because I'd be blocking the whole westbound

14   lane of Fremont.  Parking on the grass I was out of --

15   out of the traffic (indicating).

16   Q.       At the point at which you, I guess, were on

17   Fremont pulling up to the grass did you see Officer

18   Harrison?

19   A.       Yes.

20   Q.       And where did you see her?

21   A.       She -- she had her unmarked vehicle, her

22   Chevrolet Tahoe, parked at the east entrance of the

23   AM/PM.

24   Q.       And at the time that you pulled up was she in

25   her unmarked vehicle or was she out of it?

**Perez Dep.**

1    A.        I believe she was out of it.

2    Q.        Where do you remember seeing her?

3    A.        Towards the front of the vehicle.

4    Q.        And, again, we are at -- so we are at the time

5    that you are pulling, you know, over the curb and onto

6    the grass.

7              Had you heard any additional information?

8              I think the last information you said you heard

9    over the radio was that the officer was in foot pursuit

10   of the suspect?

11   A.        Correct.

12   Q.        By the time you are parking had anything else

13   come across?

14   A.        I'm listening.  My -- my objective at that

15   point was to set up a perimeter in case he ran.

16             I saw Officer Harris at the east entrance to

17   AM/PM so that was another reason why I parked at a

18   distance in case he ran east.  As I exited the vehicle I

19   heard Officer Harris say that the suspect was hiding by

20   the SUV in the parking lot behind it.  That was closest

21   to the fence that was near the freeway.

22   Q.        Before you exited your vehicle at the time that

23   you were pulling up to the gas station is your passenger

24   still screaming?

25   A.        Yes.

**Perez Dep.**

1    A.       It was -- it was very brief.  It was from the

2    point I got from my car to halfway five to ten seconds,

3    maybe closer to ten (indicating).

4    Q.       Did you have your gun out at that point?

5    A.       No -- well, when he was -- when I heard that he

6    was hiding behind the Ford, I did not have my gun out.

7    Once I heard he's trying to car jack somebody, through

8    my training and experience I know that carjackings are

9    often used -- people use -- suspects use weapons and so

10   at that point when I approached the vehicle once I was

11   close I had my gun drawn.

12   Q.       And so you think you drew your gun about when

13   you heard the carjacking about when you were halfway

14   between your car and the Ford?

15   A.       A little bit closer to the Ford.  I sprinted

16   towards the Ford observing the open driver door

17   (indicating).

18   Q.       And when you had your gun drawn do you carry

19   that in one hand or two hands?

20   A.       I was holding it with two hands.

21   Q.       And when you say you had it drawn, where were

22   you pointing it?

23   A.       I had my gun removed from my holster and I was

24   pointing it toward the driver area as I approached

25   (indicating) knowing if he's going to car jack a

**Perez Dep.**

1   vehicle, he's going to be in the front seat somewhere

2   (indicating).

3   Q.      And at the point at which you are -- again, we

4   are sort of talking about you're sprinting towards the

5   vehicle assuming he was carjacking where was Officer

6   Harrison?

7   A.      I don't know the route that she took.  She was

8   closer to the -- the west end (indicating).

9           As I got close to the Ford she was to my left

10  as I had my pistol pointed into the front seat toward.

11  Q.      Okay.  Is it your recollection because you said

12  when you first parked you saw her and she was towards

13  the front -- she was outside but towards the front of

14  her vehicle?

15  A.      Yes.

16  Q.      Do you recollect was she also approaching the

17  Ford as you were approaching the Ford?

18  A.      I don't -- I was not paying attention to her.

19  I saw her initially and I heard her put out that the

20  suspect was hiding behind the vehicle, the Ford

21  Expedition.

22  Q.      At what point did you again become aware of her

23  location?

24  A.      When I'm at the driver door.  The driver door

25  is open, fully open, and I noticed her to my left, which

**Perez Dep.**

1    approached were you able to see anything more

2    specifically?

3    A.      Not other than what we already covered.

4    Q.      Okay.

5            At the point at which you I think you said you

6    stopped at about five feet from the driver door?

7    A.      Yes.

8    Q.      Okay.  And the driver door was open?

9    A.      Yes.

10   Q.      And at that point were you looking inside the

11   car?

12   A.      Yes.

13   Q.      And what could you see?

14   A.      I saw Nathaniel Smith lying on his back on the

15   passenger -- the front passenger floorboard.  His head

16   was facing to the west, which was closest to the dash

17   (indicating), and his feet pointing towards the south --

18   not the south -- the east (indicating).  I'm sorry.

19   Q.      Is that the point -- what direction of the car?

20           Is that the back of the car?

21   A.      His feet would be towards the back of the car,

22   yes.

23   Q.      Okay.  And when you say the floorboards are you

24   talking about for the area where you put your feet when

25   you are driving?

**Perez Dep.**

1    A.        Yes.

2    Q.        Okay.  I am assuming Mr. Smith's entire body

3    was not in the passenger floorboard?

4    A.        His upper torso.

5    Q.        Okay.

6              So he was on his back, his upper torso was on

7    the -- I'm sorry -- did you say front driver's side or

8    passenger side?

9    A.        Passenger side.

10   Q.        Okay.

11             So his front torso facing up is on the front

12   passenger side of the floorboard?

13   A.        Yes, on his back.

14   Q.        Okay.

15             And then was his -- could you see his feet?

16   A.        His feet -- I don't recall how his feet were

17   positioned.  I was more concerned with, obviously, his

18   hands that could hurt me or hurt other people so I was

19   not concerned with the feet (indicating).

20   Q.        Okay.

21             I'm just trying to understand so do you

22   remember sort of where his shoulders were?

23   A.        He was on his back on the floorboard

24   (indicating) and he was -- his body was moving when I

25   first saw him and that's when I gave him commands to put

**Perez Dep.**

1   his hands up.

2   Q.       Was any part of his body, his torso was on the

3   floorboard, was sort of his midsection, was that on the

4   seat or on the center console or where was that?

5   A.       From what I recall, his back was flat on the

6   floorboard (indicating).

7   Q.       His legs would have been up in the air, I

8   guess?

9   A.       More than likely on the front passenger seat,

10   in that area (indicating).

11   Q.       So as far as you recollect, was he kind of

12   laying horizontal across on his back across the front

13   section of the car?

14   A.       Well, his head was closest to the dash and his

15   back was on the front passenger floorboard (indicating).

16   Q.       Could you see anybody else -- any other bodies

17   -- touching Mr. Smith?

18   A.       No.  Not in the front seat, no.

19   Q.       During the time that you were approaching the

20   Ford did you see anyone exit the vehicle?

21   A.       No.

22   Q.       Did you see anyone exit the vehicle at any

23   time?

24   A.       No.

25            MR. ROME:  Vague as to time.

**Perez Dep.**

1   your left arm also kind of by your side and you were

2   moving it, just, again, for the record, does that

3   represent what you saw him doing?

4   A.      Yes.

5   Q.      Okay.

6          And so at this point when you can see him

7   that's when you said you started instantaneously issuing

8   commands?

9   A.      Yes.

10  Q.      And what commands did you give?

11  A.      I told him to raise his hands and put his hands

12  up.  I repeated "Put your hands up" and after the second

13  time I told him he's staring at me and he tells me that

14  he has a gun, that he will shoot me, and as soon as the

15  last word is stated he motioned with his right hand, his

16  right arm, and is making furtive movements acting like

17  he's raising something (indicating).

18  Q.      And to the best that you recall what were the

19  words that he said to you?

20  A.      "I have a gun.  I will shoot you".

21  Q.      Do you recall if he like is he shouting this?

22  A.      He's in a normal voice but very clear and

23  concise.  There was no mumbling or slurred.  It was very

24  clear.

25  Q.      Just prior to that point when you were giving

**Perez Dep.**

1   or --

2   A.        To my left, yes.

3   Q.        -- off to your left of the car?

4   A.        I initially when I said the two feet, she was

5   to my left, which would be to the north.

6   Q.        When you heard Mr. Smith say that and you said

7   immediately he -- his right arm he was making furtive

8   movements with his right arm, is that right?

9   A.        Yes.

10  Q.        And what did you do then?

11  A.        Well, based on the totality of everything I

12  fired two shots at him.  As soon as I fired the second

13  round he raised his hands (indicating).

14  Q.        Was that the first time that you can recall

15  that he made any motion to raise his hands --

16  A.        Yes.

17  Q.        -- was after the second shot?

18  A.        After the second shot he raised both of his

19  hands straight up in the air and stared at the roof of

20  the car, the top of the car.

21  Q.        And is that the first time that you saw him

22  raise his hands?

23  A.        Yes.

24  Q.        Are you able to make a time estimate of how

25  long passed between the time you got to the driver's

**Perez Dep.**

```
1    side, started giving commands and the time that you
2    fired the shots?
3            MR. ROME:  Vague, ambiguous, misstates
4    testimony.
5            Answer if you understand it.
6            THE WITNESS:  The time period from my initial
7    arriving at the driver door to when I fired
8    (indicating)?
9            MS. RIFKIN:  Yes.
10           THE WITNESS:  It was under ten seconds.
11           MS. RIFKIN:  Q.  Do you think it was longer or
12   shorter than the time it took you to get out of the car
13   and get to that driver's side of the car?
14   A.       It was shorter.
15   Q.       At any point during your approach or up until
16   the time that you fired the shots did you see whether
17   there was anyone in the backseat of the vehicle?
18   A.       It was my concern that there may have been
19   somebody back there but due to my short contact with
20   Mr. Smith I was not able to actually look back there to
21   confirm if anybody was still there.
22   Q.       Did you know whether anyone was standing
23   outside the vehicle on the passenger side at the time
24   that you shot?
25   A.       At some point during this I recall someone --
```

**Perez Dep.**

1    there was at least one person on the side (indicating).

