1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   NATHANIEL SMITH,                          No. 2:15-cv-00363-KJM-AC

12                 Plaintiff,

13        v.                                   ORDER

14   CITY OF STOCKTON; OFFICER
     PATRICK MAYER, OFFICER ROBIN
15   HARRISON, and OFFICER MICHAEL
     PEREZ, in their individual capacities;
16   CHIEF OF POLICE ERIC JONES, in his
     Official and Individual Capacities,
17
                  Defendants.
18

19

20               Plaintiff Nathaniel Smith was pulled over based on an outstanding felony warrant.

21   Police officer Mayer was the lead officer on scene, accompanied by his police dog and his

22   superior, Detective Harrison.  As plaintiff got out of his car, Mayer immediately pointed his gun

23   at plaintiff.  Plaintiff ran; Mayer released his police dog with a bite command.  Plaintiff made it to

24   a nearby gas station without any contact from the police dog and asked two men for a ride; they at

25   first agreed, but then tried to pull him out of the car when they realized he was running from the

26   police.  Amid this struggle, a third officer, defendant Perez, unexpectedly converged on the car,

27   gun in hand, and shot at plaintiff three times.  Detective Harrison immediately fired two more

28   shots.  Two of the five shots hit plaintiff in his chest and arm.  Plaintiff now sues Mayer, Perez,

                                                1

Harrison, the Police Chief and the City of Stockton ("the City") for excessive force. Defendants jointly move for summary judgment. ECF No. 74. Plaintiff opposes. ECF No. 82. The court heard the motion on November 17, 2017. H'rg Mins., ECF No. 90. As explained below, the court GRANTS the motion IN PART and DENIES it IN PART.

I.     BACKGROUND

A.     Factual Record and Evidentiary Objections

The following facts derive from both parties' statements of undisputed facts. *See* Defs.' Facts ("DF"), ECF No. 76; Pl.'s Facts ("PF"), ECF No. 82-1. The court treats facts as undisputed unless otherwise stated. Where a genuine dispute exists, the court draws reasonable inferences in plaintiff's favor. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).

B.     Factual Background

Plaintiff was wanted for a felony warrant. DF 4-5.[1] On February 13, 2013, defendant Detective Harrison radioed Officer Mayer, telling him someone matching plaintiff's description had just left his house in a car with a woman and a young child. DF 12-13, 16. Mayer saw the car and activated his sirens. PF 2. Plaintiff immediately pulled the car over near a freeway on-ramp. PF 2; DF 21.

The City, through the police department, designates traffic stops either as low or high risk, and any traffic stop involving a felony warrant is considered high risk. PF 7-8. In high risk stops, officers are trained to get out of their cars and point their weapons at the occupants, as Mayer did here. PF 9. Officers are also trained to use police dogs to bite high risk suspects who flee. PF 10.

Officer Mayer deemed this stop high risk. PF 3-4. Mayer knew he had backup: He knew Detective Harrison was behind him and he knew a third police unit was en route. PF 65; *see also* Mayer Dep. at 51 (ECF No. 82-5). Plaintiff "nonchalantl[ly]" got out of the car, and Mayer immediately pointed his gun at him. PF 3-4, 9-11. Plaintiff's hands were empty. PF 5-6.

---

[1] Where the court cites exclusively to plaintiff's facts or defendants' facts, the court has confirmed the evidence upon which each fact relies and determined, unless otherwise stated, the fact is undisputed.

Mayer also began opening his car window to release his police dog. PF 12. Plaintiff then ran. PF 14. With no warning, Mayer released his police dog with a bite command. PF 15. The dog chased plaintiff, but plaintiff got away. DF 40-41.

Plaintiff made it to a nearby gas station where he convinced two men to give him a ride in their sports utility vehicle ("SUV"). DF 43; PF 16. The men then noticed plaintiff trying to hide as officers converged on the scene, so they tried to pull plaintiff out of the car. DF 50-51. Harrison parked and walked toward the SUV. DF 56, 72. She saw plaintiff lying prone across the SUV's center console with his legs in the back seat, resisting as three men were trying to pull him out. PF 24-25, 27. She believed plaintiff was trying to get a ride; she did not think he was stealing the car. PF 18. Perceiving no threat, Harrison holstered her gun, ordered plaintiff to put his hands up and prepared to go in "hands on," as officers are trained to do for non-violent and non-threatening suspects. PF 28, 31-32.

Unexpectedly, Officer Perez arrived. PF 22. He had been transporting a screaming, intoxicated prisoner and did not tell dispatch he was responding to plaintiff's incident. PF 20-22. Despite department protocol permitting only one officer to give commands, PF 34, Perez got out of his car, jumped the curb, left his screaming prisoner behind and sprinted toward the SUV with his gun drawn, yelling at plaintiff to put his hands up. PF 23, 34. In response, plaintiff said, "I don't have a gun"; still lying prone on the center console, he raised his hands in a "Superman-like pose." PF 36. Perez, who had a clear view of plaintiff, never saw a weapon. PF 39. Perez could have "pull[ed] out a taser [or] pepper spray" but chose not to because he suspected plaintiff was "jacking" the SUV and that plaintiff may therefore be armed and dangerous. PF 42. Instead, Perez opened fire, shooting at plaintiff three times. PF 38. Hearing these gunshots, Harrison drew her gun, ran to the front of the SUV, and fired two more shots towards plaintiff. DF 74. Whose bullets struck plaintiff is "inconclusive," but two bullets struck him, one in his chest and the other in his arm. DF 75; Swanson Dep. at 54 (Defs.' Ex. 16, ECF No. 80). Plaintiff survived, but with serious injuries. PF 43.