2    Q.       During this incident -- again, sort of going up

3    to the point at which you shot -- were you aware of

4    Officer Mayer anywhere in the vicinity?

5    A.       I don't recall that.  There was one officer

6    coming down (indicating) from the embankment of the

7    freeway and I don't recall if he was the one or it was

8    another officer that said "Stop him.  Don't let him

9    leave the parking lot.  He's trying to car jack that

10   vehicle".

11   Q.       Would that have been someone saying that over

12   the radio or like shouting it?

13   A.       At this point I don't recall if that was said

14   over the radio or if he shouted.  I was -- I was within

15   earshot if he did say it.

16   Q.       It was something that you could hear either

17   from the radio or --

18   A.       Yes.

19   Q.       Okay.

20            Where was the officer coming down from -- you

21   said coming down the embankment?

22   A.       Yes.

23   Q.       Where -- was that officer sort of straight

24   ahead as you were looking into the vehicle coming down

25   the embankment?

**Perez Dep.**

1    that you were reacting to?

2    A.       Based on the totality of circumstances starting

3    with he was wanted for felony warrants, he had -- was

4    alluding an officer going over the freeway, which is a

5    very dangerous place to escape to, it typically rarely

6    happens, he was carjacking a vehicle (indicating), there

7    are, obviously, victims inside that vehicle, there was

8    -- in my observations there existed a sense of urgency

9    to deal with the threat at that point, and I did deal

10   with the threat and use reasonable force to effect the

11   arrest, prevent his escape and overcome his resistance.

12   Q.       The threat that he was presenting that you were

13   reacting to who was that a threat to?

14   A.       To possible victims in the vehicle still, the

15   threat to myself, and based that he -- he was making eye

16   contact with me, as he stated he had a gun and he was

17   going to shoot me, and he clearly saw my pistol pointed

18   right at him (indicating), based on that fact I felt he

19   did have a weapon.

20   Q.       When you said that it -- you said it's unusual

21   that somebody would try and allude an officer by going

22   over the freeway because it's dangerous, is that right?

23   A.       Yeah.

24   Q.       Did that indicate to you one way or another

25   whether Mr. Smith might be under the influence of any

**Perez Dep.**

1    threat.

2    Q.        You said the door of the vehicle was all the

3    way open, right?

4    A.        Yes.

5    Q.        Were you -- in order to shoot at Mr. Smith were

6    you sort of shooting through the door or did you have a

7    clear line?

8    A.        I had a very clear line (indicating) where I

9    stood.

10   Q.        So the door was not in between you?

11   A.        Correct.

12   Q.        When Mr. Smith raised his hands after you did

13   the two shots, did he have anything in either of his

14   hands?

15   A.        No.

16             MS. RIFKIN:  Why don't we go off the record for

17   a minute.

18             (Off-the-record discussion)

19             MS. RIFKIN:  Q.  All right.  So to go back a

20   little bit, obviously, we are talking about this -- this

21   incident --

22   A.        Yes.

23   Q.        -- and you said that when you were approaching

24   the car during your approach to the car you could see

25   sort of the shape of bodies and the car shaking.

**Perez Dep.**

1    anyone in the backseat of the car?

2    A.       No.

3    Q.       Did you see anyone leaving the vehicle?

4    A.       At that point I still hadn't looked in the back

5    seat (indicating).  I lowered my weapon and backed away

6    and I had left the scene (indicating).

7    Q.       Sitting here today do you know whether anyone

8    was in the backseat of the vehicle during this -- during

9    the time you were shooting?

10   A.       Based on my observations there were people in

11   there.  At what point they exited, I don't know.  I

12   didn't talk to anybody else after this incident to find

13   out where Mr. Smith was shot at, how many victims were

14   in there.  I didn't -- I had no need for that

15   (indicating).

16   Q.       Okay.

17            And is that part of the protocol, that you

18   don't talk to anyone else about it?

19   A.       Yes.

20   Q.       I know you said this happened very quickly.  Do

21   you recall if during the time at which you were

22   approaching and then at the vehicle you considered using

23   a taser or pepper spray or another form of less lethal

24   force?

25   A.       That was not an option.

**Perez Dep.**

1  Q.      And why is that?

2  A.      Based on that Nathaniel Smith had escalated the

3  situation by not only fleeing from officers and going

4  through extremes to escape he was now committing a

5  carjacking, which is a violent act, and people that

6  commit carjackings are typically armed -- not all the

7  time but a lot of times they are armed -- so I was not

8  going to approach the vehicle with pepper spray in my

9  hand.

10  Q.      Did you ever actually see Mr. Smith hit or kick

11  anybody?

12  A.      No.

13  Q.      At the time at which you got to the vehicle and

14  had your clear view of him did you see him making

15  physical contact with anybody else?

16  A.      Like I said, I couldn't see clearly through the

17  vehicle through the tinted windows but I saw body

18  movements.  I saw people moving around.  It appeared to

19  me there was a fight inside.  That based on the

20  officer's statement that he was trying to car jack these

21  people, I felt there was -- he was being physical.

22  Q.      Okay.

23          And as far as when you got to the driver's side

24  door and you had a clear view into the vehicle, did you

25  see him making physical contact with anybody else?

**Perez Dep.**

```
 1    A.       No.

 2             MS. RIFKIN:  Can we mark this as the next

 3    exhibit?

 4             (Exhibit 67 marked)

 5             MS. RIFKIN:  Q.  All right.  So I've handed you

 6    what's been marked the next exhibit, 67, Bates stamped

 7    COS009995.

 8             Looking at this photograph do you believe that

 9    this photograph accurately depicts where your vehicle,

10    Officer Harrison's vehicle, and then the SUV that was

11    the subject SUV were located?

12    A.       Yes.

13    Q.       Okay.  Would this approximately depict the view

14    that you had pulling into the gas station and then when

15    you parked and were getting out of your vehicle?

16    A.       Well, this is the location where the SUV was

17    parked (indicating).  I mean, this is, obviously, from a

18    different standpoint.  Whoever took this camera is

19    behind my patrol vehicle (indicating) so the view point

20    would be different but in general that's where the gas

21    station is.  That's where the SUV was parked and that's

22    where Officer Robinson's (sic) vehicle was.

23    Q.       Harrison?

24    A.       Harrison.  Sorry.

25    Q.       Okay.
```

**Perez Dep.**

1          Was one of you, Officer Harrison or you, the

2     lead officer at the stop?

3     A.       To me it's kind of vague, but if Officer

4     Harrison was to be one of those, she would be a cover as

5     far as I'm giving verbal commands (indicating) and --

6     and she may have also been talking but I was not paying

7     attention to what was being said.  I was keyed on the

8     suspect, Nathaniel.

9     Q.       Okay.

10         As far as lead officer or backup officer does

11    it matter that -- to identifying those roles that

12    Officer Harrison was there first sort of on the ground

13    out of her car?

14         MR. ROME:  I'm sorry, that's a little vague,

15    ambiguous.

16         You can answer if you understand (indicating).

17         THE WITNESS:  Part of what I understand is she

18    was there first but that doesn't necessarily mean she

19    would be contact or cover (indicating).  I felt

20    obligated being that I was in full police uniform to

21    approach first versus she was wearing, you know, marked

22    RAID gear that say "Police" on the front and the back.

23    However, I'm in full uniform.  If things -- depending on

24    the situation -- if he comes up with no weapon, I can

25    easily go to my belt to pull out a taser, pepper spray

**Perez Dep.**

1    if I see his hands.  If he starts fighting, I can easily

2    go to my alternative weapons, but, like I said, I was in

3    full police uniform and I began talking to him

4    (indicating).

5    Q.      Were you during the course of this incident

6    from the time you arrived through the time you, I guess,

7    were moved from the situation, were you aware of whether

8    Officer Harrison had her gun out?

9    A.      I did not see her once I keyed on the suspect

10   but knowing that other rounds were being fired I felt

11   she was there to cover me and -- and deal with the

12   threat as well so I'm -- I was certain that she was

13   likely to have fired.  Although, I did not see her

14   (indicating).

15   Q.      Okay.

16           When you first got to the AM/PM and you were

17   getting out and Officer Harrison was already out of her

18   car, did you observe whether or not she had her gun out

19   at that point?

20   A.      I don't think she did.

21   Q.      Prior to this day had you worked directly with

22   Officer Harrison before?

23   A.      I had worked around her.

24   Q.      What does that mean?

25   A.      Not on the same shift but I had been in contact

**Perez Dep.**

1   the primary officer, I continued down Pershing to

2   assist" and then the sentence goes on.

3          What did you mean by saying "not knowing the

4   nature of how he fled from the vehicle and the

5   circumstances with the primary officer", what were you

6   meaning?

7   A.      There was a big question as far as what

8   occurred at the stop, the traffic stop, if an officer

9   was fighting, if this person just got out and ran, if

10  the officer had been injured, there were question marks

11  I didn't know the nature of what -- what occurred.

12  Q.      And so would it be accurate that information

13  was not broadcast on the radio?

14  A.      Other than the suspect fleeing --

15  Q.      Okay.

16  A.      -- at a later time.

17  Q.      So the kinds of information you are describing

18  exactly how it came to be that he was fleeing, whether

19  there was a flight, whether he turned and ran, that kind

20  of information you didn't have?

21  A.      Other than knowing he ran, correct --

22  Q.      Okay.

23  A.      -- and the felony warrants (indicating).  I was

24  aware of that.

25  Q.      Okay.

**Perez Dep.**

1            Did you know what the warrants were for?

2   A.      No.

3   Q.      And when you referenced "the primary officer",

4   who were you referencing?

5   A.      The first officer that was on the stop.

6   Q.      The person who made -- who would have been

7   conducting the traffic stop?

8   A.      Yes.

9   Q.      And in this case that was Officer Mayer?

10  A.      Yes.

11  Q.      Okay.

12          All right.  So the second to the last paragraph

13  on the page --

14  A.      Yes.

15  Q.      -- you are saying -- this is in the context of

16  you are saying that the officer is saying that the

17  suspect is trying to car jack them.

18          You said "They had a better view as I'm running

19  up so they obviously saw something that I didn't because

20  I'm running".

21          Are you referring to either Officer Harrison or

22  whichever officer said there was a carjacking that they

23  had the better view?