3

1    C.    Procedural Background

2        Plaintiff brings claims based on 42 U.S.C. § 1983 against all the responding

3    officers, Police Chief Jones and the City, arguing defendants violated his Fourth Amendment

4    rights by using excessive force.[2]  Second Am. Compl. ("SAC"), ECF No. 38, at 8-10; *see also*

5    Initial Compl., ECF No. 1 (filed Feb. 12, 2015).  Defendants move for summary judgment.  Mot.,

6    ECF No. 74; Defs.' Mem., ECF No. 75.  Plaintiff opposes.  Opp'n, ECF No. 82.  Defendants filed

7    a reply.  Reply, ECF No. 85.  As explained below, the court largely denies summary judgment.

8    II.    LEGAL STANDARDS

9        A.    Summary Judgment

10        A court will grant summary judgment "if . . . there is no genuine dispute as to any

11    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

12    The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

13    resolved only by a finder of fact because they may reasonably be resolved in favor of either

14    party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

15        The moving party bears the initial burden of showing the district court "there is an

16    absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S.

17    317, 325 (1986).  Then the burden shifts to the non-movant to show "there is a genuine issue of

18    material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).

19    In carrying their burdens, both parties must "cit[e] to particular parts of materials in the

20    record  . . . ; or show [] that the materials cited do not establish the absence or presence of a

21    genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

22    Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the non-movant] must do more

23    than simply show that there is some metaphysical doubt as to the material facts").  "Only disputes

24    over facts that might affect the outcome of the suit under the governing law will properly

25    preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 247-48.

26    _____

27        [2] Although plaintiff cites both the Fourth and Fourteenth Amendments in his complaint,
      SAC ¶ 56, he addresses only the Fourth Amendment in opposition, and plaintiff's counsel
      clarified at hearing that this claim is based only on the Fourth Amendment.

28                                    4

In deciding summary judgment, the court draws all inferences and views all evidence in the light most favorable to the non-movant. *Matsushita*, 475 U.S. at 587-88. "Where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant], there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). District courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial," *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)), "even in the absence of a factual dispute[,]" *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572).

### B. Section 1983 Excessive Force Claims

Plaintiff's § 1983 claims[3] stem from the excessive force he says the police officers used against him during and after the February 2013 traffic stop. Traffic stop excessive force claims are examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). The court asks "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them" and balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-97 (citations and quotations omitted). Stated differently, courts "balance the amount of force applied against the need for that force." *Meredith v. Erath*,

---

[3] Section 1983, entitled "Civil Action For Deprivation of Rights," provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

342 F.3d 1057, 1061 (9th Cir. 2003) (citation omitted).  In weighing the governmental interests involved the following should be taken into account: (1) The severity of the crime suspected, (2) whether the suspect poses an immediate threat, and (3) whether he is actively resisting arrest or attempting to flee.  *Graham*, 490 U.S. at 396.  The test is not "mechanical"; courts usually leave this fact-intensive reasonableness test to the jury to "carefully consider[] the objective facts and circumstances that confronted the arresting officer[.]"  *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) ("[T]he district court's decision to take the excessive force question away from the jury conflicts with circuit law.").

Here, defendants argue no reasonable juror could consider the force used to be excessive, but even if it was excessive, the City is not liable because no custom or policy drove the excessive force, and the individual officers enjoy qualified immunity because the relevant legal standards are sufficiently unclear.  Defs.' Mem. at 16-27.

III.    ANALYSIS: INDIVIDUAL OFFICERS

Plaintiff first argues that because he posed no immediate threat or danger, it was unreasonable for Officer Mayer to point his gun at plaintiff and deploy his police dog to bite plaintiff.  Opp'n at 13-17.[4]  Plaintiff next contends it was unreasonable for Officer Perez and Detective Harrison to shoot at him a combined five times even though he had his hands up, had just announced he had no gun, and was sprawled defenseless in an SUV.  *Id.* at 19-23.  Plaintiff also cites Police Chief Jones's inadequate response to his officers' use of excessive force as a basis for the Chief's individual liability.  As explained below, the claims against Mayer, Perez and Harrison survive summary judgment, but the claim against Chief Jones in his individual capacity does not survive summary judgment as he is entitled to qualified immunity.

/////

/////

/////

/////

_____

[4] The court cites the CMF/ECF assigned page numbers shown on the top right corner.

A.     Officer Mayer

    1.     Pointing His Gun at Plaintiff

    a)     Triable Issues

A reasonable jury could find Mayer violated a clearly established right when he pointed his gun at plaintiff during a traffic stop. To reach this conclusion, the court examines the type of force used against the threat posed, if any. *See Graham*, 490 U.S 396.

"[C]ourts have continued to hold out the possibility that . . . pointing of and threat[ening] to use a gun, might constitute use of excessive force, even without any touching," especially "where the individual poses no particular danger." *Robinson v. Solano County*, 278 F.3d 1007, 1015, 1019 (9th Cir. 2002); *see also Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) (finding excessive use of force where officer pointed gun at suspect after felony arrest arising from an automobile stop); *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537-38 (9th Cir. 2010) (describing pointing a loaded gun as "a high level of force" even if the officer does not shoot because it is a "threat of deadly force"; finding triable issues as to whether such conduct is reasonable when there is a "low level of threat."); *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir.2013) (aiming a weapon may constitute excessive force); *Tekle v. United States*, 511 F.3d 839, 845 (9th Cir. 2007).