24  A.      Yes.

25  Q.      And when you say "They obviously saw something

**Perez Dep.**

1   A.       There were not -- there were not other people

2   in the vehicle in the line of fire.

3   Q.       How do you know that?

4   A.       Because I'm shooting at a downward (indicating)

5   trajectory from my position to Nathaniel Smith, who is

6   at the bottom of the -- or lying on the floorboard

7   (indicating).  There was nobody directly behind him or

8   to the side of him (indicating).

9   Q.       What do you mean "to the side of him"?

10  A.       Well, like I said earlier, I don't recall if

11  the door was open or closed but either way there was not

12  anybody right there at the passenger door (indicating).

13  Q.       And it's also accurate that you don't know if

14  at that time there were people in the back seat of the

15  car, correct?

16  A.       Correct.

17  Q.       And you are also not sure whether there were

18  any individuals standing on the passenger side of the

19  car at that time, is that right?

20  A.       At some point when I was approaching to the

21  time I fired at some point during there I remember

22  seeing at least one person on the passenger side outside

23  the vehicle (indicating).

24  Q.       And at the time that you fired do you know if

25  that person was still on the passenger side?

**Perez Dep.**

1  A.        I don't know.

2  Q.        Okay.

3            Have you ever spoken with Officer Harrison

4  about this incident?

5  A.        Other than the checking on her that she was

6  okay but not -- not in depth as far as the investigation

7  goes.

8  Q.        And what about Officer Mayer?

9  A.        Kind of the same, just small talk, I mean, not

10 details.

11 Q.        When you say "small talk" what do you mean?

12 A.        If the case ever got resolved in criminal court

13 and just we had already gone to the Grand Jury, I

14 believe, but nothing detailed as far as this case.

15 Q.        Do you recall whether those conversations

16 happened in person or over the phone or some other way?

17 A.        It would be in person and very brief.  I don't

18 recall either one of them.

19 Q.        Are you aware of what ended up happening with

20 this case?

21 A.        No.

22 Q.        Did a supervisor ever discuss this incident

23 with you?

24 A.        No.

25 Q.        And did you ever have any -- are you aware of

Perez Dep.

```
1              REPORTER'S CERTIFICATE

2

3         I certify that the foregoing proceedings in the

4    within-entitled cause were reported at the time and

5    place therein named; that said proceedings were reported

6    by me, a duly Certified Shorthand Reporter of the State

7    of CA, and were thereafter transcribed into typewriting.

8         I further certify that I am not of counsel or

9    attorney for either or any of the parties to said cause

10   of action, nor in any way interested in the outcome of

11   the cause named in said cause of action.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   this 19th day of September, 2016.

14   _____

15   SUSAN M. PORTALE, Calif. CSR No. 4095
     Registered Merit Reporter

16

17

18

19

20

21

22

23

24

25
```

**Perez Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF CALIFORNIA
 2                      SACRAMENTO DIVISION
                          ---oOo---
 3

 4
     NATHANIEL SMITH,                    )
 5                                       )
                    PLAINTIFF,           )
 6                                       )
     vs.                                 )  2:15-cv-00363-GEB-AC
 7                                       )
     CITY OF STOCKTON, OFFICER           )
 8   MAYER, OFFICER ROBIN HARRISON,      )
     and OFFICER MICHAEL PEREZ, in       )
 9   their individual capacities;        )
     and Chief of Police Eric           )
10   Jones, in his official and         )
     individual capacities,             )
11                                       )
                    DEFENDANTS.          )
12                                       )

13

14

15       DEPOSITION OF THE PERSON MOST KNOWLEDGEABLE FOR
              30(B)(6): CITY OF STOCKTON
16
                 LIEUTENANT MICHAEL REYNOSA
17
                   STOCKTON, CALIFORNIA
18
                     JUNE 20, 2016
19

20

21

22
     ATKINSON-BAKER, INC.
23   COURT REPORTERS
     (800) 288-3376
24   www.depo.com
     REPORTED BY:  MICHELLE SAVAGE, CSR NO. 12957
25   FILE NO:  AA06A6A
```

                                                                    1

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1              If I had someone in the back of my car and

2    someone was asking me to engage in a vehicle pursuit, I

3    would -- unless it was extreme, extreme situation, I

4    would not get involved in that.

5         Q.    Why not?

6         A.    There would be some safety issues to consider

7    for the person in the back seat of the car.

8         Q.    Are you aware of whether that issue is

9    discussed in training?

10        A.    Yes.

11        Q.    And is it discussed in training?

12        A.    Yes.

13        Q.    Which type of training is it discussed in?

14        A.    On-the-job training.

15        Q.    Would there be a general protocol that

16   officers should not respond to calls, again, that

17   they're not dispatched to where it could endanger the

18   safety of a prison that they're transporting?

19             MR. WOOD:  Incomplete hypothetical.  You can

20   answer if you understand it.

21             THE WITNESS:  Yes, there are.  If you were to

22   poll our office of 406 officers, I would argue that

23   98 percent of them would tell you that it would be

24   discouraged, unless it was an extreme circumstance and

25   that it's something they wouldn't get involved in.

47

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

1    BY MS. RIFKIN:   Q.   When you say "an extreme

2    circumstance," can you give me an example or describe

3    what you mean?

4    A.    Yes, you bet.   If I am transporting someone

5    and I am driving in an area of a school and an officer

6    announces that there was someone entering the school

7    with a gun, I would go to that call.

8         If I am driving in the area and the officer

9    announces that they have one at gunpoint and they're by

10   themselves and I am very close, I would stop by that

11   call.

12   Q.    What about attempted carjacking?

13   A.    If I was close, I might stop by that call.

14   Q.    What factors would you consider?

15        MR. WOOD:   Incomplete hypothetical.   You can

16   answer.

17        THE WITNESS:   Sure.   If the carjacking call

18   that you are talking about, if it was a call of a

19   carjacking in a specific area of town and although I was

20   close to that, I probably wouldn't consider taking my

21   prisoner into that.   In fact, I know I wouldn't.

22        However, if it was a solo officer on scene

23   with a carjacking suspect, and like I said earlier one

24   at gunpoint, I would stop by that call.

25        BY MS. RIFKIN:   Q.   When you say "at

48

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   gunpoint," are you talking about the officer holding a

2   suspect at gunpoint?

3       A.    Correct.

4       Q.    Are there written procedures for how to

5   initiate a traffic stop?

6       A.    Yes.

7       Q.    Are those in the field training manual?

8       A.    Yes.

9       Q.    When initiating a traffic stop, is there a

10  policy about whether to use lights or sirens?

11      A.    Yes.

12      Q.    What's that?

13      A.    There's a practice of it, and if you give me a

14  minute, let me look through the field training manual

15  and see if I can get you a better answer.

16      Q.    Sure.

17      A.    Okay.  As an example, if you were to look in

18  the field training manual under section 3.53, it covers

19  vehicle stops, covers traffic stops, felony car stops

20  and 3.53 and 3.54.

21          And part of the training that we give is

22  considering the location of the stop, proper position of

23  the police unit, advising dispatch, utilizing our lights

24  and our spotlight, considering approaching vehicles,

25  conducting record's checks, the discretion of giving

49

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1       Q.      Do the procedures covered in the field

2   training manual for a felony stop -- well, let's define

3   a felony stop.  What does that mean?

4       A.      A felony stop is one in which the occupant or

5   occupants of the vehicle are suspected of committing a

6   felony or they had committed a felony, which is -- you

7   are attempting to arrest them for.

8       Q.      Are there procedures governing the use of a

9   firearm in conducting that stop --

10      A.      Yes.

11      Q.      -- felony traffic stop?

12              What are those procedures?

13      A.      Most often during a felony stop officers will

14  use their firearm on the stop as far as attempting to

15  control the people within the car.

16      Q.      And how are the officers supposed to use their

17  firearms to attempt to control the people in the car?

18      A.      They would point their firearms at the

19  vehicles or the people in the vehicles.  They will be

20  prepared to use them, if necessary, and they are trained

21  on and would be prepared to secure them and go the

22  opposite direction to de-escalated the force.

23      Q.      So is the standard procedure that an officer

24  conducting a felony vehicle stop gets out of the car

25  with the gun un-holstered and pointing it at the subject

51

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    of the stop?

2         A.    Most often on a felony stop that's how that

3    works, yes.   There are times where some officers won't

4    draw their weapon at all.

5         Q.    Is there a policy or procedure saying an

6    officer should do one or the other?

7         A.    No.

8         Q.    Is it up to the discretion of the officer?

9         A.    Yes, and/or the supervisor on scene.

10        Q.    What if there is no supervisor on scene?

11        A.    Then it would be the discretion of the

12   officer.

13        Q.    And are officers trained on -- you said that

14   most officers, most of the time that's how it works, the

15   officer will leave the car with their gun un-holstered

16   pointing it at the subject or the car, right?

17        A.    Yes.

18        Q.    Is that something that the Stockton Police

19   Department trains its officers to do?

20        A.    Yes.

21        Q.    And what is the reason for that?

22        A.    Depending on the type of felony stop and the

23   situation, there is usually a threat involved in the

24   stop.

25        Q.    What kind of threat?

52

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1      A.     A safety threat for us and for the people

2  around us.

3      Q.     When you say "us," you mean the officers?

4      A.     Correct.

5      Q.     What kind of safety threat is there usually in

6  this kind of situation?

7      A.     Usually a threat of some type of violence

8  being used on the officer in the general public, whether

9  it is a firearm, a weapon or at times a physical

10  confrontation.

11      Q.     Is the officer making the felony stop expected

12  to engage in an analysis of whether a threat actually

13  exists in that specific situation?

14      A.     Yes.

15      Q.     Are they allowed to just assume that a threat

16  justifying them pointing their firearm exists simply

17  because it's a felony stop?

18          MR. WOOD:  Vague and incomplete hypothetical.

19  You can answer if you understand.

20          THE WITNESS:  A felony stop, by definition,

21  would indicate to one that there are risk factors

22  involved requiring the use of force.

23          BY MS. RIFKIN:  Q.  And why is that?

24      A.     I think I would have to give you a

25  hypothetical to answer that correctly.  If a person is

53

**Reynosa Dep.**

1   suspected or arrestable for a forgery case, it is a

2   felony, I am not necessarily going to do a felony stop

3   on a person who I know has a warrant for forgery.

4   Although the person in the car is wanted for a felony,

5   they're -- if there are no outside indicators that force

6   would need to be used, I would not do a felony stop on

7   that person.

8       Q.    And when you say you wouldn't conduct a felony

9   stop, how do you differentiate in practice between

10  what's being conducted in a felony stop versus a vehicle

11  stop?

12      A.    During a felony stop, 99.9 percent of the

13  times the officers would be required to point their

14  weapons at the car because, by definition, the

15  definition of felony stop would indicate that there is a

16  threat of violence.

17      Q.    So if an officer isn't pointing their gun when

18  they make the stop, does that mean it's not a felony

19  stop?

20      A.    Not necessarily.  And I say that because there

21  are times in the field, past practice, and we do teach

22  there are times where you would have your gun out but

23  not necessarily pointed at the car.  For example, if

24  there were small children in the back of the car, I

25  would be hesitant to point my gun at the car.

54

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1        Q.      Would you agree that not all felonies involve

2    violence?

3        A.      Yes.

4        Q.      Why is it that, like you said, in 99.9 percent

5    of felony stops officers would be required to point

6    their weapons during the stop?

7        A.      By definition, when we train and we train

8    felony stop, that definition means that we are expecting

9    and there is a possibility of some type of dangerous

10   situation that we will be facing.

11           And that's why I said there are times when we

12   will conduct a stop on a person suspected of a felony

13   that we will not call that a felony stop, although we

14   intend to arrest that person for a felony and they are

15   wanted for a felony.

16       Q.      Got it.  How is an officer in the field

17   expected to determine whether or not they should be

18   anticipating a dangerous situation?

19       A.      I think the officers would make that decision

20   based on information in the call history received from

21   the dispatcher, information received from fellow

22   officers while they are en route to the call, and

23   observations that they make en route to and on scene of

24   the call.

25       Q.      Those factors you just listed, the information

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1   other officer sees or hears, you may get both at the

2   same time.

3       Q.    Are there any training or procedures for

4   trying to minimize that situation where both officers

5   are doing different things at the same time?

6       A.    We do have some training procedures that we

7   follow.  And to go back to the example of officers

8   calling someone out of a car, we do train that there is

9   usually one communicator, whether you're calling them

10  out of a car or a house or wherever it may be.

11          I mean, unless you gave me a clear example, it

12  would be tough to answer that.

13      Q.    All right.  So 4.59 also on page 104 is,

14  "Given any" -- quote -- "in-progress call, high speed

15  pursuit, felony stop or foot chase, the trainee will

16  perform all backup responsibilities in a safe and

17  effective manner."

18          Are there any backup responsibilities referred

19  to in 4.59 that we haven't talked about yet?

20      A.    I'm not sure.  Some responsibilities would be

21  radio traffic, we touched on that some.  I really can't

22  think of others.

23      Q.    Okay.  When it says "in-progress call," what

24  does that mean?

25      A.    Burglary in progress, a robbery in progress.

                                                          71

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

1    paranoia, fidgety, people constantly licking their lips.

2        Q.    Are there any de-escalation tactics that

3    officers are trained to employ with an individual who

4    may be under the influence of meth?

5        A.    Yes.  But I don't know that that is specific

6    to meth, as it is just general practice with everyone.

7        Q.    So it would be the same or similar

8    de-escalation tactics that are generally used?

9        A.    Correct.

10       Q.    And what are those?

11       A.    There would be times you would put your gun

12   away and go hands on instead of using your gun or

13   threaten to use your gun.  And certainly times where you

14   would not use a baton; you would use your hands instead.

15           When a person is complying and does go down to

16   their knees or lays down on their stomach and puts their

17   hands out, you, of course, would de-escalate the amount

18   of force that you're using.  That would be a time -- one

19   of the times you may put your gun away.

20           So it's more of a general practice that covers

21   all of it.

22       Q.    What is the command structure for the Stockton

23   Police Department?  I know we already talked about that

24   a sergeant is a supervisor of officers in the field; is

25   that right?

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

Atkinson-Baker Court Reporters
www.depo.com