Citing a single Minnesota Supreme Court case, defendants argue it is "standard" for officers to draw their guns during felony stops. Defs.' Mem. at 16 (citing *State by Beaulieu v. City of Mounds View*, 518 N.W. 2d 567, 569 (Minn. 1994)). No controlling authority appears to support this proposition. Rather, to justify a threat of deadly force, the officer must reasonably perceive a safety risk. *See Robinson*, 278 F.3d at 1015. The record here is unclear as to the risk plaintiff posed. Defendants cite plaintiff's large size and outstanding felony warrant as reason to believe he was dangerous. Defs.' Mem. at 16; *see also* DF 11 (undisputed fact stating Smith is 6'3" and 240 lbs). Yet plaintiff's size, without proof he acted aggressively or was in close proximity to Mayer, is of limited relevance. *See Thompson*, 885 F.3d at 590 (noting suspect's large size compared to officer, but emphasizing the most "critical" facts were that the suspect, who had a prior felony conviction for possessing a loaded firearm, "was within seconds of a

7

firearm"); *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 952 (9th Cir. 2017) (emphasizing suspect's large size but only because it was relevant to show why elevated force was necessary: "the officers were quickly losing in hand-to-hand combat. By the time of the shooting, [the deputy] had already tried tasing [the suspect], and it seemed to only make him more angry and aggressive.").

An outstanding felony warrant also does not alone show a safety risk. Felons may well be non-violent. *Chew*, 27 F.3d at 1442 ("[T]he existence of the [felony] warrants is of limited significance. A wide variety of crimes, many of them non-violent, are classified as felonies."); *Tennessee v. Garner*, 471 U.S. 1, 14 (1985) ("[T]he assumption that a 'felon' is more dangerous than a misdemeanant [is] untenable."); *see also Kovacic v. Cty. of Los Angeles*, No. 2:14-cv-07765-ODW-PJWx, 2016 U.S. Dist. LEXIS 35584, at *21-22 (C.D. Cal. Mar. 18, 2016) (pointing weapon at suspected felon where there was no indication he was armed or uncooperative created a triable excessive force issue). Defendants argue "Mayer knew Smith . . . had been convicted of a serious crime when he had injured two CHP officers [and] was facing a significant prison sentence," Defs.' Mem. at 16, yet no evidence of record demonstrates Mayer knew the details backing the warrant when he drew his gun, PF 48, rendering these later discoveries irrelevant.

Construing the facts in plaintiff's favor, as the court must, a reasonable juror could find plaintiff posed no immediate objective threat at the time Mayer pointed his gun. Plaintiff was two car lengths away from Mayer. He was calm and had no visible weapons. His girlfriend and child were right next to him in the car. Mayer had insufficient reason to believe plaintiff's felony warrant involved violence. Plaintiff also was outnumbered: Mayer had a police dog and a detective as backup, and Mayer knew a third squad car was en route. *See Washington v. Lambert*, 98 F.3d 1181, 1190 (9th Cir. 1996) (stating "ratio of officers to suspects" weighs against the reasonableness of an officers' use of force). Based on these facts, a reasonable juror could deem the threat of deadly force excessive. *Chew*, 27 F.3d at 1441 (criticizing district court for granting summary judgment on excessive force claim where the "record d[id] not reveal an articulable basis for believing [the plaintiff] was armed or that he posed an immediate threat to anyone's

safety.").  A reasonable juror could further fault Mayer for ignoring reasonable alternatives, such as pointing his gun at the ground as he was trained to do.  PF 67; *see Smith*, 394 F.3d at 703 (jury may rely upon training standards in assessing if force was unreasonable).

In short, there are triable issues as to whether Mayer unreasonably pointed his gun at plaintiff.  Whether the force used was excessive "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of interests, which "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom[.]" *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (citations and quotations omitted).

b)      Qualified Immunity

Mayer contends he is immune from liability because pointing his gun at plaintiff under these circumstances was not so clearly unreasonable such that he should have to go to trial. Defs.' Mem. at 18-19.

Qualified immunity balances "the need to hold [officers] accountable when they exercise power irresponsibly and the need to shield [officers] from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations and quotations omitted).  This form of immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted).

Courts analyze qualified immunity through a two-pronged test.  The first prong asks whether, viewed in the light most favorable to plaintiffs, "the facts alleged show the [defendant's] conduct violated a constitutional right"; the second prong asks whether that constitutional right was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from in Pearson*, 555 U.S. at 236 (deciding two prongs can be addressed in any sequence).  After reversing "a number of . . . federal courts in qualified immunity cases," the Supreme Court recently "reiterate[d] the longstanding principle that 'clearly established law' should not be defined at a high level of generality"; instead, it must be "particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation and

9

quotations omitted). Particularity in this context can be a challenge to sort it, even with the

increasing layers of clarification provided by the Court and federal appellate courts. Qualified

immunity does apply unless the law was sufficiently clear that every reasonable official

confronting the same scenario at the time would have understood the specific response was

unlawful. *Id*.

The question here is whether Mayer, when he pointed his gun at plaintiff in

February 2013, was on notice that his conduct violated a right that was clearly established at the

time. A right is "clearly established," if under case law existing at the time, a reasonable official

would have understood that what he was doing violated that right. *Mullenix*, 136 S. Ct. at 308.

To assess if a right was clearly established, the court first looks for a Supreme Court case

"directly on point." *Isayeva*, 872 F.3d at 947 (citation omitted). Here, neither the parties nor the

court has identified a Supreme Court case on all fours. The next step is to look to Ninth Circuit

decisions for "specific factors" allowing a determination of whether every reasonable officer

would have known that the conduct in question was unlawful. *Id.* (citing *Bryan v. MacPherson*,

630 F.3d 805, 826 (9th Cir. 2010)); *cf. Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (while

accepting Ninth Circuit could look to its own precedent when assessing clearly established law,

disagreeing with Circuit's application of that precedent); *Camreta v. Greene*, 563 U.S. 692, 709

n.7 (2011) (implying same).