```
 1                        REPORTER'S CERTIFICATE

 2

 3

 4          I, Michelle Savage, CSR No. 12957, Certified

 5   Shorthand Reporter, certify;

 6          That the foregoing proceedings were taken

 7   before me at the time and place therein set forth, at

 8   which time the witness was put under oath by me;

 9          That the testimony of the witness, the

10   questions propounded, and all objections and statements

11   made at the time of the examination were recorded

12   stenographically by me and were thereafter transcribed;

13          That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15          I further certify that I am not a relative or

16   employee of any attorney of the parties, not financially

17   interested in the action.

18          I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21

22          Dated this 27th day of June, 2016.

23

24          _____

     MICHELLE SAVAGE, C.S.R. NO. 12957
25              (Signature requested.)
```

147

30(b)(6)Lieutenant Michael Reynosa
June 20, 2016

**Reynosa Dep.**

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                     ---oOo---

4

5    NATHANIEL SMITH,

6              Plaintiff,

7    vs.                        No. 2:15-CV-00363-KMJ-AC

8    CITY OF STOCKTON, et al.,

9              Defendants.
     _____/
10

11

12

13

14         DEPOSITION OF INGRID MARIE SMITH

15            Thursday, March 23, 2017

16                  1:25 p.m.

17

18            Taken in the offices of:
              Hadsell, Stormer & Renick
19           4300 Horton Street, Suite 15
             Emeryville, California 94608
20

21

22

23

24    REPORTED BY:  LAURA HEPBURN, CSR 8428

25

**I. Smith Dep.**

1    Q.   You didn't call him back?

2    A.   No.

3    Q.   What information did he leave in his voice mail?

4    A.   He said, "Nathaniel needs to turn himself in

5    before someone gets hurt."

6    Q.   Okay.  And could you recognize the voice as

7    being the same person you spoke to the first time?

8    A.   Yes.

9    Q.   Did he say anything else?

10   A.   No.

11   Q.   Okay.  During this period that Nathaniel was on

12   the run, were you in contact with him at all?

13   A.   Yes.

14   Q.   How frequently were you speaking with him?

15   A.   Not daily.

16        MR. STEVENS:  Okay.  Let's go off the record.

17        (Discussion off the record.)

18        MR. STEVENS:  Let's go back on the record.

19   Q.   Did you have any understanding as to the time

20   when Mr. Smith was on the run that he wanted to

21   voluntarily turn himself in to police?

22        MS. RIFKIN:  I'm going to object as invading

23   spousal privilege and instruct you not to answer.

24        MR. STEVENS:  Okay.  Fair enough.

25   Q.   After the shooting, when did you first go see

**I. Smith Dep.**

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SAN JOAQUIN    )

 3

 4        I, LAURA HEPBURN, Certified Shorthand Reporter, do

 5   hereby certify:

 6        That prior to being examined, the witness in the

 7   foregoing proceedings was by me duly sworn to testify to

 8   the truth, the whole truth, and nothing but the truth;

 9        That said proceedings were taken before me at the

10   time and place therein set forth and were taken down by

11   me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13        I further certify that I am neither counsel for, nor

14   related to, any parties to said proceedings, nor in any

15   way interested in the outcome thereof.

16        In witness whereof, I have hereunto subscribed my

17   name.

18   Dated:  March 31, 2017

19

20   _____

21   LAURA HEPBURN, CSR NO. 8428

22

23

24

25
```

**I. Smith Dep.**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


NATANIEL SMITH,

        Plaintiff,

vs.                      No. 2:15-CV-00363-GEB-AC

CITY OF STOCKTON; OFFICER
MAYER, OFFICER ROBIN
HARRISON, OFFICER MICHAEL
PEREZ, and FORMER CHIEF OF
POLICE BLAIR ULRING, in
their capacities; and CHIEF
OF POLICE ERIC JONES, in his
official capacity,

        Defendants.

_____/



DEPOSITION OF NATHANIEL SMITH

Monday, June 13, 2016



Taken at the location of:

California State Prison at Solano

2100 Peabody Road

Vacaville, California



Reported by:  Robert R. Cuda, CSR 2652

**N. Smith Dep.**

1      Q.  Did you say anything to Ms. Whitfield as she

2   was pulling over?

3      A.  Not that I recall.

4      Q.  Nothing like why are we stopping?  Why aren't

5   we going?  Keep going.  Anything at all?

6         MS. RIFKIN:  Objection, asked and answered.

7      A.  Not that I recall.

8   BY MR. WOOD:

9      Q.  The car comes to a stop, the car you are in

10  comes to a stop, up against the curb?

11     A.  Yes.

12     Q.  And what do you do next?

13     A.  Opened the car door.

14     Q.  Prior to opening the car door, had you heard

15  any voice on the loudspeaker from the officer behind

16  you?

17     A.  No.

18     Q.  And what made you decide to open the car door?

19     A.  I wanted to get out of the car.

20     Q.  And why?

21     A.  Something told me to get out of the car.

22     Q.  Did you at anytime in your life before this

23  event have any understanding that when a car is pulled

24  over, you should stay in the car?  Did you ever have

25  that understanding?

**N. Smith Dep.**

1          MS. RIFKIN:  Objection, lacks foundation

2   argumentative, vague and ambiguous.

3        A.  No.

4   BY MR. WOOD:

5        Q.  But you wanted to get out of the car, and what

6   did you want to do when you got out of the car?

7        A.  I didn't want to get -- please repeat the

8   question.

9        Q.  Yeah.

10          You opened the car door, you said, because you

11   wanted to get out of the car.  Why did you want out?