Construing the facts in plaintiff's favor, the court finds every reasonable officer in

February 2013 would have known it was unlawful to point a gun at plaintiff in this scenario.

More specifically, it was clearly established in February 2013 that an officer cannot threaten to

use deadly force during a traffic stop just because the suspect is wanted for a felony, without any

objective indication that the person poses a threat of violence or danger. The Ninth Circuit, more

than fifteen years ago, reversed a grant of summary judgment to officers who pointed their guns

at a man who reportedly had just shot two dogs and was armed with a knife because the officers

had no contemporaneous information suggesting the man was currently armed or posed any

threat; the Circuit found the officers were not immune. *See Robinson*, 278 F.3d at 1014-15.

Similarly, in *Espinosa*, decided three years before the incident here, officers were not qualifiedly

immune when they pointed loaded guns at a suspect even though he was armed with a knife and had tried to flee, because the officers outnumbered him, he had not been accused of committing any crime, and he did not pose a public danger. 598 F.3d at 537-38. Mayer has less justification for his use of force than the officers in *Robinson* and *Espinosa*, both involving a suspect who was either presently or recently armed: Here, construing the facts in plaintiff's favor, Mayer had no reason to believe plaintiff was ever armed or had ever committed a violent crime, or ever posed an immediate threat.

This case is more akin to *Tekle* and *Cameron* in which the Ninth Circuit found officers not entitled to qualified immunity when they had pointed their guns even though suspects were not actively resisting or otherwise threatening officer safety. *See Tekle*, 511 F.3d at 848 (reversing summary judgment; analyzing case law preceding 1998); *Cameron*, 713 F.3d at 1021-22 (analyzing case law preceding 2009). Although *Thompson*, *supra*, analyzed case law predating December 2011, and held qualified immunity applied where an officer conducted a traffic stop and ended up pointing his gun at the suspect, the suspect there was far more dangerous than plaintiff here. *See* 885 F.3d at 589-90. *Thompson* reflected two critical factors absent here: (1) The suspect had prior felony conviction for possessing a loaded firearm; and (2) the suspect had a loaded firearm on the rear passenger floorboard. *Id.* The court held these two factors were "most critical" to the conclusion that pointing a gun, while excessive, was not so clearly excessive that every reasonable officer should have known it was unlawful. *Id.* Here, in contrast, Mayer had no reason to suspect plaintiff's prior conviction involved violence, nor any reason to believe plaintiff was armed or dangerous. In immediately pointing his gun at plaintiff without any basis to believe plaintiff posed a danger, Mayer crossed an established constitutional boundary in a way that precludes his enjoying qualified immunity.

In sum, in February 2013, it was clearly established law that a non-violent felon who poses no risk of harm has a right against having a loaded gun pointed at him during a traffic stop. Plaintiff's claim against Mayer based on the pointing of his gun survives summary judgment.

2.      Releasing Police Dog

a)      Triable Issues

A reasonable juror could also find it was constitutionally excessive for Mayer to release his police dog with a bite command, despite having no knowledge that plaintiff was armed or dangerous.

Defendants contend using a police dog to apprehend a fleeing felon who has not been searched is reasonable. Defs.' Mem. at 17-18 (citing *Quintanilla v. City of Downey*, 84 F.3d 353, 354 (9th Cir. 1996))._ As explained above, the answer depends on whether the type of force used was commensurate with the nature of the threat posed, if any. *See Graham*, 490 U.S 396.

Deadly force may not be used against fleeing felony suspects unless they pose a danger. *See, e.g.*, *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) ("[D]eadly force may not constitutionally be used against a fleeing non-dangerous burglary suspect, even though that is the only way that he can be apprehended."). Although police dogs do not categorically qualify as deadly force, they can be deadly in some scenarios and are at a minimum "dangerous force." *See Smith v. City of Hemet*, 394 F.3d 689, 707 (9th Cir. 2005) (declining to decide categorically whether use of police dogs constitutes deadly force); *Chew*, 27 F.3d at 1442 (same; noting use of police dog at least "dangerous force"). The Ninth Circuit has determined that a fleeing non-violent suspect, with nothing more, provides an insufficient justification to deploy a police dog. *See Chew*, 27 F.3d at 1441.

Here, construing the evidence in plaintiff's favor, plaintiff did not pose any immediate danger or safety threat, as discussed above. *See infra* Part III.A.1. Plaintiff never engaged in physical resistance, he was not armed, and the nature of his outstanding felony warrants did not suggest violence. *See id.*; *Chew*, 27 F.3d at 1442 (emphasizing the diminished threat where a suspect evades arrest by fleeing, as opposed to through "physical resistance," and noting felony warrants, unless knowingly violent, are "of limited significance" to the danger analysis). The lack of evidence showing plaintiff posed any danger could alone lead a reasonable juror to deem Mayer's decision to deploy his police dog was unreasonable. *Id.* at 1442 ("The existence of a factual question as to whether Chew posed a safety threat would in itself be enough

12

to preclude summary judgment"); *see also Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (explaining the suspect's "act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance. There is therefore no justification for the use of force to be found in the third *Graham* factor.").