12          MS. RIFKIN:  Objection, asked and answered.

13       A.  I didn't feel comfortable sitting in the car.

14   BY MR. WOOD:

15       Q.  Why not?

16       A.  Because the police was behind me.

17       Q.  What about the police being behind you made you

18   not comfortable sitting in the car?

19       A.  Because April 3rd, 2010, my DUI was with an

20   officer.  I hit a police car, and I felt personally it

21   was hazardous to my health to be in the car knowing that

22   the police knew that I had a DUI with officers.

23       Q.  Did you know that you had an outstanding

24   warrant as of February 13, 2013?

25       A.  Yes.

1      Q.  So you knew you had that warrant outstanding

2   for you?

3      A.  Yes.

4      Q.  And as you sat in that car, you believed that

5   the reason why you were being pulled over is because

6   there was a warrant for you and you were in that car?

7          MS. RIFKIN:  Objection, misstates the

8   testimony, lacks foundations.

9      A.  No.

10  BY MR. WOOD:

11     Q.  Did you have any understanding as to why the

12  car was being pulled over at the time it was pulled

13  over?

14     A.  No.

15     Q.  Okay.  But because of your past experience

16  striking the police car and your outstanding warrant,

17  you believe you needed to get out of that car?

18     A.  Yes.

19     Q.  And what was your plan when you got out of the

20  car?

21     A.  To run.

22     Q.  When you opened the door, did you open the door

23  on the driver's side?

24     A.  Yes.

25     Q.  So you stepped out into the street?

1     A.  Yes.

2     Q.  As opposed to stepping out on the curb or

3 sidewalk?

4     A.  Yes.

5     MS. RIFKIN:  Objection, lacks foundation.

6 BY MR. WOOD:

7     Q.  So you stepped out of the vehicle.  Which way

8 are you facing when you get out?

9     A.  Toward the officers.

10     Q.  You are facing to the rear of your car towards

11 the officer behind you?

12     A.  Yes.

13     Q.  How many officers were in the car behind you?

14     A.  One that I remember.

15     Q.  Can you describe the officer that you saw?

16     A.  A white male.

17     Q.  Did you have any words with that white male

18 while you stood there in the street?

19     MS. RIFKIN:  Objection, vague and ambiguous.

20     A.  No.

21 BY MR. WOOD:

22     Q.  Did he say anything to you; did you say

23 anything to him?

24     MS. RIFKIN:  Objection, compound.

25     A.  I can't recall.

1   BY MR. WOOD:

2       Q.   The officer, what was he doing as he was

3   standing out there facing you?

4       A.   Pointing a gun at me.

5       Q.   Anything else he was doing in those moments

6   before you ultimately ran?

7           MS. RIFKIN:   Objection, vague and ambiguous.

8       A.   Just pointing a gun at me.

9   BY MR. WOOD:

10      Q.   Did he tell you to get on the ground?   Stop?

11      A.   He told me don't move.

12      Q.   Did you say anything back to him?

13          MS. RIFKIN:   Objection, asked and answered.

14      A.   No.

15  BY MR. WOOD:

16      Q.   Did you look around and try and find a route

17  that you were going to take to run, or did you just take

18  off?

19          MS. RIFKIN:   Objection, argumentative,

20  compound.

21      A.   Just ran.

22  BY MR. WOOD:

23      Q.   Okay.  Well, which direction did you run?

24      A.   I don't understand the question.

25      Q.   Did you run across the street?  Did you run

1    between the cars, in front of the car, past the officer,

2    behind the officer?   Which direction did you go?

3        MS. RIFKIN:   Objection, vague and ambiguous.

4    Go ahead.

5        A.   I ran in front of the police officer's vehicle.

6    BY MR. WOOD:

7        Q.   And where from there?

8        A.   Jumped over a fence, up an embankment, over the

9    freeway.

10       Q.   What was the officer doing when you took off

11   running?

12       A.   I don't know.

13       Q.   Did you hear anything from him as you started

14   to run?

15       A.   I don't recall.

16       Q.   Did you hear him say anything about sending a

17   dog?

18       A.   I don't recall.

19       Q.   Prior to running, did you ever see a dog near

20   that officer?

21       A.   No.

22       Q.   When was the first time you saw the dog?

23       A.   When the dog was behind me.

24       Q.   How close did the dog ever get to you?

25       MS. RIFKIN:   Objection, vague and ambiguous.

**N. Smith Dep.**

1        A.    Within one foot.

2    BY MR. WOOD:

3        Q.    And where were you when the dog got within a

4    foot of you?

5        A.    On top of an embankment of the freeway.

6        Q.    Would that be off the top of I-5 there by the

7    shoulder?

8        A.    Yes.

9        Q.    What did the dog do, if anything, when he was a

10   foot away from you?

11           MS. RIFKIN:   Objection, calls for speculation.

12       A.    Looked at me.

13   BY MR. WOOD:

14       Q.    What did you do in response, if anything?

15       A.    Ran.

16       Q.    Did the dog continue to follow you when you got

17   to the top of the freeway?

18       A.    No.

19       Q.    Did you hear the officer call the dog back?

20       A.    No.

21       Q.    Did you hear, as you ran up the embankment

22   until you got to the top of freeway at any point in

23   time, did you hear any command or any words from the

24   officer?

25       A.    No.

**N. Smith Dep.**

1      Q.  Were you closer to the building of the gas

2  station or out by the pumps?

3          MS. RIFKIN:  Objection, calls for speculation.

4      A.  Please repeat the question?

5  BY MR. WOOD:

6      Q.  Yeah.

7          When you came to the fence, were you closer to

8  the gas station building, or were you out by the pumps?

9          MS. RIFKIN:  Objection, calls for speculation,

10  incomplete hypothetical.

11     A.  Closer to the pumps.

12  BY MR. WOOD:

13     Q.  And what did you do when you got to that fence?

14     A.  Tried to catch my breath.

15     Q.  And as you did, did you look back up the hill

16  at all?

17     A.  I never looked back.

18     Q.  Okay.  You caught your breath and then what did

19  you do?

20     A.  I seen somebody standing there putting air in

21  their tire and I asked them for a ride.

22     Q.  Was it one person there?

23     A.  I believe there was two.

24     Q.  Could you describe the car they were putting

25  air in?

**N. Smith Dep.**

1       A.   It was an SUV.

2       Q.   And what about the individuals you saw putting

3  air in their tire, what can you tell me about them?

4            MS. RIFKIN:   Objection, vague and ambiguous.

5       A.   Hispanic.   Two Hispanic males.

6  BY MR. WOOD:

7       Q.   Tall?   Short?

8       A.   I can't recall.   I don't know because they were

9  squatting down putting air in the tire.

10       Q.   You asked those two gentlemen for a ride and

11  what did they say?

12            MS. RIFKIN:   Objection, misstates testimony,

13  lacks foundation.

14       A.   I asked them for a ride and they said yes.

15  BY MR. WOOD:

16       Q.   And how did you get over the fence?

17       A.   I climbed over the fence.

18       Q.   And what did you do when you climbed over the

19  fence?

20            MS. RIFKIN:   Objection, vague and ambiguous.

21  BY MR. WOOD:

22       A.   Got in the back seat of their vehicle.

23       Q.   That would be the right rear door?

24       A.   Yes.

25       Q.   Were you sitting down in the seat when you got

1   in the car?

2       A.  Yes.

3       Q.  At some point you got into a struggle with the

4   men in the car.  How long had you been sitting down in

5   the car before you started that struggle?

6           MS. RIFKIN:  Objection, lacks foundation, vague

7   and ambiguous.

8       A.  Approximately four minutes.

9   BY MR. WOOD:

10      Q.  What was the first thing that happened that

11  started that struggle?

12      A.  I don't understand the question.

13      Q.  Yeah.

14          You were sitting in the car for about

15  four minutes.  There's two guys putting air in their

16  tire.

17      A.  Yes.

18      Q.  At any point in time, did you ever see a third

19  one show up, a third Hispanic man?

20          MS. RIFKIN:  Objection, vague and ambiguous.

21      A.  I believe he was outside the vehicle as well.

22  BY MR. WOOD:

23      Q.  Okay.  While you were sitting during those four

24  minutes, did you have any conversations with these guys?

25  Say, hey, I want to go here.  Where are you guys headed?

1   I just need a ride.  Anything like that?

2          MS. RIFKIN:  Objection, vague and ambiguous,

3   compound.

4      A.  Only conversation that I had was, "Can I have a

5   ride?  I will pay you for a ride."  And they said,

6   "Yes."  I got in the vehicle in the back seat.

7   BY MR. WOOD:

8      Q.  Was the door still open?

9      A.  Yes.

10     Q.  Okay.  At some point in time they decided they

11  weren't going to give you a ride anymore?

12         MS. RIFKIN:  Objection, calls for speculation.

13  BY MR. WOOD:

14     Q.  Did anybody tell you that?

15         MS. RIFKIN:  Objection, vague.

16     A.  Nobody told me that.

17  BY MR. WOOD:

18     Q.  Okay.  Did any of them say get out car?  Did

19  any of them say police?  Did they say anything that

20  changed the situation?

21         MS. RIFKIN:  Objection, compound, vague,

22  ambiguous.

23     A.  I don't know what they was -- I don't know.  I

24  don't understand your question.

25  BY MR. WOOD:

1      Q.   Sure.

2           You are sitting in the car for about four

3    minutes while they are doing their thing.

4      A.   Yes.

5      Q.   And then something happens.   Things change.

6    You get into a struggle with them?

7      A.   I believe they seen the police officers drive

8    into the parking lot.

9      Q.   Okay.   That's what you believe.   What did they

10   do that made you believe that?

11     A.   They start trying to pull me out the vehicle.

12     Q.   And how were they doing that?

13     A.   They were pulling my legs.

14     Q.   While you were sitting down somebody grabbed

15   your legs?

16     A.   While I was laying down.   I eventually I laid

17   down in the vehicle.

18     Q.   And why did you do that?

19     A.   Because I seen the police come through the

20   parking lot.