Two additional factors enhance the possibility Mayer could be found liable by a reasonable juror resolving disputed facts. First, he deployed the dog beyond recall; it ran "at least . . . 50 yards" away from Mayer. PF 50. Because police canines are trained to seize suspects by "biting hard and holding, by mauling and sometimes seriously injuring them," the risk of harm is far greater when the canine is deployed "beyond the reach of a countermanding order[.]" *Chew*, 27 F.3d at 1441, 1443. Second, Mayer gave no pre-release warning. PF 53; *see Nelson*, 685 F.3d at 882 (no warning made deploying dog riskier); *Bryan*, 630 F.3d at 831 (same). The omitted warning distinguishes this case from *Quintanilla*, 84 F.3d at 354, a case defendants rely on in which the officer warned the suspect before releasing his police dog, remained nearby to monitor the scene, gained control of the suspect and then ordered the dog away. *Id*. The preamble to the officer's decision to deploy a canine in *Quintanilla* is also easily distinguishable: The suspect there had stolen a vehicle, engaged officers in a high speed vehicle chase and then, once cornered, had thrown an empty vodka bottle at the officers and fled on foot. 84 F.3d at 354. Here, plaintiff posed no comparable threat to Mayer or to the public. There are triable issues as to whether Mayer's use of his police dog was reasonable.

b).     Qualified Immunity

Mayer also is not immune from liability for this decision. Before February 2013, binding case law clearly established that deploying a police dog without warning and beyond recall, and commanding the dog to bite a fleeing, non-violent suspect is constitutionally excessive.

The Ninth Circuit, more than twenty years ago, found that deploying a police dog under similar conditions constituted excessive force. *Chew*, 27 F.3d at 1436, 1446-48 (finding force used was excessive, but affirming grant of qualified immunity because relevant standards were unclear in 1988). In *Chew*, the plaintiff fled a traffic stop on foot and hid in a scrapyard. *Id*.

13

at 1436. Upon learning the plaintiff had three outstanding warrants for his arrest, the officer called for backup and released his police dog beyond recall. *Id.* In finding this decision unreasonable, the Ninth Circuit emphasized the "most important single element" to this conclusion was that the record construed in the plaintiff's favor showed the fleeing suspect posed no immediate danger. *Id.* Faced with no immediate threat, it was unreasonable to deploy the dog to such a distance that it could not be quickly recalled should the suspect surrender. *Id.*

Defendants argue *Chew* is distinguishable because the dog in that case bit the suspect, whereas here Mayer's dog did not bite plaintiff. This argument ignores the relevant focus: The risk of harm posed by the tactic used. *See Scott v. Harris*, 550 U.S. 372, 383 (2007) (courts must consider "the risk of bodily harm" that an officer's actions posed to suspect); *see also Glenn*, 673 F.3d at 871-72 (analyzing whether beanbag gun was excessive by detailing its "dangerous capabilities," not the ultimate harm caused). Mayer cannot escape liability merely because his dog fell and so did not actually bite plaintiff. DF 40-41.

Plaintiff's claim against Mayer based on his decision to deploy a police dog survives summary judgment.

B.      Officer Perez

1.      Triable Issues

Construing the evidence of record in plaintiff's favor, a reasonable juror could conclude Perez's decision to shoot at plaintiff three times, even though plaintiff had no weapon and had raised his hands in surrender, was unreasonable. As noted above, Perez was never dispatched to the scene. PF 20. He arrived spontaneously, without telling dispatch, detouring from his transport of a screaming, intoxicated prisoner. PF 20-22. A juror could reasonably conclude Perez violated department policy by shouting commands over Detective Harrison, the lead incident officer. PF 23, 34. A reasonable juror could likewise conclude that Perez shot at plaintiff, without warning, without any attempt to use a less lethal option, despite having a clear view of plaintiff, and despite seeing no weapons in plaintiff's possession. PF 34, 42. Furthermore, plaintiff avers he clearly said, "I don't have a gun," while raising his hands in surrender right before Perez fired his shots. PF 36 (citing N. Smith Dep. at 53-54). Although

14

Perez says he heard plaintiff say, "I have a gun," and that he saw plaintiff move his hands toward the front seat, DF 68; *see also* Perez Dep. at 101-02 (ECF No. 82-5 at 99-134), this discrepancy poses a credibility question that only a jury can resolve. *Smith*, 394 F.3d at 701 (concluding similar dispute was for jury to resolve); *Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998) (same)

That Perez initially thought plaintiff was "jacking" a car does not justify his subsequent use of deadly force. Force used must be reasonable at the moment deployed. *Kisela*, 138 S. Ct. at 1152 (reiterating excessive force analysis depends on facts as known to officer when force was used); *Hopkins v. Adaya*, 958 F.2d 881, 886-87 (9th Cir. 1992) (explaining although deadly force may have been justified initially, second shots were unreasonable because danger had passed), *overruled on other grounds as noted in Federman v. Cty. of Kern*, 61 F. App'x 438, 440 (9th Cir. 2003). Even if Perez believed when he initially arrived that plaintiff was forcibly stealing a car, a reasonable juror may find that maintaining such a belief was unreasonable once Perez approached and saw plaintiff flat on his belly across the center console, restrained by three civilians. Harrison Dep. at 44-45 (ECF No. 82-5 at 20-55) (explaining she could see three men had control over Smith); N. Smith Dep. at 44-45 (describing two men grabbing his legs and the third man holding him in a headlock); *cf. Padilla v. City of Alhambra*, No. CV 05-07609 MMM (CTx), 2007 U.S. Dist. LEXIS 104051, at *49-50 (C.D. Cal. May 30, 2007) (collecting cases; holding jury could find officers unreasonably applied force after plaintiff was restrained). That Harrison had just holstered her gun and was prepared to go in "hands-on," Harrison Dep. at 113-14, 167-68, is further evidence from which a jury could find Perez's going in guns blazing unreasonable.