21     Q.   All right.   So you saw the police come into the

22   parking lot, and you laid down.   Did you lay down across

23   the seat?

24     A.   No.

25           MS. RIFKIN:   Objection, vague and ambiguous.

**N. Smith Dep.**

1  BY MR. WOOD:

2      Q.  How did you lay down?

3      A.  I laid down on the center console of the

4  vehicle.

5      Q.  So you have part of your body in the rear and

6  part of your body in the front?

7      A.  Yes.

8      Q.  Why did you lay down in that direction?

9      A.  My thought was if the officers ran up to the

10  car and looked in, they wouldn't see me and would go on

11  to somewhere else and look.

12      Q.  Being perched across the front and rear seats

13  of the center console, you thought you would be hidden?

14      A.  Yes.

15      Q.  As you were laying down, your head was facing

16  the dash in front of the vehicle; right?

17      A.  Yes.

18          MS. RIFKIN:  Objection, vague and ambiguous.

19  BY MR. WOOD:

20      Q.  And your feet were towards the rear?

21      A.  Yes.

22      Q.  And the gentlemen that were part of that car

23  were starting to pull on your legs?

24          MS. RIFKIN:  Objection, vague and ambiguous.

25      A.  Yes.

**N. Smith Dep.**

1    BY MR. WOOD:

2        Q.   At anytime was anyone in the front seat trying

3    to grab you from that direction as well?

4        A.   I believe one of the young men, one of the

5    Hispanic guys got in the front seat and tried to put me

6    in a headlock.

7        Q.   Do you recall somebody getting their arms

8    around your head?

9        A.   Yes.

10       Q.   Now, in your response to that effort of getting

11   their arms around the head and nothing else going on,

12   but in response to the headlock attack, what did you do?

13           MS. RIFKIN:   Objection, vague, ambiguous,

14   unintelligible.

15       A.   I was trying to grab anything in the vehicle to

16   stop them from dragging me out.

17   BY MR. WOOD:

18       Q.   At the same time this guy is getting you in a

19   headlock, were they also pulling on your feet?

20       A.   Yes.

21       Q.   Did you feel your body moving towards the rear

22   of the vehicle?  Were they being successful in trying to

23   pull you out?

24           MS. RIFKIN:   Objection, compound.

25       A.   Yes.  One was pulling my right leg, one was

1   his hands around your neck trying to get you in a choke

2   hold.  Or excuse me.  What did you call it?  A headlock.

3       A.  Yes.

4       Q.  Okay.  And were you doing anything with the

5   other hand to try to get this guy off of you, the guy

6   that was putting you in a headlock?

7       A.  No.

8       Q.  Okay.  Were you kicking your feet trying to

9   wiggle at all?

10      A.  No.

11      Q.  You were just holding on?

12      A.  Holding on.

13      Q.  Okay.  You had one hand on the steering wheel,

14  you don't recall which one, and where was your other

15  hand?

16      A.  I don't recall.

17      Q.  As you were laying down across the center

18  console, were you laying down such that you were on your

19  chest looking down at the floor board, or were you on

20  your back looking up at the roof?

21      A.  I was on my stomach looking down.

22      Q.  So your left arm would have been the arm

23  closest to the steering wheel in that position?

24          MS. RIFKIN:  Objection, misstates the

25  testimony, lacks foundation.

1    anything like that?

2         MS. RIFKIN:  Objection, asked and answered.

3    A.  No.

4  BY MR. WOOD:

5    Q.  Did you at any point tell them that you had a

6  gun?

7    A.  No.

8    Q.  When was the first time you saw the officers

9  approach the car?

10        MS. RIFKIN:  Objection, vague and ambiguous.

11   A.  When I was sitting in the vehicle, I seen a

12 lady officer running toward the car.

13 BY MR. WOOD:

14   Q.  And how was she running; did she have a gun

15 drawn?

16        MS. RIFKIN:  Objection, vague and ambiguous.

17   A.  Yes.

18 BY MR. WOOD:

19   Q.  Was she saying anything as she ran towards the

20 car?

21        MS. RIFKIN:  Objection, calls for speculation.

22   A.  I don't know.

23 BY MR. WOOD:

24   Q.  Nothing you heard?

25   A.  No.

**N. Smith Dep.**

1    Q.   Did you ever see a male officer approach the

2  car?

3    A.   No.

4    Q.   Did you ever say anything, yell anything out

5  towards this female officer you saw running?

6    A.   No.

7    Q.   Where was she -- strike that.

8         How close to the car did you see the female

9  officer get?

10        MS. RIFKIN:   Objection, calls for speculation.

11   A.   I seen her pull inside the gas station, get out

12  of her vehicle.  I seen her for a split second because I

13  laid down in the vehicle.  I wasn't looking up to see if

14  she was still running towards the vehicle.  I just seen

15  her pull up, get out, and coming towards, you know, for

16  a few of second, and I laid down.

17        MS. RIFKIN:   At some point can we take a few

18  minutes for me?

19        MR. WOOD:   Oh, yes.

20              (Recess)

21   Q.   Mr. Smith, we are back on the record.  Do you

22  understand you are still understood oath?

23   A.   Yes.

24   Q.   Okay.  At any point in time while you were

25  laying on the console, were you ever reaching for the

1   keys?

2       A.  No.

3       Q.  Did you ever have any desire to try to start

4   the SUV that you were in?

5       A.  No.

6       Q.  Did you say anything to the officers that were

7   outside the car?

8           MS. RIFKIN:  Objection, vague and ambiguous as

9   to time.

10          MR. WOOD:  At any point in time.

11      A.  Can you please repeat the question?

12      Q.  Yeah.

13          At any point in time while you were laying

14  across the center console there in that SUV, did you

15  ever yell anything out to the officers?

16      A.  Not that I recall.

17      Q.  I use the word "yell."  Did you verbalize

18  anything in any tone to the officers while you were

19  laying across the console?

20      A.  I believe -- I don't recall.

21      Q.  Did you say anything to the effect that they

22  are going to have to shoot you, they are going to have

23  to kill you?

24      A.  No.

25      Q.  Did you say anything to the effect that you had

1   a gun or a weapon?

2       A.  No.

3       Q.  You looked like you were going to say

4   something.

5       A.  No.

6       Q.  Okay.  I just didn't want to cut you off.

7           At some point in time, did the three

8   individuals that were struggling with you stop

9   struggling with you?

10      A.  Yes.

11      Q.  And did you hear them say anything immediately

12  before they stopped struggling?

13      A.  I heard someone say, "Put your hands up."

14      Q.  Did you believe that to be one of those three

15  individuals that owned the SUV that was struggling with

16  you?

17      A.  I just heard "Put your hands up."

18      Q.  You had no idea who it was?

19      A.  No.

20      Q.  Was that before or after -- did you hear that

21  phrase before or after the individuals stopped

22  struggling with you?

23      A.  After they let me go, I heard "Put your hands

24  up."

25      Q.  Okay.  Did you see where those individuals went

**N. Smith Dep.**

1    when they stopped struggling with you?

2        A.  No.

3        Q.  And what was the next thing that happened after

4    you heard someone say, "Put your hands up"?

5        A.  At that time I said, "I don't have a gun."

6        Q.  Why did you offer that statement?

7        A.  They said, "Put your hands up."

8        Q.  And so rather than doing that, you responded

9    verbally?

10        MS. RIFKIN:  Objection, misstates the

11    testimony, argumentative, lacks foundation.

12        A.  I put my hands up, and said, "I don't have a

13    gun."

14    BY MR. WOOD:

15        Q.  How was your body positioned at this point?

16        MS. RIFKIN:  Objection, vague.

17        A.  I was still on my belly.

18    BY MR. WOOD:

19        Q.  What direction were your hands?

20        MS. RIFKIN:  Only up?

21        A.  Up.

22    BY MR. WOOD:

23        Q.  So your hands are above you now.  If you are on

24    your belly, your hands are reaching towards the dash?

25        A.  Yes (indicating).

**N. Smith Dep.**

1     Q.   You just can't bend your hands over your

2  shoulders, so they are sticking up from your back.   Can

3  you?

4     A.   Correct.   Up for me would be as I am laying

5  down, straight ahead would be up.

6     Q.   Okay.

7        MS. RIFKIN:   And just for the record, the

8  witness is putting his hands sort of above his head

9  outstretched like Supermanesque.

10  BY MR. WOOD:

11     Q.   The Superman position.

12     A.   Yeah.

13     Q.   And what happened after you made that statement

14  and put your hands reaching towards the dash?

15     A.   I couldn't breathe.

16     Q.   Did you hear anything?

17     A.   No.

18     Q.   All of a sudden you just lost your breath?

19     A.   Yes.

20     Q.   What next?

21        MS. RIFKIN:   Objection, vague and ambiguous,

22  calls for a narrative.

23     A.   I recall trying to cover my face with my arm.

24  BY MR. WOOD:

25     Q.   Why?

**N. Smith Dep.**

1      A.   At that time I believed I was shot and I

2   couldn't breathe, and I just covered my face with my

3   arm.

4      Q.   You were covering it with your left arm, it

5   looks like?

6      A.   Yes.

7      Q.   What's the next thing that happened to you?

8      A.   I was dragged out of the vehicle by my feet

9   handcuffed.   The next time I woke up, I had tubes in my

10   mouth and my throat.

11      Q.   Were you already at the hospital the next time

12   you woke up?

13      A.   Yes.

14      Q.   Do you recall being treated at the scene by any

15   paramedics or ambulance?

16      A.   No.

17      Q.   Do you recall an ambulance ride at all?

18      A.   I remember them trying to put something over my

19   mouth, but I don't recall getting in the ambulance.   I

20   don't recall getting in the ambulance.

21      Q.   Okay.   You just woke up at the hospital is your

22   next memory?