## 2.      Qualified Immunity

Perez is not immune from suit. Construed in plaintiff's favor, the evidence shows Perez shot an unarmed, fleeing suspect, who moments before the shooting had stated, "I don't have a gun" while trying to raise his hands in compliance with officers' instructions. *See infra* Part III.B.1. As in another district court case, "the same issues of material fact [precluding summary judgment] also preclude a finding [that Perez] is entitled to qualified immunity on the

excessive force claim." *Warren v. Marcus*, 78 F. Supp. 3d 1228, 1248 (N.D. Cal. 2015).  Indeed, "few things in our case law are as clearly established as the principle that an officer may not 'seize an unarmed, non-dangerous suspect by shooting him. . . .'" *See Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011).  Where the record construed in plaintiff's favor shows official conduct, as Perez's conduct was here, that is "obvious[ly]" unlawful," the court need not find a "case on all fours prohibiting that particular manifestation of unconstitutional conduct" to deny qualified immunity.  *Deorle*, 272 F.3d at 1286.[5]  Plaintiff's claim against Perez survives summary judgment.

C.      Detective Harrison

1.      Triable Issues

Given the record evidence, there are triable issues as to whether Harrison unreasonably shot at plaintiff considering the absence of an immediate threat.  As noted above, a factfinder could conclude plaintiff had just announced he had no gun and had just raised his hands in surrender.  Although Harrison later testified she thought she saw the barrel of a gun in plaintiff's hand immediately before firing her weapon, *see* Harrison Dep. at 116-17, it is undisputed that plaintiff was never armed.  DF 80.  Considering Harrison had determined just moments before firing her weapon that it was safe to enter the car "hands-on," PF 55, it is for a factfinder for assess Harrison's narrative in full.

Construed this way, a juror could reasonably find it was excessive for Harrison to fire two shots towards plaintiff without advance warning and without considering less lethal options.  PF 46, 54.  Harrison's argument that summary judgment is appropriate because her bullets never struck plaintiff is unavailing, given the disputed evidence and the argument's legal irrelevance.  *See* Defs.' Mem. at 22.  The record reflects that whose bullets struck plaintiff is "inconclusive."  DF 75; Swanson Dep. at 54.  As explained above, missing the target does not

---

[5] The Supreme Court has twice "instructed the [Ninth Circuit] not to read [*Deorle*] too broadly in deciding whether a new set of facts is governed by clearly established law," *Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018) (citing *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015)).  Neither instruction applies to the general proposition for which this court cites *Deorle* here.

absolve an officer of liability; rather what matters is Harrison's decision to shoot at an unarmed, non-violent suspect immediately after he had surrendered. *See Scott*, 550 U.S. at 383 (focus is on risk of injury officer's actions posed). Ultimately, whether that decision was reasonable or unreasonable depends on who the jury believes.

### 2. Qualified Immunity

Harrison is not entitled to qualified immunity for the same reason Perez is not: Harrison was on notice that officers may not use deadly force against a suspect absent a reasonable safety threat. *Torres*, 648 F.3d at 1128. A jury could reasonably find, as Harrison herself did moments before firing her gun, no such threat existed here.

### D. Chief Jones

Plaintiff contends Chief Jones is individually liable because he independently reviewed and approved the investigation reports that exonerated Mayer, Perez and Harrison, yet he did nothing to punish them or prevent similar, future indiscretions. Opp'n at 23-24. This claim is distinct from plaintiff's *Monell* claim against the City based on Chief Jones's alleged ratification, discussed below.

A police chief's supervisory function can blur his liability based on official contrasted to individual capacity, the proof of which often overlaps. *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991) (partially affirming and partially reversing denial of motion for new trial). Although supervisors are rarely involved at the scene of a disputed incident, they may be individually liable if they "set[] in motion" the acts that "cause[d] others to inflict constitutional injury," or if they "condoned, ratified, and encouraged the excessive use of force." *Id.* at 645-46.

Here, Chief Jones's individual liability hinges on what he actually did himself, or did not do, to address the alleged constitutional violations. Construed in plaintiff's favor, the evidence shows Chief Jones neither disciplined the officers involved nor established new procedures or trainings to prevent similar reoccurrences. PF 56. Instead, he reviewed and approved reports stating the officers acted appropriately. PF 57. Plaintiff argues this was enough for the jury to hold a police chief liable in *Larez*, 946 F.2d at 645-46. There, the jury had found a

police chief personally liable where instead of "disciplin[ing] the individual officers" or "establish[ing] new procedures for averting the reoccurrence of similar excesses in the future," he "signed a letter informing [plaintiff] none of his many complaints would be sustained, thereby ratifying the investigation into the [plaintiffs'] complaint." *Id.* at 646.  The Ninth Circuit affirmed the jury's conclusion.  *Id.*  Two more Ninth Circuit cases have found police chiefs could be held liable for excessive force based on similar conduct.  *See Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007); *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998).

Here, even if a jury could reasonably find Chief Jones personally liable for ratifying the investigation into plaintiff's shooting by reviewing and approving reports stating the officers acted appropriately, Chief Jones would be entitled to qualified immunity.[6]  *See Pearson*, 555 U.S. at 236 (courts can analyze the two prongs of the qualified immunity test in any sequence).  Precedent existing at the time did not place the constitutional question raised here "beyond debate."  *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at 308).