23      A.   Yes.

24      Q.   Had you taken any drugs that day?

25      A.   No.

**N. Smith Dep.**

1    A.  Please repeat the question.

2    Q.  Your lawsuit names three officers as

3 individuals, and one of those three is the first officer

4 that pulled you over when you were still in

5 Ms. Whitfield's car and chased you up the hill, or the

6 dog chased you up the hill.  What is it that you

7 believe, with respect to your civil rights violations,

8 what do you believe he did?

9         MS. RIFKIN:  Objection, calls for a legal

10 conclusion.

11        MR. WOOD:  If you have an opinion.

12    A.  I thought he was going to kill me.

13    Q.  Why did you have that thought?

14    A.  That's just what I believed in my head that he

15 was going to kill me because of the incident with the

16 Highway Patrol officers.

17    Q.  That first officer, did he do anything to you

18 to foster that fear?

19    A.  Pointing the gun at me.  I didn't understand

20 why you would point a gun in a traffic stop.

21    Q.  Did you ever tell anyone else before today that

22 that officer had his gun pointed at you during that

23 traffic stop?

24        MS. RIFKIN:  I am just going to object to the

25 extent that it invades attorney-client privilege.

1        MR. WOOD:  Yeah, other than your lawyer.

2     A.  I don't recall.  I don't remember.

3     Q.  Certainly the gun pointing at you left an

4  impression upon you?

5     A.  Yes.

6     Q.  It made you fear that you were going to get

7  shot, he was going to kill you?

8     A.  Yes.

9     Q.  And at any point in time prior to today, other

10  than your lawyer did you tell anyone that that first

11  officer had a gun pointed at you when you got out of the

12  car?

13     A.  I don't recall.  I believe I told Detective

14  Burrell?

15     Q.  Burrell?

16     A.  Yes.

17     Q.  B-u-r-r-e-l-l.

18        Other than the gun pointing at you on the

19  traffic stop, anything else that you believe that first

20  officer did in relation to the violation of your civil

21  rights?

22        MS. RIFKIN:  Objection to the extent it calls

23  for a legal conclusion.

24     A.  I don't know my civil rights, like I don't know

25  what my civil rights are.

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, ROBERT R. CUDA, a licensed Certified

 4   Shorthand Reporter, duly qualified and certified as

 5   such by the State of California, do hereby certify:

 6          That prior to being examined, the witness

 7   named in the foregoing deposition was by me duly sworn

 8   to testify to the truth, the whole truth, and nothing

 9   but the truth;

10          That the said deposition was by me recorded

11   stenographically at the time and place herein

12   mentioned, and the foregoing pages constitute a full,

13   true, complete and correct record of the testimony

14   given by the said witness;

15          That I am a disinterested person, not being in

16   any way interested in the outcome of said action, nor

17   connected with, nor related to any of the parties in

18   said action, or to their counsel, in any manner

19   whatsoever.

20          Dated this 22nd day of June 2016.

21

22

23   _____

24          ROBERT R. CUDA, CSR No. 2652

25
```

**N. Smith Dep.**

CERTIFIED COPY

1            UNITED STATES DISTRICT COURT

2     EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

3                               )
                                )
4                               )
   Nathaniel Smith,             )
5                               )
              Plaintiff,        )
6                               )
      vs.                       )Civil Action No.
7                               )2:15-cv-00363-KJM-AC
   City of Stockton; Officer    )
8  Patrick Mayer, Officer Robin )
   Harrison, and Officer Michael)
9  Perez, in their individual   )
   capacities; and Chief of     )
10 Police Eric Jones, in his    )
   official and individual      )
11 capacities,                  )
                                )
12            Defendants.       )
   _____)

13

14

15

16

17        DEPOSITION OF BRADLEY TARO SWANSON

18              FEBRUARY 22, 2017

19

20

21

22

23

24   EMILY RICHARDSON, CSR No. 14043
     418934

25

SINCE 1972 ✪

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles   (415) 433-5777 San Francisco   (949) 955-0400 Irvine   (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose   (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento   (800) 222-1231 Martinez   (702) 366-0500 Las Vegas   (800) 222-1231 Monterey
(951) 686-0606 Riverside   (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson   (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn   (518) 490-1910 Albany   (914) 510-9110 White Plains
(312) 379-5566 Chicago   00+1+800 222 1231 Paris   00+1+800 222 1231 Dubai   001+1+800 222 1231 Hong Kong

```
 1    hit something that is hard or immovable or unyielding.

 2    The nature of that object, because of the speed that the

 3    bullet is traveling, the amount of energy involved,

 4    you're not going to be able to discern that just from

 5    looking at the bullet.  You're going to discern that from

 6    if there's, for example, one bullet fired and you have a

 7    damaged item.  That would be the only way that you would

 8    be able to make that conclusion.

 9    Q.        Is it within your expertise to offer an opinion

10    as to whether the human body is sufficiently unmovable as

11    to cause a bullet to fragment?  Is that something that

12    you feel qualified to offer an opinion?

13    A.        Yes.  I can speak to that.

14    Q.        Okay.

15    A.        Hollow point bullets are designed to expand into

16    form, and they will expand into form even when striking

17    yielding targets.  For example, water -- when I test fire

18    a hollow-point bullet into a water tank, it will deform.