Although *Larez*, *Watkins* and *Blankenhorn* provide examples of fact patterns in which a police chief may be personally liable for approving a subordinate's use of excessive force, key factual differences blur the line between what the chiefs did in those cases and what Chief Jones did here.  *See id.* at 552.  Specifically, the police chiefs in *Larez, Watkins* and *Blankenhorn* had prior knowledge of the officers' tendencies toward excessive force and had either ratified that prior conduct or dismissed complaints against those very officers before the relevant incident.  *See Blankenhorn*, 485 F.3d at 486 (police chief approved the officer's personnel evaluations "despite repeated and serious complaints against him for use of excessive force"); *Watkins*, 145 F.3d at 1093 (police chief signed an internal affairs report dismissing a

---

[6] Defendants did not expressly move for summary judgment on qualified immunity as to Chief Jones, focusing their qualified immunity discussion on the other officers instead.  *See generally* Defs.' Mem.  Nonetheless, because qualified immunity was raised generally in defendants' opening brief, and because plaintiff's opposition focused on the case law ultimately relevant to the qualified immunity analysis of Chief Jones, the court considers this defense.  *Cf. Lane v. DOI*, 523 F.3d 1128, 1140 (9th Cir. 2008) (noting courts may consider issues raised for the first time in a reply).

police brutality complaint despite evidence of the officer's involvement in other similar excessive force incidents); *Larez*, 946 F.2d at 646 (same). Here, there is no evidence Chief Jones knew about, let alone ignored or dismissed, prior complaints against Mayer, Perez or Harrison for similar displays of excessive force.

Additionally, *Larez*, *Watkins* and *Blankenhorn* involved police chiefs' unilaterally and summarily dismissing complaints or internally approving personnel actions; whereas here, Chief Jones did not summarily or unilaterally decide the officers acted appropriately. *See* PF 57. The investigation was not summary, as it lasted approximately 22 months. PF 59; *see* Opp'n at 23-24 (taking issue with how long the investigation took). Nor was the investigation unilateral: Chief Jones investigated and approved reports from the District Attorney's office and the Protocol Review Committee, both of which independently recommended the officers not be prosecuted or disciplined. PF 57; Jones Dep. at 20-23, 99-101 (explaining process).

Given these critical factual distinctions, the court cannot conclude *Larez*, *Watkins* or *Blankenhorn* clearly established a constitutional boundary such that every reasonable officer would have known Chief Jones's conduct here was unlawful. *See White*, 137 S. Ct. at 552 (emphasizing "clearly established law" must be "particularized to the facts of the case") (quotations omitted); *see also Heston v. City of Salinas*, Case No. C 05-03658 JW, 2007 U.S. Dist. LEXIS 98433, *37-38 (distinguishing *Larez*, *Watkins* and *Blankenhorn* on similar bases). Because Chief Jones is entitled to qualified immunity in the face of claimed personal liability, this claim does not survive summary judgment.

IV.     ANALYSIS: *MONELL* LIABILITY

Plaintiff also contends the City is liable because the defendant officers violated his constitutional rights "pursuant to a formal governmental policy or a longstanding practice or custom." Opp'n at 24-26; Compl. ¶¶ 58-59.

Under the well-known *Monell* doctrine, A municipality faces liability when its policy or practice causes civil rights violations. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691(1978). To establish liability, plaintiff must show he was deprived of a constitutional right and that the City's policy or practice was the "moving force behind the

constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citation and quotations omitted). The cited policy or practice must also reveal "deliberate indifference" to constitutional rights, which requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (citations and quotations omitted).

Here, plaintiff argues (1) the City's policies and practices permit and encourage excessive force; (2) the City's training regimes inadequately address excessive force; and (3) the City systematically ratifies and acquiesces to such unconstitutional force. As explained below, plaintiff's claim survives as to (1) and (3), but not (2).

### A.    Custom or Policy

Plaintiff contends the City is liable because Officer Mayer pointed his gun at plaintiff during a traffic stop and deployed his police dog based on the department policies and practices permitting him to do so. Opp'n at 24; Compl. ¶¶ 58-59. To survive summary judgment on this theory, in the face of defendant's challenge, plaintiff must raise a triable issue as to whether a city custom or policy caused the constitutional deprivation claimed. *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) (citations omitted); *Dougherty*, 654 F.3d at 900. Plaintiff can meet this burden by citing an official citywide policy, or by citing other incidents that together show the conduct at issue "has become a traditional method of carrying out policy." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989).

Plaintiff has met his burden here. He cites undisputed evidence that the City has a policy that divides traffic stops into only two categories, high risk and low risk. PF 7. If someone is wanted for a felony, they are automatically deemed high risk, even if the felony is non-violent. PF 8; Mayer Dep. at 23 -24, 82 ((ECF No. 82-5 at 74-98); Perez Dep. at 21, 42; Harrison Dep. at 77; Reynosa[7] Dep. at 55 (ECF No. 82-5 at 135-45). In high-risk stops, the officers are authorized to point their gun at vehicle occupants. PF 9; Mayer Dep. at 24-25;

---

[7] Lieutenant Michael Reynosa, a field training officer within the police department's administrative services division, serves as the City's Rule 30(b) witness, chosen to speak on the City's behalf based on matters relevant to this case. *See* Fed. R. Civ. P. 30(b)(6).

Reynosa Dep. at 51-54.  High-risk stops also allow officers to deploy police dogs.  PF 10; Mayer Dep. at 29-30, 64-65.[8]

A reasonable juror could find City policies were the "moving force" behind Mayer's decision to prematurely and unconstitutionally threaten plaintiff with deadly force even though he posed no threat or danger, and the policies reflect deliberate indifference to a person's right to be free from excessive force.  This theory survives summary judgment.