19             So striking a human being, I would expect a

20    hollow-point bullet to deform.  That's what it's designed

21    to do and some more than others to break apart and

22    fragment.  That is a failure of the bullet.  I will point

23    out it's not designed to break apart, but they do.  My

24    experience has taught me that that happens quite

25    frequently.
```

BRADLEY TARO SWANSON

BARKLEY
Court Reporters

**Swanson Dep.**

1   scene permitted the microscopic analysis to identify the

2   gun that fired the bullets?  Did that question make

3   sense?

4   A.      If I might rephrase your question, you're asking

5   me if any of the bullets could be identified to the guns?

6   Q.      Through the rifling.

7   A.      Through the microscopic comparison.

8   Q.      I'm sorry -- the microscopic comparison.

9   A.      No.  The answer to that is no.  The three

10  bullets that were submitted to the lab could not be

11  identified to either of the two officers' weapons.

12  Q.      So moving down the page to the paragraph under

13  the header "Reconstruction," here you state that "It's

14  unlikely the two cartridge cases" -- and you state the

15  numbers -- "identified as fired in Officer Perez's pistol

16  are related to three trajectories based on their relative

17  locations.  Assuming the three trajectories observed and

18  documented at the scene are related to Officer Harrison,

19  the relative locations of these trajectories and the

20  cartridge cases indicate Officer Harrison fired three

21  rounds from a position to the west of the Ford

22  Expedition," et cetera, et cetera.

23          Is that a tentative conclusion as to which

24  officer fired which bullets?

25  A.      That's not a conclusion as to which officer

92

BRADLEY TARO SWANSON

BARKLEY
Court Reporters

**Swanson Dep.**

1  fired the bullets.  I'm saying, assuming the officer

2  fired those bullets, then we can position Officer

3  Harrison based on those trajectories and the cartridge

4  cases because we know the cartridge cases came from

5  Officer Harrison's pistol.

6  Q.      And is part of the information you're relying

7  upon for those assumptions and the analysis the

8  trajectories of the bullets?

9  A.      Yes.

10  Q.      Did you analyze any of the bullets or bullet

11  fragments recovered from the scene specifically to

12  determine whether any of them had struck Mr. Smith?

13  A.      No.

14  Q.      Do you know how many bullets struck Mr. Smith?

15  A.      No.

16  Q.      Is that information that would be relevant to

17  determining which officer or officers shot him?

18  A.      Given that we know how many rounds each officer

19  fired, that would be relevant information.

20  Q.      To your knowledge, did you analyze all of the

21  bullets that were ultimately recovered from the scene?

22  A.      I don't know.  I only know -- I examined all the

23  bullets that were submitted to the laboratory.  If there

24  was additional evidence that was not submitted, I am not

25  privy to that information.

93

1   bullets would not enter into the basis for that opinion.

2   Q.        Understood.

3           But it's correct that it's your opinion that,

4   more likely than not, it was Officer Perez that injured

5   Mr. Smith and not Officer Harrison; correct?

6           MR. OLNEY:  Objection.  Misstates the testimony.

7           THE WITNESS:  It is my opinion that, given the

8   placement of the three bullet impacts in the front of the

9   vehicle that are consistent with the position of Officer

10  Harrison, it's unlikely any of those bullets struck

11  Mr. Smith.  So by looking at the entirety of the shots

12  fired, it would be much more likely that those shots that

13  hit Mr. Smith came from Officer Perez's pistol.

14  BY MR. STEVENS:

15  Q.        And, again, you're the expert.

16          Are there any tests out there that maybe you

17  weren't able to perform that somehow could definitively

18  trace which bullet went to which gun?

19  A.        No.  There are no additional tests that could

20  have been conducted on those that would have provided any

21  additional information.

22  Q.        Okay.  Specifically, I would like to turn you to

23  page -- it's Exhibit 85 of the documents that you

24  produced today.  It's page 17 of your transcribed field

25  notes.  This page has three inserted photos and a

124

BRADLEY TARO SWANSON

1    description of the three bullets in the front of this

2    SUV.

3           Those three bullets pertain to the shots fired

4    by Officer Harrison; correct?

5    A.       That is the assumption, yes.

6    Q.       And let's move through these.

7           So the bullets are numbered "A," "B," and "C."

8    Starting at the top of the windshield, that's bullet A.

9    Bullet B is in the middle of hood.  Beneath that is

10   bullet C, the farthest down the hood in terms of bullet

11   entry marks.  That's correct; right?

12   A.       Yes.

13   Q.       Can we rule any one of these bullets out as

14   potentially injuring Mr. Smith?  Let's start specifically

15   with bullet C.

16          Is there, based on your investigation, any way

17   that bullet C could have injured Mr. Smith inside the

18   compartment of the SUV?

19          MR. OLNEY:  Objection.  Calls for speculation.

20          THE WITNESS:  Given my experience with looking

21   for bullets that have been fired into engines,

22   particularly from handguns, it's unlikely that bullet got

23   into the interior of the vehicle.  So the chances of that

24   one actually going inside and impacting Mr. Smith are not

25   impossible but fairly implausible.

                                125

BRADLEY TARO SWANSON

BARKLEY
Court Reporters

**Swanson Dep.**

1   BY MR. STEVENS:

2   Q.      And let's move up to bullet B.

3          Is there any chance that bullet B could have

4   injured Mr. Smith?

5   A.      I believe bullet B was -- or trajectory B is the

6   one that ended up in the air filter.  So that bullet was

7   recovered, and it did not penetrate into the vehicle.  So

8   that one, I would say, could not have hit Mr. Smith.

9   Q.      As you sit here, do you have any understanding

10  as to Mr. Smith's positioning inside the SUV when the

11  shots were fired?

12  A.      Mr. Smith was not on the scene when I arrived.

13  His position in the vehicle was discussed, but I don't

14  recall exactly the specific position that was described

15  to us.

16  Q.      Okay.  Moving up to bullet A, is there any

17  possibility that bullet A could have injured Mr. Smith?

18  A.      In examining that trajectory, bullet A clearly

19  fragmented when it went into the dashboard.  It is

20  possible some of the fragments could have impacted

21  Mr. Smith.

22  Q.      When you say "possible," is there any way you

23  can quantify that?

24  A.      No.

25  Q.      Would you consider that to be a likely outcome?

126

BRADLEY TARO SWANSON

BARKLEY
Court Reporters

**Swanson Dep.**

1   Q.      As you sit here today, you have not reviewed any

2   other reports from any other agencies relative to this

3   investigation; is that correct?

4   A.      That's correct.

5           MR. STEVENS:  At this point, I don't have

6   anything else.  I'll pass to counsel.

7                        EXAMINATION

8   BY MR. OLNEY:

9   Q.      Mr. Swanson, a few moments ago, in response to

10  counsel's question, you answered that bullet B, as

11  indicated on page 17 of your transcribed field notes,

12  could not have hit Mr. Smith because the bullet was

13  recovered from the air filter; is that correct?

14  A.      No.  I had to correct myself on that.  It was

15  actually bullet C -- or the path C that went into the air

16  filter.  Bullet B, I was not sure about.

17  Q.      But isn't it true that only a fragment of the

18  bullet jacket was recovered from the air filter?

19  A.      I don't recall.  But I do recall that it was

20  embedded in the air filter.  The trajectory went into the

21  air filter, and we couldn't find any evidence of it

22  having left there.

23  Q.      Can you refer back to page 3 of your report,

24  number 6?  Doesn't that indicate that only a fragment of

25  the bullet jacket and not the entirety of the bullet

                            134

BARKLEY
Court Reporters

**Swanson Dep.**

1   itself was removed from the air filter?

2   A.      Yes, it does.

3   Q.      Does that leave open the possibility that the

4   bullet itself hit Mr. Smith?

5   A.      I will state in my opinion that, given that it's

6   only a fragment, it is possible that additional portions

7   of that somehow managed to make their way in the vehicle.

8   But I would say that it is very improbable for a bullet

9   to bounce around inside that engine compartment, pass

10  through the firewall, and into the actual cabin area of

11  the vehicle.

12          So I won't rule out the possibility of it, but I

13  would say it would be highly improbable.  And the same

14  that would go for the bullet that was B but not so for

15  the bullet that was trajectory A.

16  Q.      Because the bullet that was trajectory A has a

17  higher probability of having hit Mr. Smith, based on the

18  available evidence?

19  A.      Because it passed through the windshield, was

20  already inside the vehicle, and it's not clear whether

21  portions of that actually exited the -- it appears that a

22  portion of that may have exited the dashboard.  So that

23  one, I would say it's possible, and I won't add the "it's

24  improbable" because it's not improbable.

25  Q.      You earlier referred to pictures showing damage

135

BARKLEY
Court Reporters

**Swanson Dep.**

1   And then it also has the list of the evidence that has

2   been logged into our LIMS system.  So it acts as kind of

3   an inventory as well.

4   Q.      And the section that follows are your

5   transcribed field notes?

6   A.      Yeah.  The following pages, up until we get to

7   the part that says "Reconstruction," these are my

8   transcribed field notes as well as my team's field notes

9   are interspersed throughout this as well.

10   Q.      And this is pages 3, 4, and 5?

11   A.      No.  This would be all the way until -- this

12   more or less would go through page 29 -- or up to

13   page 29.

14   Q.      Okay.  And these are the transcription of field

15   notes collected by you and the other two other members of

16   your team?

17   A.      Yes.  I have transcribed field notes and some

18   handwritten notes.  Criminalist Gallagher has, I believe,

19   all handwritten notes, and senior criminalist Hamiel has

20   both handwritten notes and transcribed dictations as

21   well.

22   Q.      Do you know whose notes are reflected on page 4?

23   A.      That's me.  Those are my notes.

24   Q.      Do you see a bullet just over halfway down the

25   page that states that Mr. Smith has a bullet lodged

141

BARKLEY
Court Reporters

**Swanson Dep.**

1    against his spine?  The bullet begins "Right now [at the

2    time of the briefing] the subject is in critical

3    condition."

4    A.      Yes, I see that.

5    Q.      Is this a note that you took down at the

6    briefing on February 13?

7    A.      This was something actually stated by Lieutenant

8    Zachary during the briefing.  I recorded the briefing,

9    and then I transcribed it into my notes.

10   Q.      And this was prior to your visit to the scene?

11   A.      The briefing was prior to my visit to the scene,

12   and then transcription was done days later.  Actually, it

13   looks like two days later.

14   Q.      And it's your testimony that you at no point

15   requested access to that bullet that's indicated that was

16   lodged inside of Mr. Smith?

17   A.      No.  I was not aware that they were able to

18   remove it.

19   Q.      Is that a topic on which you inquired at any

20   point?

21   A.      No, I did not.

22   Q.      Is that something that you would have been

23   expected to have been informed of once it happened?

24   A.      It does happen that there are times that

25   evidence does not get submitted to me for analysis

142

BRADLEY TARO SWANSON

1   because the agency just doesn't remember or I'm not aware

2   of it or they don't want it analyzed.

3          In this case, I don't know what happened, why it

4   wasn't submitted.  And, you know, I may have been aware

5   that that was in there and just not made that connection

6   and called them about it.

7   Q.      In your professional opinion, once the bullet

8   was removed from Mr. Smith's body and placed into

9   evidence, is that something that someone should have

10  notified you about? should have brought to your

11  attention?

12         MR. STEVENS:  I'll object to "should have."

13  It's vague and ambiguous.  It requires him to speculate,

14  and it's outside this expert and this witness's testimony

15  in terms of what should have happened.

16  BY MR. OLNEY:

17  Q.      You can answer.

18  A.      Ask the question again.

19  Q.      In your professional experience, understanding

20  now that the bullet was removed from Smith's body,

21  retained, and entered into evidence, is that information

22  that you think should have been brought to your attention

23  for the purpose of the analysis investigation that you

24  were performing in this case?

25         MR. STEVENS:  Same objections.

143

BARKLEY
Court Reporters

**Swanson Dep.**

```
 1   BY MR. OLNEY:
 2   Q.      Is that information that you would have liked to
 3   have known?
 4   A.      It probably should have been submitted.  I don't
 5   anticipate it would have changed my conclusions as far as
 6   the reconstruction.
 7   Q.      Assuming that the bullet could have been traced
 8   to either Officer Perez or Officer Harrison's gun and
 9   therefore conclusively determined who fired the shot,
10   would that have changed your opinion as to who fired at
11   least one of the shots that hit Mr. Smith?
12   A.      If that bullet had been submitted to me and I
13   could identify it to one of the firearms, it would have
14   solidified in my opinion, obviously, who shot that
15   bullet.  It would not have changed my opinion as to the
16   location of where the two officers were.
17   Q.      I see.  Thank you for clarifying.
18           Moving on, is there anything that jumps out at
19   you from pages 3, 4, and 5 on these briefing notes that
20   was exceptional, unusual, or of greater-than-average
21   interest?
22   A.      A lot of the information provided in these
23   briefings is really superfluous to me.  I don't need it
24   to do my job.  I pay attention in the briefings because
25   there could be information that is relevant and germane
```

144

BRADLEY TARO SWANSON

BARKLEY
Court Reporters

**Swanson Dep.**

```
 1                 DEPOSITION OFFICER'S CERTIFICATE
 2
    STATE OF CALIFORNIA      )
 3                           ) ss.
    COUNTY OF SACRAMENTO      )
 4

 5

 6       I, Emily Richardson, hereby certify:

 7       I am a duly qualified Certified Shorthand Reporter

 8  in the State of California, holder of Certificate Number

 9  12806 issued by the Court Reporters Board of California

10  and which is in full force and effect.  (Fed. R. Civ. P.

11  28(a)).

12       I am authorized to administer oaths or affirmations

13  pursuant to California Code of Civil Procedure, Section

14  2093(b) and, prior to being examined, the witness was

15  first duly sworn by me.  (Fed. R. Civ. P. 28(a),

16  30(f)(1)).

17       I am not a relative or employee or attorney or

18  counsel of any of the parties nor am I a relative or

19  employee of such attorney or counsel nor am I financially

20  interested in this action.  (Fed. R. Civ. P. 28).

21       I am the deposition officer that stenographically

22  recorded the testimony in the foregoing deposition and

23  the foregoing transcript is a true record of the

24  testimony given by the witness.  (Fed. R. Civ. P.

25  30(f)(1)).
```

157

BRADLEY TARO SWANSON

BARKLEY
Court Reporters

**Swanson Dep.**

1      Before completion of the deposition, review of the

2  transcript [  ] was [XX] was not requested.  If

3  requested, any changes made by the deponent (and provided

4  to the reporter) during the period allowed are appended

5  hereto.  (Fed. R. Civ. P. 30(e)).

6

7  Dated:  March 8, 2017

8

9

10

11

12    _____

13

14

15

16

17

18

19

20

21

22

23

24

25

158

BRADLEY TARO SWANSON