B.    Inadequate Training

Plaintiff also contends the City is liable for the premature and excessive firing of their guns by Perez and Harrison, reasoning they were improperly trained.  For a failure-to-train theory to proceed to trial, the City must have "disregarded the known or obvious consequence that a particular omission in [its] training program would cause [municipal] employees to violate citizens' constitutional rights."  *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  Failure-to-train claims cannot survive based on training deficiencies alone; the claim must identify a conscious or deliberate choice to ignore training deficiencies.  *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).  "Mere negligence in training or supervision" is not enough, *Dougherty*, 654 F.3d at 900; plaintiffs must also "present . . . evidence of prior incidents of the same character that would have made City officials aware of the situation such that the City could reasonably be said to have been deliberately indifferent to the need for further training," *Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 771 n.10 (9th Cir.1989) (quotation marks and alteration omitted); *Mueller v. Auker*, 700 F.3d 1180, 1194 (9th Cir. 2012) (citing *Merritt*, 875 F.2d at 771 n.10).

Here, plaintiff contends that over the last seven years, the City has inadequately trained its officers on the use of less lethal force options.  PF 47.  Yet plaintiff points to no evidence showing the City deliberately chose to disregard omissions in its training program.  Rather, plaintiff vaguely critiques the City's training regimes and cites training deficiencies only

---

[8] Defendants have not produced a copy of the policy itself.  Because the parties agree on the general nature of the policy, and policy's precise wording does not drive this dispute, the court has not required a formal copy.

as to Harrison and Perez. Opp'n at 25; PF 47; *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91 (1989) ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.") (citations omitted). Examples of actions that might expose training deficiencies from the February 2013 incident alone do not evince a "pattern or practice" of training deficiencies, let alone show the City knew of any deficient training before the incident. *See Blankenhorn*, 485 F.3d at 484; *cf. Mueller*, 700 F.3d at 1194 (four similar prior incidents sufficient for failure-to-train theory to survive summary judgment). Finally, this theory is supported solely by the testimony of plaintiff's police practices expert Scott DeFoe; yet DeFoe admitted he lacked knowledge and so could not testify about the officers' training after 2006; the expert specifically conceded he did not consider firearms training beyond the initial, standard POST training provided to all police officers. DeFoe Dep. at 200-203 (Defs.' Ex. A, ECF No. 85-3). The record is insufficient to raise a triable issue on failure-to-train. The court GRANTS summary judgment for the City on this theory.

### C. Ratification

Finally, plaintiff contends the City is liable for ratifying the unconstitutional conduct of Perez and Harrison. Opp'n at 25-26. A ratification theory may be based either on a "pattern" of ratification that constitutes a practice or custom, *see, e.g.*, *Canton*, 489 U.S. at 389, or it may be based on a single act by an official with policy making authority, such as Chief Jones, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *see also Larez*, 946 F.2d at 645-46 (noting this distinction). Evidence of a custom or policy of acquiescing to the use of excessive force may therefore impose official liability under *Canton* and its progeny; evidence that Chief Jones, an authorized policymaker, ratified a decision that deprived plaintiff of his constitutional rights can suffice for official liability under *Pembaur*. *See Larez*, 946 F.2d at 646.

Here, there is sufficient evidence for both theories to proceed to trial. Plaintiff identifies twenty shootings involving City officers that have remained unresolved for up to five years. PF 59-62; *see also* Pl.'s Ex. 8 (newspaper articles from Feb. 28, 2015, discussing police shootings from 2009-2014). A reasonable juror could find these delays amount to a pattern of

ratification that undermines the accountability and deterrent effects of post-incident investigations because officers have no reason to fear punishment if they shoot at someone without the required justification.  *See Larez*, 946 F.2d at 647 (affirming municipal liability based on similar facts).  A reasonable juror might also find the pattern and practice of inadequately reviewing or disciplining officers when they unjustifiably shoot at someone leads to more unjustifiable shootings.  *See id.* ('The jury properly could find such policy or custom from the failure of [the Police Chief] to take any remedial steps after the violations").  Plaintiff also argues the City improperly justifies shootings that may in fact be unjustifiable.  PF 60; Opp'n at 25.  Plaintiff cites evidence showing, for instance, that of the twenty officer-involved shootings in five years mentioned above, the City deemed nineteen  to be "within" department policies.  PF 60-62.  A factfinder could deem this widespread acceptance, in turn, cultivates a culture in which officers can "get away with anything."  *See Larez*, 946 F.2d at 647.

Chief Jones's sole official decision in this case, given his policy-making role, may also support a ratification theory.  Although "[a] policymaker's knowledge of an unconstitutional act," or "mere refusal to overrule a subordinate's completed act" is not enough to constitute official "approval," *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999), the record here shows more than that.  Defendants maintain Chief Jones "independently reviewed" the investigation and "did not merely 'rubber-stamp' its final determination."  PF 63-64; Defs.' Mem. at 20; Jones Dep. at 111-101, 104-105, 117-118 (describing his review process).  This concession leaves open the possibility a juror could draw a reasonable inference that Chief Jones, the top police department policymaker, made a "conscious, affirmative choice" to approve the investigation and ratify Perez's and Harrison's unreasonable use of deadly force.  *Larez*, 946 F.2d at 646.  Plaintiff's ratification theories survive summary judgment.

V.     CONCLUSION

The court GRANTS summary judgment for the City on plaintiff's failure-to-train theory and on plaintiff's claim against Chief Jones in his individual capacity, but DENIES summary judgment as to all remaining claims and defendants.

23

1       A final pretrial conference is set for **September 21, 2018, at 10:00 a.m**. The

2    parties shall confer and file a joint pretrial conference statement by **September 7, 2018**.

3       IT IS SO ORDERED.

4       This resolves ECF No. 74.

5    DATED:  August 10, 2018.

6

7

8              UNITED STATES DISTRICT JUDGE